**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

VANESSA WILLIAMS and KORY TURNER,
individually and on behalf of all persons similarly
situated,

                          Plaintiffs,

                -against-

EQUITABLE ACCEPTANCE CORPORATION,
SLF CENTER, LLC, INTEGRA STUDENT
SOLUTIONS, LLC, and DOES 1-41.

                       Defendants.

**No.**

**CLASS ACTION
COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

## PRELIMINARY STATEMENT

1.      Plaintiffs are among the millions of Americans who struggle to repay their federal

student loan debt.  They and the 60,000 members of the proposed class (the "Borrowers") seek

redress for Defendants' unlawful scheme to sell them purported "student loan relief" services

(the "Scheme").  Defendants' practices saddle these Borrowers with additional, unnecessary debt

on deceptive terms and at usurious rates—all to pay for services that are available for free and

are often disadvantageous to the borrower.

2.      The Scheme is masterminded by Defendant Equitable Acceptance Corporation

("EAC"), and depends on the coordinated efforts of EAC and individual "Dealers," including

Defendants SLF Center, LLC ("SLF Center"), Integra Student Solutions, LLC ("Integra"), and

up to forty-one other companies ("Doe Dealers").

3.      The Dealers lure vulnerable federal student loan borrowers with promises of so-

called loan "forgiveness"—which the Dealers do not and cannot actually offer.  At EAC's

direction, they sell this worthless "service" for $1,300.  Because few borrowers can afford that exorbitant sum up-front, the Dealers purport to offer a "payment plan" of around $39 to $49 per month.  But the Dealers do not, in fact, offer any payment plan.  Instead, they steer the borrowers to EAC to provide funding to complete the sale.

4.      EAC extends each borrower *an entirely new loan*, in the form of a maxed-out "line of credit" for the full price of the services.  The total cost is amortized over multiple years, with a sky-high annual interest rate of almost 21%—with the effect that borrowers end up owing EAC hundreds of dollars more than the already-inflated purchase price.  EAC secures borrowers' agreement to these usurious terms by deliberately disguising the nature and true cost of the credit it is extending.

5.      EAC in turn pays the Dealers, which are rewarded for each new loan generated long before the Borrowers realize the Dealers' promises of loan "forgiveness" were false.  At best, the Dealers enroll borrowers in programs available for free—often by falsely impersonating the Borrower.  At worst, the Dealers take steps (some irrevocable) that effectively raise the Borrowers' student loan interest rates, balances, repayment terms, or all of the above.  If and when Borrowers realize what has happened, EAC blames the Dealers for the purported services, but continues to extract payments on its own loan with the threat of negative credit reporting.

6.      The Scheme depends on the coordinated efforts of both EAC and the Dealers, which must engage in concerted unlawful activity for the Scheme to succeed.  EAC needs the Dealers to misrepresent the services they sell, or else no Borrower would agree to buy them and need EAC's financing.  The Dealers, meanwhile, need EAC's financing to get the otherwise unattainable up-front payments that fund their operations.

7.     In short, the Scheme perpetrated by Defendants deliberately targets those whose student debt burden is most crushing, then diverts those Borrowers' limited resources into Defendants' own pockets—when every single dollar could have gone, instead, to reducing the Borrowers' student loan burden.

8.     It has not escaped notice that Defendants' pattern of behavior is unlawful.  Many hundreds of borrowers have complained about Defendants' practices to the Better Business Bureau ("BBB") and Consumer Financial Protection Bureau ("CFPB").  EAC and various Dealers have been sued multiple times over their practices.  And, on information and belief, multiple state and federal regulators are investigating Defendants.  Defendants have nonetheless continued their practices unabated.

9.     Plaintiffs therefore bring this action to seek relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ l962(c), (d); the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*; New York General Business Law ("GBL") § 349; New York common law; and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 *et seq.*

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this class action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs are citizens of different states than Defendants and the amount in controversy exceeds $5,000,000.

11.     Alternatively, this Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1640(e), and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Declaratory relief is available pursuant to 28 U.S.C. §§ 2201(a) and 2202.

13.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because it is the District in which a substantial part of the events giving rise to Ms. Williams's claims occurred.

**PARTIES**

14.     Plaintiff Vanessa Williams is a natural person residing in Manhattan, New York. New York is Ms. Williams's domicile in that it is the place where she has her true home and intends to remain indefinitely.

15.     Plaintiff Kory Turner is a natural person residing in Brooklyn, New York.  New York is Mr. Turner's domicile in that it is the place where he has his true home and intends to remain indefinitely.

16.     Plaintiffs are "consumers" as that term is used in TILA, *see* 15 U.S.C. § 1602(i), in that they are natural persons and the credit extended to them was for personal, family, or household purposes.

17.     Defendant Equitable Acceptance Corporation is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota.  Defendant EAC is registered as a regulated lender with the Minnesota Department of Commerce.  Defendant EAC extends credit to consumers who purchase goods or services from third-party companies.

18.     Defendant Integra Student Services, LLC is a limited liability company registered in Utah, with its principal place of business in Sandy, Utah.  Integra purports to offer loan assistance and debt relief services to student loan borrowers.

19.     Defendant SLF Center, LLC is a limited liability company registered in California, with its principal place of business in Irvine, California.  SLF Center purports to offer loan assistance and debt relief services to student loan borrowers.

## FACTUAL ALLEGATIONS

### I.   BACKGROUND ON THE FEDERAL STUDENT LOAN PROGRAM

20.     The United States Department of Education ("USED") oversees the approximately $17 billion per year federal student loan program, which has over forty million borrower participants.

21.     Students obtain federal loans through one or more federal student loan programs created by statute.  Since July 1, 2010, the vast majority of federal student loans have been made through the William D. Ford Federal Direct Loan Program, 20 U.S.C. 1087a *et seq.*

22.     Each federal student loan borrower is assigned to one (or, in rare circumstances, more than one) of the ten federal student loan servicers ("Servicers").  The Servicers contract with USED to provide billing and other services to borrowers. The Servicer is the borrower's point of contact regarding his or her federal loans, and the entity to which the borrower makes payments.

23.     Federal student loan borrowers have rights in connection with their loans, including the rights to participate in certain repayment programs, that are set forth in federal statute and regulation.

24.     Federal student loan borrowers can consolidate their loans to replace multiple student loans with one or more new consolidation loans.

25.     The total balance of the consolidation loan is at least equal to, and in some cases exceeds, the borrower's pre-consolidation total balance.  Likewise, the interest rate on the consolidation loan is at least equal to, but in virtually every case exceeds, the weighted average of the interest rate of the borrower's pre-consolidation loans.

26.     Because consolidation does not lower a borrower's total loan balance or interest rate, and it re-starts a borrower's repayment history, consolidation is not in the best interest of many borrowers.

27.     Once a borrower consolidates his or her loans, the consolidation cannot be undone.

28.     Federal student loan borrowers can enroll in an "Income Driven Repayment" plan, which sets the borrower's required monthly payment at a percentage of his or her discretionary income.  Payments can be as low as $0 per month.

29.     Although monthly payments in the Income Driven Repayment program are affordable, a borrower's loans continue to accrue interest while he or she is enrolled.  Often, the borrower's monthly payments are lower than interest accrued that month, so that the balance of the borrower's loans balloons.

30.     To enroll in Income Driven Repayment, a borrower must send documentation of his or her income to his or her Servicer.  To remain enrolled in Income Driven Repayment, the borrower must re-submit income documentation at regular intervals.

31.     A borrower who makes *twenty to twenty-five years* of payments under Income Driven Repayment is eligible to have the remaining balance of his or her loans forgiven. The amount of balance ultimately forgiven is taxable to the Borrower.

32.     Student loan borrowers may consolidate their loans or apply for Income Driven Repayment by logging on to the USED-run website "studentloans.gov."  The website states:

> This is a U.S. Federal Government computer system intended to be accessed solely by individual users expressly authorized to access the system by the U.S. Department of Education. . . . Except as expressly authorized by the U.S. Department of Education, unauthorized attempts to access, obtain, upload, modify, change, and/or delete information on this system are strictly prohibited and

are subject to criminal prosecution under 18 U.S.C. 1030, and other applicable statutes, which may result in fines and imprisonment. For purposes of this system, unauthorized access includes, but is not limited to: Any access by an employee or agent of a commercial entity, or other third party, who is not the individual authorized user, for purposes of commercial advantage or private financial gain (regardless of whether that commercial entity or third party is providing a service to an authorized user of the system); and Any access in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

33.     A borrower who has made ten years of loan payments while working in a public interest field may be eligible to have the remaining balance of his or her loans forgiven under the Public Service Loan Forgiveness Program.  The application is made at the end of the ten-year period.  Consolidation starts the ten-year clock over.

34.     Any borrower can request a temporary "forbearance" from his or her Servicer. During forbearance, the borrower is not obligated to make any payments, but interest continues to accrue.  A forbearance period does not count toward the borrower's required monthly payments under the Public Service Loan Forgiveness Program or Income Driven Repayment. Forbearance requests are often granted by phone or online without any documentation requirements.

35.     A borrower may contact his or her Servicer to enroll in Income Driven Repayment, apply for Public Service Loan Forgiveness, or be placed in forbearance, and may apply for a consolidation loan from the federal government at studentloans.gov.  These services are available *for free*.

## II.    DEFENDANTS' SCHEME TO DEFRAUD STUDENT LOAN BORROWERS

36.     The following account of Defendants' scheme is drawn from the experiences of Ms. Williams and Mr. Turner, which are described in more detail below, as well as publicly

available information that includes many hundreds of complaints filed against EAC and the Dealers.

### A.     The Dealers' False Promises of "Student Loan Forgiveness"

37.     For decades EAC has extended credit to consumers purchasing goods for household use such as vacuum cleaners, cookware, and air purifiers.  In around 2015, EAC expanded its business to provide financing for purported "student loan assistance services" (the "Purported Services" or the "Services").

38.     EAC depends for referrals on individual Dealers, which pitch the Purported Services directly to Borrowers.  EAC recruits these Dealers, and then, on information and belief, enters contracts with them.  EAC has stated that it has made arrangements with forty-three such Dealers.

39.     The Dealers find potential customers by cold-calling Borrowers.  The Dealers also find Borrowers through referrals from EAC.

40.     The Dealers purport to offer legitimate student loan assistance services to Borrowers.  The Dealers fraudulently induce Borrowers to purchase the Purported Services by making a series of misrepresentations and material omissions in phone calls and emails to the Borrowers.

41.     The primary false representation that the Dealers make to Borrowers to induce them to sign up for the Purported Services is that the Purported Services will provide loan "forgiveness."  The Dealers intend Borrowers to understand, and Borrowers do understand, that "forgiveness" means that their total loan balance will be eliminated.

42.     But the Dealers do not—and cannot—obtain loan forgiveness for Borrowers.

43.     Instead, the Dealers either do nothing, or perform one or more of the following: loan consolidation; initial enrollment and subsequent re-enrollment in Income Driven

Repayment; or forbearance.  To do so, they use the same forms and online interfaces that USED and Servicers make available to every Borrower.

44.     The Dealers do not disclose that these services are available for free to any Borrower, simply by making a request to his or her Servicer or directly to USED.

45.     The Dealers also do not disclose that many of these services are actually harmful for Borrowers.  For example, the Dealers falsely represent that loan consolidation reduces or eliminates the Borrower's total loan balance.  The Dealers do not disclose that, to the contrary, consolidation can increase the Borrower's total loan balance and interest rate.

46.     Similarly, the Dealers do not disclose that Income Driven Repayment does not reduce or eliminate the Borrower's total loan balance.  And the Dealers do not disclose, and actively conceal, the fact that an Income Driven Repayment in the long term can increase the Borrower's total loan balance because a borrower's monthly payment often does not cover the amount of interest that has accrued.

