**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
VANESSA WILLIAMS and KORY TURNER,
individually and on behalf of all persons similarly
situated,                                                                                    18 Civ. 07537 (NRB)

                                        Plaintiffs,                    **Oral Argument Requested**

                        vs.

EQUITABLE ACCEPTANCE CORPORATION,
SLF CENTER, LLC, INTEGRA STUDENT
SOLUTIONS, LLC, and DOES 1-41,

                                        Defendants.
-----------------------------------------------------------------x


### MEMORANDUM OF LAW IN SUPPORT OF
### EQUITABLE ACCEPTANCE CORPORATION'S
### MOTION TO DISMISS THE RICO CLAIMS


JOSEPH HAGE AARONSON LLC
Gregory P. Joseph
Sandra M. Lipsman
Gila S. Singer
485 Lexington Avenue, 30th Floor
New York, New York 10017
(212) 407-1200

*Counsel for Defendant Equitable*
*Acceptance Corporation*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF THE CASE ................................................................................... 3

ARGUMENT .............................................................................................................. 6

I.    PLAINTIFFS DO NOT STATE A VIABLE RICO CLAIM UNDER § 1962(C) (CLAIM I) ................. 7

    A.    Plaintiffs Do Not Plead Predicate Acts ........................................................ 7

        1.    Violation of the CFAA Is Not a RICO Predicate Act ........................... 7

        2.    Plaintiffs Improperly Seek to Criminalize TILA ................................. 8

        3.    Plaintiffs Fail to Plead Predicate Acts of Mail and Wire Fraud ........... 8

            a.    Plaintiffs Fail to Plead Fraudulent Misstatements ...................... 9

            b.    The Credit Agreements Were Not Deceptive ........................... 12

            c.    Vague Allegations of "Similar" Frauds Fail under Rule 9(b) ................... 16

    B.    Plaintiffs' Purported Pattern of Racketeering Lacks Continuity ................. 17

II.   PLAINTIFFS DO NOT PLEAD A VIABLE RICO CONSPIRACY CLAIM (CLAIM II) ................. 19

CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Angermeier v. Cohen*,
   14 F. Supp. 3d 134 (S.D.N.Y. 2014)................................................................9 n.20

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010)...................................................................17 n.39

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................6

*Benion v. Bank One, Dayton, N.A.*,
   144 F.3d 1056 (7th Cir. 1998) ...............................................................15 n.32

*Carr v. CIGNA Sec., Inc.*,
   95 F.3d 544 (7th Cir. 1996) ...........................................................................20

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
   187 F.3d 229 (2d Cir. 1999)....................................................................17 n.40

*Colonial Funding Network, Inc. v. Epazz, Inc.*,
   252 F. Supp. 3d 274 (S.D.N.Y. 2017)........................................................9 n.23

*Cortes v. 21st Century Fox Am.*,
   2018 WL 4694181 (2d Cir. Oct. 1, 2018)..........................................................1 n.2

*Crawford v. Franklin Credit Mgmt. Corp.*,
   758 F.3d 473 (2d Cir. 2014)....................................................................19 n.46

*Dahlgren v. First Nat'l Bank*,
   533 F.3d 681 (8th Cir. 2008) ...................................................................18 n.42

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)...........................................................18 n.42, 20

*Fresh Meadow Food Servs., LLC v. RB 175 Corp.*,
   282 F. App'x 94 (2d Cir. 2008) ...............................................................18 n.41

*Goren v. New Vision Int'l, Inc.*,
   156 F.3d 721 (7th Cir. 1998) ...................................................................19 n.44

*Gracia v. City of New York*,
2017 WL 4286319 (S.D.N.Y. Sept. 26, 2017)..................................................3 n.7

*Grimes v. Fremont Gen. Corp.*,
785 F. Supp. 2d 269 (S.D.N.Y. 2011)................................................18 n.43, 19 n.47

*Hirsch v. City of New York*,
300 F. Supp. 3d 501 (S.D.N.Y. 2018).............................................................9 n.21

*In re Crude Oil Commodity Litig.*,
2007 WL 1946553 (S.D.N.Y. June 28, 2007) ..............................................17 n.37

*In re Hanes*,
2013 WL 1934942 (Bankr. D. Or. May 8, 2013) ........................................15 n.32

*In re Patchell*,
336 B.R. 1 (Bankr. D. Mass. 2005) ...............................................................5 n.10

*Joe N. Pratt Ins. v. Doane*,
2008 WL 819011 (S.D. Tex. Mar. 20, 2008).................................................8 n.16

*Knoll v. Schectman*,
275 F. App'x 50 (2d Cir. 2008) ................................................................. 19-20

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)...........................................................................6 n.11

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
711 F.3d 106 (2d Cir. 2013)...........................................................................7 n.14

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006)............................................................................1 n.2

*Morrissey v. Gen. Motors Corp.*,
21 F. App'x 70 (2d Cir. 2001) .......................................................................9 n.23

*Ozbakir v. Scotti*,
764 F. Supp. 2d 556 (W.D.N.Y. 2011)........................................................19 n.45

*Pedersen v. Greenpoint Mortg. Funding, Inc.*,
900 F. Supp. 2d 1071 (E.D. Cal. 2012)...........................................................5 n.10

*Peralta v. Peralta*,
2018 WL 1384509 (S.D.N.Y. Mar. 16, 2018),
*appeal dismissed*, No. 18-1137 (2d Cir. May 24, 2018)..................................8 n.17

*Purchase Real Estate Grp. Inc. v. Jones*,
2010 WL 3377504 (S.D.N.Y. Aug. 24, 2010)...............................................7 n.13

*Pyskaty v. Wide World of Cars, LLC,*
    856 F.3d 216 (2d Cir. 2017)............................................................. 17 nn.37-38

