**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

VANESSA WILLIAMS and KORY TURNER, individually and on behalf of all persons similarly situated,

Plaintiffs,

vs.

EQUITABLE ACCEPTANCE CORPORATION, SLF CENTER, LLC, INTEGRA STUDENT SOLUTIONS, LLC, and DOES 1-41,

Defendants.

---------------------------------------------------------------x

18 Civ. 07537 (NRB)

**Oral Argument Requested**

# MEMORANDUM OF LAW IN SUPPORT OF EQUITABLE ACCEPTANCE CORPORATION'S MOTION TO DISMISS THE RICO CLAIMS IN THE AMENDED CLASS ACTION COMPLAINT


**JOSEPH HAGE AARONSON LLC**
Gregory P. Joseph
Sandra M. Lipsman
Gila S. Singer
485 Lexington Avenue, 30th Floor
New York, New York 10017
(212) 407-1200

*Counsel for Defendant Equitable Acceptance Corporation*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF THE CASE ..... 4

ARGUMENT ..... 9

I. PLAINTIFFS DO NOT STATE A VIABLE RICO CLAIM UNDER § 1962(C) (CLAIM I) ..... 9

A. Plaintiffs Do Not Plead Predicate Acts of Mail and Wire Fraud ..... 10

1. Plaintiffs Fail to Plead Fraudulent Misstatements by SLF or Integra ..... 11

2. The Credit Agreements Were Not Deceptive ..... 15

a. Plaintiffs Improperly Seek to Criminalize TILA ..... 15

b. The Credit Agreements Did Not Offer "Spurious Open-Ended Credit" ..... 16

c. The Credit Agreements Did Not Unlawfully Omit Information ..... 18

d. The Credit Agreements Do Not Obscure the Identity of the Lender ..... 20

3. Alleged Dealer Misstatements Cannot Be Attributed to EAC ..... 20

4. Statements by Unidentified "Dealers" to Unidentified "Borrowers" Do Not Sustain Plaintiffs' RICO Claims ..... 21

B. Plaintiffs' Purported Pattern of Racketeering Lacks Continuity ..... 22

II. PLAINTIFFS DO NOT PLEAD A VIABLE RICO CONSPIRACY CLAIM (CLAIM II) ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angermeier v. Cohen*,
14 F. Supp. 3d 134 (S.D.N.Y. 2014)....................10 n.21

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)....................22 n.42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................9

*Benion v. Bank One, Dayton, N.A.*,
144 F.3d 1056 (7th Cir. 1998) ....................17 n.32

*Carr v. CIGNA Sec., Inc.*,
95 F.3d 544 (7th Cir. 1996) ....................25

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
187 F.3d 229 (2d Cir. 1999)....................22 n.43

*Colonial Funding Network, Inc. v. Epazz, Inc.*,
252 F. Supp. 3d 274 (S.D.N.Y. 2017)....................11 n.24

*Cortes v. 21st Century Fox Am.*,
2018 WL 4694181 (2d Cir. Oct. 1, 2018)....................2 n.3

*Crawford v. Franklin Credit Mgmt. Corp.*,
785 F.3d 473 (2d Cir. 2014)....................24 n.49

*Dahlgren v. First Nat'l Bank*,
533 F.3d 681 (8th Cir. 2008) ....................23 n.45

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004)....................23 n.44, 24

*Fresh Meadow Food Servs., LLC v. RB 175 Corp.*,
282 F. App'x 94 (2d Cir. 2008) ....................23 n.44

*Goren v. New Vision Int'l, Inc.*,
156 F.3d 721 (7th Cir. 1998) ....................23 n.47

*Gracia v. City of New York*,
2017 WL 4286319 (S.D.N.Y. Sept. 26, 2017)....................4 n.9

*Grimes v. Fremont Gen. Corp.*,
785 F. Supp. 2d 269 (S.D.N.Y. 2011)....................23 n.46, 24 n.50

*Hirsch v. City of New York*,
300 F. Supp. 3d 501 (S.D.N.Y. 2018)....................11 n.22

*In re Crude Oil Commodity Litig.*,
2007 WL 1946553 (S.D.N.Y. June 28, 2007) ....................22 n.40

*In re Hanes*,
2013 WL 1934942 (Bankr. D. Or. May 8, 2013) ....................17 n.32

*In re Patchell*,
336 B.R. 1 (Bankr. D. Mass. 2005) ....................16 n.30

*Knoll v. Schectman*,
275 F. App'x 50 (2d Cir. 2008) ....................24

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)....................9 n.15

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
711 F.3d 106 (2d Cir. 2013)....................10 n.18

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006)....................2 n.3

*Miccosukee Tribe of Indians v. Cypress*,
814 F.3d 1202 (11th Cir. 2015) ....................9 n.14

*Morrissey v. Gen. Motors Corp.*,
21 F. App'x 70 (2d Cir. 2001) ....................11 n.24

*Ozbakir v. Scotti*,
764 F. Supp. 2d 556 (W.D.N.Y. 2011) ....................24 n.48

*Pedersen v. Greenpoint Mortg. Funding, Inc.*,
900 F. Supp. 2d 1071 (E.D. Cal. 2012)....................16 n.30

*Peralta v. Peralta*,
2018 WL 1384509 (S.D.N.Y. Mar. 16, 2018) ....................15 n.29

*Purchase Real Estate Grp. Inc. v. Jones*,
2010 WL 3377504 (S.D.N.Y. Aug. 24, 2010) .......... 9 n.17

*Pyskaty v. Wide World of Cars, LLC*,
856 F.3d 216 (2d Cir. 2017) .......... 22 nn.40-41

*Reich v. Lopez*,
858 F.3d 55 (2d Cir. 2017),
*cert. denied*, 138 S. Ct. 282 (2017) .......... 11 n.23, 24 n.50

*Smulley v. FHFA*,
2018 WL 4849667 (2d Cir. Oct. 5, 2018) .......... 9 n.16

*Spool v. World Child Int'l Adoption Agency*,
520 F.3d 178 (2d Cir. 2008) .......... 22

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) .......... 10 n.19

*Wexner v. First Manhattan Co.*,
902 F.2d 169 (2d Cir. 1990) .......... 21 n.38, 22 n.42

*Williams v. Affinion Grp., LLC*,
889 F.3d 116 (2d Cir. 2018) .......... 10 n.20, 22 n.41

*Zander v. ACE Mortg. Funding LLC*,
2012 WL 601896 (C.D. Cal. Feb. 23, 2012) .......... 16 n.30

