**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

VANESSA WILLIAMS and KORY TURNER, individually and on behalf of all persons similarly situated,

Plaintiffs,

vs.

EQUITABLE ACCEPTANCE CORPORATION, SLF CENTER, LLC, INTEGRA STUDENT SOLUTIONS, LLC, and DOES 1-41,

Defendants.

---------------------------------------------------------------x

18 Civ. 07537 (NRB)

**Oral Argument Requested**

# MEMORANDUM IN OPPOSITION TO EQUITABLE ACCEPTANCE CORPORATION'S MOTION TO DISMISS THE RICO CLAIMS IN THE AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 2

- A. Defendants' Scheme To Defraud Student Borrowers ..... 2
- B. The Dealers' Fraudulent Pitch To Student Loan Borrowers ..... 3
  - 1. The Dealers Falsely Promise "Loan Forgiveness" ..... 3
  - 2. The Dealers Falsely Represent Their Worthless Services As Valuable, Conceal Harms, And Misrepresent Affiliation With Government ..... 5
  - 3. The Dealers Use High-Pressure Sales Tactics ..... 7
- C. EAC's Deceptive Loans ..... 8
- D. The Dealers' And EAC's Interdependent Scheme ..... 11
- E. This Action ..... 13

ARGUMENT ..... 13

I. PLAINTIFFS PROPERLY PLEAD A § 1962(C) CLAIM ..... 14

- A. The Purported Disclosures Cited By EAC Do Not Support Dismissal ..... 14
- B. Plaintiffs Allege Each Element Of The RICO Claims With Particularity ..... 16
- C. EAC's Credit Plans Are Materially Misleading to Borrowers ..... 19
- D. Plaintiffs Properly Allege Continuity ..... 23

II. PLAINTIFFS PLEAD A VIABLE CONSPIRACY CLAIM ..... 25

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**PAGE(S)**

## CASES


*Angermeir v. Cohen*,
14 F. Supp. 3d 134 (S.D.N.Y. 2014) .......... 18

*Azrielli v. Cohen Law Offices*,
21 F.3d 512 (2d Cir. 1994) .......... 24

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008).......... 14, 15

*Cohen v. S.A.C. Trading Corp.*,
711 F.3d 353 (2d Cir. 2013) .......... 13

*Columbus McKinnon Corp. v. HealthNow New York, Inc.*,
No. 03-CV-831S, 2006 WL 2827675 .......... 24

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
822 F.2d 1242 (2d Cir. 1987) .......... 18

*Glidepath Holding B.V. v. Spherion Corp.*,
590 F. Supp. 2d 435 (S.D.N.Y. 2007) .......... 15

*In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*,
795 F.3d 380 (3d Cir. 2015) .......... 19

*In re Sumitomo Copper Litig*.,
995 F. Supp. 451 (S.D.N.Y. 1998) .......... 17, 23

*Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*,
No. 13-CV-4650, 2015 WL 769573 .......... 15

*Morrissey v. Gen. Motors Corp.*,
21 F. App'x 70 (2d Cir. 2001) .......... 14

*Neder v. United States*,
527 U.S. 1 (1999).......... 14

*Related Companies, L.P. v. Ruthling*,
No. 17-CV-4175, 2017 WL 6507759 .......... 14

*SKS Constructors, Inc. v. Drinkwine*,
458 F. Supp. 2d 68 (E.D.N.Y. 2006) .......... 24

*United States v. Arif*,
897 F.3d 1(1st Cir. 2018).......... 15

*United States v. Ghilarducci*,
480 F.3d 542 (7th Cir. 2007) .......... 15

*United States v. Weaver*,
860 F.3d 90 (2d Cir. 2017) .......... 14

**STATUTES**

18 U.S.C. § 1961(1) .......... 16

18 U.S.C. § 1961(3) .......... 16

18 U.S.C. § 1961(5) .......... 16

18 U.S.C. § 1962(b) .......... 16

18 U.S.C. § 1962(c) .......... 1, 17

18 U.S.C. § 1962(d) .......... 1

**REGULATIONS**

OFFICIAL STAFF INTERPRETATION OF 12 C.F.R. § 226.2(A)(20), codified at 12 C.F.R. Part 226, Suppl. I, Subpt. A .......... 21

Plaintiffs respectfully submit this brief in opposition to EAC's[1] motion to dismiss Plaintiffs' claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d), Counts I and II in the Amended Complaint. *See* Mem. of Law in Support of EAC's Mot. to Dismiss RICO Claims ("Br."), Dkt. 38.

**PRELIMINARY STATEMENT**

Plaintiffs' Amended Complaint presents extensive and specific factual allegations exposing Defendants' ongoing scheme of providing scam student loan services to tens of thousands of federal student loan borrowers. It describes with specificity the how, what, where, and when of Defendants' fraud on the named Plaintiffs, and also presents detailed accounts from twenty other identified borrowers whom Defendants victimized in like manner. These allegations, which amply detail the fraudulent operations, massive scope, and ongoing nature of Defendants' scheme, more than suffice to plead RICO liability.

EAC's motion to dismiss only underscores the strength of Plaintiffs' allegations. EAC's primary argument is that it included disclosures in contracts Plaintiffs purportedly signed, and these disclosures supposedly negate Plaintiffs' reasonable reliance on the many misrepresentations by EAC and its partners. But reasonable reliance, as Supreme Court and Second Circuit precedent holds, is not an element that Plaintiffs need prove (nor plead). EAC next contends that the Amended Complaint fails to include sufficiently particularized allegations of RICO violations. This argument ignores the expansive allegations included in the Amended Complaint, which more than satisfy the necessary pleading elements. EAC also devotes pages to the strawman argument that Plaintiffs seek to "criminalize TILA," even though Plaintiffs do not allege TILA as a basis for RICO. Defendants' failure to disclose information that TILA requires,

---

[1] Except as noted, defined terms have the same meaning as in Plaintiffs' Amended Complaint ("Am. Cmplt.").

however, is one way (among many) in which they materially misled borrowers. EAC's remaining attack on the RICO claims asserts that Plaintiffs do not adequately allege the element of continuity. This, too, is incorrect: Plaintiffs' allegations show that EAC's business model is fraud; that EAC has been regularly defrauding borrowers for more than three years; and that EAC will continue this course of fraud absent court intervention. Finally, EAC contends that if the RICO claim is defective the RICO conspiracy claim should also be dismissed. Having failed to show such defect, however, the conspiracy claim too should proceed. EAC's motion should be denied.