47.     In fact, to the extent the Dealers reduce Borrowers' student loan payments in the short term, doing so helps facilitate Defendants' Scheme by redirecting to EAC and the Dealers money that Borrowers could otherwise be using to repay their student loans.

48.     Ms. Williams, for example, was offered loan forgiveness by SLF Center, which she agreed to purchase.  Instead of getting her loans forgiven, however, SLF Center consolidated her loans and enrolled her in Income Driven Repayment.  This had the effect of increasing her interest rate and her ultimate outstanding balance.

49.     Mr. Turner was offered loan forgiveness by Integra, which he agreed to purchase. Instead, Integra put his loans into forbearance.  This set back his eligibility for eventual Public

Service Loan Forgiveness by months, and had the effect of increasing his ultimate outstanding balance.

50.     Thus, as a result of Defendants' Scheme, the debt obligations of Ms. Williams and Mr. Turner increased while money they could have been devoting to repaying their loans was directed to EAC and the Dealers.

51.     Ms. Williams and Mr. Turner are not alone. Many hundreds of Borrowers have complained to the BBB and the CFPB about strikingly similar conduct by EAC and its affiliated Dealers.

52.     As of the date of this Complaint, Borrowers have filed 190 complaints and 60 reviews with the BBB regarding EAC.  EAC currently has an "F" rating from the BBB, and, per the BBB website, 95% of the reviews about EAC have been negative.

53.     As of the date of this Complaint, Borrowers had filed 1 review and 11 complaints with the BBB concerning Integra Student Services.  This company has an "F" rating on the BBB website.

54.     As of the date of this Complaint, Borrowers had filed four reviews and six complaints with the BBB concerning SLF Center.  This company has an "F" rating on the BBB website.

55.     As of the date of this Complaint, Borrowers have filed 249 complaints with the Consumer Financial Protection Bureau ("CFPB") about EAC.

56.     Dozens of these Borrowers have specifically complained to the BBB and the CFPB that they purchased Purported Services based on false promises of loan forgiveness.  For example:

- "[I was p]romised that my student loans . . . would be forgiven."  BBB Complaint (July 22, 2018).[1]

- "They were soliciting a student loan forgiveness for me.  They informed me that if I paid them $300 up front and than $49.00 every month thereafter for 2 years, my loans would be forgiven completely."  BBB Complaint (May 6, 2018).

- "I was scammed by Equitable Acceptance last year.  They lied like they were a loan forgiveness company but that's far from the truth.  They do not do loan forgiveness. . . . .  My loans have not been forgiven and they keep trying to collect . . . ."  BBB Complaint (Dec. 4, 2017).

- "[A] company called me back in June 2017 stating that President Obama had implemented a student loan forgiveness program and this would allow me to pay around $50 for my current student loan for about 2 years and I would be done with it."  BBB Complaint (Nov. 19, 2017).

- "[T]hey told me that I qualified for loan forgiveness and that I just had to pay a fee each month to cover their cost for paperwork."  CFPB Complaint (Oct. 5, 2017).

- "[A Dealer] reached out to me on July 31, 2017 about the Student Loan Forgiveness program.  They informed me that I qualified for student loan forgiveness and all I needed to do is pay 39.50 a month for three years."  BBB Complaint (Sept. 9, 2017).

- "Equitable acceptance told me that they were part of . . . student loan forgiveness and that my loan was going to be forgiven."  CFPB Complaint (Jun. 16, 2017).

57.    Dozens of Borrowers have complained to the BBB and the CFPB that they

purchased Purported Services without having been informed that the services were available

from their Servicers and/or USED for free.  For example:

- "You call [the Dealer] in hopes to get a new affordable monthly rate or forgiveness on your loans.  Instead they charge you $1300 on top of what you owe in loans for a 'service'. . . .  All of this you could do yourself or through your [Servicer] for free. . . .  They mislead and fooled me."  BBB Review (Apr. 4, 2017).

---

[1] For each consumer narrative excerpted in this Complaint, the full text of the consumer narrative, as the consumer posted it to the BBB or CFPB website, is attached as Exhibit A.

- "The saddest thing is that when this process could be done for free, [My Dealer is] charging almost {$2000.00}, which is still an extreme [r]ipp off of which I have been a victim as many hundreds of others." CFPB Complaint (Dec. 4, 2017).

- "The agent that called me was a fast talker and completely misled me!!! . . . They charged $1,400 at 21% for something I could have done for free online!!!!" BBB Review (May 26, 2017).

- "Two years ago, I was misinformed about the terms of my contract, and how it would effect my student loan balance with [my Servicer]. The sales rep on the phone basically told me anything I wanted to hear so that I could sign up. . . . I am stuck paying for a service that was already being offered by [my Servicer] for free." BBB Complaint (Apr. 12, 2018).

58.     Many Dealers also falsely suggest or represent that they are affiliated with USED and/or that they are student loan servicers.

59.     Dozens of Borrowers have complained to the BBB and the CFPB that they purchased Purported Services based on misrepresentations that the Dealers and/or EAC were affiliated with USED or served as the Borrower's Servicer. For example:

- "Equitable Acceptance posed to be working with the U.S. Department of Education to consolidate my student loans so I could be enrolled in the Public Service Loan Forgiveness. The U.S. Department of Education has informed me that they do not work with Equitable Acceptance, and that there is no reason I need to be paying a third party company $1,300 with credit card high interest (20.99%) to be in the Public Service Loan Forgiveness Program." BBB Complaint (Feb. 10, 2018).

- "I felt pressured because they said that I needed to act fast before Trump changed the law that Obama had implemented. In the end they made me believe that they had some connection with the Department of Education given the advertisements they use and [em]ails I received." CFPB Complaint (Dec. 4, 2017).

- "I thought [the Dealer was] a credible company because they advertised that they are affiliated with the Department of Education." BBB Complaint (Sept. 9, 2017).

- "I thought they were a credible company because they claim to have affiliations with the Department of Education. . . . Mistakenly, I thought [the Dealer] was related to my current lender . . . and that's not the case. [The

12

Dealer] misrepresented their selves and did not disclosed that their finance company is Equitable Acceptance."  CFPB Complaint (Aug. 24, 2017).

- "They claimed themselves as a 'federal loan servicer ' while other companies were 'servicers of federal loans.'  Essentially, that they were mandated and authorized by the federal government and in the public realm while the 'servicers of federal loans' were in the private realm and made money off of my loans."  CFPB Complaint (Jan. 24, 2017).

60.     The Dealers use high-pressure sales tactics to secure Borrowers' agreements to purchase Purported Services.  Borrowers often agree to purchase the Services within a matter of minutes.

61.     EAC sets the price for the Purported Services charged by the Dealers at approximately $1,300.  The Dealers offer the Services to Borrowers at that price.

62.     Most Borrowers that purchase the Purported Services cannot afford the up-front cost charged by the Dealers.

63.     Even if a Borrower could afford the full up-front cost charged by the Dealer, the Dealer is prohibited by federal regulation from accepting up-front payment before performing services for the Borrower.  *See* 16 C.F.R 310.4(a)(5)(i).

64.     The Dealers thus refer Borrowers to EAC to finance the purchase.  The Dealers condition "acceptance" in the Dealer's program upon the extension of financing by EAC.

65.     The Dealers falsely state that the financing from EAC constitutes a "payment plan."  The Dealers do not disclose that the financing from EAC is in fact a new loan from EAC to the Borrower and that monthly payments are to pay off that loan (the "Deceptive Loan").  The Dealers do not disclose that the Deceptive Loan will appear as an additional line of credit on Borrowers' credit reports.

66.     The Dealers make these misrepresentations and omissions knowing they do not accurately, materially, or completely describe the terms of EAC's financing, and with intent to secure Borrowers' agreement to accept financing with EAC.

67.     For example, Ms. Williams was told she could pay her $1,377 purchase price through a down payment of $150 and a payment plan of $49 per month.  Mr. Turner was told that he could pay his $1,314 purchase price through a payment plan of $39 per month.

68.     Dozens of Borrowers have complained to the BBB and the CFPB that they were not informed that they were obtaining a loan from EAC to finance the Dealer's fee.  For example:

- "I was contacted by a student loan forgiveness agency in February of 2016. . . . I [made payments] 1 1/2 years, but never received any student loan forgiveness services.  Then upon checking my credit I find that there is a loan for about 1300.00 held by this same company. I never agreed to a loan . . ." BBB Complaint (March 13, 2018).

- "Was tricked into getting loan forgiveness through this company.  We agreed to pay them 49$ a month and the board of education was supposed to pay off our loans.  Then without consent they took out a credit card under my social security #."  BBB Complaint (December 2, 2017).

- "[Dealer] called me about student loan forgiveness.  They told me all I have to pay is a one time fee of $1300.00 and they will wipe away my student loan. . . .  They emailed me papers and I signed I had no idea they opted me into a loan with a company called equitable acceptance. . . .  [I] have been paying them for a year now with an interest rate of 20 %. They did not tell me this verbally.  I have no idea why I'm paying this company from. I was scammed."  CFPB Complaint (Sep. 13, 2017).

- "[T]he representative I spoke with. . . advised there would be a flat fee of $1300.00 payable in 48 months in monthly installments. . . .  I later found out that my payment is actually higher and not set up as a flat fee payment, but actually as a revolving credit line with severely high interest serviced by Equitable Acceptance Corp. . . .  I was not sold a credit card and I would not have opened a credit card with Equitable Acceptance if properly advised." CFPB Complaint (May 8, 2017).

- "[EAC] misled me into making monthly payments directly to them, saying the payments were going towards my student loans.  Additionally, this 'loan' from Equitable Acceptance Corp. is being listed on my credit reports as a Credit Card.  There services are false, misleading and a scam."  CFPB Complaint (Jan. 19, 2017).

69.     The Dealers falsely represent that monthly payments on the Deceptive Loan will be credited toward the Borrower's federal student loan balance or that the Dealers are otherwise taking care of their student loan obligations.  As a result, many borrowers, including Ms. Williams, stop making payments upon enrollment in a Dealer's services even though such payments are required.

70.     The Dealers represent that documentation of the Borrower's income is necessary for determination of eligibility for federal government programs and conceal that the Dealers must first provide that information to EAC to determine the Borrower's creditworthiness.

71.     The Dealers falsely represent that they need access to a Borrower's personal identifying information and log-in credentials for their Servicer's website and studenloans.gov to obtain the Purported Services.

72.     The Dealers subsequently log in to the Borrower's Servicer's website by falsely impersonating the Borrower and using the Borrower's personal information.

73.     While impersonating the Borrower, the Dealers execute promissory notes for loan consolidation, creating a new legal obligation for the Borrower.  This practice violates federal law.

74.     The Dealers regularly change Borrowers' contact information with their Servicers and USED so that notifications regarding the Borrowers' loans will go to the Dealers, instead of the Borrowers.  The Dealers also change Borrowers' log-in credentials.

75.     As a result, Borrowers can no longer access information about their accounts, nor can they obtain the free services and information available from their Servicers.  Borrowers do not receive notice of delinquency or default in their federal student loan accounts.

76.     The Dealers do this to conceal their misconduct from Borrowers.

77.     The Dealers and EAC routinely provide Borrowers negative information about their Servicers.  For example, they falsely represent to Borrowers that their Servicers are trying to profit for themselves by failing to tell Borrowers about loan forgiveness.  The Dealers provide this negative information to discourage Borrowers from contacting their Servicers, because by doing so, the Borrowers would learn of the Dealers' deception.

78.     For example, in a November 27, 2017 response to a BBB review, EAC wrote: "[T]o the extent [the Borrower] is suggesting that federal student loan debtors can obtain the same assistance for free from their federal loan servicer, that too is inaccurate."  This statement is false.

79.     The Dealers knowingly and actively conceal their fraud not only to protect themselves, but to protect EAC, because Defendants' Scheme depends on the continued active participation of both the Dealers and EAC.