*Reich v. Lopez,*
    858 F.3d 55 (2d Cir. 2017)...................................................... 9 n.22, 19 n.47

*Rickett v. Smith,*
    2015 WL 3580500 (W.D. Ky. June 5, 2015)................................... 8 n.16

*Smulley v. FHFA,*
    2018 WL 4849667 (2d Cir. Oct. 5, 2018)......................................... 7 n.12

*Spool v. World Child Int'l Adoption Agency,*
    520 F.3d 178 (2d Cir. 2008)....................................................... 8 n.15, 18

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000)................................................................ 8 n.18

*Wexner v. First Manhattan Co.,*
    902 F.2d 169 (2d Cir. 1990)............................................................... 17 n.39

*Williams v. Affinion Grp., LLC,*
    889 F.3d 116 (2d Cir. 2018)..................................................... 8 n.19, 7 n.38

*Zander v. ACE Mortg. Funding LLC,*
    2012 WL 601896 (C.D. Cal. Feb. 23, 2012).................................... 5 n.10

## RULES, STATUTES, AND OTHER AUTHORITIES

15 U.S.C. § 1602...........................................................................................14, 15

15 U.S.C. § 1637................................................................................5, 14 n.31

15 U.S.C. § 1638...............................................................................14 n.31

18 U.S.C. § 1030(g)...........................................................................................7

18 U.S.C. § 1341...........................................................................................7, 8

18 U.S.C. § 1343...........................................................................................7, 8

18 U.S.C. § 1961(1) ......................................................................5 n.10, 8, 12

18 U.S.C. § 1962...................................................................................1, 7, 19

Fed. R. Civ. P. 9(b) ................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6)...........................................................................1 n.2, 6

iv

## PRELIMINARY STATEMENT

Plaintiffs Vanessa Williams and Kory Turner are college graduates who owe tens of thousands in federal student loans (¶¶156, 198).[1]  They wish to represent a class of student loan borrowers seeking redress for an allegedly "unlawful scheme to sell them purported 'student loan relief' services" that was "masterminded" by Equitable Acceptance Corporation ("**EAC**") and involved the "coordinated efforts" of EAC, SLF Center, LLC ("**SLF**"), Integra Student Services, LLC ("**Integra**"), and 41 unidentified others (all Defendants but EAC are "**Dealers**") (¶¶1-2).

Plaintiffs allege purported violations of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. § 1962(c) and (d) (Claims I and II) based on supposedly misleading statements, including that the Dealers were "affiliated with **USED**" (the U.S. Department of Education, or "**DOE**"), and fraudulently concealed the fact that the services they provided "were available to all student loan borrowers for free from their Servicers and/or USED" (¶¶168, 206, *also* ¶¶44, 57, 58).  These allegations cannot support a RICO claim.  They are not based in fact—they are refuted by the contracts the Plaintiffs signed and associated documents on which their claims are based.[2]

The first sentence of Plaintiffs' Service Agreements with the Dealers is:  "<u>We [each Dealer] are a private company not affiliated with the Department of Education</u>."[3]

---

[1]   "¶" references are to the Class Action Complaint ("**Complaint**").  Emphasis is added to, and internal quotations, brackets, ellipses, and citations omitted from, quoted material in this brief, unless otherwise indicated.

[2]   Documents discussed in the Complaint and integral to Plaintiffs' claims are attached as Exhibits to the Declaration of Gila S. Singer ("**Singer Declaration**") and cited as "**Ex. __.**"  Under Rule 12(b)(6), "[w]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss."  *Cortes v. 21st Century Fox Am.*, 2018 WL 4694181, at *2 n.1 (2d Cir. Oct. 1, 2018); *accord Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).  All of the Singer Declaration exhibits are cited in or integral to the Complaint.

[3]   Exs. A & C at 1.

The second sentence is:  "<u>You may, of course, try to complete your applications and consolidate your student loans or make changes to their repayment plans yourself without paying anyone a fee—the results could be the very same or they might vary</u>.[4]

Both disclosures are later repeated, in bold face, in the documents Plaintiffs signed, one preceded by the warning:  "**Important Disclosure**" (Ex. A at 6, 7 § 10; Ex. C at 4 § 2).

Plaintiffs claim that, in violation of RICO, they were fraudulently induced to pay SLF and Integra for "loan assistance" services that would result in "forgiveness" of the "total loan balance" of their federal student debt by those Dealers' concealment of the fact that they "do not and cannot actually offer" loan forgiveness, and instead "do nothing" or enroll borrowers in programs that increase their debt (¶¶3, 41, 161, 203).  These allegations are refuted by the documents Plaintiffs received and signed.  Plaintiffs also claim that all Defendants induced them to finance the Dealers' fees with credit from EAC bearing a "sky-high" rate of interest—which was repeatedly, and accurately, disclosed as 20.99%—by concealing that a contract with the very clear title "**Equitable Acceptance Revolving Credit Plan**" was a "new loan from EAC to the Borrower" (¶¶4, 65).  The Plaintiffs are college graduates.  A revolving credit plan is a loan.

SLF's and Integra's services as document-preparation firms were fully disclosed in their agreements with the Plaintiffs, and these firms prepared documents and put Plaintiffs in a position to obtain forgiveness (in Turner's case, tax-free) of all student debt outstanding after 10 years (Turner) or 20 years (Williams) of timely payments on income-based repayment plans.[5] Notwithstanding the demonstrable benefits of their agreements with the Dealers, Plaintiffs

---

[4]   *Id.*

[5]   Exs. A & B at 1; ¶¶31, 33, 183, 215-16, 223; Exs. E, F.

defaulted on their duty to repay EAC for financing the Dealers' fees—Williams after making a

$150 deposit and one $49 payment, and Turner after sporadic payments totaling about $475.[6]

Whatever other claims the Plaintiffs may think they have, the RICO claims are fatally

flawed.