**Rules & Statutes**

8 U.S.C. § 1341 .......... 10

8 U.S.C. § 1343 .......... 10

15 U.S.C. § 1602 .......... 16, 17

15 U.S.C § 1637 .......... 1, 16

15 U.S.C § 1638 .......... 16

18 U.S.C. § 1030 .......... 1 n.2

18 U.S.C. § 1961 .......... 16 n.30, 18

18 U.S.C § 1962 .......... *passim*

28 U.S.C § 2201 ........ 1 n.2

28 U.S.C § 2202 ........ 1 n.2

N.Y. Banking Law § 14-a(1) ........ 1 n.2

N.Y. GBL § 349 ........ 1 n.2

N.Y. GOL § 5-501 ........ 1 n.2

Rule 12(b)(6) ........ 9

Rule 9(b) ........ *passim*

## PRELIMINARY STATEMENT[1]

Plaintiffs Vanessa Williams and Kory Turner, college graduates who owe tens of thousands in federal student loans (¶¶270, 317), seek to represent a class of 60,000 student loan borrowers ("**Borrowers**") allegedly harmed by an "unlawful scheme" to sell them "worthless" "purported 'student loan relief' services." (¶¶1, 7). Plaintiffs claim the scheme involves defendants SLF Center, LLC ("**SLF**"), Integra Student Services, LLC ("**Integra**"), and 41 unidentified others (the "**Dealers**") (¶¶1-2) who fraudulently induced "Borrowers … to purchase [the Dealers'] valueless Purported Services" for an "exorbitant" $1,300 fee, and then "steer the Borrowers" to finance the fee with a "Deceptive Loan" from defendant Equitable Acceptance Corporation ("**EAC**"). (¶¶4-5, 67-68). This is Plaintiffs' second failed attempt to plead violations of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. §§ 1962(c), (d).[2]

The FAC does not cure the Complaint's defective allegations of racketeering activity or continuity. The FAC discards only some of the Complaint's erroneous allegations—*e.g.*, that violations of the CFAA are RICO predicate acts. (Complaint ¶274). But Plaintiffs continue to rely on allegations of mail and wire fraud that are refuted by the documents on which their

---

1 Paragraph references ("¶") are to the Amended Class Action Complaint ("**FAC**") (ECF 30), unless otherwise indicated. Plaintiffs' original August 17, 2018, Class Action Complaint is referred to as the "**Complaint**" (ECF 1). Emphasis is added to, and internal quotations, brackets, ellipses, and citations omitted from, quoted material in this brief, unless otherwise indicated.

2 The Complaint asserted claims for violations of RICO, §§ 1962(c) and (d) (Claims I, II); violation of the Truth in Lending Act, 15 U.S.C. §§ 1637(a)-(b), 1638(a) ("**TILA**") (Claims III, IV); deceptive practices in violation of N.Y. GBL § 349 (Claims V, VI); primary and aiding and abetting liability for common law fraudulent inducement (Claims VII, VIII); usury in violation of N.Y. GOL § 5-501(1) and N.Y. Banking Law § 14-a(1)) (Claim IX), and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) ("**CFAA**") (Claim X). The FAC adds a claim for a declaratory judgment, under 28 U.S.C. §§ 2201-02, regarding enforceability of the Credit Agreements (Claim XI).

claims are based.[3] Allegations that SLF and Integra made "false promises of loan 'forgiveness'" (*e.g.*, ¶4), misrepresented themselves as "affiliated with **USED**" (the U.S. Department of Education, or "**DOE**") (*e.g.*, ¶115), and concealed the fact that the services the Dealers proffered "are otherwise available for free from their Servicers and USED" (*e.g.*, ¶89), remain irreconcilable with Plaintiffs' Service Agreements with SLF and Integra. Those agreements specify in detail the services to be provided and promise updates to the client but pointedly omit any guarantee of "loan forgiveness;"[4] advise, repeatedly, that Borrowers "*may, of course, try to complete … applications and consolidate … student loans or make changes to their repayment plans [themselves] without paying anyone a fee—the results could be the very same or they might vary*;"[5] and state, repeatedly, that each Dealer is *"a private company not affiliated with the Department of Education*."[6]

The FAC claims that the Service Agreements' "attempted disclosures are not labelled [*sic*] as disclosures and do not disclose or disclaim most of the Dealers' misrepresentations." (¶161). That allegation is both false and irrelevant for RICO purposes. First, it is refuted by the warning "**Important Disclosure**" preceding the Service Agreements' bold face repetition of

---

[3] Documents attached as exhibits to the FAC are cited as "**FAC Ex.__.**" Other documents discussed in the FAC and integral to Plaintiffs' claims are attached to the Declaration of Gila S. Singer ("**Singer Declaration**") and cited as "**Ex. __**." "When a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss." *Cortes v. 21st Century Fox Am.*, 2018 WL 4694181, at *2 n.1 (2d Cir. Oct. 1, 2018); *accord Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006). All of the Singer Declaration exhibits are cited in or integral to the FAC.

[4] Ex. A at 6 § 2, Ex. C at 4 § 3. The only Limited Guarantee given is that the documents provided "will be sufficient to obtain a federal student loan consolidation or acceptance into another DOE-offered program for student loan debt." Ex. A at 6 § 5; Ex. C at 5 § 5. The Plaintiffs also acknowledge that no guarantee of success has been given. Ex. A at 8; Ex. C at 7.

[5] *Id.*

[6] Exs. A & C at 1.

certain disclosures,[7] and by each Plaintiff's signed acknowledgment that "**NO GUARANTEES CONCERNING THE SUCCESS OF ANY LOAN CONSOLIDATION OR CHANGES TO THEIR REPAYMENT PLANS HAVE BEEN PROVIDED TO [Plaintiff] BY [Dealer]**."[8] Second, and more importantly, as long as a disclosure is made, there is no RICO requirement that it be labeled "disclosure." There simply is no fraud.

The FAC alleges that "EAC purposefully drafted the Credit Plan with the intent to deny that it originated any loans, in order to avoid liability arising from the deceptive and usurious nature of the loans" (¶168), and "deliberately disguises the … true cost of the credit it is extending to secure Borrowers' agreement to … usurious terms" including, *e.g.*, "a sky-high annual interest rate of almost 21%" (¶5). These allegations are contradicted by Plaintiffs' Credit Agreements with EAC, which bear the very clear title "**Equitable Acceptance Revolving Credit Plan**" and fully, and accurately, disclose all supposedly hidden terms, including an interest rate of 20.99%. (*See* FAC Exs. B, C at 3-4). Plaintiffs continue to claim that they did not understand that the Equitable Acceptance Revolving Credit Plan represented a "new line of credit from EAC" (¶¶281, 326), which makes no sense since they simultaneously allege that they made payments to EAC for the loan (¶¶306, 343, 345, 348, 350). In all events, the Plaintiffs are college graduates. A revolving credit plan is a loan. If they had any doubt—and their payments prove they did not—they could have Googled "revolving credit." It is not a mysterious term.