## STATEMENT OF FACTS

### A. Defendants' Scheme To Defraud Student Borrowers

Defendants EAC, SLF Center, Integra, and their business partners are engaged in an ongoing scheme to defraud tens of thousands of federal student loan borrowers ("Borrowers") by selling fraudulent student loan assistance services ("Purported Services" or "Services") and extending usurious and deceptive loans to finance those Services. Defendants' Scheme targets those for whom student debt is most crushing, then diverts those Borrowers' limited resources into Defendants' own pockets.

Defendant EAC masterminds the Scheme by contracting with SLF Center, Integra, and the other Dealers to sell the Purported Services to Borrowers at wildly inflated prices. The Services are worthless: Borrowers could sign up for them in minutes, for free, on their own or with help from their federal loan Servicer. Dealers thus have to lure customers with false promises—in particular, that they can secure "loan forgiveness" for Borrowers. Once the Dealers have procured Borrowers' purchases based on this and other misrepresentations, the Dealers refer Borrowers to EAC for financing. This financing comes in the form of an entirely

new loan, deceptively structured as a maxed-out line of credit at an unreasonable interest rate—over 20%.

The Amended Complaint relates with specificity how and when Named Plaintiffs Vanessa Williams and Kory Turner were defrauded by EAC and its partners. Am. Compl. ¶ 10. The Amended Complaint also alleges detailed facts about twenty other Borrowers, identified by first name and last initial, whom Defendants victimized. *See id.* ¶¶ 80, 87, 90, 200, 202. Since this action was filed, Plaintiffs' counsel have spoken to over one hundred and thirty Borrowers, each reporting the same experience: Defendants promised loan forgiveness; Defendants never told them the Dealers' Services were available for free; Defendants misrepresented the terms of their Loans; and if Defendants had accurately described the Purported Services and Deceptive Loans, the Borrowers never would have accepted them.

Hundreds of other Borrowers have complained of this same conduct to the Consumer Financial Protection Bureau and the Better Business Bureau. *Id.* ¶¶ 10, 61-63. The New York Attorney General recently sued EAC and certain Dealers for precisely the Scheme identified in the Amended Complaint,[2] and EAC recently stated during a conference in that proceeding that it is also being investigated by the federal government.[3]

**B. The Dealers' Fraudulent Pitch To Student Loan Borrowers**

**1. The Dealers Falsely Promise "Loan Forgiveness"**

The Dealers seek out Borrowers burdened with student loan debt using cold calls, direct mail solicitation, and online advertising, then pitch them on the Purported Services by making a series of misrepresentations. Am. Cmplt. ¶¶ 65-66. Prominent among these misrepresentations

[2] *People of the State of New York v. Debt Resolve Inc.*, 18-CV-9812 (S.D.N.Y. 2018).

[3] Initial Pre-trial Conference, *People of the State of New York v. Debt Resolve Inc.* (March 8, 2019).

is that the Purported Services will provide "loan forgiveness"—that is, that the Services will eliminate Borrowers' total loan balance. *Id.* ¶ 72.

But the Dealers do not, and cannot, provide loan forgiveness. *Id.* ¶ 74. Instead, the Dealers enroll Borrowers in loan repayment programs offered by the federal government for free. *Id.* ¶ 75. Most often, the Dealers enroll Borrowers in Income Driven Repayment, a free federal government program that allows student loan borrowers to make affordable monthly payments tied to their income. *Id.* ¶¶ 40, 75-77. Dealers also perform loan consolidation, a free transaction that replaces multiple student loans with a single loan. *Id.* ¶¶ 30, 75. Neither process grants loan forgiveness—in fact, Borrowers must make payments for twenty years or more (ten years for certain government or nonprofit employees) to even be eligible for loan forgiveness. *Id.* ¶¶ 45, 75-77.

The false promise of loan forgiveness was central to the recruitment of Ms. Williams and Mr. Turner, and other Borrowers described in the Amended Complaint. In August 2017, a supposed "enrollment counselor" at SLF Center made an unsolicited phone call to Ms. Williams, a college graduate with $21,000 in loans. *Id.* ¶¶ 270-71. The representative told Ms. Williams that SLF Center would obtain loan forgiveness for her and that she would "never need to worry about this overwhelming issue again." *Id.* ¶¶ 78, 271-72, 277. In September 2016, Integra told Mr. Turner, who took out $80,000 in loans to obtain his bachelor's and master's degrees, that Integra would obtain loan forgiveness for him, later describing its Services as a "Federal Forgiveness Program" and a "Loan Forgiveness program." *Id.* ¶¶ 79, 317, 321-22, 358. SLF Center and Integra both openly promote loan "forgiveness" on their websites. *Id.* ¶¶ 73, 76. Other Dealers make the same pitch, several instances of which are described with particularity in the Amended Complaint: for example, Dealer Student Loan Care's November 2016 direct mail

solicitation offered Kevin S. "Forgiveness of Debt" and that same Dealer told Deidra B. by phone in August 2017 that "[o]nce you're processed and get approved to the forgiveness program, then the Department of Education pays off the full loan, so it it's like a clean slate for you." *Id.* ¶¶ 80 (pleading time, speaker, and manner of fraudulent misrepresentation for Kevin S. and six other Borrowers), 147 (Deidra B.).

### 2. The Dealers Falsely Represent Their Worthless Services As Valuable, Conceal Harms, And Misrepresent Affiliation With Government

Enrolling in Income Driven Repayment or consolidating one's loans is not just free, it is easy. According to the Department of Education, it takes most people "10 minutes or less" to apply for Income Driven Repayment, and "less than 30 minutes" to consolidate. *Id.* ¶¶ 32, 43. The four-page Income Driven Repayment application form and five-page Consolidation application form are attached to the Amended Complaint as Exhibits D and E. Applying does not require expertise; for example, an Income Driven Repayment applicant can choose the "recommended" option of "the income-driven repayment plan with the lowest monthly payment." *Id.* ¶ 42. Any Borrower who has questions can get free advice from his or her Servicer. *Id.* ¶¶ 24-25, 88.