80.     The fraudulent misrepresentations made by Dealers are strikingly consistent with how the FTC has described "deceptive student loan debt relief scams."  The FTC has explained that hallmarks of such scams include "promise[s of] fast loan forgiveness"; "pay[ing] an upfront fee for help"; requesting a Borrower's username and password for studentloans.gov;

"pretend[ing] to be affiliated with the government"; and "charg[ing] a monthly fee for the life of the loan … and represent[ing] that the fee would go towards the student loan balance" when it did not.[2]

81.    On information and belief, EAC is under investigation by the FTC for its practices.

82.    On information and belief, EAC is also under investigation by other regulators.

83.    In August 2017, one Dealer entered into an Assurance of Voluntary Compliance with the North Dakota Attorney General's Office based on the Attorney General's allegations that the Dealer had engaged in unlawful solicitation and debt relief services.

84.    In January 2017, the BBB notified EAC of a "pattern of complaints" about EAC and the Dealers, and "expressed concern" about practices described in the complaints. "However," the BBB reports, "the volume of complaints filed against the business has not decreased."[3]

85.    Borrowers and other entities have sued EAC and/or Dealers over conduct similar to that described in this Complaint.

86.    In July 2018, a federal student loan borrower sued EAC and a Dealer, alleging, among other things, that the Dealer "represented that it was affiliated with the United States Department of Education [and] that its consolidation services were pursuant to the William D. Ford Act" and that the Dealer and EAC refused to cancel her account.  *Potts v. SAS Marketing Group LLC, et al*, No. 18-cv-1835 (M.D. Fla. 2018).

---

[2] *See* 10/13/2017 FTC Blog Post, *available at* https://www.ftc.gov/news-events/press-releases/2017/10/ftc-state-law-enforcement-partners-announce-nationwide-crackdown; 3/8/2018 FTC Blog Post FTC, *available at* https://www.consumer.ftc.gov/blog/2018/03/ftc-continues-crack-down-student-loan-scams.
[3] https://www.bbb.org/us/mn/minnetonka/profile/financing/equitable-acceptance-corporation-0704-3943/details#Pattern-of-Complaint

87.     In October 2017, a Servicer sued EAC and a Dealer, alleging that they had unlawfully conspired to obtain funds from a federal student loan borrower "based upon a false promise to obtain loan forgiveness on her behalf" and impersonated that borrower when calling the Servicer and logging in to her studentloans.gov account.  *Higher Ed. Loan Auth. of the State of Missouri v. Equitable Acceptance Corp.*, No. 17SL-AC28273 (St. Louis Cty Ct., Mo.).

**B.     EAC's Deceptive Loans**

88.     Once a Dealer has secured a Borrower's agreement to purchase the Purported Services, the Dealer refers the Borrower to EAC to extend financing.

89.     The terms of these referrals are set forth in contracts that EAC enters with each Dealer.  After EAC has approved a referred Borrower for financing, EAC provides a payment to the Dealer.

90.     On EAC's website, which it uses to recruit new Dealers, EAC states that this "fast funding" pumps money into the Dealer's "revenue stream."

91.     This arrangement benefits the Dealers by allowing them to (in substance) obtain upfront payments for each new customer, while sidestepping the federal prohibition against telemarketers directly charging Borrowers for services that have not yet been provided.

92.     On information and belief, EAC has designed an integrated software platform by which each Dealer can submit financing referrals to EAC with the click of a button.

93.     EAC sends by email to all Borrowers who purchase Purported Services from Dealers a standard document packet prepared by EAC.  These document packets are virtually identical except for the Borrower's information, the name of the Dealer, and the description and price of the specific Purported Services purchased.

94.     Each document packet sent by email by EAC is stamped on the first page with EAC's name and corporate logo.

95.     EAC communicates with Borrowers about the document packet by email and phone.  Many of the Borrowers with whom EAC communicates are located in New York.

96.     EAC electronically sends each Borrower the document packet through "DocuSign," an electronic signature application.  Borrowers frequently execute the documents in the packet through DocuSign in a matter of minutes.

97.     EAC provides each Borrower with the executed document packet upon completion.  The executed document packet contains a stamp on each page stating that "[t]he original document is owned by Equitable Acceptance."

98.     The document packet contains a "Purchase Agreement," which sets forth the terms of the Borrower's purchase of Purported Services from the Dealer, including total sales price, down payment, unpaid balance, and monthly payment.  The Purchase Agreement conditions the Borrower's purchase of the Purported Services on the Borrower obtaining financing from EAC.

99.     The document packet also contains an "Equitable Acceptance Revolving Credit Plan" (the "Credit Contract"), which provides for EAC's financing of the Borrower's purchase.  The Credit Contract is labeled a "Revolving Credit Plan," and extends a "line of credit" from EAC to the Borrower.

100.    Through the Credit Contract, EAC extends credit in the amount of the Borrower's "unpaid balance"—that is, the total sale price minus any down payment.  The Credit Contract provides for an annual interest rate of 20.99%.  It provides for minimum monthly payments, and sets forth the number of months it will take the Borrower to pay off the balance by making the minimum monthly payments.  It also provides that EAC may collect a $20 fee for late payments or payments returned due to insufficient funds.

101.    The Credit Contract states that as a holder, EAC "is subject to all claims and defenses" that any Borrower could assert against the seller of goods or services" obtained "with the proceeds" of the Credit Contract, i.e., the Dealer.

102.    The packet also includes an "Equitable Acceptance Auto Pay Terms of Use," by which the Borrower authorizes EAC to make monthly electronic ACH debits from the Borrower's bank account in the amount of the "Monthly Payment" set forth in the Purchase Agreement. EAC charges a 4% surcharge on any credit or debit card payment that is not made through Auto Pay.

103.    The entire structure of EAC's Credit Contract is deceptive to the Borrower. "Revolving credit" and "line of credit," also known as "open-end credit," describe a consumer credit arrangement—like a credit card—that allows the borrower to buy goods on a continuing basis, through repeat transactions as long as the outstanding balance does not exceed the credit limit.

104.    But what EAC offers through the Credit Contract is *not* open-end credit.  It is closed-end credit.

105.    In the prototypical closed-end credit sale, such as a car sale, the creditor extends the borrower a fixed amount of credit to finance a single purchase at a particular interest rate, to be payable in equal monthly installments over a fixed number of months.

106.    Although described as open-end credit, EAC's Credit Contract extends a fixed amount of credit (the unpaid balance), at a particular interest rate, to fund a single purchase, and is payable in equal monthly installments over a fixed number of months.

107.    Dealers regularly describe EAC's financing as a "payment plan."  The Purchase Agreement states a "Monthly Payment" amount, and EAC's Auto Pay program is set up to debit that same amount each month.

108.    EAC does not reasonably contemplate repeated transactions under the Credit Contract.

109.    The Credit Contract permits Borrowers to make additional purchases only with permission from EAC itself (not the Dealer).  Specifically, the Credit Contract requires that Borrowers "reapply" for credit if they want to use it for additional purchases, and "this requirement will be exercised at the sole discretion of Equitable Acceptance."  The Credit Contract also states that "[a]dditional purchases may be made in excess of the credit extended under this agreement only upon written application and advance approval by [EAC]."

110.    In addition, because the initial purchase draws the Borrower's full line of credit, and the monthly payments are minimal compared to the total balance, no Borrower would have sufficient credit to purchase additional services for a long period of time.

111.    In any event, as EAC knows, no reasonable Borrower would repeatedly purchase the Purported Services, because the "loan forgiveness" the Dealers promise, if actually obtained, would end the Borrower's loan obligation.  Thus no Borrower would need to engage in future transactions with the Dealer or EAC.

112.    When credit is facially characterized as open-end, but is in fact closed-end, it is called "spurious open-end credit."  Spurious open-end credit is subject to disclosure requirements that apply to closed-end credit.

113.    Provision of closed-end credit is highly regulated.  Extenders of closed-end credit are subject to strict disclosure laws designed to ensure that Borrowers have adequate information to assess the true cost of credit.

114.    EAC offers its spurious open-end credit plan in order to conceal the total cost of credit from Borrowers, and to deceive Borrowers into accepting unfavorable credit terms that they would not accept if they received the disclosures required for extensions of closed-end credit.

115.    EAC's Credit Contract unlawfully omits numerous pieces of information that are mandated by law.

116.    The Credit Contract does not set forth the actual amount financed under the contract—that is, the Purported Services sales price minus any down payment made by the Borrower.

117.    The Credit Contract does not state the dollar amount of the finance charge, as required by law.  Instead, it expresses the finance charge as a Daily Periodic Rate (0.0575%) and corresponding Annual Percentage Rate (20.99%).

118.    The Credit Contract does not state the dollar amount of the total payments the Borrower will have to make, which would be calculated as the sum of the amount financed and the amount of the finance charge.

119.    The Credit Contract does not state how a Borrower can avoid having to pay a finance charge, or whether there is any time period during which a Borrower can make payments without having a finance charge imposed (a "Grace Period").

120.    The Credit Contract does not state the "Monthly Payment" amount, which it also describes as a "Monthly Minimum Payment," as a dollar amount.  Nor does the Credit Contract

state the due date of any payment. Instead, the Credit Contract only describes the method of calculating that payment.

121.    The Credit Contract does not disclose the Borrower's right to dispute billing errors.

122.    EAC prepares and transmits monthly billing statements to Borrowers.  These statements provide the starting balance, the finance charge and any fees imposed, any payments made, and the resulting closing balance.  The statements do not disclose any Grace Period available to Borrowers.

123.    The Credit Contract and the Billing Statements deliberately conceal the true cost of obtaining credit from EAC.

124.    As a result of EAC's misrepresentations and omissions, Borrowers do not know, and are misled as to, the true cost of obtaining credit from EAC.

125.    Most importantly, EAC never tells Borrowers that because the Credit Contract provides for a high interest rate and a long repayment term, Borrowers will pay hundreds of dollars more for the Purported Services than the purchase price they agreed to.

126.    If the documents disclosed the true cost of obtaining credit from EAC, including the total cost of the supposed Services, few if any Borrowers would accept EAC's financing terms.

127.    EAC takes a number of steps to conceal its fraud and to limit its exposure when Borrowers suspect that fraud has occurred.

128.    EAC's website states:

> If someone contacts you, and tells you that you have been 'scammed' or defrauded by choosing to hire an expert to help you take advantage of student loan assistance programs, and/or they encourage you not to make your payments, you have been misled!  Please gather whatever details you

can about the person who contacted you with this misinformation, and call us ASAP. We understand that receiving calls such as these can be distressing.  We care about our customers, and are here to address any concerns you have, including unlawful calls you may receive.

129.     By including this statement on its website, EAC discourages (and intends to discourage) Borrowers from realizing or complaining that they have been the victims of fraud.

130.     EAC has full knowledge that the Dealers with which it affiliates market the Purported Services using fraudulent misrepresentations and omissions because, among other reasons, it reviews the voluminous complaints and reviews Borrowers submit on the BBB and CFPB websites.  Nonetheless, EAC routinely and falsely disclaims responsibility for the fraudulent misrepresentations made by the Dealers.

131.     In response to the large numbers of negative reviews and complaints lodged against it, EAC began in April 2017 to post a uniform response to Borrowers' complaints on the BBB website.  To date, EAC has posted over 100 such responses.  Each states, in sum and substance, something similar to the following response, posted on May 26, 2017:

> We purchased a contract from [Dealer] for the customer to finance the documentation preparation fee the dealer charged to work with the Department of Education to consolidate or refinance student loans. The customer and dealer entered into a written agreement, which Equitable was not involved and clearly states the dealer was offering to help navigate the student loan relief bureaucracy. Equitable did not contact the customer about this process, that was done by the dealer. The customer needs to read the documents she signed to better understand the transaction she signed up for. We look forward to having the customer fulfilling her obligation to us.

*Response to BBB Review* (May 26, 2017).

132.     To over 200 of the CFPB complaints, EAC responded that it "believes it acted appropriately as authorized by contract or law."