## STATEMENT OF THE CASE

The Department of Education offers relief from student debt through loan consolidation,

income-driven repayment ("**IDR**") plans, deferment, forbearance, and loan forgiveness after a

period of public service or income-based repayment.[7]  All programs require navigation of agency

websites, collation of borrower information, analysis of eligibility, and submission of

applications and forms.  All income-based repayment plans require multiple submissions over

the years to certify and recertify eligibility.[8]

Turner financed two degrees and a post-graduate training program with $99,800 in loans

(¶¶198, 220, 237).  On September 23, 2016, he hired Integra under Ex. A (the "**Turner Service**

**Agreement**") to help him apply for debt assistance.  He financed Integra's $1,314 fee with

revolving credit from EAC under Ex. B (the "**Turner Credit Agreement**"), which clearly calls

---

[6]   ¶¶178, 187, 189, 219, 221, 224, 226, 232.

[7]   ¶¶24, 28, 33-34.  Details of federal student debt relief programs discussed in this brief may be found on the USED website, https://studentaid.ed.gov/ (last visited November 19, 2018).  The Court may take judicial notice of this information, and EAC requests that the Court do so, as it is fundamental to the allegations in the Complaint.  *See Gracia v. City of New York*, 2017 WL 4286319, at *3 n.3 (S.D.N.Y. Sept. 26, 2017) ("A court may take judicial notice of information on an official government website.").  Pages downloaded from that site are attached to the Singer Declaration as Exs. I-M.

[8]   Each deferment or forbearance requires a new submission.  Income-driven repayment plans require annual recertification of income and family size.  Public Service Loan Forgiveness requires immediate certification of qualifying employment, recertification with each new employer, and an application for forgiveness only after 120 qualifying payments (*see* ¶¶30, 33; Exs. J-M).

for minimum monthly payments to EAC of $39.42 beginning December 5, 2016.  If Turner had declined financing, the full amount of Integra's fee would have been "due immediately."[9]

Williams financed her bachelor's degree with $21,000 in loans (¶156).  In August 2017, she hired SLF under Ex. C (the "**Williams Service Agreement**") to "assist [her with] assembly of loan consolidation documents or other application documents for student loan debt assistance programs offered by the DOE."  She financed SLF's $1,377 fee with credit drawn under Ex. D (the "**Williams Credit Agreement**").  She paid EAC $150 in August 2017 and agreed to repay EAC a minimum of $49 monthly beginning October 25, 2017, for financing the $1,277 balance of SLF's fee.  Had she not financed those fees, payment to SLF for its entire fee would have been "due immediately" (¶¶99, 172, 174-75,178; Ex. C at 4 § 3 & Exhibit A; Ex. D at 3-4).

SLF and Integra placed Plaintiffs in programs to reduce their monthly student loan payments and that would result in forgiveness of all remaining balances after a set number of payments.  SLF "consolidated [Williams'] loans and enrolled her in [IDR]," lowering her monthly payment from $122.48 to $0.  Integra sought a lower monthly payment under Turner's IDR plan and obtained forbearance for him in October 2016 and again at the end of his 2017 training program (¶¶31, 33, 48, 180, 183, 215-16, 223, 345(a); *see also* Exs. E, F).

The Credit Agreements expressly contemplated financing Plaintiffs' "future purchases," such as fees for periodic recertification of status under their IDR plans (Exs. B & D at 3 § 1).  Contrary to Plaintiffs' allegation that "additional purchases" would require Plaintiffs to "reapply' for credit" (¶109), the Credit Agreements required a new application only for "[a]dditional purchases . . . made in excess of the credit extended . . . under this agreement" (Exs. B & D at 3 § 1).  Plaintiffs do not allege that purchases of additional services would have exceeded original

---

[9]    ¶¶209, 211-12; Ex. A at 6 § 4; Ex. B at 4.

line of credit, and the scenario is unlikely.  Williams would have paid at least $788 (her $150 down payment plus 12 monthly minimum payments of $49 each) before her first annual recertification of status was due.  Turner would have made at least three years of monthly payments before additional services were needed, since his agreement with Integra "included" "[a]n additional 3 years of re-enrollment . . . at no cost" (Ex. A at 6 § 4).

Plaintiffs claim they were induced to enter the Service Agreements by SLF's and Integra's deception, including:  (i) false promises of "loan forgiveness" (¶¶41, 161, 203); (ii) false "suggest[ions]" that SLF and Integra were affiliated with the government (¶¶58, 164, 201); (iii) failure to disclose that Plaintiffs could apply for federal programs by themselves for free (¶¶44, 168, 206); (iv) failure to disclose that "payment plans" for the services were new lines of credit provided by EAC (¶65); (v) failure to disclose the ostensible "disadvantage[s]" of loan consolidation (¶217; *see also* ¶¶45-46); and (vi) misrepresentations leading Williams to believe SLF was "taking care" of her student loan payments (¶¶69, 180).  The documents belie their claims of fraud.

The documents also disprove Plaintiffs' sole claim of misrepresentation or nondisclosure by EAC, which is that the Credit Agreements "deceptive[ly]" characterize "highly regulated" "closed-end credit" as "revolving" or "open-end credit." and, consequently, "unlawfully omit[] numerous pieces of information that are mandated by law [*i.e.* the Truth in Lending Act ("**TILA**"), 15 U.S.C. § 1637(a)-(b)]." (¶¶103-15).  Whether or not Plaintiffs state claims under TILA, they fail to allege a RICO violation.  Violations of TILA are not RICO predicate acts.[10] Plaintiffs cannot evade that Congressional judgment and transform technical TILA violations

---

[10]    *See* 18 U.S.C. § 1961(1); *Pedersen v. Greenpoint Mortg. Funding, Inc.*, 900 F. Supp. 2d 1071, 1082-83 (E.D. Cal. 2012); *Zander v. ACE Mortg. Funding LLC*, 2012 WL 601896, at *4 (C.D. Cal. Feb. 23, 2012); *In re Patchell*, 336 B.R. 1, 12-13 (Bankr. D. Mass. 2005).

into RICO predicate acts by relabeling them mail or wire fraud.