The FAC also fails to cure the Complaint's defective allegations of RICO continuity. No new allegations of misleading statements to Williams or Turner expand the pattern to state closed-ended continuity to the 2+ years required in this Circuit. Nor do conclusory allegations of

---

[7] Ex. A at 7 § 10; Ex. C at 4 § 2 (bold font in original)

[8] Ex. A at 8; Ex. C at 7 (bold font and capitalization in original).

supposedly similar schemes with unidentified others, or of acts that are not "inherently unlawful, like murder," state open-ended continuity (*see* Point I(A)(4), I(B), below).

Plaintiffs' RICO claims are fatally flawed.

## STATEMENT OF THE CASE

### The FAC's Allegations

### The Parties' Service and Credit Agreements

The USED offers relief from student debt through loan consolidation, income-driven repayment ("**IDR**") plans, deferment, forbearance, and loan forgiveness after a period of public service or income-based repayment. (¶¶30-31, 40, 42, 47-50).[9] All programs require navigation of agency websites, collation of borrower information, analysis of eligibility, and submission of applications and forms. All income-based repayment plans require multiple submissions over years to certify and recertify eligibility. The webpages cited in the FAC as minimizing the time to apply to the programs estimate the time required only after the critical and time-consuming process of choosing a program and gathering all required documentation. (¶¶32, 43).[10]

Turner paid for two degrees and a post-graduate training program with federal student loans he alleges currently amount to $99,800. (¶¶317, 344, 362). On September 23, 2016, he hired Integra under Ex. A (the "**Turner Service Agreement**") to "assist in assembly of loan

---

[9] Details of federal student debt relief programs discussed in this brief may be found on the USED website, https://studentaid.ed.gov/ (last visited March 11, 2019). The Court may take judicial notice of this information, and EAC requests that the Court do so, as it is fundamental to the allegations in the Complaint. *See Gracia v. City of New York*, 2017 WL 4286319, at *3 n.3 (S.D.N.Y. Sept. 26, 2017) ("A court may take judicial notice of information on an official government website."). Pages downloaded from that site are attached to the Singer Declaration as Exs. I-M.

[10] The FAC admits income-driven repayment plans require annual recertification of income and family size; Public Service Loan Forgiveness requires immediate certification of qualifying employment, recertification with each new employer, and an application for forgiveness only after 120 qualifying payments. (*e.g.*, ¶¶40, 42, 44, 48); and does not dispute that each deferment or forbearance requires a new submission.

consolidation documents or other application documents for student loan debt assistance programs offered by the DOE." (Ex. A at 6). He financed Integra's $1,314 fee with revolving credit from EAC under an Equitable Acceptance Revolving Credit Plan (the "**Turner Credit Agreement**") (FAC Ex. C). That Agreement plainly states that the "unpaid balance" in that amount will (i) incur interest at an annual percentage rate of 20.99%, (ii) be payable in minimum monthly payments to EAC of $39.42 beginning December 5, 2016, and (iii) be paid off in full, if "only minimum payments" are made, in "51 months." (*id.* at 3-4; *see* ¶¶322-23). If Turner had declined financing, the full amount of Integra's fee would have been "due immediately." (Ex. A at 6 § 4; FAC Ex. C at 10).

Williams financed her bachelor's degree with federal student loans currently amounting to $23,000. (¶¶270, 310). In August 2017, she hired SLF under Ex. C (the "**Williams Service Agreement**") to "assist [her with] assembly of loan consolidation documents or other application documents for student loan debt assistance programs offered by the DOE." (*Id.* at 4). She financed SLF's $1,377 fee with credit drawn under FAC Ex. B (the "**Williams Credit Agreement**"), which (i) calls for minimum "monthly payments" of $49 commencing October 25, 2017, on the $1,227 "unpaid balance" remaining after her payment to EAC of a $150 "down payment," (ii) states that "all balances" incur interest at an "annual percentage rate" of 20.99%, and (iii) estimates 34 months for "payoff balance in full" if "only minimum payments" are made. (*Id.* at 3-4). Had Williams not financed SLF's fee, payment to SLF for the entire amount would have been "due immediately." (Ex. C at 10).

SLF and Integra placed Plaintiffs in programs to reduce their monthly student loan payments, which would result in forgiveness of all remaining balances after a set number of payments. SLF consolidated Williams' loans and enrolled her in IDR, lowering her monthly

payment from $122.48 to $0. (¶¶298, 301, Exs. E-F). Integra sought a lower monthly payment under Turner's IDR plan and obtained forbearance for him in October 2016 and again at the end of his 2017 training program. (¶¶339-41).[11]

The Credit Agreements expressly contemplated financing Plaintiffs' "future purchases," such as fees for periodic recertification of status under their IDR plans. (FAC Exs. B & C at 3 § 1; *see* ¶¶301, 339). Contrary to Plaintiffs' allegation that "additional purchases" would require Plaintiffs to "reapply' for credit" (¶186), the Credit Agreements required a new application only for "[a]dditional purchases . . . made in excess of the credit extended . . . under this agreement." (FAC Exs. B & C at 3 § 1). The FAC pleads that "no borrower would have sufficient credit to purchase additional services for a long time" (¶187), but the documents refute this. Williams would have paid at least $738 (her $150 down payment plus 12 monthly minimum payments of $49 each) before her first annual recertification of status was due. (FAC Ex. B at 3-4). Turner would have made at least three years of monthly payments before additional services were needed, since his agreement with Integra "included" "[a]n additional 3 years of re-enrollment . . . at no cost." (Ex. A at 6 § 4).

**SLF's and Integra's Alleged Fraud**

The FAC discards the Complaint's groundless allegation that Williams failed to make a student loan payment because she was led to believe SLF was "taking care of [her] student loan obligations" (Complaint ¶¶69, 144), a claim that was irreconcilable with express disclaimers in

[11] The FAC seeks to minimize the value of the Services to Plaintiffs in allegations that are infirm for various reasons. For example, the allegation that putting Turner in forbearance had the effect of increasing his outstanding loan balance (¶113) conflicts with the admission that Turner sought Public Service Loan Forgiveness, which would have resulted in forgiveness of any such inflated balance. None of these allegations cures the FAC's RICO deficiencies.

Williams Service Agreement.[12] Those disclaimers equally refute the FAC's allegations that the Dealers fraudulently concealed that "monthly payments [to EAC] were not being applied to [Williams or Turner's] student loan balance," explicitly requiring them to continue to make all student loan payments. (¶¶134-35).[13]

Williams and Turner continue to claim they were fraudulently induced to enter the Service Agreements by SLF and Integra, respectively, whose misrepresentations and omissions allegedly included: (i) false promises of "loan forgiveness" (¶¶78-79, 272, 275, 320-22, 324); (ii) false "suggest[ions]" that SLF and Integra were affiliated with the government (¶¶79, 116, 121, 278, 294, 297); (iii) failure to disclose that Plaintiffs could apply for federal programs by themselves for free (¶¶282, 327); (iv) failure to disclose that "payment plans" for the services were new lines of credit provided by EAC (¶¶130-31, 134-35, 281, 326); and (v) failure to disclose the ostensible disadvantages of loan consolidation, forbearance, and IDR (¶112-13, 283-86). The documents belie these claims of fraud, too.