The only way Dealers can persuade Borrowers to buy their Services at outrageous prices is by lying. *Id.* ¶ 86. During their solicitation phone calls, the Dealers do not tell the Borrowers that all the Services being offered are otherwise available for free. *Id.* ¶¶ 88-92. Instead, they claim they will perform a personalized evaluation of the Borrower's loans, and use their supposed expertise to fill out the required forms. *Id.* ¶ 97. These statements are false. The Dealers do not perform an individualized evaluation of the Borrower's student loans and neither have, nor apply, any specialized expertise. *Id.* ¶¶ 98-99. They do not, for example, screen Borrowers for valuable loan cancellation programs, such as those for disability or school closure.

*Id*. Instead, the Dealers use the same application forms and websites available to all borrowers for free, simply transcribing demographic and loan information provided by the Borrower. *Id.* ¶ 92. Borrowers must locate the only required supporting document—the prior year's tax return—which the Dealers simply forward. *See id.* ¶¶ 42, 92. The "critical and time-consuming process of choosing a program" that EAC describes in its Memorandum is a fabrication, and even if "gathering all required documentation" (i.e., the tax return) is burdensome, Borrowers must gather the documentation themselves no matter who submits the application. Br. 4.

SLF Center did not tell Ms. Williams that its Services were available for free through the government. *Id.* ¶ 282. Instead, it told her that SLF Center would "get [her] into the best financial position possible." *Id.* ¶ 277. But SLF Center simply consolidated Ms. Williams's loans and signed her up for Income Driven Repayment using the forms available to everybody, which she could have done herself in a matter of minutes. Integra's Services for Mr. Turner were even less valuable. Mr. Turner, like many Borrowers, had *already* consolidated his loans and enrolled in Income Driven Repayment on his own. *Id.* ¶¶ 93-94, 328. Integra's so-called Services actually *increased* his monthly payment by triggering an earlier payment reset. *Id.* ¶ 339. For Borrowers like these, the Dealers' Services are transparently of no value, and their experiences underscore that no Borrower who understood what the Services were would pay $1,300 for them. *Id.* ¶¶ 87, 93-95.

The only way that Dealers might obtain lower payments for Borrowers than the Borrowers got (or could get) on their own is by falsifying documents to defraud the federal government. Dealers do this as a matter of course, impersonating Borrowers and submitting false information in their name to unlawfully obtain lower loan payments. *Id.* ¶¶ 238-45. For example, Dealers understate Borrowers' income (as SLF Center did on Ms. Williams's

application by falsely stating she had not filed taxes for two years) or overstate their number of dependents (as Integra did for Mr. Turner by falsely stating he supported two children). *Id.* ¶¶ 304, 338.

The Dealers also fail to disclose the many ways their Services can harm Borrowers, including by increasing a Borrower's total loan balance, interest rate, or repayment term; causing Borrowers to lose credit for prior payments and future valuable opportunities; and leading to detrimental tax consequences. *Id.* ¶¶ 106-111 (all Borrowers); 112 (Williams); 113 (Turner); 114 (other identified Borrowers).

Finally, Dealers lure Borrowers to purchase their Services by misrepresenting their affiliation with the federal government, with authorized Servicers, or both. *Id.* ¶¶ 115, 120. SLF Center falsely told Ms. Williams that her payment to SLF Center was a "federal transaction," and suggested that SLF Center was a legitimate entity related to USED. *Id.* ¶¶ 116, 278, 297. Integra told Mr. Turner that Integra assists with loan forgiveness through the Department of Education, and suggested that Integra would become a servicer of his student loans. *Id.* ¶ 121. The Amended Complaint describes flagrant misrepresentations made to other Borrowers, such as the email with an overwhelmingly large U.S. Department of Education seal that Dealer Mentor USA sent to Borrower Jesus A. *Id.* ¶ 118; *see also id.* ¶ 117 (specific misrepresentations to other identified Borrowers).

### 3. The Dealers Use High-Pressure Sales Tactics

The Dealers pressure Borrowers to purchase Purported Services with sales tactics that are manipulative. *Id.* ¶ 140. Their solicitation calls misrepresent the Purported Services and EAC's financing, then create a false sense of urgency by stating that relief is only available for a short time or has an "Expiration date." *Id.* ¶¶ 141, 150.

As a result, Borrowers often agree to purchase the Purported Services during the first phone call with the Dealer, and are immediately referred to EAC for financing. *Id.* ¶¶ 151, 153. Only after the Borrower has orally agreed to buy the Services do Defendants send Borrowers the paperwork relating to the transaction: two document packets, one from the Dealer and one from EAC.[4] *Id.* ¶¶ 154-55. The Dealers pressure Borrowers to electronically sign those documents while they remain on the phone with the Dealer; take other steps designed to ensure that Borrowers will not read or understand the documents; and conceal that the documents contradict explicit material representations the Dealer made orally. *Id.* ¶¶ 156-60. Borrower Jordan M., for example, asked SLF Center, "What am I signing?" *Id.* ¶ 159. The representative told Jordan that he was "signing over" his loans, and repeated his previous explanation that SLF Center was offering full student loan forgiveness. *Id.* ¶¶ 80, 159.

### C. EAC's Deceptive Loans

Borrowers' purchases of the Purported Services are financed by Deceptive Loans from EAC. *Id.* ¶ 127. The Dealers misrepresent this financing to Borrowers when pressuring them to buy the Services, and EAC furthers the deception with its misleading loan documents.

Knowing that the loans are toxic, Dealers conceal every important aspect of the loans from Borrowers. Dealers often conceal that the financing is a loan at all—instead quoting to Borrowers a single monthly payment amount that bundles the payment to EAC with the

---

[4] The Document Packet purportedly sent by SLF Center to Ms. Williams titled "Preparation Service Agreement" is attached as Exhibit C to the Singer Declaration. Dkt. 39-3. The Document Packet purportedly sent by Integra to Mr. Turner titled "Document Preparation & Administrative Service Agreement" is attached as Exhibit A to the Singer Declaration. Dkt. 39-1. The Document Packet purportedly sent by EAC to Ms. Williams is attached as Exhibit B to the Amended Complaint, (Dkt. 30-2), and attached as Exhibit D to the Singer Declaration, (Dkt. 39-4). The Document Packet purportedly sent by EAC to Mr. Turner is attached as Exhibit C to the Amended Complaint, (Dkt. 30-3), and attached as Exhibit B to the Singer Declaration, (Dkt. 39-2). Plaintiffs do not concede that such Agreements were in fact sent to or electronically signed by Plaintiffs and reserve the right to take discovery on those issues.