133.    Many of EAC's responses to the complaints and reviews also indicate that EAC has full knowledge of the specific Purported Services offered by the Dealer to each Borrower as well as the consequences to the Borrower.

134.    Borrowers who complain to Dealers face the opposite problem: the Dealers point the finger at EAC.  For example, Integra responded to a Borrower's complaints as follows: "Because this client chose to incur a Finance Contract for our services, we have no ability to refund this client's loan.  Again, this client has chosen to borrow, from a third party [EAC], the fee's required to have our company provide our services, to this client.  We have no ability to require a refund be made, by an 3rd party organization."

135.    Both the Dealers and EAC knowingly and actively conceal one another's fraud in order to ensure that the Scheme can be perpetuated.

136.    EAC requires each Dealer to record a "verification" portion of any call with a Borrower being referred to EAC for financing.  The Dealer's verification must follow a script that EAC writes and provides to the Dealer, in which the Dealer confirms with the Borrower that he or she is agreeing to obtain third party financing from EAC.  EAC requires the Dealer to transmit the audio recording of the verification through the software platform designed by EAC.

137.    The representations in this script do not disclose that the Borrower will obtain a new "line of credit" from EAC or that the Borrower will be charged interest.  On information and belief, the script often contradicts other representations made by the Dealers during the calls.

138.    EAC requires Dealers to record the verification call so that EAC can later claim that the Borrower understood the nature of EAC's financing.  By the same token, on information and belief, the Dealers generally do not record their representatives' sales pitch to Borrowers

because those sales pitches contain material false and misleading statements and material omissions.

### C.    Harm to Borrowers

139.    As a direct and proximate result of EAC and the Defendants' conduct, Borrowers experience financial and other harm.

140.    Borrowers are harmed financially in the amount of the approximately $1,300 they are induced into paying for the Purported Services, or for which they have outstanding indebtedness.

141.    Borrowers are also harmed financially by the Deceptive Loan's usurious interest, totaling hundreds of dollars, and, where applicable, late fees and insufficient funds charges, that they pay to EAC or for which they have outstanding indebtedness.

142.    Each payment a Borrower pays to EAC or a Dealer could have been paid directly to reduce the Borrower's federal student loan balance.  But with the payments going instead to EAC or a Dealer, the Borrower's federal student loan balance does not decrease and continues to accrue interest.

143.    Many Borrowers are harmed by the Dealers' Purported Services themselves, which for many Borrowers increase their total loan balance and interest rate on their federal student loans.

144.    Because the Dealers mislead many Borrowers into believing that their monthly payments to EAC satisfy their student loan obligations or that the Dealers are otherwise taking care of their student loan obligations, many Borrowers stop making payments on their federal loans upon enrollment with EAC.  This results in delinquency and even default on those Borrowers' federal student loans, with associated late fees and collections costs.  Defaulted

Borrowers face the federal government's extraordinary collections powers, including tax offset, wage garnishment, and litigation.

145.     Borrowers' credit reports and credit scores are quadruply damaged by Defendants' Scheme.

146.     *First*, EAC routinely runs credit checks ("inquiries") on Borrowers and reports Borrowers' loan status to credit bureaus.  This negatively affects their credit scores.

147.     *Second*, EAC reports the financing it extends to Borrowers as a fully maxed out line of credit, which negatively affects the Borrowers' scores.

148.     *Third*, for Borrowers who miss or fall behind on payments, EAC provides further negative reporting associated with missed payments or delinquent accounts.

149.     *Fourth*, Borrowers who cease federal student loan payments experience negative reporting associated with those missed payments or delinquent accounts.

150.     EAC also uses threats of negative credit reporting to induce Borrowers to continue making payments.

151.     Diminished credit scores inhibit Borrowers' ability to access credit (or allow them to access it only on more disadvantageous terms) and can prevent Borrowers from obtaining housing or jobs.

152.     Borrowers experience financial harm enlisting professionals, such as financial counselors and attorneys, to help them uncover Defendants' Scheme and address negative consequences of the Scheme on their student loans.

153.     Borrowers experience emotional and psychological harm, both from the toll of mounting debt and, for those who learn about the scam, Defendants' efforts to block Borrowers from obtaining relief.

154.    Borrowers' complaints demonstrate the wide-ranging harm they have experienced.  For example:

- "I do not know what to do. I want all my monies returned to me.  I have read the complaints on the BBB website and I am literally sick to my stomach. They have all my personal information to do with whatever they want."  BBB Complaint (May 6, 2018).

- "I told Equitable Acceptance I wanted out of the contract because of this problem, and they told me my credit would receive bad reports.  I am stuck paying for a service that was already being offered by FedLoan for free, a service that I am now at risk of having my student loan default . . . .  P.S. I am currently 20 weeks pregnant and currently unemployed so please help."  BBB Complaint (Apr. 12, 2018).

- "Well, tonight I decided to check credit karma for my credit score, and it looks like they've done a wonderful job at screwing me because my account shows that a credit card under the name 'Equitable Acceptance' has been maxed out, and it seems that the $49 payment I have been making toward Equitable every month was actually the minimum amount paid toward this credit card."  BBB Review (Sep. 9, 2017).

- "YOUR COMPANY SERVED NO PURPOSE WHATSOEVER.  I paid a thousand dollars to Equitable acceptance for absolutely no reason.  That money could have been used to feed my family.  Believe it or not, in a lower middle class family $40 a month adds up and could have served a better purpose than in the pockets of an employee at Equitable Acceptance Corporation."  BBB Review (Jul. 12, 2017).

- "Since I started associating and making payments with equitable Acceptance, my credit score has dropped by over 100 pts and also they are showing up as a credit card on my credit report for $1414.00!"  BBB Complaint (May 22, 2018).

155.    Defendants' conduct injures consumers located in New York in all the ways described above.  More than a dozen New York Borrowers have submitted CFPB complaints that are similar in substance to those described above.

## THE NAMED PLAINTIFFS

### I.   VANESSA WILLIAMS

156.   Plaintiff Vanessa Williams is a twenty-three year old Manhattan resident. She graduated from the State University of New York- Buffalo State with a bachelor's degree in fashion and textile technology in 2016.  Ms. Williams borrowed approximately $21,000 in federal student loans to obtain her bachelor's degree.

### A.   SLF Center's Fraudulent Sale of Purported Services to Ms. Williams

157.   On August 17, 2017, Ms. Williams received an unsolicited phone call on her cell phone from Samantha Gonzalez-Banuelos ("Gonzalez-Banuelos"), an "enrollment counselor" at SLF Center.

158.   Gonzalez-Banuelos asked Ms. Williams whether she had federal student loans and told Ms. Williams that SLF Center could obtain loan forgiveness for Ms. Williams.

159.   Gonzalez-Banuelos informed Ms. Williams that Ms. Williams' loan servicer, Navient, had engaged in illegal activity and had been sued.

160.   Gonzalez-Banuelos told Ms. Williams that SLF Center charged approximately $1,300 for loan forgiveness services.  Gonzalez-Banuelos told Ms. Williams that she could pay through a payment plan of $49 per month.

161.   In reliance on Gonzalez-Banuelos's statements, Ms. Williams understood that by paying $1,300 in $49 monthly payments, she would have her full $21,000 of loans forgiven— that is, eliminated.  She therefore agreed to purchase SLF Center's services.

162.   Gonzalez-Banuelos also asked Ms. Williams for her studentloans.gov log-in credentials, stating that SLF Center required them to take the steps that would result in loan forgiveness.  In reliance on this representation, Ms. Williams provided the log-in credentials.

163.    Later that day, Gonzalez-Banuelos emailed Ms. Williams.  The email contained numerous misrepresentations and misleading information, including that: "it is our mission to throw a life line to everyone that feels like they are drowning in debt"; that with SLF Center's assistance, Ms. Williams "will never need to worry about this overwhelming issue again"; that "President Obama and Congress passed . . . the William D Ford Act which allows the Department of Education to consolidate your existing student loans"; that the "William D Ford Act" was "continued in the court of Law"; that "Federal Student Loan Consolidation" would "lower [Ms. Williams's] payments"; and that SLF Center would "get [her] into the best financial position possible."  The email also described lawsuits against Navient and provided "helpful links regarding Student Loan Forgiveness."

164.    Gonzalez-Banuelos provided information and links to induce Ms. Williams to agree to purchase SLF Center's services by suggesting that SLF Center was a legitimate entity related to the Department of Education and that SLF Center's services would be financially advantageous to her.

165.    Gonzalez-Banuelos's representations about Navient were intended to discredit Navient and to discourage Ms. Williams from contacting Navient and thus learning that SLF Center's services were scam.  Ms. Williams searched on the internet and verified that Navient had in fact been sued, which made her think that Gonzalez-Banuelos was credible.

166.    In reliance on Gonzalez-Banuelos's email, Ms. Williams agreed to continue with her purchase of SLF Center's services.

167.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams that the $49 per month payment plan was, in reality, a new line of credit from EAC that would be drawn in

full immediately to pay for SLF Center's purchase price, or that interest would accrue on the $1,300.

168.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams that the government programs Ms. Gonzalez-Banuelos described to Ms. Williams were available to all student loan borrowers for free from their Servicers and/or USED.

169.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams that consolidation would increase the overall interest charged on her loans.

170.    Each of Gonzalez-Banuelos's representations in the August 17, 2017 phone call and email was false.  Gonzalez-Banuelos made those misrepresentations, and omitted material information, knowingly, and with the intent to induce Ms. Williams to purchase the Purported Services.

### B.    EAC's Deceptive Loan to Ms. Williams

171.    Only an hour later, EAC emailed Ms. Williams a document packet through DocuSign.

172.    The document packet sent by EAC had the same form and content described above (¶¶ 93-102).  The Credit Contract sent to Ms. Williams did not contain the disclosures described above (¶¶ 114-21), including but not limited to disclosures of the amount financed, the finance charge, the total of payments, the amount and due dates of required payments, the grace period, and billing error rights.

173.    Specifically, the Credit Contract did not disclose that due to the 21% interest rate and 34 month repayment schedule, she would be required to pay nearly $400 in finance charges in addition to the purchase price.

174.    In reliance on the representations made by Gonzalez-Banuelos and the material nondisclosures in the documents, Ms. Williams executed the documents in the document packet.

175.     Only nine minutes after receiving confirmation of her executed document packet via DocuSign, Ms. Williams received another e-mail from EAC with the subject line "Congratulations on your approval."  This email attached the completed copy of her document packet, which is attached hereto as Exhibit B.  The email stated that she should call EAC with "any questions regarding [her] financing."

**C.     Defendants' Misconduct in Providing Purported Services and Collecting on the Deceptive Loan**

176.     The next day, Gonzalez-Banuelos emailed Ms. Williams, instructing her to provide proof of income so that SLF Center could "send it to the Department of Education for review."  Three days later, Ms. Williams sent Gonzalez-Banuelos her paystubs. Gonzalez-Banuelos responded that she would "send this right over to the DOE."

177.     Gonzalez-Banuelos's representation that the proof of income was to be sent to USED was false, and Gonzalez-Banuelos made that misrepresentation knowingly with the intent to secure Ms. Williams's proof of income for other purposes.  In fact, SLF Center requested Ms. Williams's proof of income to send to EAC.  SLF Center sent that information to EAC shortly after receiving it.

178.     A few weeks later, Ms. Williams authorized an electronic payment to SLF Center of $150 as a down payment on the Deceptive Loan.

179.     On September 18, Ms. Williams emailed Gonzalez-Banuelos to see whether her down payment had been processed.  Later that day, Gonzalez-Banuelos responded that the payment "usually takes a few days to process due to the fact that it is a federal transaction."  The representation that Ms. Williams's down payment to SLF Center was a "federal transaction" was false and Gonzalez-Banuelos made that misrepresentation knowingly and with intent to disguise

the true nature of the Purported Services so that Ms. Williams would not understand she had been fraudulently induced to purchase them.