Plaintiffs allege out-of-pocket losses in the amount of their minimal payments to EAC (¶¶192, 239), and purport to identify a variety of other harms caused by Defendants' alleged acts. They seek to represent a class of 60,000 other student loan borrowers allegedly injured in the same way.  They purport to state a scheme through allegations:  (i) that "many hundreds" of unidentified "Borrowers" complained to third parties about EAC and unidentified "Dealers," (ii) "EAC and various Dealers have been sued multiple times over their practices," and (iii) "on information and belief [that] multiple state and federal regulators are investigating Defendants" (¶¶8, 36-68, 80-87).

## ARGUMENT

On this 12(b)(6) motion, the Complaint must be dismissed if it does not allege facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and show "more than a sheer possibility that . . . defendant[s] . . . acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where, as here, the Complaint does not "nudge[] . . . claims across the line from conceivable to plausible," it "must be dismissed."  *Twombly,* 550 U.S. at 570.

Under Rule 9(b), allegations of fraud must be pled "with particularity" and specify "the circumstances constituting fraud."  The complaint must:  "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[11]  It must also plead "events which give rise to a strong inference that the defendant had an intent to defraud,

---

[11]   *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

knowledge of the falsity, or a reckless disregard for the truth.[12]  "[Rule] 9(b) governs the pleading requirements for RICO claims for which the predicate illegal act is fraud."[13]

The Complaint does not satisfy these strict standards.

## I.   PLAINTIFFS DO NOT STATE A VIABLE RICO CLAIM UNDER § 1962(C) (CLAIM I)

Plaintiffs allege violations of § 1962(c), which makes it unlawful to conduct, or participate in the conduct of, an enterprise through a pattern of racketeering activity (Claim I). "To establish a civil RICO claim, a plaintiff must allege:  (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation."[14]  The § 1962(c) claim fails because Plaintiffs do not plead predicate acts or pattern (continuity).  The § 1962(d) claim cannot survive dismissal of the § 1962(c) claim (*see* Part II, below).

### A.   Plaintiffs Do Not Plead Predicate Acts

The alleged racketeering activity consists of violations of (i) the Computer Fraud and Abuse Act ("**CFAA**"), 18 U.S.C. §1030(g) (¶274), and (ii) "mail and/or wire fraud," 18 U.S.C. §§ 1341 and 1343 (¶273).  The first is not a predicate act; the second is not adequately pled.

### 1.   Violation of the CFAA Is Not a RICO Predicate Act

EAC is not alleged to have committed any CFAA violation (*see* ¶¶162, 182-84, 215-18, 228, 274).  The CFAA allegations against EAC's co-defendants are irrelevant because violation of the CFAA is not a predicate act.  "The acts of racketeering activity that constitute the pattern

---

[12]   *Smulley v. FHFA*, 2018 WL 4849667, at *3 (2d Cir. Oct. 5, 2018) (dismissing RICO claim under Rule 9(b)).

[13]   *Purchase Real Estate Grp. Inc. v. Jones*, 2010 WL 3377504, at *8 (S.D.N.Y. Aug. 24, 2010).

[14]   *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).

must be among the various criminal offenses listed in § 1961(1) . . . ."[15]  Section 1961(1) "does

not include violations of the CFAA, and thus they may not serve as predicate offenses."[16]

### 2. <u>Plaintiffs Improperly Seek to Criminalize TILA</u>

"Fraud-based RICO claims are subject to heightened scrutiny because virtually every

ordinary fraud is carried out in some form by means of mail or wire communication, and such

claims thus have the potential to transform garden-variety common law actions into federal

cases."[17]  The fraud predicate acts attributed to EAC simply reprise claims that Credit Agreement

disclosures are inadequate under TILA (¶¶93-121, 171-75, 186, 208-14).  While this is not true,

it is also not relevant.  A failure to comply with TILA is not a crime, and it is not a RICO

predicate act.

### 3. <u>Plaintiffs Fail to Plead Predicate Acts of Mail and Wire Fraud</u>

The elements of mail or wire fraud are:  "(i) a scheme to defraud (ii) to get money or

property, (iii) furthered by the use of interstate mail or wires."[18]  Even though "the mail or wire

communications themselves need not contain a false statement," a plaintiff "still needs to allege

a material misrepresentation as part of the defendants' scheme to fraud to state a violation of

section 1341 or 1343," and "[t]hat is so notwithstanding characterization of the alleged frauds as

predicate acts of a racketeering conspiracy."[19]

"[A]ll allegations of fraudulent predicate acts are subject to the heightened pleading

---

[15]  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).

[16]  *Rickett v. Smith*, 2015 WL 3580500, at *4 (W.D. Ky. June 5, 2015); *accord Joe N. Pratt Ins. v. Doane,* 2008 WL 819011, at *3-4 (S.D. Tex. Mar. 20, 2008).

[17]  *Peralta v. Peralta*, 2018 WL 1384509, at *8 (S.D.N.Y. Mar. 16, 2018), *appeal dismissed*, No. 18-1137 (2d Cir. May 24, 2018).

[18]  *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).