**EAC's Alleged Fraud**

The misrepresentations and omissions specifically attributed to EAC relate to its supposedly "deceptive" loans. (¶¶1, 5). The FAC's allegations that the Credit Agreements are

---

[12] *See* Exs. A at 8, C at 6-7 ("**I HAVE NOT BEEN ADVISED BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES TO FOREGO A STUDENT LOAN PAYMENT OR DEFAULT ON ANY CREDITOR OBLIGATIONS. FAILURE TO MAKE TIMELY CREDITOR PAYMENTS COULD DISQUALIFY THE CLIENT FROM OBTAINING DOE RELIEF AND NEGATIVELY IMPACT CLIENT'S CREDITWORTHINESS**") (bold emphasis and capitalization in original); Ex. C at 12 ("**I …. expressly authorize Company ... to communicate with all parties involved with my Federal Student Loans, <u>to whom I understand and agree I remain primarily obligated</u>**") (all emphasis added). The same disclaimers appear in the Turner Service Agreement.

[13] The FAC attempts to salvage Williams' claim with an allegation that "SLF Center never disclosed to Ms. Williams that a payment on her [student loan] account was missed or that her account became past due … to disguise the true nature of the Purported Services so that Ms. Williams would not understand she had been fraudulently induced to purchase them." (¶298). The point is both incoherent and—absent the withdrawn allegation that SLF undertook (or led Williams to believe it was undertaking) any responsibility for her student loan account—baseless.

omissive or misleading are refuted by the Credit Agreements the Plaintiffs signed. *See, e.g.*, ¶¶290, 332 ("No provision of the Credit Plan sent to [Williams or Turner] purports to extend credit, or states the amount of credit purportedly being extended, or identifies any party purportedly extending credit [or discloses, *inter alia*,] disclosures of the amount financed, the finance charge, the total of payments, the amount and due dates of required payments, the Grace Period, and billing error rights"); FAC Exs. B, C.

The FAC also seeks to characterize the ostensible omissions as flouting TILA, on the theory that EAC has deceived Borrowers by characterizing "highly regulated" "closed-end credit" as "revolving" or "open-end credit." (¶¶178-203). Whether or not Plaintiffs state claims under TILA, violations of TILA are not RICO predicate acts. *See* Point A(2)(a), below. Plaintiffs cannot evade that Congressional judgment and transform technical TILA violations into RICO predicate acts by relabeling them mail or wire fraud.

**Unidentified Dealers and Borrowers**

The FAC pleads that "[o]ver sixty Borrowers have described their negative experiences with Defendants to putative class counsel" (¶10), but it does not add any of them—or any of the 60,000 alleged members of the putative class—as named plaintiffs. Nor does the FAC identify these Borrowers or otherwise cure the Complaint's impermissibly vague allegations that "[m]any hundreds" of unidentified borrowers complained to third parties about EAC and unidentified "Dealers;" that "EAC and various Dealers have been sued multiple times over their practices;" and that "on information and belief, [that] multiple state and federal regulators are investigating Defendants." (*E.g.* Complaint ¶¶8, 36-68, 80-87). The FAC is padded with dozens of equally non-specific and infirm "examples." *See* Point I(A)(4), below. The longer FAC "therefore, appear[s] largely to be an attempt to create the impression of specificity through page-number

'shock and awe.'"[14]

## ARGUMENT

On this 12(b)(6) motion, the FAC must be dismissed if it does not allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The FAC must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and show "more than a sheer possibility that . . . defendant[s] . . . acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where, as here, the FAC does not "nudge[] . . . claims across the line from conceivable to plausible," it "must be dismissed." *Twombly*, 550 U.S. at 570.

Under Rule 9(b), allegations of fraud must be pled "with particularity" and specify "the circumstances constituting fraud." The complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[15] It must also plead "events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.[16] "[Rule] 9(b) governs the pleading requirements for RICO claims for which the predicate illegal act is fraud."[17]

The Complaint does not satisfy these strict standards.

### I. Plaintiffs Do Not State A Viable RICO Claim under § 1962(c) (Claim I)

In Claim I, Plaintiffs allege violations of § 1962(c), which makes it unlawful to conduct,

---

[14] *Miccosukee Tribe of Indians v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015).

[15] *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

[16] *Smulley v. FHFA*, 2018 WL 4849667, at *3 (2d Cir. Oct. 5, 2018) (dismissing RICO claim under Rule 9(b)).

[17] *Purchase Real Estate Grp. Inc. v. Jones*, 2010 WL 3377504, at *8 (S.D.N.Y. Aug. 24, 2010).

or participate in the conduct of, an enterprise through a pattern of racketeering activity. "To establish a civil RICO claim, a plaintiff must allege: (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation."[18] The FAC's § 1962(c) claim fails because Plaintiffs do not plead predicate acts or pattern (continuity). The § 1962(d) claim cannot survive dismissal of the § 1962(c) claim (*see* Point II).

### A. Plaintiffs Do Not Plead Predicate Acts of Mail and Wire Fraud

The FAC abandons the Complaint's flawed allegation that the alleged racketeering activity included violation of CFAA (Complaint ¶274), and relies solely on predicate acts of mail and wire fraud under 8 U.S.C. §§ 1341 and 1343 (¶¶395-99). But it fails to plead mail or wire fraud, or, consequently, any pattern of racketeering activity, dooming both of its RICO claims.

The elements of mail or wire fraud are: "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires."[19] Even though "the mail or wire communications themselves need not contain a false statement," a plaintiff "still needs to allege a material misrepresentation as part of the defendants' scheme to fraud to state a violation of section 1341 or 1343," and "[t]hat is so notwithstanding characterization of the alleged frauds as predicate acts of a racketeering conspiracy."[20]

"[A]ll allegations of fraudulent predicate acts are subject to the heightened pleading requirement of Rule 9(b)."[21] "In civil RICO actions, the concerns that dictate that fraud be

---

18 *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).

19 *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).

20 *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125 (2d Cir. 2018).