Borrower's student loan payment, misleading Borrowers into believing the single payment will all go towards their student loans. *Id*. ¶ 128. When Dealers do identify that Borrowers will be making a separate payment, they often falsely describe it as a "payment plan" to purchase the Services. *Id*. ¶ 129. For example, SLF Center told Ms. Williams that she could pay through a payment plan of $49 per month, and Integra told Mr. Turner that he could pay through a payment plan of $39 per month. *Id*. ¶¶ 274, 322. In their solicitation phone calls, the Dealers never disclose that there is interest on the loan at all, much less that the rate is a usurious 21%, and never disclose that the loan will appear on Borrowers' credit reports as a maxed-out line of credit. *Id.* ¶¶ 131-32. SLF Center concealed this from Ms. Williams, *id.* ¶ 281; Integra concealed it from Mr. Turner, *id.* ¶ 326; and Dealers misrepresented the loans to countless other Borrowers. *Id.* ¶¶ 136-37.

The loans themselves are usurious and deceptive. *Id.* ¶ 174. EAC's Credit Plans—drafted to confuse Borrowers and evade liability for EAC—do not state the dollar amount that the sky-high interest rate will cost Borrowers, or the total payments the Borrower will have to make, or other critical information required by federal law. *Id.* ¶¶ 168, 192-94, 199; *see generally* Am. Cmplt. Exs. B, C (Williams and Turner Credit Plans). As a result, many Borrowers, like Ms. Williams and Mr. Turner, do not understand that the true cost of credit is hundreds of dollars more than the already inflated purchase price. *Id.* ¶¶ 291, 333. In addition, although the Credit Plans purport to extend "revolving" credit, they actually offer closed-end credit: a fixed amount of credit (the $1,300 purchase price) at particular interest rate (20.99%) to fund a single purchase (of the Services) that is payable in equal monthly installments (often $39 or $49) over a fixed number of months (about 36 to 60). *Id.* ¶¶ 178-182.

No provision of the Credit Plan purports to extend credit, states the amount of credit purportedly being extended, or identifies any party purportedly extending credit. *Id.* ¶¶ 170-71; *see generally* Am. Cmplt. Ex. B, C. As a result, the Credit Plans are so defective that they do not even create enforceable loan obligations. *Id.* ¶ 169. That has not stopped EAC from extracting payments on them and reporting them to credit bureaus. *Id.* ¶¶ 203, 212, 234.

The purported disclosures in the Credit Plans or other contracts, on which EAC's motion to dismiss relies almost exclusively, do not rescue the transactions from being fraudulent. Br. 4-8, 11-15. None of the documents disclose or disclaim the core falsity that the Borrowers will obtain loan forgiveness through buying the Purported Services, nor do they disclose key material omissions like the fundamental worthlessness of the Services. *Id.* ¶ 161. The purported disclosures that do appear in the Dealers' document packets contradict extensive and explicit material misrepresentations made orally by the Dealers—which is why Dealers go to such lengths to ensure that Borrowers do not read or understand them. *Id.* ¶¶ 156-61.

Falling for Defendants' Scheme leads to devastating harm for Borrowers. They are harmed financially to the tune of the $1,300 plus hundreds of dollars of usurious interest that they must pay to EAC and the Dealers. *Id.* ¶¶ 247-48. Many Borrowers are also harmed by the Purported Services themselves, which may increase their student loan balance and interest rate, lose Borrowers' credits for payments, and deprive them of a future opportunity to consolidate. *Id.* ¶ 251. Many Borrowers fall into delinquency or default on their loans, with its own tremendous costs, because Dealers mislead them into believing that their monthly payments to EAC satisfy their student loan obligations. *Id.* ¶ 251. Borrowers' credit is damaged, making access to housing, jobs, or future credit impossible or expensive. *Id.* ¶ 252. And the experience of being deceived by Defendants, and left with even worse student loans, causes already taxed

Borrowers significant emotional and psychological distress. *Id.* ¶ 255. Both Ms. Williams and Mr. Turner experienced harm of all of these types. *Id.* ¶¶ 299, 306-07, 310-12, 314-15, 343, 345, 348, 350, 356, 364, 366-67.[5] Because Defendants' Scheme is ongoing, more Borrowers are being harmed every day. *See id.* ¶ 237.

### D. The Dealers' And EAC's Interdependent Scheme

EAC and the Dealers need each other's coordinated efforts to make their Scheme effective and lucrative. EAC profits through the Deceptive Loans, which obligate Borrowers to pay thousands of dollars to EAC at usurious interest rates over the span of years. EAC requires that a steady stream of new customers rely on its financing to purchase Purported Services. EAC recruits dozens of Dealers to provide these referrals, signing a contract with each Dealer. *Id.* ¶ 60. EAC needs the Dealers to misrepresent the Services they sell, because if the Services were accurately described, no Borrower would purchase them or need EAC's Deceptive Loans. *Id.* ¶¶ 205, 391. So EAC coordinates with the Dealers on their fraudulent pitch, training the Dealers, for example, via phone calls, online video conference programs, and at least one in-person meeting. *Id.* ¶¶ 206, 390.

For their part, to facilitate referrals to EAC, the Dealers need quick funding. The Borrowers that purchase the Purported Services cannot afford to pay the exorbitant $1,300 cost all at once, and in any event, the Dealers are prohibited by federal regulation from accepting payment upfront. *Id.* ¶¶ 387-88. EAC solves this problem by providing Dealers with an early influx of cash for each customer referred—the "fast funding" EAC markets to potential Dealers on its website. *Id*. ¶¶ 210, 387.

---

[5] For example, the Amended Complaint alleges that SLF Center's consolidation increased the interest rate on Ms. Williams's student loans. Am. Cmplt. ¶¶ 112, 310. EAC's assertion to the contrary, *see* Br. 14, is incorrect.