180.    In fact, $122.48 was due to Navient for Ms. Williams's federal loans on September 12, 2017, but SLF Center never made this payment, and Ms. Williams's federal student loan account became past due as a result.  SLF Center never disclosed to Ms. Williams that a payment on her account was missed or that her account became past due.  SLF Center concealed that information to disguise the true nature of the Purported Services so that Ms. Williams would not understand she had been fraudulently induced to purchase them.

181.    On September 19, the $150 payment to SLF Center was debited from Ms. Williams's bank account.

182.    In late September 2017, SLF Center logged in to Ms. Williams's online federal student loan account on studentloans.gov by falsely impersonating Ms. Williams.  To do so, SLF Center entered Ms. Williams's personal information.

183.    Through the website, SLF Center electronically submitted an application for Loan Consolidation and a request for Income Driven Repayment by falsely impersonating Ms. Williams.  On September 27, 2017, SLF Center falsely impersonated Ms. Williams and electronically signed her name on the Master Promissory Note for Ms. Williams's new consolidation loans.

184.    On the Master Promissory Note, SLF Center listed Ms. Williams's email address as at the domain numailnow.com. Ms. Williams has never had an email address at this domain. SLF Center changed Ms. Williams's email address to attempt to direct all communication regarding the consolidation loan directly to SLF Center, not Ms. Williams, to disguise the true

nature of the Purported Services so that Ms. Williams would not understood she had been fraudulently induced to purchase them.

185.    The consolidation loans obtained by SLF Center for Ms. Williams increased the overall interest being assessed on Ms. Williams's federal loans.

186.    EAC sent monthly billing statements to Ms. Williams from November 2017 to February 2018.  None of these billing statements disclosed the grace period.

**D.    Harms to Ms. Williams**

187.    On October 21, 2017, Ms. Williams made the first $49 monthly payment to EAC via auto-debit.

188.    Ms. Williams later reviewed her credit report and saw the EAC trade line.  She learned that EAC was likely a student loan assistance scam.

189.    Soon thereafter, Ms. Williams logged in to EAC's online web portal and cancelled the auto-debit authorization to EAC.  She made no further payments to EAC.

190.    As a direct and result of Defendants' Scheme, Ms. Williams has experienced financial and other harm.

191.     Ms. Williams's federal student loans were not forgiven.  Ms. Williams currently owes over $23,000 on her loans. Ms. Williams now owes increased interest on those loans because of the consolidation SLF Center performed.  She was also harmed by the missed payment on her federal student loans.

192.    Ms. Williams was financially harmed in the amount of the payments she made to SLF Center and EAC.  She is also harmed by her ongoing outstanding indebtedness to EAC.

193.    Every dollar that Ms. Williams paid to EAC and SLF Center could have gone to reducing her federal student loan burden.

194.    Ms. Williams's credit was damaged by Defendants' Scheme in multiple ways, including by EAC's "inquiry" into her creditworthiness, EAC's reporting of her debt obligation as a fully maxed-out $1,227 line of credit, and EAC's reporting of her missed payments.  Ms. Williams worries that this will hurt her future opportunity to obtain housing and access credit.

195.    As a result of her reduced credit score, two of Ms. Williams's credit card issuers reduced the credit limits associated with her cards.

196.    Ms. Williams also experienced emotional distress because of Defendants' Scheme.

197.    Ms. Williams resided and was present in New York during all or some of the time period during which she was sold the Purported Services, made payments on her Deceptive Loan, otherwise interacted with the Defendants, and was ultimately harmed by the Defendants' fraudulent conduct.

## II.    KORY TURNER

198.    Plaintiff Kory Turner is a thirty-one year old Brooklyn resident.  He graduated from Montclair State with a bachelor's degree in 2011.  He attended seminary at Drew Theological School and graduated with a master's degree in 2015.  He borrowed approximately $80,000 in federal student loans to obtain his undergraduate and graduate degrees.

### A.    Integra's Fraudulent Sale of Purported Services to Mr. Turner

199.    Mr. Turner learned of Integra through a co-worker.

200.    In September 2016, Mr. Turner called Integra.  An Integra representative told him that Integra could obtain loan forgiveness for Mr. Turner.

201.    The representative told Mr. Turner that Integra assists with loan forgiveness through the Department of Education, and suggested that Integra would become a servicer of his

federal student loans.  In reliance on the representative's statements, Mr. Turner believed that Integra was affiliated with the government.

202.    The Integra representative told Mr. Turner that Integra charged approximately $1,300 for loan forgiveness services, which Mr. Turner could pay through a payment plan of $39 per month.

203.    In reliance on Integra's statements, Mr. Turner understood that by paying $1,300 in $39 monthly payments, he would have his full $80,000 of loans forgiven—that is, eliminated. He therefore agreed to purchase Integra's services.

204.    The Integra representative also told Mr. Turner that Integra would take over all communications with Mr. Turner's Servicer and that Mr. Turner should not contact his Servicer because doing so would interfere with Integra's Services.

205.    At no point did Integra tell Mr. Turner that the $39 per month payment plan was, in reality, a new line of credit from EAC that would be drawn in full immediately to pay for SLF Center's purchase price, or that interest would accrue on the $1,300.

206.    At no point did Integra tell Mr. Turner that the government programs Integra described were available to all student loan borrowers for free from their Servicers and/or USED.

207.    Each of Integra's representations in the September 2016 phone call was false. Integra made those misrepresentations, and omitted material information, knowingly, and with the intent to induce Mr. Turner to purchase the Purported Services.

**B.      EAC's Deceptive Loan to Mr. Turner**

208.    A few days later, on September 23, 2016, EAC emailed Mr. Turner a document packet through DocuSign.

209.    The document packet sent by EAC had the same form and content described above (¶¶ 93-102).  The Credit Contract sent to Mr. Turner did not contain the disclosures

described above (¶¶ 115-21), including but not limited to disclosures of the amount financed, the finance charge, the total of payments, the amount and due dates of required payments, the grace period, and billing error rights.

210.    Specifically, the Credit Contract did not disclose that due to the 21% interest rate and 51 month repayment schedule he would be required to pay nearly $700 in finance charges in addition to the purchase price.

211.    In reliance on the representations made by Integra and the material nondisclosures in the documents, Mr. Turner executed the documents in the document packet.

212.    Only one minute after receiving confirmation of his executed document packet via DocuSign, Mr. Turner received another e-mail from EAC that attached the completed copy of his document packet, which is attached hereto as Exhibit C.  The email stated that he should call EAC with "any questions regarding [his] financing."

213.    Upon Integra's request, Mr. Turner faxed his tax return to Integra as proof of his income. On information and belief, Integra submitted Mr. Turner's tax return to EAC to verify his creditworthiness.

214.    EAC transmitted billing statements to Mr. Turner from November 2016 to August 2017.  None of these billing statements disclosed the grace period.

**C.    Defendants' Misconduct in Providing Purported Services and Collecting on the Deceptive Loan**

215.    On October 4, 2016, Integra submitted an Income Driven Repayment application on Mr. Turner's behalf. Mr. Turner was already on an Income Driven Repayment plan before he purchased the Purported Services from Integra.  As a result of the Income Driven Repayment application Integra submitted, the amount of Mr. Turner's required monthly payment *increased*, from $0 to $58.74 per month.

216.    Integra applied for forbearance on Mr. Turner's loans on October 10, 2016. Integra applied for this forbearance to conceal from Mr. Turner that his loan payments had increased.

217.    The forbearance in which Integra placed Mr. Turner was disadvantageous to him because months in forbearance do not count for Public Service Loan Forgiveness, which Mr. Turner intends to seek as soon as he is eligible.  As a result of the forbearance, Mr. Turner lost credit for months of eligible payments.

218.    On November 9, 2016, an agent of Integra requested Mr. Turner's log-in credentials for his Servicer's website, representing that the credentials were needed to bring his account to current status.  These statements were false, and were made with knowledge of falsity and with intent to induce Mr. Turner to send his log-in credentials.  In reliance on the misrepresentations, Mr. Turner did provide his log-in credentials.

219.    On December 5, 2016 Mr. Turner made the first $39.42 monthly payment to EAC via auto-debit.

220.    In January 2017, Mr. Turner began a five-month training program, for which he borrowed an additional $6,000 in federal student loans. Mr. Turner did not owe payments on any of his federal loans while he was back in school.  Nonetheless, EAC continued to send billing statements that demanded payment from Mr. Turner.

221.    Mr. Turner made payments to EAC via Auto Pay in January, February, March, and April 2017.

222.    When Mr. Turner completed his training program and was looking for a job, he removed EAC's Auto Debit authorization to his bank account to avoid the possibility of overdraft charges.

223.    After Mr. Turner left school, Integra again placed his loans in forbearance.

224.    Mr. Turner made a $90 payment to EAC in June 2017.

225.    On August 10, 2017, EAC sent Mr. Turner a letter stating that his account was "severely delinquent" and "is now facing further actions." Mr. Turner's past due balance was listed as $87.68.

226.    In response to this email, on August 30, 2017, Mr. Turner made a $41 payment to EAC.

227.    On September 15, 2017, Integra emailed Mr. Turner, stating: "Should you ever receive something regarding your student loans that doesn't match what we are telling you then please contact us immediately."  This statement was made to alert Integra if anyone, including Mr. Turner's Servicer, notified him of his repayment options or informed him that Integra's Purported Services were fraudulent.

228.    In a second email Integra sent to Mr. Turner on that same day, Integra wrote that the log-in credentials to Mr. Turner's studentloans.gov account that it "had on file ha[d] been changed" and asked Mr. Turner to "[p]lease reply with [his] username and password."

229.    On September 29, 2017, EAC sent Mr. Turner a "Final Demand Letter" stating that his account was "seriously delinquent" and "is now facing further actions."

230.    EAC assigned Mr. Turner's Credit Contract to Integra shortly after sending the Final Demand Letter.

231.    After Mr. Turner's contract was assigned to Integra, he received numerous text messages and emails prompting him to pay Integra.

232.     Mr. Turner made $49 payments to Integra in December 2017 and January and February 2018.  On information and belief, Mr. Turner at some point made one additional $49 payment to Integra.

233.     After learning that EAC and Integra's services were a scam, Mr. Turner stopped paying making payments to Integra.  He mailed a cancellation letter to Integra in February 2018 via certified mail, which asserted that Mr. Turner was cancelling his account because Integra did not provide the services it had promised and that the high interest rate on the loan violated usury laws.  The letter was returned as undeliverable.

234.     On March 20 and April 12, 2018, Integra emailed Turner stating that he did not pay and asking him to call Integra "as soon as possible so we can get these payments processed and get you all caught up with the program."  On March 20, April 20, and May 20, Integra texted Mr. Turner stating that "[t]here's a problem with a payment" on his Integra account and asking him to call Integra immediately.

235.     On April 17, 2018, Mr. Turner faxed to Integra a new cancellation letter that raised similar grounds as his February letter.  Mr. Turner has never received a response to the cancellation letter.

**D.     Harms to Mr. Turner**

236.     As a direct and result of Defendants' Scheme, Mr. Turner has experienced financial and other harm.

237.     Mr. Turner's federal student loans were not forgiven.  Mr. Turner currently owes $99,800 on his loans, which continue to accrue interest.

238.     Mr. Turner was also harmed because the forbearance into which Integra placed him has the effect of increasing his total loan balance, and extending the period after which he will become eligible for Public Service Loan Forgiveness.

40

239.     Mr. Turner was financially harmed in the amount of the payments he made to Integra and EAC.  He is also harmed by his ongoing outstanding indebtedness to Integra.

240.     Every dollar that Mr. Turner paid to EAC and Integra could have gone to reducing his federal student loan burden.

241.     Mr. Turner's credit was damaged by Defendants' Scheme in multiple ways, including by EAC's "inquiry" into his creditworthiness, EAC's reporting of his debt obligation as a fully maxed-out $1,314 line of credit, and EAC's reporting of his missed payments.  Mr. Turner worries this will hurt his future opportunity to obtain housing or access credit.