[19]  *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125 (2d Cir. 2018).

requirement of Rule 9(b)."[20]  "In civil RICO actions, the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency."[21]  "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."[22]

### a.   Plaintiffs Fail to Plead Fraudulent Misstatements

Plaintiffs' allegations of fraudulent inducement are refuted by the Complaint and documents it incorporates or relies on.  "[R]eliance on . . . alleged oral promises, which directly contradict the terms of . . . written agreements [is] unreasonable as a matter of law."[23]

**Loan Forgiveness.**  Turner, who is 31 years old and holds a master's degree, claims he "understood that by paying $1,300 in $39 monthly payments, he would have his full $80,000 of loans . . . eliminated" (¶203).[24]  Williams, a college graduate, claims an identical belief about her $21,000 of loans based on $49 monthly payments to SLF (¶161).  It is not plausible that Plaintiffs were led to believe a $1,300 fee would purchase guaranteed "forgiveness" of tens of thousands of dollars in student loans, and their allegations are irreconcilable with Plaintiffs' Service Agreements, which include, for example, each Plaintiff's signed acknowledgment that **"NO GUARANTEES CONCERNING THE SUCCESS OF ANY LOAN CONSOLIDATION OR CHANGES TO THEIR REPAYMENT PLANS HAVE BEEN PROVIDED TO CLIENT BY COMPANY, EXCEPT AS CONTAINED HEREIN"** (Ex. C at 7; Ex. A at 8) (capitalization emphasis in originals).

---

[20]   *Angermeier v. Cohen*, 14 F. Supp. 3d 134, 146 (S.D.N.Y. 2014).

[21]   *Hirsch v. City of New York*, 300 F. Supp. 3d 501, 516 (S.D.N.Y. 2018).

[22]   *Reich v. Lopez*, 858 F.3d 55, 59-60 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 282 (2017).

[23]   *Morrissey v. Gen. Motors Corp.*, 21 F. App'x 70, 73 (2d Cir. 2001); *see also Colonial Funding Network, Inc. v. Epazz, Inc*., 252 F. Supp. 3d 274, 284 (S.D.N.Y. 2017).

[24]   Turner elsewhere pleads that his student loans now amount to $99,800 (¶237).

Plaintiffs' Agreements with Integra and SLF do not mention loan forgiveness.  The Agreements identify Integra and SLF as "provid[ing] document preparation services to assist consumers who are applying for Federal Student Loan Consolidation Services" (Ex. A at 6; Ex. C at 4).  The Agreements' particularized descriptions of the services to be provided to Plaintiffs notably omit obtaining loan forgiveness.[25]  The Complaint actually <u>admits</u> that Integra's and SLF's performance can result in forgiveness.  SLF reduced Williams' monthly payment from $122.48 to $0, and any balance remaining after 240 payments, including any "extra" interest, will be forgiven (¶¶31, 48).  Turner also has IDR and "intends to seek" forbearance "as soon as he is eligible" (¶217), which will occur after 120 timely payments on that plan (¶33, Ex. M).

**Government Affiliation.**  It is not plausible that Turner alleges he "believed that Integra was affiliated with the government" (¶201) or that Williams claims she believed SLF "was . . . related to the Department of Education" (¶164).  Each Service Agreement—which the Plaintiffs signed—states in three different places:  "**Company is a private company, not affiliated with any government agency**" (Ex. A at 6; Ex. C at 4 (bold emphasis in original); *see also* Exs. A & C at 1, 2).

**Free Services Disclosed.**  Plaintiffs' allegation that Defendants concealed the availability of government services "for free from . . . Servicers and/or USED" (¶¶168, 206, *also* ¶¶44, 57), is irreconcilable with the Service Agreements' "**Important Disclosure**" that:

> **You may, of course, try to complete your applications and consolidate your student loans yourself without paying anyone a fee—the results could be the**

---

[25]   Instead, they require Integra and SLF to perform standard document preparation, including "review the information provided by the Client, and complete the application forms required for the DOE program(s) that have been selected by the Client . . . prepare for filing an application to initiate a Federal Student Loan Consolidation through the DOE on behalf of Client, or alternatively and at the Client's option, identify and apply for other DOE-sponsored programs suitable for Client . . . [deliver a]ll completed applications . . . by . . . direct submission to DOE . . . monitor application progress and provide reasonable updates . . . ." Ex. A at 6 § 2, Ex. C at 4 § 3.

**very same or they might vary.**[26]

As noted above, the same disclosure appears on first page of each Service Agreement.

**New Line of Credit.**  It is not plausible that these college-educated Plaintiffs signed a document labeled "**Equitable Acceptance Revolving Credit Plan**"—and began to repay amounts they received thereunder—without understanding they were obtaining "a new line of credit from EAC" (¶¶167, 205).  Directly under EAC's name and logo on the first page of each Credit Agreement is the title "**Credit Request Authorization**" (Exs. B & D at 1).  Each Plaintiff signed an authorization for EAC's credit check and an acknowledgment they were agreeing to a "Revolving Credit Plan."[27]  Integra gave Turner written notice that "payment of our $1314 fee is executed by a Third Party (Equitable Acceptance Corporation) . . . using a Credit Plan that you have agreed with them to set up" (Ex. A at 6 § 4).  Williams had written notice that "the payment of $1377.00 for [SLF]'s services relating to the student loan assistance application" will be through the "financing option" of a "Third Party Credit Plan" (Ex. C at 10).

Plaintiffs certainly understood a new line of credit "would be drawn in full immediately to pay [Integra and SLF and] . . . interest would accrue on the $1,300" (¶¶167, 205).  Each acknowledged, in writing, that the "Revolving Credit Plan governs all purchases of authorized products or merchandise made by me from Seller.  These purchases will be debited against the line of credit that . . . Equitable Acceptance Corporation . . . may establish hereunder" (Ex. B at 3

---

[26]   Ex. A at 1, 7 § 10; Ex. C at 1, 4 § 2 (emphasis in original).