21 *Angermeier v. Cohen*, 14 F. Supp. 3d 134, 146 (S.D.N.Y. 2014).

pleaded with particularity exist with even greater urgency."[22] "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."[23]

### 1. Plaintiffs Fail to Plead Fraudulent Misstatements by SLF or Integra

Plaintiffs' allegations of fraudulent inducement are refuted by the documents the FAC incorporates and relies on. "[R]eliance on . . . alleged oral promises, which directly contradict the terms of . . . written agreements [is] unreasonable as a matter of law."[24]

**Loan Forgiveness.** Turner, who is 31 years old and holds a master's degree, claims he "understood that by paying $1,300 in $39 monthly payments, he would have his full $80,000 of loans . . . eliminated." (¶324).[25] Williams, a college graduate, claims an identical belief about her $21,000 of loans based on $49 monthly payments to SLF. (¶275). It is not plausible that Plaintiffs were led to believe a $1,300 fee would purchase guaranteed "forgiveness" of tens of thousands of dollars in student loans, and their allegations are irreconcilable with Plaintiffs' Service Agreements, which include, for example, each Plaintiffs' signed acknowledgments, among others, that (1) "**I HAVE NOT BEEN ADVISED BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES TO FOREGO A STUDENT LOAN PAYMENT**" (Ex. A at 8; Ex. C at 6) and (2) "**NO GUARANTEES CONCERNING THE SUCCESS OF ANY LOAN CONSOLIDATION OR CHANGES TO THEIR REPAYMENT PLANS HAVE BEEN PROVIDED TO CLIENT BY COMPANY, EXCEPT AS CONTAINED HEREIN.**"

---

22 *Hirsch v. City of New York*, 300 F. Supp. 3d 501, 516 (S.D.N.Y. 2018).

23 *Reich v. Lopez*, 858 F.3d 55, 59-60 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 282 (2017).

24 *Morrissey v. Gen. Motors Corp.*, 21 F. App'x 70, 73 (2d Cir. 2001); *see also Colonial Funding Network, Inc. v. Epazz, Inc.*, 252 F. Supp. 3d 274, 284 (S.D.N.Y. 2017).

25 Turner elsewhere pleads that his student loans now amount to $99,800. (¶362).

(Ex. C at 7; Ex. A at 8) (capitalization and bold emphasis in originals).

Plaintiffs' Agreements with Integra and SLF do not mention loan forgiveness. The Agreements identify Integra and SLF as "provid[ing] document preparation services to assist consumers who are applying for Federal Student Loan Consolidation Services." (Ex. A at 6; Ex. C at 4). The Agreements' particularized descriptions of the services to be provided to Plaintiffs notably omit obtaining loan forgiveness, as do the Limited Guarantees they provide.[26] The FAC actually <u>admits</u> that Integra's and SLF's performance can result in forgiveness. SLF reduced Williams' monthly payment from $122.48 to $0, and any balance remaining after 240 payments, including any "extra" interest, will be forgiven. (¶45). Turner also has IDR and "intends to seek" forbearance "as soon as he is eligible" (¶341), which will occur after 120 timely payments on that plan. (¶¶47-48, Ex. M).

**Government Affiliation.** It is not plausible that Turner "believed that Integra was affiliated with the government" (¶321) or that Williams believed her payment to SLF was "a federal transaction." (¶¶116, 294, 297). Each Service Agreement—which the Plaintiffs signed—states in three different places: "**Company is a private company, not affiliated with any government agency**." (Ex. A at 6; Ex. C at 4 (bold in original); *see also* Exs. A & C at 1, 2).

[26] Instead, they require Integra and SLF to perform standard document preparation, including "review the information provided by the Client, and complete the application forms required for the DOE program(s) that have been selected by the Client . . . prepare for filing an application to initiate a Federal Student Loan Consolidation through the DOE on behalf of Client, or alternatively and at the Client's option, identify and apply for other DOE-sponsored programs suitable for Client . . . [deliver a]ll completed applications . . . by . . . direct submission to DOE . . . monitor application progress and provide reasonable updates . . . ." Ex. A at 6 § 2, Ex. C at 4 § 3.

**Free Services Disclosed.** Plaintiffs' allegation that Integra and SLF concealed the availability of government services "for free from . . . Servicers and USED" (¶¶282, 327), is irreconcilable with the Service Agreements' "**Important Disclosure**" that:

> **You may, of course, try to complete your applications and consolidate your loans yourself without paying anyone a fee—the results could be the very same or they might vary.**[27]

As previously noted, the same disclosure appears on first page of each Service Agreement.

**New Line of Credit.** It is not plausible that these college-educated Plaintiffs signed a document labeled "**Equitable Acceptance Revolving Credit Plan**"—and began to repay amounts they received thereunder—without understanding they were obtaining "a new line of credit from EAC." (¶¶281, 326). Directly under EAC's name and logo on the first page of each Credit Agreement is the title "**Credit Request Authorization**." (FAC Exs. B & C at 1). Each Plaintiff signed an authorization for EAC's credit check and an acknowledgment they were agreeing to a "Revolving Credit Plan."[28] Integra gave Turner written notice that "payment of our $1314 fee is executed by a Third Party (Equitable Acceptance Corporation) . . . <u>using a Credit Plan</u> that you have agreed with them to set up." (Ex. A at 6 § 4). Williams had written notice that "the payment of $1377.00 for [SLF]'s services relating to the student loan assistance application" will be through the "financing option" of a "<u>Third Party Credit Plan</u>." (Ex. C at 10).

---

27 Ex. A at 1, 7 § 10; Ex. C at 1, 4 § 2 (bold in original).

28 *See* FAC Exs. B, C at 2 ("By signing below, I . . . agree to authorize you to <u>obtain credit report</u> and any other information about my . . . <u>creditworthiness from credit bureaus</u> and other sources . . . . I authorize you to give information concerning <u>your credit experience</u> with me (us) to others <u>including credit bureaus</u> . . . . I authorize you to furnish information about my account to <u>credit reporting agencies</u> and anyone else who may lawfully receive such information. By signing below, <u>I am executing my Revolving Credit Plan with you (the 'Credit Plan') as well as signing my Credit Application</u>. . . . I understand that you will rely on the information stated in my Credit Application in <u>granting me credit under the Credit Plan</u> . . . .").

Plaintiffs could not have failed to understand a new line of credit "would be drawn in full immediately to pay [Integra and SLF and] . . . interest would accrue on the $1,300." (¶¶281, 326). Each acknowledged, in writing, that the "Revolving Credit Plan governs all purchases of authorized products or merchandise made by me from Seller. These purchases will be debited against the line of credit that . . . Equitable Acceptance Corporation . . . may establish hereunder." (FAC Exs. B, C at 3 § 1). Plaintiffs knew that if they did not execute the Credit Agreements, they had to pay the full price of SLF's and Integra's services. (Ex. A at 6 § 4; Ex. C at 10).

**Increased Interest.** Williams complains that "[a]t no point did . . . SLF Center tell [her] that consolidation would increase the overall interest charged on her loans" or have other disadvantages. (¶¶283-85). There is no allegation that consolidation increased her interest rate or time for repayment. Even if it had, the Complaint admits any remaining balance is forgiven after 20 years under her IDR plan. (¶45).

The FAC makes the new allegation that even when "Dealers include language in the document packets … they send to Borrowers that purports to disclose features of the transaction, such as that the Dealers are not affiliated with the Department of Education," these disclosures are ineffective because they "are not labelled [*sic*] as disclosures and do not disclose or disclaim most of the Dealers' misrepresentations, including the core falsity that the Borrowers will obtain loan forgiveness through buying the Purported Services." (¶161). In fact, as shown above, the Service Agreements do label certain disclosures, and directly vitiate the claim that Services will lead inevitably to loan forgiveness. More to the point, there is no requirement that terms of written agreements that contradict oral promises be labeled as such to be effective. If the disclosure is made, there is no fraud.