EAC has set up the Scheme to be fluid and easy for itself and the Dealers. For example, EAC designed an integrated software platform that Dealers use to submit financing referrals to EAC with the click of a button. *Id.* ¶ 153. EAC wrote the terms of documents the Dealers provide to Borrowers, and requires the Dealers to use them. *Id.* ¶ 163. EAC maintains detailed information about the specific Purported Services Dealers offer to each Borrower and, sometimes, EAC is even directly involved in providing Services to Borrowers. *Id.* ¶¶ 208-09.

Once Borrowers are on the hook for thousands of dollars, EAC and the Dealers work in concert to ensure that Borrowers do not detect the fraud. EAC and the Dealers cut Borrowers off from any contact with their federal loan Servicers, because the Servicers would alert Borrowers that the Dealers' Purported Services are a scam. *Id.* ¶¶ 216-20. For example, SLF Center changed the email address associated with Ms. Williams's Servicer account so that all communication from the Servicer would go directly to SLF Center. *Id.* ¶ 302. Integra told Mr. Turner not to contact his Servicer, adding, "Should you ever receive something regarding your student loans that doesn't match what we are telling you then please contact us immediately." *Id.* ¶¶ 219, 325. EAC's website brazenly states: "If someone contacts you, and tells you that you have been 'scammed' or defrauded by choosing to hire an expert to help you take advantage of student loan assistance programs, and/or they encourage you not to make your payments, you have been misled." *Id.* ¶ 221.

When Borrowers realize the nature of the Scheme and complain to EAC, EAC points to the Dealer and falsely disclaims any responsibility, even though under terms in the Credit Plan that are required by federal regulation EAC is "subject to all claims and defenses" that any Borrower "could assert against" the Dealer. *See id.* ¶¶ 175, 227-33. EAC also often invokes the recourse agreement that it requires Dealers to enter, under which EAC may assign any Credit

Plan to the pertinent Dealer, deflecting Borrowers who raise complaints or legal challenges to the thinly capitalized Dealers. *Id.* ¶ 391. And finally, EAC tries to hide behind the purported disclosures it inserted into the Borrower documents with precisely this scenario in mind—just as it has done in this Motion. Br. 4-8, 11-15.

### E. This Action

Plaintiffs filed this action on August 17, 2018. Compl., Dkt. 1. EAC moved to dismiss Plaintiffs' RICO claims, (Dkt. 23), and in response, Plaintiffs filed the First Amended Complaint, (Dkt. 30). The Amended Complaint added additional particularized allegations of fraud. EAC then moved to dismiss Plaintiffs' RICO claims on substantially the same grounds, largely without addressing the new allegations. *See* Dkt. 38.

Neither Integra nor SLF Center has yet appeared, and the Clerk has entered a Certificate of Default against SLF Center. Dkt. 45.

## ARGUMENT

On a motion to dismiss, the court must

> accept[] as true the complaint's factual allegations and draw[] all inferences in the plaintiff's favor. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Claims that sound in fraud are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b), which requires that averments of fraud be stated with particularity. To satisfy this requirement, a complaint must specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth. This standard also applies to allegations of fraudulent predicate acts supporting a RICO claim.

*Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 358-59 (2d Cir. 2013) (internal quotations, citations, and alterations omitted). The Amended Complaint more than meets this standard in alleging the RICO claims.

## I. PLAINTIFFS PROPERLY PLEAD A § 1962(C) CLAIM

### A. The Purported Disclosures Cited By EAC Do Not Support Dismissal

EAC incorrectly argues that disclaimers purportedly contained in agreements signed by Plaintiffs supply a basis to dismiss the RICO claims. Br. 11-15. The crux of EAC's argument is that Plaintiffs unreasonably relied on false or misleading oral statements contradicted by written disclaimers in the contracts they signed. Supreme Court precedent forecloses this argument, and it is otherwise infirm.

"[A] plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008). "By prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted." *Neder v. United States*, 527 U.S. 1, 25 (1999) (quotation omitted). Ignoring this binding precedent, EAC cites a case holding that "reliance on … oral promises, which directly contradict the terms of … [later] written agreements, [is] unreasonable as a matter of law." Br. 11 & 11 n.24 (citing *Morrissey v. Gen. Motors Corp.*, 21 F. App'x 70, 73 (2d Cir. 2001)). But that case is about common law fraud, not RICO. Because Plaintiffs have amply "detail[ed] the steps which defendants took to deceive them," they need not "prove the reasonableness of their reliance to survive defendants' motion to dismiss" their RICO claims. *Related Companies, L.P. v. Ruthling*, No. 17-CV-4175, 2017 WL 6507759, at *19 (S.D.N.Y. Dec. 18, 2017).

Nor do the disclosures EAC cites bear on materiality. The Second Circuit has held that, in the RICO context, "contractual disclaimers of reliance on prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes." *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (affirming denial of judgment of

acquittal on a criminal RICO claim). In *Weaver*, the defendant ran a vending machine sales scheme in which salespeople called potential customers and made misrepresentations; after agreeing to purchase a machine, the customers signed a written contract with disclaimers including that there was "no reliance upon any verbal representation whatsoever." *Id.* at 93. Like the *Weaver* defendants, EAC's arguments that such disclaimers preclude liability for any oral misrepresentations "largely 'confuse materiality … for reliance.'" *Id.* at 95 (quoting *United States v. Ghilarducci*, 480 F.3d 542, 546 (7th Cir. 2007)); *see also id.* at 546 (rejecting argument that "any oral misrepresentations [the defendants] might have made were immaterial because investors signed contracts stating that no oral promises had been made"); *United States v. Arif*, 897 F.3d 1, 10–11 (1st Cir. 2018) (holding that "presence of a disclaimer does not defeat [the defendant's] criminal liability under the wire fraud statute").

*Bridge*'s holding that "a showing of first-party reliance is not required" suffices to refute EAC's argument that the RICO claims should be dismissed for a supposed failure of reasonable reliance. 553 U.S. at 642. But this argument has further flaws. Even if reasonable reliance were an element or RICO, and it plainly is not, reasonable reliance is "a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007) (quotation omitted). The purported disclosures EAC cites would not undermine a showing of reliance in any event, were one necessary, because they are not "explicit disclaimers of the particular representations that form the basis of Plaintiffs' … claims." *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13-CV-4650, 2015 WL 769573, at *4 (S.D.N.Y. Feb. 24, 2015) (quotation marks and citations omitted). None of the documents disclose or disclaim the core falsity that the Borrowers will obtain loan forgiveness through buying the Purported Services. Am. Cmplt.