242.     Mr. Turner has also experienced emotional distress because of Defendants' Scheme.

243.     Mr. Turner spent time and faced difficulty accessing his online accounts with his Servicer.

244.     Mr. Turner resided and was present in New York during all or some of the time period during which he was sold the Purported Services, made payments on his loan from EAC, otherwise interacted with the Defendants, and was ultimately harmed by the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

245.     Plaintiffs bring this action, pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a nationwide class consisting of:

> All individuals who have obtained financing from EAC for student loan assistance services.

246.     The class is so numerous that joinder of all class members in this action would be impracticable.

247.   On information and belief, the class consists of approximately 60,000 individuals. EAC's general counsel, Daniel D. Hill, has stated that EAC has provided financing to about 60,000 Borrowers.  The precise number and identity of the class members is contained within Defendants' business and litigation records.

248.   Defendants have acted and continue to act on grounds generally applicable to each member of the plaintiff class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

249.   Class members present common questions of law and fact and these questions predominate over any individual questions.

250.   The common questions of law include, but are not limited to, whether:

- EAC is a creditor under TILA;

- the credit extended under the Credit Contracts constitutes spurious open-end credit;

- EAC is liable for the Dealers' actions as a holder of the Credit Contract;

- Defendants' conduct is consumer-oriented;

- the Dealers' sales practices constitute deceptive acts or practices;

- the Credit Contracts constitute a loan or forbearance of money subject to usury limitations;

- Defendants form an association-in-fact enterprise; and

- Defendants committed a pattern of racketeering activity.

251.   The common questions of fact include, but are not limited to: whether:

- the Dealers falsely represented that Borrowers would obtain loan "forgiveness";

- the Dealers falsely represented that loan consolidation would benefit Borrowers;

- the Dealers failed to disclose that the financing is in the form of a new loan from EAC;

- the Dealers made such false representations with the intent to induce Borrowers to purchase the Purported Services;

- the Dealers electronically signed consolidation loan promissory notes on behalf of borrowers;

- EAC drafted standard form Purchase Agreements and Credit Contracts;

- the Credit Contracts failed to disclose the amount financed, finance charge, total of payments, due date and schedule of payments, billing notice rights, and grace period;

- EAC drafted and transmitted monthly billing statements;

- EAC charged and collected 21% interest; and

- Defendants used the interstate mails and wires.

252.    The claims of the named Plaintiffs are typical of the claims of the class.  On information and belief, Defendants offered the named Plaintiffs "student loan assistance" services by making the same types of misrepresentations as they did to members of the putative class.  Defendants also offered Plaintiffs the same extension of credit using the same standard form contract as they did to members of the putative class and acted in the same manner applicable to the class as a whole, including: offering nearly identical extensions of credit using standard form contracts; charging the same interest rate; and sending nearly identical billing statements.  Defendants also worked together, as a unified enterprise, to cold-call Plaintiffs, use false or misleading statements to steer Plaintiffs into purchasing the Purported Services, and use the wires or mails to conceal from Plaintiffs the true nature of the Services (and that the Services

did not reduce, but increased, the amount of Plaintiffs' debt). Defendants performed each step in this scheme knowingly, and the scheme caused similar kinds of harm to each Plaintiff.

253. The Named Plaintiffs will adequately and fairly protect the interests of all members of the proposed class because they have the requisite personal interest in the outcome of this litigation and have no interest antagonistic to any member of the proposed class.

254. The Named Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG") and Quinn Emanuel Urquhart & Sullivan LLC ("QEU&S"). Attorneys at NYLAG and QEU&S are experienced in complex federal litigation, class action litigation, and consumer defense litigation.

255. A class action is the superior method for a fair and efficient adjudication of this matter in that Defendants have acted in a manner generally applicable to the class and a class action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate as to the class as a whole.

256. Moreover, it would be impracticable for potential plaintiffs, who are, on information and belief, primarily individuals with high debt burden and limited means and thus have limited access to counsel, to obtain legal services on an individual basis for their claims. Hence their rights under the law may well be meaningless without certification of a class action seeking common redress.

## FIRST CAUSE OF ACTION
### (Civil RICO, 18 U.S.C. § 1962(c))
*Against Dealers and EAC*

257. Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

258.    Defendants are corporate entities, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

A.    **The Enterprise**

259.    EAC and the Dealers together form an association-in-fact and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). Each and every Defendant is associated with the Enterprise.

260.    The purpose of the Enterprise is to extract payments from federal student loan borrowers by using material false or misleading statements and omissions to induce those borrowers to purchase Purported Services and take out Deceptive Loans from EAC. The Enterprise consists of EAC and the 43 Dealers which sell Services and steer students to EAC to obtain Deceptive Loans to finance their purchases of the Services.

261.    The Dealers primarily find customers by cold-calling phone numbers in search of federal student loan borrowers. On these cold-calls, the Dealers make false or misleading statements and omissions to induce borrowers to purchase Purported Services, including that the Dealers offer "loan forgiveness." Through these material false or misleading statements and omissions, the Dealers induce students to purchase Services, which typically include loan consolidation; initial enrollment and subsequent re-enrollment in Income Driven Repayment; or forbearance.

262.    The Enterprise is intertwined and financially interdependent. The Dealers depend upon payments from EAC to fund their operations. EAC provides these payments; in fact, it advertises itself as offering the Dealers "fast funding" to support the Dealers' "revenue stream."

263.    The Dealers are also financially intertwined with EAC in that the Borrowers that purchase the Purported Services cannot afford the up-front cost charged by the Dealers and, in

any event, the Dealers are prohibited by federal regulation from accepting such payment up-front.

264.    In fact, the Dealers condition "acceptance" into the Purported Services program upon EAC extending credit to the Borrowers.  The Dealers cannot profit unless Borrowers are successfully steered to EAC to accept Deceptive Loans.  The Dealers and EAC together misrepresent the nature of the financing EAC extends, concealing its usurious terms so that Borrowers will agree it to it.

265.    EAC is financially intertwined with, and dependent on, the Dealers' fraudulent marketing of the Purported Services.  If the Dealers accurately described the Purported Services, no Borrower would agree to pay approximately $1,300 plus usurious interest to obtain those Services, and thus no Borrowers would ever agree to EAC's Deceptive Loans.

266.    What is more, the standard Credit Contract extended by EAC to Plaintiffs is subject to a recourse agreement between the Dealer and EAC, such that EAC may assign the Credit Contract to the pertinent Dealer.  On information and belief, EAC is thereby able to use the thinly-capitalized Dealers as a way to deflect Borrowers who raise complaints or legal challenges.  This aspect of the Purported Services further illustrates that Defendants act as a single Enterprise in carrying out their scheme.

267.    For at least three years the Enterprise has been engaged in, and continues to be engaged in, activities that affect interstate commerce.  Defendants' unlawful Enterprise in violation of RICO has been and remains longstanding, continuous, and open-ended.

**B.    Pattern of Racketeering Activity**

268.    Defendants, individually and as part of the Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity in violation of 18 U.S.C. § l962(c).

269.     Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations (the "Scheme").  Each Defendant's participation is critical to the racketeering scheme; they have enabled, conducted, and maintained the racketeering scheme by:

    a.   Knowingly making material false or misleading statements, or material omissions, to Borrowers through the mail or wires, in order to induce Borrowers to purchase Purported Services;

    b.   Knowingly providing Purported Services and receiving funds therefore;

    c.   Knowingly extending deceptively-marketed and unnecessary loans at usurious rates;

    d.   Knowingly employing Borrower credentials to log on to restricted USED and Servicer websites in order to alter Borrower loan terms and contact information, in furtherance of providing Purported Services and to conceal their true nature.

270.     Defendants, acting individually and as part of the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, to knowingly make fraudulent misrepresentations and/or omissions. Each use of the mails and wires has furthered the fraudulent scheme and enabled Defendants to take money and property from Ms. Williams and Mr. Turner and putative class members by means of false pretense and material false or misleading statements or material omissions. Specifically:

    a.   Defendants used the mails and wires to knowingly make fraudulent misrepresentations and omissions to Ms. Williams by phone and email on August 17, 2017 and various dates thereafter, as described with particularity above (¶¶ 157–86), with the intent to induce her to agree to purchase Purported Services

from SLF Center; agree to a Deceptive Loan from EAC; make payments to Defendants; provide information to Defendants to facilitate their fraud; and conceal their fraud after the fact.

b. Defendants used the mails and wires to knowingly make fraudulent misrepresentations and omissions to Mr. Turner by phone and email in September 2016 and on various dates thereafter, as described with particularity above (¶¶ 200–35), with the intent to induce him to agree to purchase Purported Services from Integra; agree to a Deceptive Loan from EAC; make payments to Defendants; provide information to Defendants to facilitate their fraud; and conceal their fraud after the fact.

c. Defendants used the mails and wires to knowingly make fraudulent misrepresentations and omissions to members of the putative class, in the manner exemplified by those made to Ms. Williams and Mr. Turner.  Defendants have made fraudulent misrepresentations and omissions on thousands of other occasions that Plaintiffs cannot identify at this time but are known to Defendants.

271.    Defendants' pattern of using the mail or wires to perpetrate fraud is further illustrated by the numerous complaints that have been filed against EAC and the Dealers with the CFPB and BBB, as well as by the litigation and investigations alleged above (¶¶ 51–59, 68, 80–87).

272.    Each and every Defendant has specific knowledge that the mails and wires are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used because executing Defendants' Scheme depends on cold calling or emailing Borrowers, transmitting and requesting

the execution and return of various forms and contracts via the mails and wires, and unlawfully accessing the internet while purporting to be a Borrower.

273.    Each of the thousands of uses of the mails and wires in connection with Defendants' scheme to defraud, spanning a period of no fewer than three years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. § 1341 and 1343, and thus is a predicate act.

274.    Defendants, acting individually and as part of the Enterprise, have each engaged in hundreds (or thousands) of uses of computers in order to further the Purported Services scheme by submitting federal student loan applications and executing documents while purporting to be a borrower. Each of these uses constitutes a violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030(g)), COUNT X, *infra*, and thus is also predicate act. Specifically:

   a.    Defendants intentionally accessed Ms. Williams's online student loan accounts as described with particularity above (¶¶ 182–84).

   b.    Defendants intentionally accessed Mr. Turner's online student loan accounts as described with particularity above (¶¶ 215–18, 228).

   c.    Defendants intentionally accessed the online student loan accounts of members of the putative class on thousands of other occasions that Plaintiffs cannot identify at this time but are known to Defendants.

275.    These predicate acts constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

276.    In connection with Defendants' scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 et seq.  The acts of

racketeering are an ongoing part of Defendants' regular way of doing business.  The predicate

acts have been, and will be, repeated over and over again, absent judicial redress.

        **C.**      **Relationship of Pattern of Racketeering Activity to Enterprise**

277.     The goal of the Enterprise is to fraudulently procure payments from Borrowers in

connection with their purchase of Purported Services and their Deceptive Loans from EAC.

278.     The pattern of racketeering activity described above is integral to the Scheme.

Without engaging in mail and wire fraud and violating the CFAA, Defendants would be unable

to procure the payments they seek.

279.     Each Defendant, individually and as a member of the Enterprise, has conducted or

participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of

racketeering activity described above.  Accordingly, each Defendant has violated 18 U.S.C.

§ l962(c).

280.     As a direct and proximate result of the RICO violations described in this

Complaint, Ms. Williams and Mr. Turner and putative class members have suffered substantial

and concrete injury.  Defendants' actions in violation of 18 U.S.C. § 1962(c) have caused

Plaintiffs and putative class members to unknowingly enter into credit arrangements at usurious

interest rates; incur costs by making unlawfully procured payments to Dealers and EAC pursuant

to their Purchase Agreements and Credit Contracts; default on or accept unfavorable alterations

to their student loans; and suffer damage to their credit ratings.  These harms constitute an injury

to Plaintiffs' property within the meaning of 18 U.S.C. § 1964.