[27]   *See* Ex. B at 2 ("By signing below, I . . . agree to authorize you to obtain credit report and any other information about my . . . creditworthiness from credit bureaus and other sources . . . .  I authorize you to give information concerning your credit experience with me (us) to others including credit bureaus . . . .  I authorize you to furnish information about my account to credit reporting agencies and anyone else who may lawfully receive such information.  By signing below, I am executing my Revolving Credit Plan with you (the 'Credit Plan') as well as signing my Credit Application. . . . I understand that you will rely on the information stated in my Credit Application in granting me credit under the Credit Plan . . . ."); Ex. D at 2 (same).

11

§ 1, Ex. D at 3 § 1).  Plaintiffs knew that if they did not execute Credit Agreements, they would be billed directly for the full price of services (Ex. at A 6 § 4; Ex. C at 10).

**Increased Interest.**  Williams complains that "[a]t no point did . . . SLF Center tell [her] that consolidation would increase the overall interest charged on her loans" (¶169).  There is no allegation that consolidation increased her interest rate or time for repayment.  Even if it had, the Complaint admits any remaining balance is forgiven after 20 years under her IDR plan (¶31).

**Continuing Obligations.**  Williams' allegation that she failed to make a student loan payment because she thought SLF was "taking care of [her] student loan obligations" (¶69, 180), is irreconcilable with her signed acknowledgement in her Service Agreement:

> **I HAVE NOT BEEN ADVISED BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES TO FOREGO A STUDENT LOAN PAYMENT OR DEFAULT ON ANY CREDITOR OBLIGATIONS.  FAILURE TO MAKE TIMELY CREDITOR PAYMENTS COULD DISQUALIFY THE CLIENT FROM OBTAINING DOE RELIEF AND NEGATIVELY IMPACT CLIENT'S CREDITWORTHINESS.**

Ex. C at 6-7 (bold emphasis in original).  *See also id.* at 12 ("I …. expressly authorize Company, …. to communicate with all parties involved with my Federal Student Loans, to whom I understand and agree I remain primarily obligated").

### b.   The Credit Agreements Were Not Deceptive

Plaintiffs claim the Credit Agreements "unlawfully omit[] numerous pieces of information that are mandated by law" (¶115; *see also* ¶116-21).  But that law is TILA.  Even if Plaintiffs stated an actionable TILA claim (which they do not), failure to comply with TILA is not a predicate act.  Plaintiffs must allege mail or wire fraud—that is, actual deception—to state a RICO claim, not failure to comply with a statute that is not among the dozens listed in 18 U.S.C. § 1961(1).  The Credit Agreements and the billing statements that Plaintiffs received defeat their allegations of deception.  Each Plaintiff knew s/he was taking out a loan and all

material aspects of that loan, including the amount of the debt, the interest rate, and the repayment terms.

More specifically, their allegations of deception are belied by the clear terms of the Credit Agreements and billing statements Plaintiffs received:

- The Credit Agreements state the "actual amount financed" as "sales price minus any down payment" (¶116).[28]

- The "dollar amount of the finance charge" (¶117) and "Monthly Minimum Payment as a dollar amount" (¶120) are stated on the first page of Plaintiffs' monthly bills.[29]

- It would have been impossible to show the "dollar amount of the total payments the Borrower will have to make . . . calculated as the sum of the amount financed and the amount of the finance charge" (¶118) because that amount is contingent on such future events as the amount and rate of payments, and use of the re-earned credit (following repayments) for additional purchases.

- The Credit Agreements describe the grace period (¶119).  Under the heading "Period for Which Finance Charges are Assessed," each Credit Agreement discloses:

> In . . . NY . . . new purchases will not be added to my beginning balance until the first day of the next billing period and finance charges will not be imposed on those purchases until such date . . . . If I pay the full amount of the new balance shown on my billing statement within 15 days after the closing date shown on the statement, you will not charge me any finance charges . . . between the closing date and the date I make my payment.[30]

---

[28]   *See* Ex. D at 4 (showing Williams' Unpaid Balance of $1,277 after reduction of $1,377 Total Sale Price by $150 Down Payment); Ex. B at 4 (showing Total Sale Price and Unpaid Balance of $1,314); *see also* Ex. C at 10; Ex. A at 6 § 4.

[29]   Exs. G & H at 1.

[30]   Exs. B & D at 3 § 5.

- The monthly billing statements also disclose the grace period (¶¶122, 186, 214).  Each monthly billing statement contained same the disclosure found in the Credit Agreements quoted above (Exs. G & H at 2).

- The Credit Agreements provide that the "the due date of any payment" (¶120) is "within fifteen days after each statement closing date."  The due date also is also stated as a calendar date on monthly statements.  (*See* Exs. B & D at 3; Exs. G & H at 2).

The rest of the Plaintiffs' allegations all center on technical distinctions that exist only in TILA and do not independently state deception.  All material information was in substance disclosed.

Plaintiffs allege that the Credit Agreements "falsely present[] the credit offered . . . as open-end when it is, in fact, closed-end" (¶¶291, 299).  That is a distinction drawn in TILA.  In fact, the Credit Agreements satisfy all of TILA's criteria for "open end credit plans"—they are plans (1) "under which the creditor reasonably contemplates repeated transactions;" (2) "which prescribes the terms of such transactions;" and (3) "which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance."  *See* § 1602(j).[31]  By name, and in substance, the Credit Agreements are "Revolving Credit Plans."  They provide that a Borrower's "future purchases" will be "debited against the line of credit that [EAC] may establish hereunder" and impose a "finance charge" on the "Average Daily Balance."  (Exs. B & D at 3 §§ 1, 5).  None of this, however, is relevant to RICO.