The FAC alleges that Dealers pressure borrowers to move quickly, present documents only after Borrowers have been persuaded by oral misrepresentations, or take similar measures "designed to ensure that the Borrower will not read or understand any of the documents sent to them by the Dealer or EAC." (¶¶154-160). The Service Agreements, however, provide that a Borrower effectively has a 31-day period to read and consider the executed documents, since a Borrower has that amount of time, beginning "when [he or she] sign[s] th[e] agreement" to submit proof of income. "If 31 Days pass and we have NOT received your proof of income, then we will cancel your file to the Department of Education Servicer and cancel this agreement." (Ex. A at 6 § 3; Ex. C at 4 § 4). In addition, EAC's Credit Agreement provides a "BUYERS RIGHT TO CANCEL: YOU MAY CANCEL THE PURCHASE MADE UNDER THIS AGREEMENT WITHOUT PENALTY OR OBLIGATION WITHIN 3 DAYS . . . AFTER THE DATE OF THIS ORDER IF IT HAS BEEN SIGNED BY YOU AT A PLACE OTHER THAN THE ADDRESS OF THE SELLER." (FAC Exs. B, C at 4).

**2. <u>The Credit Agreements Were Not Deceptive</u>**

**a. <u>Plaintiffs Improperly Seek to Criminalize TILA</u>**

"Fraud-based RICO claims are subject to heightened scrutiny because virtually every ordinary fraud is carried out in some form by means of mail or wire communication, and such claims thus have the potential to transform garden-variety common law actions into federal cases."[29] The fraud predicate acts attributed to EAC simply reprise claims that Credit Agreement disclosures are inadequate under TILA. While this is not true, it is also not relevant. A failure to

[29] *Peralta v. Peralta*, 2018 WL 1384509, at *8 (S.D.N.Y. Mar. 16, 2018), *appeal dismissed*, No. 18-1137 (2d Cir. May 24, 2018).

comply with TILA is not a crime, and it is not a RICO predicate act.[30]

**b. The Credit Agreements Did Not Offer "Spurious Open-Ended Credit"**

Plaintiffs allege that the Credit Agreements are "deceptive" in 'label[ing]" the credit offered as "open-end credit" when it "is in reality closed-end credit." (¶¶177, 181). That is a distinction drawn in TILA and is therefore irrelevant. It is also untrue. The Credit Agreements satisfy all of TILA's criteria for "open end credit plans"—they are plans (1) "under which the creditor reasonably contemplates repeated transactions;" (2) "which prescribe[] the terms of such transactions;" and (3) "which provides[] for a finance charge which may be computed from time to time on the outstanding unpaid balance." *See* § 1602(j).[31] By name, and in substance, the Credit Agreements are "Revolving Credit Plan[s]." They provide that a Borrower's "future purchases" will be "debited against the line of credit that [EAC] may establish hereunder" and impose a "finance charge" on the "Average Daily Balance." (FAC Exs. B & C at 3 §§ 1, 5). None of this, however, is relevant to RICO.

*Second*, Plaintiffs' further allegation that, under TILA, the Credit Agreements are "spurious open-end credit" plans (¶189) is meritless. In both form and substance, the credit plan was open-ended. Plaintiffs allege that Borrowers are "permit[ted] . . . to make additional purchases only" if they "'reapply' for credit" (¶186). That is false. The Credit Agreements permit a borrower to "make [] future purchases under this agreement . . . up to the amount of [credit] extended under this agreement." (FAC Exs. B & C at 3 § 1). The Credit Agreements

---

30 *See* 18 U.S.C. § 1961(1); *Zander v. ACE Mortg. Funding LLC*, 2012 WL 601896 (C.D. Cal. Feb. 23, 2012); *In re Patchell*, 336 B.R. 1, 12-13 (Bankr. D. Mass. 2005) ("Violations of TILA are not, in and of themselves, predicate acts."); *Pedersen v. Greenpoint Mortg. Funding, Inc.*, 900 F. Supp. 2d 1071, 1082-83 (E.D. Cal. 2012) ("[T]o the extent plaintiffs rely generally on predatory lending and the creation of false documents, they have not pleaded a RICO violation.").

31 "Closed-end credit" is not a defined term in TILA, and is unmentioned in §§ 1637-38.

require a new application only for "[a]dditional purchases . . . made in excess of the credit extended [] under this agreement" (*id.*). Again, this is irrelevant to RICO.

*Third,* Plaintiffs claim that "no reasonable Borrower would repeatedly purchase the Purported Services, because the 'loan forgiveness' the Dealers promise, if obtained, would end the Borrower's student loan obligations." (¶188). But the Complaint acknowledges that "[f]orgiveness" would not occur for at least ten years (¶48), and borrowers would, in the meantime, need to "recertify each year" in order to "remain enrolled in Income Driven Repayment." (¶44). Resubmission by the Dealers would reasonably be expected to entail additional fees. Moreover, the views of a "reasonable borrower" are irrelevant. Designation of a credit plan as one that is "open end" depends on whether "the creditor reasonably contemplates repeated transactions." § 1602(j). "The fact that a particular consumer does not return for further credit extensions does not prevent a plan from having been properly characterized as open-end."[32] Even less relevant are Plaintiffs' wholly unsubstantiated and untestable allegations that "[n]one of the [unidentified] Borrowers who have contacted undersigned counsel have made repeated purchases under the Credit Plan" (¶184), and, "[o]n information and belief, no Borrower has ever made repeated purchases under the Credit Plan." (¶185). Again, this dispute is purely TILA-related and has no cogency under RICO.

*Fourth,* Plaintiffs allege that "no Borrower would have sufficient credit to purchase additional services for a long time" because "monthly payments are minimal compared to the total balance." (¶187). This tacitly admits the Credit Agreements afford credit for future

[32] *Benion v. Bank One, Dayton, N.A.*, 144 F.3d 1056, 1058 (7th Cir. 1998) (to be open-end, "the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business"); *see also In re Hanes*, 2013 WL 1934942, at *1-2 (Bankr. D. Or. May 8, 2013) (credit was "properly characterized as open-end" even though debtor "actually utilized the account only for one advance;" dispositive factors were that "loan documents . . . contemplate[d] repeat transactions" and credit was "generally available to the extent outstanding balances are repaid").

purchases once the balance has shrunk. Even if Plaintiffs' allegation were true, nothing in TILA suggests that a "long" period of time between purchases has any bearing on whether a credit plan is "open end." But it is false. Recertification was not required for at least a year after the initial extension of credit (Ex. K), and the FAC reveals that a year of minimum payments would make a substantial amount of credit available for future services.[33]

### c. The Credit Agreements Did Not Unlawfully Omit Information

Plaintiffs claim the Credit Agreements "omits numerous pieces of information that are mandated by law." (¶191; *see also* ¶¶192-98). But that law is TILA. Even if Plaintiffs stated an actionable TILA claim, failure to comply with TILA is not a predicate act.[34] Plaintiffs must allege mail or wire fraud—that is, actual deception—to state a RICO claim, not failure to comply with a statute that is not among the dozens listed in 18 U.S.C. § 1961(1). The Credit Agreements and the billing statements that Plaintiffs received defeat their allegations of deception. Each Plaintiff knew s/he was taking out a loan and all material aspects of that loan, including the amount of the debt, the interest rate, and the repayment terms.