¶ 161. Likewise, none of the documents disclose the fundamental worthlessness of the Purported Services. *Id.*

### B. Plaintiffs Allege Each Element Of The RICO Claims With Particularity

The Amended Complaint specifically describes the misrepresentations Dealers make with the knowledge and participation of EAC, including the promise of loan forgiveness that EAC and the Dealers cannot offer. Am. Cmplt. ¶¶ 69, 72-163, 205-07. It pleads the details of EAC's deceptive financing, which causes Borrowers to take on new revolving loans, at usurious rates, while their existing student loan debt is left to grow ever larger. *Id.* ¶¶ 164-204. And critically, the Amended Complaint details EAC's role in masterminding the Scheme—by recruiting Dealers, training them to misrepresent the Services they sell, drafting Borrower contracts, and taking other steps to integrate Defendants' operations. *Id.* ¶¶ 60, 153, 163, 206, 210-11, 390-91.

This Scheme violates the RICO statute, which makes it "unlawful for any *person*[6] through a *pattern*[7] of *racketeering activity*[8] … to *acquire or maintain*, *directly or indirectly*, any interest in or control of any *enterprise the activities of which affect*[ ] interstate … commerce," (18 U.S.C. § 1962(b) (emphasis added)), and provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of" the statute, (18 U.S.C. § 1926). "[R]acketeering activity" refers to the commission of certain predicate acts, including mail and wire fraud. 18 U.S.C. § 1961(1). The predicate acts here are mail and wire fraud, which require

---

6 18 U.S.C. § 1961(3) ("'[P]erson' includes any individual or entity capable of holding a legal or beneficial interest in property.").

7 18 U.S.C. § 1961(5) ("'[P]attern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.").

8 18 U.S.C. § 1961(1) ("'[R]acketeering activity' means … any act which is indictable under any of the following provisions of title 18, United States Code: [including] Section … section 1341 (relating to mail fraud), section 1343 (relating to wire fraud).").

"(i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).

In the Amended Complaint, Plaintiffs allege each element of the Section 1962(c) RICO claim in painstaking detail, well exceeding Rule 9(b)'s requirement that "[i]n complex civil RICO actions involving multiple defendants … the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *In re Sumitomo Copper Litig*., 995 F. Supp. 451, 456 (S.D.N.Y. 1998). The Amended Complaint identifies the many times Defendants made fraudulent misrepresentations and material omissions to the Named Plaintiffs, each pleaded with the particular fraudulent content, date, speaker, and manner of communication, and similarly does so as to twenty additional Borrowers.[9] *See id.* (Where specific statements allegedly "contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred."). The Amended Complaint also alleges additional uses of interstate mail or wires by Defendants in furtherance of their "master plan to defraud," and the connection of the mail and wire communications to that Scheme. *See id.*[10]

EAC's assertion that the Amended Complaint "is rife with" "non-specific" allegations about "unidentified" Dealers and Borrowers is baseless. Br. 21-22. While the allegations regarding the Named Plaintiffs are themselves sufficient, in each of the many specific allegations of fraudulent communications directed at Borrowers other than Named Plaintiffs, Plaintiffs stated the name of the Dealer making the misrepresentation; the date, method, and content of the

---

[9] Am. Cmplt. ¶¶ 271-305 (Ms. Williams); 319-60 (Mr. Turner); 80, 82-83, 90, 95, 99, 103, 114, 117-18, 121, 136, 142-50, 159, 209, 219, 228, 231-32, 236, 244-45 (other twenty borrowers).

[10] *See, e.g.*, Am. Cmplt. ¶¶ 112-13, 127, 153-58, 198, 203-04, 206, 208, 211, 217, 221, 224, 229-30, 233-37, 239-45, 252.

communication; and the first name and last initial of the Borrower.[11] Even if Plaintiffs had withheld the identities of these Borrowers, the allegations would withstand scrutiny. "[T]here is no requirement that [confidential sources] be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

EAC's claim that the Amended Complaint "is devoid of any allegation that EAC itself made false or omissive statements," Br. 20, is both incorrect and legally irrelevant. EAC itself made many allegedly false and misleading statements: it sent every Borrower a Credit Plan misrepresenting the Borrowers' payment obligations, it misrepresented the value of the Purported Services and its role in the scheme, and it made other false and misleading statements. *E.g.*, Am. Cmplt. ¶¶ 155, 164-202, 290, 332 (EAC transmitting Credit Plans); 96, 209, 227-8 (EAC misrepresenting value of Purported Services); 230-33 (EAC misrepresenting its own role in the scheme); 204, 229, 235-36 (other misrepresentations by EAC).

Plaintiffs' claims are based not only on EAC's *own* misstatements, but also on fraudulent misrepresentations made by Dealers who participated in EAC's Scheme—as RICO allows. A RICO plaintiff need not allege a specific connection between a particular defendant and particular misrepresentations, so long as "'the complaint … inform[s] each defendant of the nature of his alleged participation in the fraud.'" *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 147 (S.D.N.Y. 2014) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). Here, the Amended Complaint specifically alleges that EAC recruits the Dealers

---

[11] Plaintiffs omitted the full last names of the non-Plaintiff Borrowers identified in the Amended Complaint to protect them from turning up in searches of public court files. Because each such Borrower has a business relationship with EAC, their identities should be easily ascertainable by EAC from EAC's own business records.

and requires each to enter a contract favorable to EAC, (Am. Cmplt. ¶¶ 60, 391); trains the Dealers on how to pitch the Purported Services, (*id.* ¶¶ 206, 390); wrote the documents it requires Dealers provide to Borrowers, (*id.* ¶ 163); designed the integrated software platform that Dealers use to submit financing referrals to EAC, (*id.* ¶ 153); and actively conceals the scheme by, for example, posting false statements on its website, (*id.* ¶ 221). Nor are Plaintiffs required to allege specific uses of the mails and wires by EAC itself, since the complaint pleads that EAC orchestrates the overall scheme and "direct[s] [the enterprise] to use the mails and/or wires to further" it. *Serin v. N. Leasing Sys., Inc.*, No. 06-CV-1625, 2009 WL 7823216, at *8 (S.D.N.Y. Dec. 18, 2009) (citation omitted). In other words, EAC cannot avoid liability for the scheme it orchestrated by arguing that the thinly capitalized Dealers were the initial mouthpieces of the fraud. *See* Br. 20.