281.     Defendants' conduct has involved and continues to pose a threat of long-term

illegality since it is believed to have commenced three years ago and has actively continued to

the present.  The pattern of racketeering activity has been directed towards thousands of persons,

including Ms. Williams and Mr. Turner, and the pattern has spanned many years.

282.     By reason of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

## SECOND CAUSE OF ACTION
### (Civil RICO, 18 U.S.C. § 1962(d))
*Against Dealers and EAC*

283.     In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants conspired to violate the provisions of 18 U.S.C. § l962(c) in that, beginning no later than 2015 and continuing through today, they knowingly agreed and conspired to conduct or participate in, directly or indirectly, the affairs of the Enterprise through the pattern of racketeering activity described above.

284.     The volume and frequency of the fraudulent activity, and the continuance of the scheme for over three years, could not have occurred without the consent and knowing collusion of Defendants and other conspirators.

285.     As part of, and in furtherance of, their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that those acts were in furtherance of that pattern of racketeering activity.  As part of and in furtherance of their conspiracy, each Defendant agreed to and did commit at least two predicate acts of racketeering.

286.     Plaintiffs' property interests have been injured by, and as a direct and proximate result of, Defendants' violations of 18 U.S.C. § 1962(d).

287.     By reason of Defendants' violations of 18 U.S.C. § l962(d), Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

**THIRD CAUSE OF ACTION**

**Violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1637(a), 1637(b), 1638(a)**

*Against EAC*

288.    The Truth in Lending Act ("TILA"), 15 U.S.C. §1601, *et seq.*, requires creditors to provide meaningful disclosures of credit terms "so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."

289.    The Credit Contract constitutes an extension of "credit" as that term is defined by TILA, 15 U.S.C. § 1692(f), in that it provides for the Borrower to incur debt and defer its payment.

290.    EAC is a "creditor" as that term is defined under TILA, 15 U.S.C. § 1602(g), because it regularly extends consumer credit for which the payment of a finance charge is required and it is the entity to which Borrowers' obligations on the Credit Contracts were initially payable.

291.    Defendant EAC violated TILA by falsely presenting the credit offered under the Credit Contract as open-end when it is, in fact, closed-end.  Defendant EAC did not disclose to Plaintiffs and putative class members certain required disclosures for closed-end credit, including:

      a.   The "amount financed," 15 U.S.C. § 1638(a)(2)(A);

      b.   The "finance charge," 15 U.S.C. § 1638(a)(3);

      c.   The "total of payments," which is determined by the sum of the amount financed and the finance charge, 15 U.S.C. § 1638(a)(5); and,

      d.   The amount and due dates of the required payments, 15 U.S.C. § 1638(a)(6).

292.    Defendant EAC also did not disclose to Plaintiffs and putative class members certain required open-end credit account-opening disclosures, including:

    a.   The Grace Period, which must be disclosed in tabular format, 15 U.S.C. § 1637(a)(1); 12 C.F.R. § 1026.6(b)(2)(v);

    b.   A statement of the Borrower's billing error rights, 15 U.S.C. § 1637(a)(7).

293.    Defendant EAC transmitted monthly billing statements to Plaintiffs and putative class members that did not disclose certain required open-end credit monthly billing statement disclosures, including:

    a.   The Grace Period, or that no such period is provided, 15 U.S.C. § 1637(b)(9).

294.    Plaintiffs and putative class members relied on the Credit Contracts and billing statements containing the violations described above.

295.    As a direct and proximate result of these violations of the Truth in Lending Act, 15 U.S.C. §1601, *et seq*., Plaintiffs and putative class members have suffered compensable harm and are entitled to recover statutory and actual damages.

## FOURTH CAUSE OF ACTION
## Violation of TILA, 15 U.S.C. §§ 1637(a), 1637(b), 1638(a)
*Against Dealers and EAC*

296.    The Credit Contract constitutes an extension of "credit" as that term is defined by TILA, 15 U.S.C. § 1692(f), in that it provides for the Borrower to incur debt and defer its payment.

297.    In the alternative: each of the Dealer Defendants is a "creditor" as that term is defined under TILA, 15 U.S.C. § 1602(g), because it regularly extends consumer credit for which the payment of a finance charge is required and are the entities to which Borrowers' obligations on the Credit Contracts were initially payable.

298.    Defendant EAC is an "assignee" as that term is defined under TILA, 15 U.S.C. § 1641(a), that is liable for the below-listed violations that are evident on the face of the Credit Contracts.

299.     The Defendant Dealers violated TILA by falsely presenting the credit offered under the Credit Contract as open-end when it is, in fact, closed-end.  The Defendant Dealers did not disclose to Plaintiffs and putative class members certain required disclosures for closed-end credit, including:

  a.  The "amount financed," 15 U.S.C. § 1638(a)(2)(A);

  b.  The "finance charge," 15 U.S.C. § 1638(a)(3);

  c.  The "total of payments," which is determined by the sum of the amount financed and the finance charge, 15 U.S.C. § 1638(a)(5); and

  d.  The amount and due dates of the required payments, 15 U.S.C. § 1638(a)(6).

300.     The Defendant Dealers also did not disclose to Plaintiffs certain required open-end credit account-opening disclosures, including:

  a.  The Grace Period, which must be disclosed in tabular format, 15 U.S.C. § 1637(a)(1); 12 C.F.R. § 1026.6(b)(2)(v);

  b.  A statement of the Borrower's billing error rights, 15 U.S.C. § 1637(a)(7).

301.     Defendant EAC transmitted monthly billing statements to Plaintiffs and putative class members that did not disclose certain required open-end credit monthly billing statement disclosures, including:

  a.  The Grace Period, or that no such period is provided, 15 U.S.C. § 1637(b)(9).

302.     Plaintiffs and putative class members relied on the Credit Contracts and billing statements containing the violations described above.

303.     As a direct and proximate result of these violations of the Truth in Lending Act, 15 U.S.C. §1601, *et seq.*, Plaintiffs and putative class members have suffered compensable harm and are entitled to recover statutory and actual damages.

## FIFTH CAUSE OF ACTION

### (N.Y. Gen. Bus. Law § 349)

*Against Dealers and EAC*

304.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

305.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."  N.Y. Gen. Bus. Law § 349(h).

306.    The Defendant Dealers violated New York General Business Law Section 349 by using deceptive acts and practices in the conduct of their scam student loan assistance business.

307.    The Defendant Dealers committed the deceptive acts and practices willfully and/or knowingly.

308.    The Defendant Dealers' conduct was consumer-oriented and has a broad impact on New York consumers at large.

309.    The Defendant Dealers caused actual injury and damages to Ms. Williams, Mr. Turner, and class members, including the financial harm of paying for and owing outstanding indebtedness on a loan to fund services that are available for free and the enrollment in student loan programs that may ultimately increase their debt burden over time.  Unless enjoined, the Defendant Dealers' conduct will cause further irreparable injury to class members and to members of the public.

310.    To induce the Borrowers to purchase the Purported Services and while providing the Services, the Defendant Dealers made a series of willful and/or knowing

misrepresentations and material omissions to Ms. Williams, as described with particularity above
(¶¶ 157–70, 176–85), to Mr. Turner, as described with particularity above (¶¶ 199–207, 215–218,
227–28), and to the putative class members.  The Dealers' knowingly and/or willfully wrongful
and deceptive acts include, but are not limited to one or more of:

    a.   Falsely representing that consumers will obtain loan "forgiveness" through the
Purported Services;

    b.   Failing to disclose that the Services would increase the Borrower's total loan
balance and interest rate;

    c.   Failing to disclose that the services provided by the Dealer Defendants are all free
federal programs that can be obtained by the Borrower without fees from their
federal student loan Servicer and/or USED;

    d.   Falsely representing that the Dealer is affiliated with the Department of Education
and that the Dealer is a federal student loan servicer;

    e.   Falsely representing that the Borrower can pay for the Services through a payment
plan;

    f.   Failing to disclose that the financing for the Services is a new loan from EAC to
the Borrower and that monthly payments would be made pursuant to that loan;

    g.   Falsely representing that monthly payments on the new loan would be credited
toward the Borrower's federal student loan balance;

    h.   Falsely representing that documentation of the Borrower's income was necessary
for determination of eligibility for federal government programs when, in fact, it
was used by EAC to determine the Borrower's credit worthiness; and

    i.   Using the Borrower's log-in credentials to impersonate the Borrower.

311.    Defendant EAC is also liable for the above-listed violations by the Dealers because EAC is a holder of Borrower's Credit Contracts, which state: "[A]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services [obtained] pu[]rsuant hereto or with the proceeds hereof."

312.    As a direct and proximate result of these violations of Section 349 of the General Business Law, Ms. Williams, Mr. Turner, and class members have suffered compensable harm and are entitled to injunctive relief and to recover actual and treble damages, costs, and attorney's fees.

### SIXTH CAUSE OF ACTION
#### (N.Y. Gen. Bus. Law § 349)

*Against EAC*

313.    Defendant EAC violated New York General Business Law Section 349 by using deceptive acts and practices in the conduct of its business of financing student loan assistance scams.

314.    Defendant EAC committed the deceptive acts and practices willfully and/or knowingly.

315.    Defendant EAC's conduct was consumer-oriented and has a broad impact on New York consumers at large.

316.    Defendant EAC caused actual injury and damages to Ms. Williams, Mr. Turner, and class members, including the financial harm of paying for a loan to fund services that are available for free and negative credit reporting.  Unless enjoined, Defendant EAC's conduct will cause further irreparable injury to class members and to members of the public.

317.    To induce Borrowers to agree to the Deceptive Loans and while collecting payments on those loans, Defendant EAC made a series of willful and/or knowing

misrepresentations and material omissions to Ms. Williams, as described with particularity above (¶¶ 171–75, 186), to Mr. Turner, as described with particularity above (¶¶ 208–214), and to the putative class members.  EAC's wrongful and deceptive acts include, but are not limited to one or more of:

      a.   Failing to disclose the amount of finance charge and the total cost of credit;

      b.   Falsely representing the nature of the credit extended; and

      c.   Falsely representing that the Servicers do not provide free services.

318.    As a direct and proximate result of these violations of Section 349 of the General Business Law, Ms. Williams, Mr. Turner, and class members have suffered compensable harm and are entitled to injunctive relief and to recover actual and treble damages, costs, and attorney's fees.

## SEVENTH CAUSE OF ACTION
### (Fraudulent Inducement)
*Against Dealers and EAC*

319.    The Defendant Dealers committed fraud in the inducement by knowingly making material misrepresentations or omitting material facts, with the intent to induce Plaintiffs and the putative class to act thereon.  Plaintiffs and the putative class reasonably relied upon the Defendant Dealers' misrepresentations and suffered pecuniary damages as a result.

320.    To induce the Borrowers to purchase the Purported Services, the Defendant Dealers made a series of knowing and material misrepresentations and omissions to Ms. Williams, as described with particularity above (¶¶ 157–70, 176–85), and to Mr. Turner, as described with particularity above (¶¶ 199–207, 215–218, 227–28), and to the putative class members.  The Dealers' material misrepresentations and omissions include, but are not limited to:

a.   Falsely representing that the Borrower will obtain loan "forgiveness" through the Purported Services;

b.   Failing to disclose that the Services would increase the Borrower's total loan balance and interest rate;

c.   Failing to disclose that the services provided by the Dealer Defendants are all free federal programs that can be obtained by the Borrower without fees from the federal student loan Servicer and/or USED;

d.   Falsely representing that the Dealer is affiliated with the Department of Education and that the Dealer is a federal student loan servicer;

e.   Falsely representing that the Borrower can pay for the Services through a payment plan;

f.   Failing to disclose that the financing for the Purported Services is a new loan from Defendant EAC to the Borrower and that monthly payments would be made pursuant to that loan;

g.   Falsely representing that monthly payments on the new loan would be credited toward the Borrower's federal student loan balance;

h.   Falsely representing that documentation of the Borrower's income was necessary for determination of eligibility for federal government programs when, in fact, it was used by Defendant EAC to determine the Borrower's credit worthiness; and

i.   Using the Borrower's log-in credentials to impersonate the Borrower.