*Second*, Plaintiffs' further allegation that, under TILA, the Credit Agreements are "spurious open-end credit" plans (¶114) is meritless.  In both form and substance, the credit plan was open-ended.  Plaintiffs allege that Borrowers are "permit[ted] . . . to make additional

---

[31]  "Closed-end credit" is not a defined term in TILA, and is unmentioned in §§ 1637-38.

purchases only" if they "'reapply' for credit" (¶109).  That is false.  The Credit Agreements permit a borrower to "make [] future purchases under this agreement . . . up to the amount of [credit] extended under this agreement" (Exs. B & D at 3 § 1).  The Credit Agreements require a new application only for "[a]dditional purchases . . . made in excess of the credit extended [] under this agreement" (*id.*).

*Third,* Plaintiffs claim that "no reasonable Borrower would repeatedly purchase the Purported Services, because the 'loan forgiveness' the Dealers promise, if actually obtained, would end the Borrower's loan obligation" (¶111).  But the Complaint acknowledges that "forgiveness" would not occur for at least ten years (¶¶31, 33), and borrowers would, in the meantime, need to "re-submit income documentation at regular intervals" in order to "remain enrolled in Income Driven Repayment" (¶30).  Resubmission by the Dealers would reasonably be expected to entail additional fees.  Moreover, the views of a "reasonable borrower" are irrelevant.  Designation of a credit plan as "open end" depends on whether "the creditor reasonably contemplates repeated transactions."  § 1602(j).  "The fact that a particular consumer does not return for further credit extensions does not prevent a plan from having been properly characterized as open-end."[32]

*Fourth,* Plaintiffs allege that "no Borrower would have sufficient credit to purchase additional services for a long period of time" because "monthly payments are minimal compared to the total balance" (¶110).  This tacitly admits the Credit Agreements afford credit for future purchases once the balance has shrunk.  Even if Plaintiffs' allegation were true, nothing in TILA

---

[32]   *Benion v. Bank One, Dayton, N.A.*, 144 F.3d 1056, 1058 (7th Cir. 1998) (to be open-end, "the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business"); *see also In re Hanes*, 2013 WL 1934942, at *1-2 (Bankr. D. Or. May 8, 2013) (credit was "properly characterized as open-end" even though debtor "actually utilized the account only for one advance;" dispositive factors were that "loan documents . . . contemplate[d] repeat transactions" and credit was "generally available to the extent outstanding balances are repaid").

suggests that a "long period of time" between purchases has any bearing on whether a credit plan is "open end." But it is false. Recertification was not required for at least a year after the initial extension of credit (Ex. K; *cf.* ¶30), and the Complaint reveals that a year of minimum payments would make a substantial amount of credit available for future services.[33]

The Credit Agreements and billing statements vitiate Plaintiffs' claims of deception.

### c.   Vague Allegations of "Similar" Frauds Fail under Rule 9(b)

Turner and Williams seek to represent 60,000 other student loan borrowers who supposedly sustained the same "fraudulent inducement" (¶¶326, 247) but do not describe a single statement made to these people with any particularity. Instead, they conclusorily allege that:

(i)  Unidentified "Dealers" defrauded unidentified "Borrowers" using "similar" tactics.[34] Plaintiffs do not allege the time, place, content, or other particulars of these "similar" frauds.

(ii)  EAC supposedly made unspecified statements to unidentified "Borrowers" at unidentified times and places.[35]

(iii)  "Many hundreds of Borrowers have complained to the BBB and the CFPB about strikingly similar conduct by EAC and its affiliated Dealers."[36] Plaintiffs provide dates of

---

[33]   It would have taken Williams only one year of $49 monthly minimum payments, after her $150 initial payment, to clear $738 of her $1,300 credit line (¶¶160-61). Turner's Service Agreement provided for "[a]n additional 3 years of re-enrollment" to be "included at no cost to [him]" (Ex. A at 6 §4). His $39 monthly minimum payments would have amounted, in three years, to $1,404 (¶¶202-03), which would have been available for his use. Even Turner's irregular payments cleared at least $475 of the $1,300 (¶¶219, 221, 224, 226, 232).

[34]   *See, e.g.*, ¶3 ("Dealers lure vulnerable federal student loan borrowers with promises of so-called loan 'forgiveness'—which the Dealers do not and cannot actually offer"); *see also* ¶¶1, 5, 39-47, 58, 60, 65-66, 69-70, 77, 137, 139-53.

[35]   *See, e.g.*, ¶114 ("EAC offers its spurious open-end credit plan in order to conceal the total cost of credit from Borrowers, and to deceive Borrowers into accepting unfavorable credit terms that they would not [otherwise] accept.").

[36]   ¶52; *see also* ¶¶53-57, 59, 68, 84. The "BBB" is the Better Business Bureau; the "CFPB" is the Consumer Finance Protection Bureau.

Internet postings but do not identify any complainant or plead the date, place, or particulars of any statement.  This is unauthenticated hearsay, inadmissible for its truth.

(iv)  FTC statements about "deceptive student loan debt relief scams"—not tied by the FTC to EAC—are "strikingly consistent" with Plaintiffs' experience (¶80).  Plaintiffs also proffer information-and-belief allegations that there exist investigations by "regulators" and lawsuits involving "conduct similar to that described in this Complaint" (¶¶8, 81-87).

Claims that "similar[]" frauds occur "regularly" are "speculative" without specific "allegations of fact."[37]  Plaintiffs' allegations glaringly lack the requisite "who, what, when, where, and why of the fraud at issue" required by Rule 9(b).[38]  These "conclusory allegation[s] on information and belief . . . [are] insufficient to make [a] claim plausible" where "the complaint's *factual allegations* . . . [do not] raise a right to relief above the speculative level."[39]

## B.   Plaintiffs' Purported Pattern of Racketeering Lacks Continuity

Plaintiffs do not plead a pattern of racketeering.  They must factually allege continuity— that Defendants' acts "amount to or pose a threat of continued criminal activity."[40]  The Complaint does not plead either closed-ended continuity—a pattern of "related predicate acts extending over a substantial period of time" in the past—or open-ended continuity, "racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the

---

[37]   *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 226 (2d Cir. 2017); *see also In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) ("It is clear that the pleading of fraud through completely unattributed statements and representations is insufficient to meet the dictates of Rule 9(b) . . . .").