More specifically, their allegations of deception are belied by the clear terms of the Credit Agreements and billing statements Plaintiffs received:

- The Credit Agreements state the "actual amount financed" as "sales price minus any down

---

33 It would have taken Williams only one year of $49 monthly minimum payments, after her $150 initial payment, to clear $738 of her $1,300 credit line. (¶¶274, 296). Turner's Service Agreement provided for "[a]n additional 3 years of re-enrollment" to be "included at no cost to [him]." (Ex. A at 6 §4). His $39 monthly minimum payments would have amounted, in three years, to $1,404 (¶¶322-23), which would have been available for his use. Even Turner's irregular payments cleared at least $475 of the $1,300. (¶¶343, 345, 348, 350, 356).

34 *See* authorities in note 30, *supra*.

payment." (¶192).[35]

- The "dollar amount of the finance charge" (¶193) and "'Monthly Minimum Payment' as a dollar amount" (¶196) are stated on the first page of Plaintiffs' monthly bills.[36]
- It would have been impossible to show the "dollar amount of the total payments the Borrower will have to make . . . calculated as the sum of the amount financed and the amount of the finance charge" (¶194) because that amount is contingent on such future events as the amount and rate of payments, and use of the re-earned credit (following repayments) for additional purchases.
- The Credit Agreements describe the grace period. (¶195). Under the heading "Period for Which Finance Charges are Assessed," each Credit Agreement discloses:

  > In . . . NY . . . new purchases will not be added to my beginning balance until the first day of the next billing period and finance charges will not be imposed on those purchases until such date . . . . [I]f I pay the full amount of the New Balance shown on my billing statement within 15 days after the Closing Date shown on the statement, you will not charge me any finance charges . . . between the Closing Date and the date I make my payment.[37]

- The monthly billing statements also disclose the grace period. (¶198). Each monthly billing statement contained same the disclosure found in the Credit Agreements quoted above. (Exs. G & H at 2).
- The Credit Agreements provide that the "the due date of any payment" (¶196) is "within 15 days after each statement closing date." The due date also is also stated as a calendar

---

[35] *See* FAC Ex. B at 4 (showing Williams' Unpaid Balance of $1,227 after reduction of $1,377 Total Sale Price by $150 Down Payment); FAC Ex. C at 4 (showing Total Sale Price and Unpaid Balance of $1,314); *see also* Ex. C at 10; Ex. A at 6 § 4.

[36] Exs. G & H at 1 ("Minimum Payment Due").

[37] FAC Exs. B & C at 3 § 5.

date on monthly statements. (*See* FAC Exs. B & C at 3; Exs. G & H at 2).

#### d. <u>The Credit Agreements Do Not Obscure the Identity of the Lender</u>

The FAC introduces a new claim that the Credit Agreements somehow obscure EAC's identity as the lender or that it is extending a loan:

> On information and belief, EAC purposefully drafted the Credit Plan with the intent to deny that it originated any loans, in order to avoid liability arising from the deceptive and usurious nature of the loans.
>
> As a result, the Credit Plan is so ambiguous about the identity of any purported extender of credit and the establishment of a loan that it does not create any enforceable obligation at all.

(¶¶168-69). Thus, the FAC pleads, "[n]o provision of the Credit Plan purports to extend credit, or states the amount of credit purportedly being extended" or "identifies any party purportedly extending credit." (¶¶170-71). The allegations are spurious. Leaving aside such previously cited indicia of credit extended by EAC as the prominent title "Equitable Acceptance Revolving Credit Plan" (FAC Exs. B, C at 2), the first paragraph of the Credit Agreement states (for the customer's signature): "I may make future purchases under the terms of this agreement … <u>to the amount of credit extended under this agreement.</u> These purchases will be debited against the <u>line of credit that you (meaning only Equitable Acceptance Corporation</u> or [your assignee] may establish hereunder…." (FAC Exs. B, C at 3 § 1).

### 3. <u>Alleged Dealer Misstatements Cannot Be Attributed to EAC</u>

Like the Complaint, the FAC is devoid of any allegation that EAC itself made false or omissive statements resembling those attributed to Integra and SLF. The FAC tries to fill this gap with new allegations that "EAC is aware of and participates in the Dealers' misrepresentations, which are necessary to persuade Borrowers to purchase the Purported Services and to steer Borrowers to EAC to obtain the Deceptive Loans" (¶69), and "EAC knows about, and actively participates in, the misrepresentations and material omissions used by the

Dealers in the sales and marketing process." (¶206). The claim rests solely on the following bare, conclusory allegations: "On information and belief, in December 2016, EAC convened an in-person meeting with multiple Dealers. On information and belief, EAC has provided and continues to provide training to Dealers via phone calls and online video conference programs regarding the Dealers' marketing practices." (*Id.*). These allegations are not sustainable in the Second Circuit,[38] and other allegations about statements to unidentified "Borrowers" are plainly insufficient under Rule 9(b). (*See* ¶¶209, 227).

#### 4. **Statements by Unidentified "Dealers" to Unidentified "Borrowers" Do Not Sustain Plaintiffs' RICO Claims**

The FAC is rife with conclusory allegations about representations by unidentified "Dealers" to unidentified "Borrowers" that echo and amplify, but do not substantiate allegations that Integra and SLF: (i) made false promises of "loan forgiveness" (¶¶78-79; *see, e.g.*, ¶¶4, 66, 72-74, 76-77); (ii) falsely suggest they are affiliated with USED (¶¶116, 121; *see, e.g.*, ¶¶66, 115, 118, 120); and (iii) conceal that services are available for free (¶¶89, 94; *see, e.g.*, ¶¶92-93).

Nor does the FAC salvage the Complaint's non-specific allegations that unidentified "Dealers" defrauded unidentified "Borrowers" using "similar" tactics (*e.g.*, Complaint ¶¶39-47); that EAC supposedly made unspecified statements to unidentified "Borrowers" at unidentified times and places (*e.g.*, Complaint ¶114); that "[m]any hundreds of Borrowers have complained to the BBB and the CFPB about strikingly similar conduct by EAC and its affiliated Dealers" (*e.g.*, Complaint ¶¶51-57); and information-and-belief allegations that there exist lawsuits involving "conduct similar to that described in this Complaint" (*e.g.*, Complaint ¶¶8, 81-87).