### C. EAC's Credit Plans Are Materially Misleading to Borrowers

EAC has not moved to dismiss Plaintiffs' Truth in Lending Act (TILA) claims. And Plaintiffs have not pleaded TILA violations as predicate RICO acts. *See* Am. Cmplt. ¶¶ 398-99. EAC's extended argument about TILA is therefore irrelevant—as even EAC acknowledges. *See* Br. 15 (purported inadequacies under TILA "not relevant" to RICO); *id.* at 16 ("None of this, however, is relevant to RICO."); *id*. at 17 (similar).

Regardless of whether it violates TILA, however, EAC's provision of deceptive Credit Plans to Borrowers violates the mail and wire fraud statutes and thus forms a basis for Plaintiffs' RICO claims. *See In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 408 n.26 (3d Cir. 2015) (affirming certification of class bringing TILA and RICO claims against predatory lenders based on same conduct).

EAC's Credit Plans are materially deceptive to Borrowers in many ways. *First*, the Credit Plans deliberately conceal the true cost of the credit because they do not state the amount

financed, the dollar amount of the finance charge, or the total amount the credit will cost. Am. Cmplt. ¶¶ 192-94. Borrowers are never told that under the Credit Plan they will pay hundreds of dollars more for the Purported Services than the purchase price due to the Credit Plan's high interest rate and long repayment term. *Id.* ¶¶ 199-202. For example, the Credit Plans provided to Ms. Williams and Mr. Turner do not state the finance charge, amount financed, total of payments, or total sales price. *Id.* ¶¶ 290-91, 332-33. As a result, Ms. Williams did not know that she would be paying another $433.53 in interest, and $1,810.53 in total, for SLF Center's Purported Services, and Mr. Turner did not know that he would be paying another $670.69 in interest, and $1,984.69 in total, for Integra's Purported Services.[12] In like fashion, EAC's Credit Plans concealed this information from every other Borrower who obtained financing from EAC. *Id.* ¶¶ 163-67. These omissions are not just TILA violations, they are fraud: they materially misled Plaintiffs and other Borrowers and caused them harm as a result. *See*, *e.g.*, *id.* ¶¶ 168-202, 247-49, 290-91, 311-12, 332-33, 364-65. EAC tacitly acknowledges the omissions, as their submission does not identify the crucial missing terms within the Credit Plans or any other document.[13]

---

[12] Plaintiffs' counsel calculated these figures based on the interest rate, monthly payment amount, and payment term in the document packets EAC submitted with its motion.

Even EAC's counsel appears not to understand how the Credit Plans' extremely high interest rate drastically increases the amount a Borrower must pay over time. EAC's counsel represents that if Ms. Williams made one year of payments, she would have paid down $738 of the loan balance. Br. at 18 n.33. In reality, however, due to the Credit Plan's high interest rate, nearly half of each payment would be applied to interest, and so one year of payments on Ms. Williams's loan would have only reduced her loan balance by approximately $350.

Moreover, the real interest rate on Ms. Williams's Credit Plan may have been even higher. The Billing Statement provided by EAC's counsel in support of its motion shows an inflated finance charge that amounts to a criminally usurious interest rate of *thirty-seven percent*. *See* Singer Decl. Ex. H ($36.34 monthly finance charge on $1,178 principal yielding annual interest rate of 37%); N.Y. Penal Law § 190.40 (felony to charge over 25% interest).

[13] For example, EAC states that the "dollar amount of the finance charge" is provided on the first page of Plaintiffs' bills, Br. 19, but the bills state only the finance charge for the *particular*

*Second*, the Credit Plans are deceptive because they purport to extend revolving credit, when, in reality, they are installment loans. "Revolving credit" and "line of credit," also known as "open-end credit," describe a consumer credit arrangement—like a credit card—that allows the borrower to buy goods on a continuing basis, through repeat transactions, as long as the outstanding balance does not exceed the credit limit. Am. Cmplt. ¶ 178. But EAC's Credit Plans do not offer revolving credit; they offer a fixed amount of credit to fund a single purchase that is payable in equal monthly installments over a fixed number of months. *Id.* ¶ 181. This type of credit is an installment loan, also known as closed-end credit. *Id.* ¶ 180. EAC's attempts to defend its misleading characterization of the Credit Plan are refuted by the Amended Complaint's allegations and the documents EAC attached to its own motion.[14] These fact disputes cannot be resolved on a motion to dismiss. *Cf.* OFFICIAL STAFF INTERPRETATION OF 12 C.F.R. § 226.2(A)(20), codified at 12 C.F.R. Part 226, Suppl. I, Subpt. A (whether credit is open-end "a question of fact" inappropriate for resolution on a motion to dismiss).

Falsely labeling closed-end credit as open-end credit does not just violate TILA—it causes meaningful harm to Borrowers in the form of reduced credit scores. A revolving credit account lowers a borrower's credit score when a high percentage of the credit is being used. EAC reports Borrower's accounts as a fully drawn line of credit—the same way a fully-maxed-out credit card is reported—which decreases Borrowers' credit scores. Am. Cmplt. ¶¶ 203, 252.

---

*month*—not the total amount. In any event, of course the Borrower cannot see a bill until after he or she enters the agreement, so information in the bill cannot cure the contract's inadequacies. As to the "dollar amount of the total payments the Borrower will have to make," EAC admits that does not appear anywhere. *Id.*

[14] For example, EAC claims Borrowers need not seek EAC's permission for other purchases, but its selective quotation from the Credit Plan ignores the provision stating that Borrowers "may be required to reapply for The Revolving Credit Plan if [they] want to use it for additional purchases and ... this requirement will be exercised at the sole discretion o[f] Equitable Acceptance." Singer Decl. Ex. B-C; Am. Cmplt. ¶ 186.