321.   Defendant EAC is also liable for the above-listed violations by the Defendant Dealers because EAC is a holder of the Borrowers' Credit Contracts, which state: "[A]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could

assert against the seller of goods or services [obtained] pu[]rsuant hereto or with the proceeds hereof."

322.    The actions of the Defendant Dealers, in coordination with Defendant EAC, have caused injury and damages to Plaintiffs and putative class members and unless enjoined, will cause further irreparable injury.

323.    As a direct and proximate result of these violations, Plaintiffs and putative class members have suffered compensable harm and are entitled to recover actual and punitive damages and are entitled to rescission of their contracts with Defendants.

### EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Fraudulent Inducement)
*Against EAC*

324.    The Defendant Dealers committed fraud in the inducement by knowingly making material misrepresentations or omitting material facts, with the intent to induce Plaintiffs and the putative class to act based on the misrepresentations.  Plaintiffs and the putative class reasonably relied upon Defendant Dealers' misrepresentations and suffered injuries as a result.

325.    Defendant EAC had knowledge of the fraudulent representations and omissions by the Defendant Dealers and the resulting fraud in the inducement.

326.    Defendant EAC knowingly provided substantial assistance to the Defendant Dealers' in accomplishing the fraudulent inducement, thereby aiding and abetting the fraudulent inducement.

327.    Defendant EAC's assistance included:

   a.   Consummating the transaction with the Borrowers initiated by the Defendant Dealers, including furnishing the Purchase Agreement to the Borrowers, which formalizes the terms agreed to between the Borrowers and the Defendant Dealers, and procuring the Borrowers' electronic signatures on that agreement, as pled with respect to Ms. Williams above (¶¶ 171–75), and Mr. Turner above (¶¶ 208–12);

     b.   Referring Borrowers to the Dealers;

     c.   Designing software used by the Dealers to transmit Borrowers' information and applications to EAC; and

     d.   Financing the up front purchase of the Purported Services through the Credit Contract and making a payment to the Dealers, such that the Defendant Dealers can profit from the contracts the Borrowers are induced to sign through the Defendant Dealers' misrepresentations.

328.    Defendant EAC's acts to aid and abet the fraud contemplated by the Defendant Dealers have caused injury and damages to Plaintiffs and putative class members and unless enjoined, will cause further irreparable injury.

329.    As a direct and proximate result of these violations, Plaintiffs and putative class members have suffered compensable harm and are entitled to recover actual and punitive damages and are entitled to rescission of their contracts.

### NINTH CAUSE OF ACTION

**(Violations of New York's Civil Usury Cap: New York General Obligations Law § 5-501(1), Banking Law § 14-a(1))**

*Against EAC and Dealers*

330.    New York General Obligations Law Section 5–501(1) provides that "[t]he rate of interest . . . upon the loan or forbearance of any money, goods, or things in action, except as . . . otherwise provided by law, shall be six per centum per annum unless a different rate is prescribed in section fourteen-a of the banking law."

331.    Banking Law Section 14–a(1) states: "The maximum rate of interest provided for in section 5–501 of the general obligations law shall be sixteen per centum per annum."  Thus, the interest rate on any "loan or forbearance of any money, goods, or things in action" cannot exceed sixteen percent in New York.

332.    EAC, or, in the alternative, the Dealers, extended credit at an interest rate of 20.99% APR on the loans extended under the Credit Contracts.

333.    EAC and/or the Dealers collected payments on the loans extended under the Credit Contracts.

334.    Defendant EAC is liable for any above-listed violations committed by the Defendant Dealers because EAC is a holder of Borrowers' Credit Contracts, which state: "[A]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services [obtained] pu[]rsuant hereto or with the proceeds hereof."

335.    At all times and continuing to the present, against the extenders of credit through the Credit Contracts and all subsequent assignees, the Credit Contracts are void due to the usurious interest rate. Ms. Williams, Mr. Turner, and the putative class members are thus entitled to rescission of their Credit Contracts with Defendants.

**TENTH CAUSE OF ACTION**
**(Civil Violations of the Computer Fraud and Abuse Act: 18 U.S.C.A § 1030(g))**
*Against Dealers*

336.    The Computer Fraud and Abuse Act imposes civil liability on a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," 18 U.S.C. § 1030(a)(2)(C), who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value," § 1030(a)(4), or who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss," § 1030(a)(5)(C), where the violation causes a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value," §§ 1030(c)(4)(A)(i)(I), (g).

337.   When student loan borrowers log on to their accounts at the federal studentloans.gov website, whether to consolidate their loans or apply for Income Driven Repayment plans, they are warned that the site is "intended to be accessed solely by individual users expressly authorized to access the system by the U.S. Department of Education" and that "unauthorized attempts to access, obtain, upload, modify, change, and/or delete information on this system are strictly prohibited and are subject to criminal prosecution under 18 U.S.C. § 1030, and other applicable statutes."  The notice further states that "unauthorized access includes, but is not limited to . . . [a]ccess by employee or agent of a commercial entity, or other third party . . .  for purposes of commercial advantage or private financial gain."

338.   In providing Purported Services, the Dealers intentionally accessed the online studentloans.gov and Servicer accounts of Ms. Williams, Mr. Turner, and putative class members without authorization or in excess of any authorization provided.

339.   To obtain the Borrowers' studentloans.gov and Servicer website account credentials and personal identifying information, the Dealers used misrepresentations and did not disclose to the Borrowers the illegality of the Dealers' accessing the Borrowers' accounts.  The Dealers used the credentials and personal information to impersonate the Borrowers and log on to studentloans.gov and Servicer websites.

340.   While improperly accessing the Borrowers' studentloans.gov and Servicer website accounts and with an intent to defraud the Borrowers, the Dealers altered the Borrowers' loan obligations, including by executing loan consolidation promissory notes, enrolling the Borrowers in Income Driven Repayment programs, and placing the Borrowers' loans into forbearance.

341.    While improperly accessing the Borrowers' studentloans.gov and Servicer accounts and with an intent to defraud the Borrowers, the Dealers changed the Borrowers' contact information and log-in information, in order to sever contact between the Borrowers and USED or the Servicers, to conceal the Dealers' fraudulent activities, and to delay the Borrowers' discovery of the resulting harms. The Dealers also obtained information about the Borrowers' student loans which the Dealers used to conceal their fraudulent activities.

342.    By accessing the Borrowers' studentloans.gov accounts, the Dealers furthered the Scheme, allowing EAC to continue to collect payments from Borrowers.

343.    Over a one year period, Ms. Williams, Mr. Turner, and class members each suffered losses resulting from the Dealers' conduct aggregating at least $5,000 in value.

344.    Ms. Williams suffered losses collectively in excess of $5,000, including but not limited to:

    a.  Over $23,000 in indebtedness on the new consolidation loans in Ms. Williams' name, fraudulently originated by SLF Center when it accessed Ms. Williams' studentloans.gov account and electronically signed her name on the new Master Promissory Note;

    b.  Increased indebtedness for interest on her consolidated loans, which exceeds her interest on her pre-consolidation loans, and increased indebtedness for interest because of the payment SLF Center's unlawful activities caused her to miss;

    c.  Ms. Williams's payment to SLF Center for the Purported Services, which included SLF Center's improper and unauthorized accessing of Ms. Williams' online accounts;

d.  Ms. Williams's payment to EAC toward the Deceptive Loan that financed her
purchase of the Purported Services, which included SLF Center's improper and
unauthorized accessing of Ms. Williams' online accounts, plus outstanding
indebtedness for the remainder of the $1,227 plus interest in financing due to
EAC in payment for the Services,

e.  Financial harm stemming from negative credit reporting by EAC resulting from
Ms. Williams's cessation of payments to EAC upon learning of SLF Center's
fraud, which included SLF Center's improper and unauthorized accessing of Ms.
Williams' online accounts.

345.    Mr. Turner suffered losses collectively in excess of $5,000, including but not
limited to:

a.  Increased monthly payments—$58.74 instead of $0—under the Income-Driven
Repayment plan in which Integra enrolled Mr. Turner when it improperly and
unlawfully accessed his online accounts;

b.  The cost of additional months of federal student loan payments towards eligibility
for the Public Service Loan Forgiveness program, due to the forbearance that
Integra initiated when it accessed Mr. Turner's federal student loan account or
Servicer account;

c.  The cost of approximately five additional months of payments on Mr. Turner's
loan, resulting from Integra placing the loan into forbearance, which will cost
Mr. Turner approximately $1,000 per month under a standard repayment plan;

d.  The approximately $2,000 in interest accrued during the months when Integra
placed Mr. Turner's loans into forbearance;

e.  The over $3,000 increase in Mr. Turner's loan balance between October 2016, when Integra placed his loans into forbearance, and February 2017, when the loans for his training program were disbursed;

f.  The over $5,000 increase in Mr. Turner's loan balance between June 2017, when he left the training program, and February 2018 when he learned of the EAC/Integra Scheme and attempted to cancel the Deceptive Loan;

g.  Mr. Turner's payments to EAC and Integra toward the Deceptive Loan that financed his purchase of the Purported Services, which included Integra's improper and unauthorized accessing of Mr. Turner's online accounts, plus outstanding indebtedness for the remainder of the $1,314 plus interest in financing due to EAC and/or Integra in payment for the Services; and

h.  Financial harm stemming from negative credit reporting by EAC and/or Integra resulting from Mr. Turner's cessation of payments to EAC and/or Integra upon learning of Integra's fraud, which included Integra's improper and unauthorized accessing of Mr. Turner's online account.

346.   Members of the class suffered losses of the type experienced by Ms. Williams and Mr. Turner and described above, (¶¶ 139–55).

347.   As a result of these violations of the CFAA, Ms. Williams, Mr. Turner, and class members have suffered losses and are entitled to compensatory damages and injunctive relief.

WHEREFORE, Plaintiffs request that this Court decree, order, and/or adjudge as follows:

a.  Certifying this case as a class action, pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with a class defined as:

All individuals who have obtained financing from EAC for student loan assistance services.

b.   Declaring that Defendants have committed the violations of law alleged in this action and enjoining Defendants from committing further violations;

c.   Enjoining and directing Defendants to cease committing the violations of law alleged in this action;

d.   Ordering rescission of all contracts between Defendants and Plaintiffs and putative class members;

e.   Awarding to Plaintiffs:

   i.   actual and/or compensatory damages against all Defendants, in an amount to be proven at trial;

   ii.   treble damages, pursuant to RICO, 18 U.S.C. § 1964(c), and N.Y. G.B.L. § 349(h)

   iii. statutory damages pursuant to TILA, 16 U.S.C. § 1640(a)(2)(B);

   iv.  punitive damages pursuant to New York law; and

   v.   disbursements, costs, and attorneys' fees pursuant to RICO, 18 U.S.C. § 1964(c), TILA, 16 U.S.C. § 1640(a)(3), and N.Y. G.B.L. § 349(h); and,

f.   Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues triable by a jury.

Dated:  August 17, 2018
          New York, New York


                              Respectfully submitted,




_____
Jonathan Oblak                              Danielle Tarantolo
Stephen Schweizer                           Jane Greengold Stevens
Anna Deknatel                               Jessica Ranucci
QUINN EMANUEL URQUHART                       NEW YORK LEGAL ASSISTANCE GROUP
& SULLIVAN, LLP                             7 Hanover Square
51 Madison Avenue, 22nd Floor               New York, NY 10004
New York, NY 10010                          (212) 613-5000
(212) 849-7199                              dtarantolo@nylag.org
jonoblak@quinnemanuel.com

          *Counsel for Plaintiff*