[38]   *Affinion*, 889 F.3d at 125; *see also Pyskaty*, 856 F.3d at 226.

[39]   *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis in original); *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) ("Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.").

[40]   *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).

predicate acts were performed."  *Spool*, 520 F.3d at 183.

**Closed-End Continuity.**  The Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years."[41]  Even if the allegedly misleading communications with Turner and Williams constituted predicate acts (they do not), the Complaint alleges a pattern spanning at most 19 months.  The earliest communication with Williams is an August 17, 2017, phone call from SLF (¶157), and the latest is a bill from EAC in Feb. 2018 (¶186), 6 months later.  The earliest involving Turner is a September 2016 phone call with Integra (¶200), and the latest is a bill from EAC in August 2017 (¶214), 11 months later.  Even if the communications regarding Turner's cancellation of his Credit Agreement are tacked on, the last is April 2018 (¶235), resulting in a span encompassing all allegations about both Plaintiffs of at most 19 months (September 2016 to April 2018).[42]  This does not state closed-end continuity.

Plaintiffs' conclusory allegation of a RICO pattern consisting of "thousands of uses of the mails and wires in connection with Defendants' scheme to defraud, spanning a period of no fewer than three years" (¶273) is inadequate.  "[A] conclusory allegation . . . without any specifics, fails to meet the particularity requirements of Rule 9(b), and simply is insufficient" to establish "a pattern of using the mail and wires to commit fraudulent acts."[43]  The allegations of anonymous complaints are equally infirm.  "[C]onclusory allegations that defendants also

---

[41]  *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) (quoted with approval in *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 98 (2d Cir. 2008)).

[42]  These cancellation-related communications are irrelevant to a determination of continuity.  "[M]ailings are insufficient *to establish the continuity factor* unless they contain misrepresentations themselves." *Dahlgren v. First Nat'l Bank*, 533 F.3d 681, 689 (8th Cir. 2008).  Therefore, the relevant period ends in February 2018 and is only 17 months long (September 2016 to February 2018).

[43]  *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 301 (S.D.N.Y. 2011).

defrauded unidentified 'others' are not enough to plead the requisite pattern of fraud."[44]

**Open-Ended Continuity.**  Plaintiffs' allegations of fraud on unidentified "Borrowers" and anonymous consumers do not state open-ended continuity.  A "sweeping allegation that defendants employed the same scheme in connection with [others] is insufficient to show open-ended continuity" without "<u>factual allegations</u> indicating that defendants engaged in fraud . . . in a manner and by means similar to those alleged" by Plaintiffs.[45]  Nor does the Complaint plead "racketeering acts" that (i) "themselves include a specific threat of repetition extending indefinitely into the future, such as demands for monthly 'protection' money," or (ii) "can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes, such as an organized crime 'family.'"  *Id.* at 571.  "Mere mailings of monthly statements seeking payment with respect to a single established debt . . . do not, without more, amount to or suggest a threat of continued criminal activity . . . ."[46]  Importantly,

> inherently unlawful acts, such as murder, committed in pursuit of inherently unlawful goals, such as narcotics trafficking, are generally found to generate the requisite threat of continuity even if the time period is short, while racketeering activities furthering endeavors that are not inherently unlawful, such as frauds in the sale of property, are generally found wanting despite even longer periods of time.[47]

## II.   PLAINTIFFS DO NOT PLEAD A VIABLE RICO CONSPIRACY CLAIM (CLAIM II)

Because Plaintiffs fail to state a claim for violation of § 1962(c), their claim under § 1962(d) for conspiracy necessarily fails.  *Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir.

---

[44]   *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998).

[45]   *Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 572 (W.D.N.Y. 2011).

[46]   *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 488 (2d Cir. 2014).

[47]   *Grimes*, 785 F. Supp. 2d at 300.  *See also Reich*, 858 F.3d at 59-60 (defendant's business was not "primarily unlawful . . . [e]ven if [it] pays bribes," as "it is primarily in the energy business; it is not a narcotics ring or an organized crime family").

2008) ("Because the plaintiff has failed to allege a substantive violation of RICO, the complaint's . . . claim of RICO conspiracy also fails.")  *Accord, e.g.*, *First Capital*, 385 F.3d at 182.

## CONCLUSION

"If a literate, competent adult is given a document that in readable and comprehensible prose says *X* . . . and the person who hands it to him tells him, orally, not-*X* . . . , our literate, competent adult cannot maintain an action for fraud against the issuer of the document."  *Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996). These college-educated Plaintiffs were explicitly informed in writing that SLF and Integra were document-preparation firms, that they were not affiliated with USED, and that the Plaintiffs could make the applications to USED themselves for free (Ex. A at 1, 6, 7 § 10; Ex. C at 1, 4 § 2).  Their claims should be dismissed with prejudice.

Dated:  November 19, 2018

Respectfully submitted,

JOSEPH HAGE AARONSON LLC

By:____*/s/ Gregory P. Joseph*_____
    Gregory P. Joseph (gjoseph@jha.com)
    Sandra M. Lipsman (slipsman@jha.com)
    Gila S. Singer (gsinger@jha.com)
485 Lexington Ave, 30th Floor
New York, NY 10017
Phone: (212) 407-1200
Fax: (212) 407-1280

*Counsel for Defendant Equitable Acceptance Corporation*

804349

20