---

[38] *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) ("Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.").

Instead, the FAC adds multiple, equally non-specific "examples."[39] The tactic is particularly inexcusable in light of the FAC's allegations that, of the supposed 60,000 Borrowers in the proposed class (¶1), "[o]ver sixty" "have described their negative experiences with Defendants to putative class counsel." (¶10).

Claims that "similar[]" frauds occur "regularly" are "speculative" without specific "allegations of fact."[40] Plaintiffs' allegations glaringly lack the requisite "who, what, when, where, and why of the fraud at issue" required by Rule 9(b).[41] These "conclusory allegation[s] on information and belief . . . [are] insufficient to make [a] claim plausible" where "the complaint's *factual allegations* . . . [do not] raise a right to relief above the speculative level."[42]

### B. <u>Plaintiffs' Purported Pattern of Racketeering Lacks Continuity</u>

Plaintiffs do not plead a pattern of racketeering. They must factually allege continuity—that Defendants' acts "amount to or pose a threat of continued criminal activity."[43] The Complaint does not plead either closed-ended continuity—a pattern of "related predicate acts extending over a substantial period of time" in the past—or open-ended continuity, "racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).

---

39 *See* ¶¶9-10, 61-64, 80, 82-83, 90, 95, 99, 103, 114, 117, 136, 142-49, 159, 219, 232, 236, 244, 267-68.

40 *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 226 (2d Cir. 2017); *see also In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) ("It is clear that the pleading of fraud through completely unattributed statements and representations is insufficient to meet the dictates of Rule 9(b) . . . .").

41 *Affinion*, 889 F.3d at 125; *see also Pyskaty*, 856 F.3d at 226.

42 *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis in original); *Wexner*, 902 F.2d at 172.

43 *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).

**Closed-End Continuity.** The Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years."[44] Even if the allegedly misleading communications with Turner and Williams constituted predicate acts (they do not), the Complaint alleges a pattern spanning at most 19 months. The earliest communication with Williams is an August 17, 2017, phone call from SLF (¶271), and the latest is a bill from EAC in Feb. 2018 (¶305), 6 months later. The earliest involving Turner is a September 2016 phone call with Integra (¶320), and the latest is a "Final Demand Letter" from EAC in September 2017 (¶353), 12 months later. Even if the communications regarding Turner's cancellation of his Credit Agreement (which are hardly fraudulent) are tacked on, the last is April 2018 (¶360), resulting in a span encompassing all allegations about both Plaintiffs of at most 19 months (September 2016 to April 2018).[45] This does not state closed-end continuity.

Plaintiffs' conclusory allegation of a RICO pattern consisting of "thousands of uses of the mails and wires as part of the Scheme, spanning a period of no fewer than three years" (¶398) is inadequate. "[A] conclusory allegation . . . without any specifics, fails to meet the particularity requirements of Rule 9(b), and simply is insufficient" to establish "a pattern of using the mail and wires to commit fraudulent acts."[46] The allegations of anonymous complaints are equally infirm. "[C]onclusory allegations that defendants also defrauded unidentified 'others' are not enough to plead the requisite pattern of fraud."[47]

---

[44] *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) (quoted with approval in *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 98 (2d Cir. 2008)).

[45] These cancellation-related communications are irrelevant to a determination of continuity. "[M]ailings are insufficient *to establish the continuity factor* unless they contain misrepresentations themselves." *Dahlgren v. First Nat'l Bank*, 533 F.3d 681, 689 (8th Cir. 2008). Therefore, the relevant period ends in February 2018 and is only 17 months long (September 2016 to February 2018).

[46] *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 301 (S.D.N.Y. 2011).

[47] *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998).

**Open-Ended Continuity.** Plaintiffs' allegations of fraud on unidentified "Borrowers" and anonymous consumers do not state open-ended continuity. A "sweeping allegation that defendants employed the same scheme in connection with [others] is insufficient to show open-ended continuity" without "factual allegations indicating that defendants engaged in fraud . . . in a manner and by means similar to those alleged" by Plaintiffs.[48] Nor does the Complaint plead "racketeering acts" that (i) "themselves include a specific threat of repetition extending indefinitely into the future, such as demands for monthly 'protection' money," or (ii) "can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes, such as an organized crime 'family.'" *Id.* at 571. "Mere mailings of monthly statements seeking payment with respect to a single established debt . . . do not, without more, amount to or suggest a threat of continued criminal activity . . . ."[49] Importantly,

> inherently unlawful acts, such as murder, committed in pursuit of inherently unlawful goals, such as narcotics trafficking, are generally found to generate the requisite threat of continuity even if the time period is short, while racketeering activities furthering endeavors that are not inherently unlawful, such as frauds in the sale of property, are generally found wanting despite even longer periods of time.[50]

## II. PLAINTIFFS DO NOT PLEAD A VIABLE RICO CONSPIRACY CLAIM (CLAIM II)

Because Plaintiffs fail to state a claim for violation of § 1962(c), their § 1962(d) claim for conspiracy necessarily fails. *Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008) ("Because the plaintiff has failed to allege a substantive violation of RICO, the complaint's . . . claim of RICO conspiracy also fails."). *Accord, e.g.*, *First Capital*, 385 F.3d at 182.

---

[48] *Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 572 (W.D.N.Y. 2011).

[49] *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 488 (2d Cir. 2014).

[50] *Grimes*, 785 F. Supp. 2d at 300. *See also Reich*, 858 F.3d at 59-60 (defendant's business was not "primarily unlawful . . . [e]ven if [it] pays bribes," as "it is primarily in the energy business; it is not a narcotics ring or an organized crime family").

## CONCLUSION

"If a literate, competent adult is given a document that in readable and comprehensible prose says *X* . . . and the person who hands it to him tells him, orally, not-*X* . . . , our literate, competent adult cannot maintain an action for fraud against the issuer of the document." *Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996). These college-educated Plaintiffs were explicitly informed in writing that SLF and Integra were document-preparation firms, that they were not affiliated with USED, and that the Plaintiffs could make the applications to USED themselves for free. (Ex. A at 1, 6, 7 § 10; Ex. C at 1, 4 § 2). Their claims should be dismissed with prejudice.

Dated: March 11, 2019

Respectfully submitted,

JOSEPH HAGE AARONSON LLC

By: *\/s/ Gregory P. Joseph*
Gregory P. Joseph (gjoseph@jha.com)
Sandra M. Lipsman (slipsman@jha.com)
Gila S. Singer (gsinger@jha.com)
485 Lexington Ave, 30th Floor
New York, NY 10017
Phone: (212) 407-1200
Fax: (212) 407-1280

*Counsel for Defendant Equitable Acceptance Corporation*