By contrast, if EAC had labeled the Credit Plans accurately as offering installment loans, the reporting of the installment loan would not have had the same negative effect on borrowers' credit scores.[15] EAC then uses its fraudulent reporting as leverage over Borrowers—threatening negative credit reporting against Borrowers who uncover the scam in order to extort continued payment. *Id.* ¶ 234.

*Third*, the Credit Plans deliberately obscure the identity of the lender. Am. Cmplt. ¶¶ 169-73. While the Amended Complaint alleges that EAC's primary purpose in drafting the Plans this way was to avoid liability for extending toxic loans, (*id.* ¶ 168), it also has the effect of concealing from Borrowers that they are taking out a brand-new loan from a third party that is neither the Dealer nor the U.S. government. Despite EAC's protests, it cannot point to a provision of the Credit Plan that explicitly identifies the lender. EAC recites the title of the document and quotes a provision stating that the document "*may* establish" credit, but no provision that actually established credit. Br. 20 (emphasis added).

*Fourth*, the language of the Credit Plans is carefully crafted to hide or obscure information that would contradict oral misrepresentations about Borrowers' payment obligations made by the Dealers. The Dealers routinely quote Borrowers a single monthly amount that includes both payments to EAC and to their student loans, or else describe EAC's financing as a "payment plan." Am. Cmplt. ¶¶ 128-29, 136-37. They conceal that the financing is in the form of a new maxed-out loan from a third party that will ruin Borrowers' credit scores. *Id.* ¶¶ 131-35. And they never tell Borrowers the true, full cost of their purported Services,

---

[15] In fact, making payments on an installment loan can *increase* borrowers' credit scores. *Compare* Nerdwallet, What to Expect When You Max Out a Credit Card, https://www.nerdwallet.com/blog/credit-cards/expect-max-credit-card/, *with* Nerdwallet, Do Installment Loans Build Credit? https://www.nerdwallet.com/blog/finance/installment-loan-boost-credit-fico-score/.

including the usurious interest—because no rational Borrower would agree to pay that much for Services so worthless. *Id.* ¶ 202. The Credit Plans assist these deceptions by concealing the nature of the loan, the cost, and the lender.

In any event, EAC's provision of the Credit Plans to Borrowers supports Plaintiffs' RICO claims whether or not the documents were, themselves, fraudulent. *See Sumitomo*, 995 F. Supp. at 456 (where plaintiffs allege that the mails or wires were used "in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves"). The Amended Complaint alleges that the Credit Plans were integral to Defendants' Scheme, in that they were the mechanism by which EAC extracted Borrower payments and sought to shield itself from liability for the Dealers' misrepresentations. Am. Cmplt. ¶¶ 205, 212, 230, 248, 389. As a result, every transmission of a Credit Plan to a Borrower, including to Ms. Williams and Mr. Turner, constituted a use of the interstate wires that forms a RICO predicate act. *Id.* ¶¶ 155, 165 (all borrowers), 289 (Williams), 331 (Turner), 395 (use of mails and wires as predicate acts).

### D. Plaintiffs Properly Allege Continuity

Finally, EAC offers a threadbare argument that the Amended Complaint does not adequately plead continuity. Br. 23-24. Once again, EAC is wrong. A RICO complaint must plead either open ended (ongoing) or closed ended continuity; the Amended Complaint properly alleges both.

A RICO plaintiff may plead open-ended continuity by alleging "that the predicate acts are part of an ongoing entity's regular way of doing business." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989). The Amended Complaint more than meets this standard by alleging with specificity that the illegal scheme is part of EAC's ongoing and regular way of doing business, that Defendants commit the same acts of fraud many times, and that EAC continues to

issue new Credit Plans to new Borrowers and collect on existing Plans. Am. Cmplt. ¶¶ 237, 394-97. And the nature of Defendants' fraud—selling scam services and misdescribed loans that amortize over years—inherently lends itself to a finding of open-ended continuity. *See Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994) (repeated fraudulent sales involving "same fundamental alleged misrepresentation[s]" supports finding of continuity).

Defendants' systematic fraudulent activities also suffice to prove closed-ended continuity. The Amended Complaint specifically alleges that EAC and the Dealers engaged in a scheme to sell scam services to Ms. Williams, Mr. Turner, and tens of thousands of other Borrowers, and then conceal the substance of those services, over the course of more than three years. Am. Cmplt. ¶¶ 392, 398, 406. The Amended Complaint alleges wire communications in furtherance of the scheme as early as March 2015, and as recently as January 11, 2019 (just days before the Amended Complaint was filed). *Id.* ¶¶ 103, 237. Plaintiffs' allegations that EAC "committed numerous acts of mail fraud [and] wire fraud" over the span of nearly four years, and engaged in separate activity to conceal this unlawful activity, "are sufficient to meet the pleading requirements, under a closed-ended continuity theory, of a pattern of racketeering." *Columbus McKinnon Corp. v. HealthNow New York, Inc.*, No. 03-CV-831S, 2006 WL 2827675, at *11 (W.D.N.Y. Sept. 29, 2006). And "[w]hile closed ended continuity is primarily concerned with the time period of the activities, … factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes [are also] relevant when determining whether closed ended continuity exists." *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006) (quotation marks and citations omitted). These plus factors are fully present here, and so the sheer scope of Defendants' scheme and the

large number of victims provide added reasons for finding sufficient allegations of closed ended continuity. Am. Cmplt. ¶¶ 61-63, 81, 91, 122, 137, 260-68.

## II. PLAINTIFFS PLEAD A VIABLE CONSPIRACY CLAIM

EAC argues that the RICO conspiracy claim, Count II, should be dismissed on the sole basis that the primary RICO claim is not viable. Br. 24. Because this premise is wrong, EAC's argument fails. Plaintiffs' RICO conspiracy claim should be sustained.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court deny EAC's motion to dismiss Counts I and II of the Amended Complaint.

DATED: New York, New York
April 15, 2019

Respectfully submitted,

Jonathan Oblak
Stephen Schweizer
Anna Deknatel
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7199
jonoblak@quinnemanuel.com

Danielle Tarantolo
Jane Greengold Stevens
Jessica Ranucci
NEW YORK LEGAL ASSISTANCE GROUP
7 Hanover Square
New York, NY 10004
(212) 613-5000
dtarantolo@nylag.org

*Counsel for Plaintiffs*