UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

VANESSA WILLIAMS and KORY TURNER, *individually and on behalf of all persons similarly situated,*

Plaintiffs,

v. 18 CV 7537 (NRB)

EQUITABLE ACCEPTANCE CORPORATION, SLF CENTER, LLC, INTEGRA STUDENT SOLUTIONS, LLC, DOES 1-41,

Defendants. ORAL ARGUMENT

------------------------------x

New York, N.Y.
December 9, 2019
11:10 a.m.

Before:

HON. NAOMI REICE BUCHWALD,

District Judge

APPEARANCES

NEW YORK LEGAL ASSISTANCE GROUP
Attorneys for Plaintiffs
BY: DANIELLE F. TARANTOLO
JESSICA G. RANUCCI
-AND-
QUINN EMANUEL
BY: JONATHAN B. OBLAK
STEPHEN SCHWEIZER
ANNA DEKNATEL

JOSEPH HAGE AARONSON
Attorneys for Defendant Equitable Acceptance Corporation
BY: GREGORY P. JOSEPH
GILA S. SINGER

(Case called)

THE LAW CLERK: Is the plaintiff present and ready to proceed?

MR. OBLAK: Yes, your Honor. Good morning.

Jonathan Oblak of Quinn Emanuel, on behalf of the plaintiffs.

MS. TARANTOLO: Good morning, your Honor.

Danielle Tarantolo from the New York Legal Assistance Group, on behalf of plaintiffs.

MR. SCHWEIZER: Good morning, your Honor.

Stephen Schweizer, also with Quinn Emanuel, for plaintiffs.

THE LAW CLERK: Is the defendant present and ready to proceed?

MR. JOSEPH: Yes, your Honor.

Gregory Joseph and Gila Singer, Joseph Hage Aaronson, for EAC.

THE COURT: All right. I have a boatload of questions, so let's begin with those. And then I'll give you a chance to speak to any issue that you think we haven't covered.

My first question is, is EAC still in business?

MR. JOSEPH: In a modest way. I mean as you saw from perhaps the New York settlement, it wasn't even able to pay the amount that was requested because of an inability to pay. But it hasn't closed down, and this lawsuit is a principal reason

why it hasn't closed down.

THE COURT: So I guess that kind of raised the next question of really why in the government settlements EAC was not required to pay the full amount of damages.

MR. JOSEPH: It's on the attorney general's website; there are a couple of different places.

THE COURT: I think we may have read it.

MR. JOSEPH: It just says that there was an inability to pay. In addition to settling with New York, there's a settlement with the FTC out in California that counsel was kind enough to provide. They also settled with the FTC and Minnesota. And I can't go further than that, but I wouldn't be surprised if that were not the end.

THE COURT: I thought there was a settlement with Massachusetts.

MR. JOSEPH: There is. I'm sorry, I forgot the Massachusetts one.

THE COURT: Okay.

MR. JOSEPH: That, like New York, applies to residents, which would include these plaintiffs, because they are both New Yorkers. But the New York -- excuse me, the California and Minnesota ones apply to everybody that dealt with the dealers wherever they are in the country. It's not these dealers though. It has a list of dealers in California and there's one dealer in Minnesota.

THE COURT: I know that defaults were entered against the two dealers in this case. Would I be correct in assuming that they are out of business?

MR. JOSEPH: That I don't know, your Honor.

THE COURT: Okay.

Anybody on the plaintiffs' side know that?

MR. OBLAK: Your Honor, again, John Oblak from Quinn Emanuel.

We do not know. I think default was entered against SLF Center. I don't believe one has been entered against Integra. My understanding is they are not currently in business; although we have heard from borrowers who have indicated that attempts have been made to collect on their loans still. So it's not clear who would be doing that collecting if it's not Integra.

THE COURT: Collecting their loans from EAC or collecting their loans from the federal government?

MR. OBLAK: From EAC and however you want to describe the financing. But, yes, those arrangements that were entered into with dealers financed by EAC.

MR. JOSEPH: Your Honor, if I may.

And I can't address that, which I'd be happy to find out, but I can't address that. In all of these settlements, EAC is agreeing not to provide debt relief services and not to loan money in support of debt relief services. I don't want to

go further than that; that's all I can say about that at this time. And I'm not going to challenge anything Mr. Oblak says, because I haven't asked my client about that.

THE COURT: So, Mr. Oblak, if the reason that the various governmental entities accepted an amount in settlement far less than the amount of damages that they could calculate and that the defendant would agree to, what is it that you hope to achieve here?

MR. OBLAK: Well, your Honor, given the settlements that have been entered into so far as we understand them, they do not provide relief from, the very least, the potential debt for all borrowers. So as Mr. Joseph indicated, some of the settlements are state specific, they only cover residents of the states. Some cover particular dealers.

Over the course of this enterprise, we believe there are more than 40 dealers, and I think the number is something like 60,000 borrowers. So there continue to be borrowers in states who are not covered by any settlement, who are subject to debt relief and are continuing, in fact, to make payments nominally to either EAC or to the dealer because, as we've alleged and understand, the structure of the arrangements allows EAC to put back the payment obligation to the dealer so that dealers could be collecting themselves, even if EAC has ceased collecting activities as to some borrowers.

So the bottom line is there are borrowers out there

who are still subject to these debts and are still making payments.

THE COURT: Just to clarify, is EAC collecting any monies from any individual that might be included in the class that the plaintiff seeks to represent?

MR. JOSEPH: I cannot say no to that, so I won't say no. I can say that if the goal of this litigation is to get EAC to shut down, then we could have a discussion about that as a way of resolving the litigation. Because EAC is -- they use the word "equitable." This is not The Equitable. This is a very small company.

THE COURT: When I went on their website, they --

MR. JOSEPH: -- still collecting because they may have automatic billing statements that go out. I just haven't asked that question, which I'm happy to do. If they've given it to the dealers, they may not be collecting, but maybe the dealers are. And again, I don't want to make a factual representation I don't know the answer to.

MS. TARANTOLO: Your Honor, may I for a moment --

THE COURT: Please. Sure.

MS. TARANTOLO: I'm from the New York Legal Assistance Group.

My office talks to borrowers who are subject to EAC's credit plans, many per week. We've spoken to over 300 borrowers thus far. They are absolutely still being collected

on by Equitable Acceptance.

MR. JOSEPH: Then that's the answer, if that's the answer. As I said, I can't represent what I don't know.

THE COURT: Well, okay. That's like, shall we say, a little puzzling. Because I would have thought that the role of government entities would be sort of to bring the harm to an end. And despite all of these consent decrees, none of them required that EAC stop collecting after the premise of the consent decrees was that the agreements were violative at least of TILA?

MR. JOSEPH: Your Honor, EAC is definitely in compliance with every one. It has zeroed out the balances on every borrower, including these borrowers. It's not making any collection efforts in New York. In the California settlement it has a whole list of dealers; it's not doing anything as to the borrowers with respect to those dealers. In Massachusetts it's not doing anything. It goes to the credit agencies. And in the case of these plaintiffs, it has said, Don't consider the EAC loans in connection with credit history. It does that for everybody covered by any of these consent decrees.

But you're asking about those that are not currently. And that's what I assume counsel is talking about. And that's why I can't dispute where there hasn't been any litigation or consent decree. But I reiterate, if the goal of this is to get this business out of business, that's a different issue.

THE COURT: Did you just say that EAC sends notices to the major credit reporting agencies to tell them that they should zero out or otherwise ignore any debt apparently owed to EAC?

MR. JOSEPH: For any of the New Yorkers that are covered by this, that's specifically required. I believe it's required in all of the other settlements also. And that has been done as to these plaintiffs. In fact, as to these plaintiffs, I believe it was done before this litigation even began. But it clearly is required, and EAC is honoring those consent decrees.

THE COURT: What's confusing, then, is Ms. Tarantolo is in New York, and she's reporting -- I don't know, are you reporting that recently, subsequent to the agreement with the attorney general, that you still have people coming into you and saying that they are being done for these debts?

MS. TARANTOLO: Your Honor, let me back up one step.

We're talking about three overlapping consent decrees: The New York AG, the Massachusetts AG, and the combined FTC in Minnesota Attorney General lawsuit.

THE COURT: Okay.

MS. TARANTOLO: All three of those consent decrees prohibited Equitable from making future loans of the nature that we have alleged are unlawful in this lawsuit.

What my colleague Mr. Oblak was saying is as to

cessation of collections, each of the consent decrees is limited in its scope to specific groups of borrowers that are covered by that consent decree. The New York consent decree covers New York borrowers where Equitable Acceptance continues to hold the credit obligation, and I'll come back to that in one moment. The same is true for Massachusetts. And the FTC settlement stops collections on borrowers who initially transacted with a particular set of dealers, but not all the dealers.

We don't have full information, but we estimate that the majority of borrowers who were obligated to Equitable in the past continue to be obligated to Equitable; and that Equitable is continuing to collect on those contracts. The borrowers that contact my office are nationwide. So if we were to learn that -- I am not representing that we have any reason to believe that Equitable has violated the consent decrees that it has agreed to. The problem is that within the putative class in this case, the majority of borrowers are not protected from ongoing collections by the consent decrees.

I'll also note that the two named plaintiffs in this action are not covered by the attorney general -- New York Attorney General's consent decree, despite being New York residents, because their obligations were put back from Equitable to the dealers with which they transacted. Equitable is not the party that is responsible for collecting those.

Does that clarify the --

THE COURT: That's helpful.

MR. JOSEPH: That means that these plaintiffs have no debt to Equitable, they have no injury -- even though it's not a RICO injury to their credit history, they may or may not be eligible for any kind of restitution, I have no idea. And they are going to lead a nationwide class on behalf of people that do have a debt and are paying. I don't know where we're going with this, but there are some representativeness issues there.

THE COURT: You pick up what he's --

MS. TARANTOLO: I do understand, your Honor. We'll be delighted to brief class certification when the opportunity arises.

These plaintiffs were collected upon by Equitable, and they have out-of-pocket damages for which they've never been made whole. I'm not sure why there's a question about their injury.

MR. JOSEPH: It's true Ms. Williams paid $49, and Mr. Turner paid about $475. And that's why we didn't challenge injury. However, as I read the New York settlement, it applies to all New York consumers. So I'm not sure that they are not covered by the New York AG settlement, but --

THE COURT: Why or under what circumstances does EAC, sort of, return the debts or the loans to the dealers? Because that didn't seem to be the basic structure here.

MR. JOSEPH: I can't answer that, your Honor. I haven't looked at that. I'm not going to challenge anything counsel says on that. EAC financed the loan. I don't know if they have the right to put back loans. I don't know if the dealers are in business to --

THE COURT: Well, but that's sort of actually inconsistent, is it not? Let me just see if I find the right exhibit. With help, I can find the right exhibit.

Looking at Exhibit B to the complaint, three pages in -- for this case, reading glasses are definitely necessary -- paragraph 23, which actually is consistent with paragraph 2 on assignment, it specifically says that: The undersigned assigns to Equitable Acceptance Corporation this contract. The assignment is covered and made subject to a master dealer agreement or similar document between seller and the Equitable Acceptance Corporation.

So it seems on the face of it in the initial documents that there is assignment to EAC.

MR. OBLAK: Your Honor --

THE COURT: I'm curious as to why EAC would return any of these loans to a dealer. It's not the setup. The setup is the opposite.

MR. OBLAK: Your Honor, I think if you step back and you look at the overall course of conduct as to how these loans are issued --

THE COURT: You know what? Let me return then to my questions, that's more of where I was going. I sort of got off on this topic of what if EAC has no money and several government agencies have accepted that.

What is it that the plaintiffs hope to achieve? Because zero is zero, no matter how you count it.

MR. OBLAK: Indeed. And I think, your Honor, the principal form of relief would be to ensure that the borrowers, within the prospective class are no longer subject to collection efforts. And they remain subject to collection efforts.

So with respect to the named plaintiffs in this action, Mr. Joseph is correct that their debt obligations were assigned to -- back to -- and we do think that's the arrangement, back to the dealers, Integra and SLF, before these settlements were reached, I think perhaps even before the complaint was filed. And so the collection efforts with respect to them had been by the dealers themselves.

And this all comes back to what we allege in paragraph 213 of the complaint, that there's this master dealer agreement that permits EAC to put the debt back to the dealers. And we very much believe that the way that these agreements are entered into, if anyone is the lender, it has to be EAC; they are the finance entity. And the mechanics of it are that they have this ability to put it back to the dealers if, in fact,

there are complaints. And that's what we've seen happen, both in talking to borrowers and in the discovery that's been provided to date.

Just to answer the question --

THE COURT: That's sort of not the purpose of the original structure. The original structure, as I understood it, was that if a dealer found a debtor and was able to sell them this service, that the dealer got some fixed per-head fee, and then EAC received the bulk of the $1300, assuming that the student continued to pay through completion.

MS. TARANTOLO: If I may clarify one aspect of this.

THE COURT: Yes.

MS. TARANTOLO: Your Honor is absolutely correct that the provision that you read describes an initial assignment, sort of, from a dealer --

THE COURT: Not sort of. It's in black and white, and it's important to you that it be the way it is.

MS. TARANTOLO: Yes, your Honor.

The reason I say "sort of," and I apologize, the language says one thing here, Equitable has represented a different thing in its briefs, which is that Equitable is the initial lender; that if anyone is a lender, it is Equitable.

I don't think for present purposes we have to resolve that confusion, although we do believe it is confused about who is the initial lender.

The subsequent assignment that we're talking about is not addressed in this document; it is addressed in a separate master dealer that Equitable enters, we understand, with the various dealers. It provides Equitable the possibility -- which, again, only from our anecdotal experience, is not often taken up, but is on occasion taken up -- for Equitable to assign that contract to the initial dealer that contracted with the borrower.

In our experience, again, anecdotally, when a borrower complains, for example, that they were defrauded, at that point Equitable prefers not to deal with that borrower anymore, and makes the borrower's -- they have a separate arrangement with the dealer to assign the contract back to the dealer, then Equitable is relieved of having to deal with the unhappy borrower, and it's on the dealer to collect.

To be very clear, the consent decrees prohibit collection for the designated groups of borrowers that I described, where Equitable continues to hold the obligation; and we understand that's the vast majority of the obligations.

The chief relief that we're looking for through the lawsuit is to extend that cessation of collection to the majority of borrowers who are in the class who are not currently affected by it.

Thank you.

THE COURT: Okay.

Do you have or hope to maybe in the future get the master dealer agreement?

MR. OBLAK: I believe we've received it in discovery, yes.

THE COURT: Oh, okay. All right.

So as I sort of indicated, I would like to be sure that I fully understand the sequence of events.

So if I'm correct, the place to begin this sequence is with a phone call between a dealer and a borrower, is that fair?

MR. OBLAK: That's correct, your Honor. That's our understanding of the primary way which borrowers are identified.

THE COURT: Okay.

MR. OBLAK: I'll add occasionally there are click advertisements that direct a borrower to call a number. So sometimes the borrowers will make that call, but it's in response to a solicitation or advertisement they've seen.

THE COURT: Okay.

Okay. Then, if I'm correct, tell me if I'm wrong, the first document that the borrower receives is exhibit -- and we'll just use one, Exhibit A to the Singer declaration. And that document is entitled "Document Preparation and Administrative Service Agreement." Is that correct? Is that the first document in the sequence?

MR. OBLAK: Generally, yes, that is our understanding, that at some point following a conversation with someone from one of these dealer entities, the borrower is sent a packet like this.

THE COURT: Okay. And who are the parties to this agreement?

MR. OBLAK: This is an agreement between the dealer entity and the borrower. That's our understanding.

And my colleague was just reminding me that as far as what -- the process through which a borrower receives this is it's typically electronic; it may be via an email while the borrower is on the phone with the dealer representative. And as we allege in the complaint, they are urged often with suggestions that there's some exigency to sign the document on the spot via an electronic signature program.

So we don't know for sure with respect to each borrower what appears on the screen, but it's our understanding it's typically filled out with the person on the phone, encouraging them to move along and proceed with the process.

THE COURT: And who is the drafter of the form that is Exhibit A to the Singer affidavit?

MR. OBLAK: Our understanding and what we've alleged is that the various documents in both packets -- so we refer to this sometimes as the dealer packet -- the substance of them were prepared either by or in conjunction with EAC; and that

the arrangements that are entered into are all subject to this master servicer agreement.

THE COURT: Mr. Joseph, can you shed some light on who the author of this --

MR. JOSEPH: I will ascertain now that there's no factual allegation that we drafted this in that complaint, which goes on for hundreds of allegations. All they have is a conclusory allegation, which is false, that we train the dealers in what to say.

But as to who drafted this, I have no information that we had anything to do with drafting it. But, again --

THE COURT: Are you suggesting then that these dealers independently spent the effort, the money, to hire clearly experienced counsel?

MR. JOSEPH: I think this is a form on the internet. I think this is a form on the internet.

But, again, I'm not going to make a representation.

I understand these forms are out there for anybody who wants to become a dealer to use. My understanding is we have nothing to do with it, but if they want to make a factual allegation, I will ascertain that.

THE COURT: But dealers -- presumably, if these forms are on the internet and dealers could use them, then why would the dealer need to have any relationship with a company like EAC?

MR. JOSEPH: It assures them of payment of the $1300; that EAC takes the credit risk. And EAC does that pursuant to its own agreement.

THE COURT: And EAC is guaranteeing to these dealers that they will pay the $1300?

MR. JOSEPH: I did not, for purposes of this argument, study the master agreement with the dealers.

THE COURT: Well, if we want to avoid the facts, that's a good method, but -- no, look, I'm angry at them, too, all right? I don't appreciate the fact that several of the documents come with the defendants' papers. Why didn't all of the documents come with the complaint? The pick-and-choose approach doesn't do it for me.

MR. OBLAK: I can address that, your Honor.

We did not have the credit plans when we filed the complaint. I'm sorry, the other way around. We had one set of the packages when we filed the complaint, not the other. But our borrowers had. We were not trying to pick and choose as to what we put in front of the Court.

THE COURT: So are you questioning whether the signatures that appear as exhibits -- in these exhibits are the signatures of your clients?

MR. OBLAK: No, your Honor. And I think --

THE COURT: Therefore, your clients didn't manage to keep a copy in any format of these documents that they agreed

to pay people money? I'm sorry. That was a horrible sentence. Let me just start it again.

Are you telling me that your clients who both graduated from college, borrowed money to go to college, didn't keep in any format -- either on their phones, on their computers, in hard old-fashioned hard copy -- all of the documents that they signed involving these debts? Is that what you're telling me?

MR. OBLAK: No, your Honor.

THE COURT: Then why didn't you have them, if your clients had them?

MR. OBLAK: Maybe I'll let one of my colleagues address -- the question seems to have information --

MS. RANUCCI: Good afternoon, your Honor.

I'm Jessica Ranucci, New York Legal Assistance Group.

As I understand it, these documents are presented to borrowers through an electronic signature application. It doesn't generally look how it looks on paper.

My understanding is that our borrowers may never have seen or been provided a copy with any document that resembles the way that it looks on paper. They did, after filling out the electronic signature, receive an email, at least one of the plaintiffs, that had a -- supposedly had a link to the completed document. The link was broken. So they did not -- from our understanding, we do not believe that our borrowers

may have ever even received a completed copy that looked like this, which is why they didn't maintain it and why we did not view it in advance of the action.

THE COURT: Okay.

Just to go back for a second, Exhibit A obviously is filled with personal information that only the borrowers have. And it bears apparently signatures in six places.

Are you suggesting that -- or seven places, actually -- that, in fact, your client never signed their name seven times; that there's one signature block, and then the dealer populated the signature lines with that single signature, is that what you're saying?

MS. RANUCCI: Yes, that's exactly what we want to get discovery into. We're not sure exactly what was presented. And we think that very well may be the case.

MR. OBLAK: And I'd add that's often the case with electronic signature; you sign once, and then you're asked to populate at various places. You know, we don't know obviously what exactly our plaintiffs saw at each time they were asked to affix their signature, but that's the general way in which these type of programs work.

THE COURT: Let's hear it for paper.

MR. OBLAK: Indeed. Indeed.

THE COURT: Okay. Now that you've seen Exhibit A, what are you going to do about the arbitration clause and the

class action waivers?

MR. OBLAK: Your Honor, certainly Equitable has not asked for any relief on that.

THE COURT: I understand that.

I find that interesting too.

MR. OBLAK: Those are only in the dealer agreements; there is not a similar provision in the credit plans, what we refer to as the credit plans, the EAC set of documents.

THE COURT: All right.

So let's look at the purchase agreement. We'll just use Exhibit B to the complaint.

Again, who are the parties to this agreement?

MR. JOSEPH: May I?

MR. OBLAK: You can begin.

MR. JOSEPH: I'll take a shot at it; you can correct me.

I believe that it is between the borrower and the dealer and then assigned to EAC.

THE COURT: Okay. And what does it mean, Mr. Joseph, at the bottom of the various pages of the revolving credit plan and the purchase agreement, this -- the original document is owned by Equitable Acceptance, and this copy was created on August 17, 2017. I'm not so interested in the latter part of that sentence, but the first part, the original document is owned by Equitable Acceptance.

MR. JOSEPH: This is EAC's document. It prepared this document; it drafted this document. And so --

THE COURT: You take ownership of these, but you don't take ownership of the documents A and C to the Singer declaration.

MR. JOSEPH: Right. The dealer agreements are not ours, but this agreement is ours.

And in the dealer agreements, it says -- each of the dealers says we are not a lender, we are not a debt consolidation agency. So this is provided for EAC to extend the credit. And I'm sorry if there's some confusion as to who the original lender was, but --

THE COURT: What credit? There's nobody -- in other words, just think of a car loan. If you finance your car loan, the car company is paid right up front for the cost of the car.

Here, is anyone being paid up front $1300? Or is this just a situation where you've persuaded these borrowers that this is a good idea to get this help with respect to their student loans, and the borrowers pay the 49 or $39 a month, whatever it is, as long as they pay it, but that nobody is getting $1300 at the beginning. Is that right? Unlike the example of buying a car on credit.

MR. JOSEPH: That's not my understanding, your Honor, but I --

THE COURT: Who gets the $1300?

MR. JOSEPH: My understanding is that money is paid to the dealers in connection with these, but I do not want to make --

THE COURT: No, I agree with you. There's no question. They are not doing this for charity. But the issue is, is the dealer getting a per-borrower fee or is the dealer somehow getting $1300 up front?

MR. JOSEPH: Go ahead, John.

MR. OBLAK: Sure.

Our understanding is that there was --

THE COURT: That was really a question for Mr. Joseph.

MR. JOSEPH: Your Honor, it wasn't alleged. I haven't inquired into it. I've really -- all I focused on for this argument is the RICO claim.

THE COURT: That may be what the argument is, but there is an entire complaint. And when you considered what you were going to move against, presumably you considered the other parts of the complaint, as well, not simply the RICO claim. Because the RICO claim doesn't, sort of, sit there in absolute isolation.

MR. JOSEPH: We're prepared to move on everything. We sent a letter; your Honor discouraged that. We honored that. And as it turned out, the client then began settling a bunch of lawsuits, which made that a very wise decision. But I haven't gotten into the mechanics because it wasn't --

THE COURT: Well, it's so fundamental. It's not subtle. It's is the deal that Equitable decided that this was a new good line of business, and they developed a whole bunch of dealers who would sell these services, and then Equitable would actually pay the dealers $1300 at the outset in the hopes that these students who were presumably delinquent on their college loans would repay Equitable the $1300, and that Equitable was really taking a $1300 risk.

Or another system is, No, they didn't take a $1300 risk; they took about $150 risk, and they paid the dealers a fee per student and then, you know, after the third payment, they were about at zero. And anything above payment three was a profit for doing nothing.

MR. JOSEPH: Your Honor, I can only say I don't understand why the dealers would agree to that, but I'd rather not guess and just get the information. My understanding was that there was a payment made to the dealers --

THE COURT: I agree with that. I'm sure there was. People don't do things for nothing.

MR. OBLAK: Your Honor --

THE COURT: But it's a big deal of difference in the structure of this whether it's a per-student fee or it is the whole $1300.

MR. OBLAK: Our understanding is that there is not a $1300 payment; there is a payment that's made to the dealers

that's based on some sort of formula that takes into account the borrower's creditworthiness. So there is an upfront payment, and then there's the potential for more payments over time. It's a fairly complicated arrangement. But you're quite right, it's not a $1300 payment.

The other issue --

THE COURT: Wait a minute.

You have the dealer master agreement, right, that we talked about earlier?

MR. OBLAK: I believe we do. I don't know --

THE COURT: What does it say about this? Would you like to let me know?

MR. OBLAK: Our understanding is that there is a schedule. I don't know whether it's included with that.

THE COURT: All right. I have a simple question: Does the dealer get $1300? Is Equitable financing -- truly financing $1300, like the car loan?

MR. OBLAK: No.

THE COURT: Or is this an arrangement whereby dealers find people, they get a particular -- a fee for doing that, for making a phone call, putting some information on -- populating a form, and then most of the time that's it. But apparently sometimes they may get the opportunity to continue to collect from the student.

MR. OBLAK: That's absolutely right, your Honor. You

described it accurately. There's no $1300 payment; there's some initial upfront fee, and the potential for more payments down the road.

If I may, I just wanted to address one point that Mr. Joseph made about the credit plan.

We certainly agree that it is an EAC document. We disagree with the notion that EAC is not the lender to the extent that the entity extending the loan. In fact, in EAC's motion to dismiss -- I'm sorry, their reply as to motion to dismiss, they take issue and they identify, based on the title of the document, that they must be the entity extending the credit.

MR. JOSEPH: We are not disputing that. And if I said anything that gave a suggestion to the contrary, I did not mean it.

I was just asked who signed the document initially. It's our understanding that it's initially signed --

THE COURT: Isn't it initially between the dealer and the student, and then, on its face, assigned to EAC, or do you disagree with that sequence?

MR. OBLAK: I think it's, frankly, confusing the way it's set up.

THE COURT: That may be. But we're not the students; we're the lawyers here. So we should be able to figure this out as the lawyers.

MS. TARANTOLO: Your Honor, if I may, as a lawyer who has looked at these agreements very carefully, I believe that even applying a legal mind to these documents doesn't clarify what is going on.

As Mr. Joseph just stated earlier -- and I'm not sure actually whether he's retracted that, but as he stated earlier and as the document, on its face, the provision you previously read, suggests, it's contemplating an arrangement where the dealer is the initial lender and there's a subsequent assignment to Equitable.

I think the position that Equitable took in their papers and that Mr. Joseph took just now is that, in fact, Equitable is the lender, but extending the loan through a document that Equitable didn't sign, that was a document between the borrower and the dealer.

So we think there is just irreducible confusion. And, in fact, as you've seen in our papers, we think the confusion is so irreducible, that, in fact, no loan is being offered by anyone. If we can't even, as lawyers, figure out here who is the lender and what they're loaning and how much to whom, then there's no loan.

THE COURT: When you argue that, aren't you leaving out that -- and we'll just look at the numbers on the bottom of the pages on Exhibit B, which are a little -- 1 through -- actually, 1 through 7 -- 8 -- wait a minute. There's 1 through

8, and they're all -- it says at the bottom: All created at the exact same time, which means that the student is getting page 3 and page 4 at the same time.

If you put those two together, which I'm not saying is consistent with the TILA, but it does tell you what the total price is, what the down payment is, what the unpaid balance is. And then there's a disclosure of the interest rates on page 3. So you got the -- so I never quite understood your argument that -- on this, because it seems from the face of the document that all these pages are provided at the same time.

MS. TARANTOLO: Your Honor, is your question -- I think we -- our primary issue is with the identity of the lender, because -- not the -- not the total amount. And separately, as you note, with the multiple TILA violations that relate to the total cost of the credit.

One point I failed to make earlier is that under the theory that the additional lender is the dealer and EAC is simultaneously taking assignment, that's actually inconsistent with the dealer/borrower agreement, which specifically says that the dealer is not a lender and is not extending any credit to anybody.

THE COURT: So then focusing on the assignment provisions, it's reasonable to conclude -- or is it not -- that the dealer filled in all the blanks on Exhibit B?

MR. OBLAK: We're not entirely sure.

As we allege in the complaint, oftentimes this package from EAC came within minutes via email, after some other interaction, either call or completing forms that were completed by the dealer. So our assumption is that there is -- and we allege and believe that there is some coordination, obviously -- it's not coincidence -- they come minutes later. We don't know the extent to which information is populated from one or the other; although I do think the dealer agreement states and they represent to borrowers they're collecting certain information that may be used to assess their creditworthiness.

So it's really not clear. We just see a very coordinated chain of events.

THE COURT: Okay. Mr. Joseph.

MR. JOSEPH: Unless you have a question, I'm not going to just comment on that.

I would only say EAC doesn't have anything to do with the dealer agreements and the initial interactions; it deals only with its own lending agreement. But I can't answer the question whether, you know, the population is done initially by the dealers. I will find that out, but I cannot answer that today.

THE COURT: Mr. Oblak, a moment ago you said that it was your understanding that Exhibit B came very quickly, after something else. What is the something else?

MR. OBLAK: The completion of the packet of information that was provided by the dealer.

THE COURT: Okay. Namely --

MR. OBLAK: So -- sorry --

THE COURT: Which exhibit?

MR. OBLAK: It would be the exhibit to the declaration submitted by EAC, by Ms. Singer's declaration. That would be A and C, I believe.

THE COURT: Okay.

MR. OBLAK: I think we allege it at paragraph 289 that Ms. Williams received the EAC document packet the same day; and for Mr. Turner at 331, that about three minutes after he completed signing the dealer package with Integra, EAC emailed him their own separate document package.

THE COURT: Someplace, I just can't put my hands on it right now, but help me out. Isn't there a document where the borrower -- I think I may have found it -- gives permission to get a credit score on them? I guess that's at the beginning of B.

MR. OBLAK: Yes.

THE COURT: Right?

MR. OBLAK: Credit report authorization.

THE COURT: Right. Okay.

So I guess my question -- I don't know if anyone can answer it -- is, is there actually an attempt to run a credit

score on somebody? In other words, is there enough time between the authorization that you may obtain a credit score, and the actual provision of the loan?

MR. OBLAK: Our understanding is a credit report is run. That is in part because the way the compensation package, as it were, for the dealer's work is that what they receive is that upfront payment is based on the creditworthiness of the borrower. And we do understand that a credit report is run. And we think it's before this credit plan package is actually sent and received. I know this authorization is in that second package.

But our understanding from borrowers is that they are often asked to provide various information to support their income, their tax forms, things like that, that may be used for actually dealing with the student loan financiers, but are, in fact, also used to run credit reports and check credit. And we allege that in the complaint.

THE COURT: Did I misunderstand the plaintiffs' position to be that the credit plan is not enforceable because it didn't recite the principal amount? And that was the source of my question, but they got all the pages at one time. So even though it's on a separate page, is that -- even though the principal amount appears on a separate page, is it still a good argument that the credit plan is unenforceable because it doesn't contain a recital of the principal amount?

MR. OBLAK: I think our principal -- the defect that we would point to is the principal reason that we don't think this is enforceable, is because it's not clear which entity has, in fact, entered into an agreement to extend the loan to the borrower.

THE COURT: And that is a violation of what? In other words, I'm sure it's a TILA violation, without reading the statute. But why, in the end, does that matter to a borrower?

MR. OBLAK: Right. I mean it doesn't matter to RICO. I think it would matter to a borrower. And I'm not sure whether it's something we would pursue here; we certainly wanted to flag it here because we have this concern. But is there, in fact, an enforceable agreement?

So in this kind of context where EAC may be trying to collect a debt or a dealer may be trying to collect a debt, is this agreement -- if that's the instrument that is supposed to be the basis for that collection, is, in fact, enforceable. So we do have a declaratory judgment action as one of our claims that would seek to invalidate this agreement as a collectible instrument.

THE COURT: Okay.

And despite -- I guess I'm a little confused about why you think this is confusing.

If you look at page 4, the purchase agreement, I think it seems clear that that's between the student and the seller,

the seller being, as defined at the top, SLF Center.

MR. OBLAK: Right. And that's not the position that EAC has taken in its briefing. This is page 20. I can read through it, but Mr. Joseph's -- their papers indicate that by including the title of EAC on the document --

THE COURT: Wait a second. Let's just take one document at a time.

MR. OBLAK: Sure, sure.

THE COURT: I'm looking at page 4, a document called "Purchase Agreement."

MR. OBLAK: Right. I'm sorry.

THE COURT: Okay. Can we agree that that's not confusing?

MR. OBLAK: The purchase agreement?

THE COURT: The purchase agreement is clear that it is between the borrower and the seller, and the seller is defined as the SLF Center.

MR. OBLAK: I'll let my colleague address this.

MS. RANUCCI: Your Honor, if I may take a shot at this.

THE COURT: Sure.

MS. RANUCCI: So we are not disputing that, on paper, there is a clear -- you are correct, the purchase agreement provides for a purchase of services between the dealer and the borrower. That purchase does not suggest a loan.

And so what we are disputing is whether or not there's a lender on a loan.

And what we think is confusing is in order for there to be an enforceable loan, there must be a lender. And the lender, we believe, is in dispute, because there are two simultaneous things happening on the other side, you said page 3, the credit side of this, which purportedly would establish some loan. One of those is that Equitable is taking the position now that Equitable is itself the lender. The other is that this document suggests that there has already been some assignment of some credit agreement, suggesting that somebody else was the lender and just assigned the loan to Equitable.

THE COURT: Okay. Wait a second.

So looking at page 4, the purchase agreement says, right under the numbers: I agree to purchase and seller agrees to sell the listed items, provided this purchase agreement -- and I think there's a missing word -- is accepted under the revolving credit plan for purchases of products, the credit plan.

And then the student says: I request that this purchase agreement be accepted under the credit plan. I agree to pay the unpaid balance -- which is clearly spelled out -- in accordance with the terms of the credit plan. And it goes on to say that you can cancel this.

But I don't think I -- isn't it clear from the

purchase agreement that the repayment is going to -- that actually that the purchase cannot even occur unless this purchase agreement is accepted under the credit plan, and that the repayment will be under the credit plan, namely, pages 2 and 3?

MS. RANUCCI: Sure. But that still leaves open the question -- and again, the reason that we think that this is confusing is who is extending credit.

So if this purchase agreement is conditioned on the extension of credit through the credit plan from some party to the borrower, the thing that we think is fatally ambiguous is we do not understand who the identity is of the company that is extending credit to the borrower, which should be answered, I agree with you, on the credit plan portion, but we can't make heads or tails of it.

THE COURT: Wait a second.

So if you agree with me that the purchase agreement, page 4 of Exhibit B, provides that there's no deal, no contract, no purchase, unless the purchase agreement is accepted under the revolving credit plan, and then we look at page 2 and 3, and those are both entitled "Revolving Credit Plan," indeed, "Equitable Acceptance Revolving Credit Plan," and page 3 in paragraph 23 says: The undersigned assigns to Equitable Assistance Corporation this contract, and paragraph 2 says: The seller may assign this agreement to Equitable

Assistance Corporation, what is the confusion?

MS. RANUCCI: Your Honor, all the provisions that you just read would suggest -- I think what you're getting at, you're suggesting that on those provisions that the dealer is, in fact, lending money to the borrower.

THE COURT: No.

MS. RANUCCI: And then subsequently sending to Equitable.

THE COURT: Oh, yeah, maybe.

Well, but, no, no, no. No, I don't agree with that. No. Because on page 4, it says that there will be no sale because. The student says, I agree to purchase, and the seller agrees to sell the listed items, provided this purchase agreement is accepted under the revolving credit plan. So it is a conditional sale. And I don't think -- the dealer can't be both the seller and the provider of a revolving credit plan, because it can't, sort of, condition something on yourself.

So I think it's quite clear, if you bothered to read this, that -- and I don't mean you, that the dealer is not providing the credit. And you learn with the other parts of this, which are all produced at the exact same moment, that it's Equitable Acceptance.

MS. TARANTOLO: Your Honor, I'm not sure that I agree that a seller couldn't condition a sale on also separately agreeing whether to issue credit or not.

I think, regardless of whether that's the case though, it can't be true that Equitable is the lender and the dealer is also the lender. And there are aspects of the revolving credit plan that say that the dealer is initially -- what would the assignment provision mean? What is the dealer assigning? The dealer is assigning the credit obligation. How can it assign a credit obligation if it hasn't actually extended and entered the credit obligation?

THE COURT: It's assigning the contract to purchase.

MS. TARANTOLO: I don't believe that's the case, your Honor. I think Equitable would agree that what is assigned to Equitable is the credit obligation; that it's assigned -- what this purports to assign, it purports to assign the revolving credit plan from the initial lender to Equitable.

MR. JOSEPH: Your Honor, if I may.

There's a document in Exhibit A to Ms. Singer's affidavit, which is the service agreement. If you go to page 7 of 14 --

THE COURT: Okay. Just a second. I will. 7 of 14.

I'm sorry, I had the wrong document. Hold on.

MR. JOSEPH: This is the Integra agreement between Mr. Turner and Integra.

THE COURT: Exhibit A to Ms. Singer's affidavit. 7 of 14. Hold on. I need to count to seven. That's the idea.

MR. JOSEPH: No, no, you've got to actually look at

the top, because it starts on 2.

THE COURT: Look at the top.

MR. JOSEPH: Right.

THE COURT: I'm sorry. Are you sure --

MR. JOSEPH: Very, very top, the ECF number.

THE COURT: Okay. I have a copy that doesn't have an ECF number. I'm not a --

MR. JOSEPH: It's the sixth page.

THE COURT: Okay.

MR. JOSEPH: It's Item 4.

THE COURT: Just tell me what's on the top of the page.

MR. JOSEPH: It says "Document Preparation and Service Agreement."

THE COURT: Okay.

MR. JOSEPH: And then it has a series of items, goes 1 through 6.

THE COURT: I got that page.

MR. JOSEPH: On Item No. 4, if you go down --

THE COURT: Fees that client pays.

MR. JOSEPH: Yes. You can read the whole thing. But if you go down one, two, three, four, it says -- three lines: The payment of our $1314 fee is executed by a third party, Equitable Acceptance Corporation, in a separate document using a credit plan you have agreed with them to set up.

Client should review the separate credit plan which sets the schedule for filing fees that the client will be charged. The credit plan pays all authorized services provided by Integra student services under this agreement. In no way does Integra student services offer its own credit plan or administer the credit plan offered by Equitable Acceptance Corporation.

So I don't think there's any question that your Honor was correct, that there's a purchase that's done under the original agreement; it's subject to the credit plan. There's an assignment of the purchase agreement, but the credit plan is itself between Equitable and the individual.

THE COURT: I don't think you should be finding that. Because that's really consistent with the notion that Equitable stands to make $1300, minus whatever they pay the dealer, rather than having the dealer making the $1300. I think it's consistent with the basic big-picture scheme.

MS. TARANTOLO: Your Honor, just one aspect of the big-picture scheme that I think is helpful to understand why this is not just a technicality, but is important.

Subsequently, when borrowers complain to Equitable -- often what happens when a borrower realizes they've been defrauded, they first contact the dealer. The dealer says, Your payments are owed to Equitable; go talk to them.

Then they call up Equitable.

And what Equitable says is, We had nothing to do with this transaction at all. We were assigned your loan obligation. We don't have any idea what happened to you. If you have a problem with the services that you received and you think you were cheated in the initial transaction, that's not our problem.

So I think our ultimate point is just they like to -- it's helpful to Equitable to claim at some points and some circumstances that they are an initial lender, and in other circumstances that they are an assignee that had nothing to do with the initial loan. And that's really our point.

But we don't disagree with the many points that you've made. We just think that it's important to put the confusion -- it's not just confusion for the sake of confusion. We believe it's deliberate confusion so that Equitable can try to take the two positions in different circumstances.

MR. JOSEPH: Your Honor, there is a huge difference between the representations a dealer makes in connection with the services agreement -- and Equitable is not going to get involved in that -- and Equitable's plan, which they're separately claiming they didn't even understand was a loan, even though it says what it says on it. But there's no inconsistency in that position.

THE COURT: Well, to me, those two situations. They're sort of at a different point in time. And let's just

leave it at that.

Let's talk a little more about the revolving credit plan, again, Exhibit B to the complaint.

I think that the plaintiffs have argued that describing this document as a revolving credit plan is problematic or worse. Is that correct?

MR. OBLAK: Correct, your Honor.

We think this is -- I think what they call spurious, open-ended credit. It is dressed up to be open-ended credit; but, in reality, it's a maxed-out credit card. There is not the ability to borrow off of it, go back and go out and buy groceries, draw on this line of credit. It's essentially a fully -- it's an installment loan, in essence.

THE COURT: What is your, sort of, reference point? Where do you get your definition of what a revolving credit plan is?

MR. OBLAK: When you say --

THE COURT: Is there a statute that defines it? Is it *Black's Law Dictionary*?

MR. OBLAK: I think there's a lot of, I think, statutory -- I think it's addressed both by consumer regulations, as well as --

THE COURT: In other words, you say this is not revolving credit, and I think I understand why you say that. You're basically making a fraud claim, all right.

So to fill in the blank, it is fraud to describe this agreement as revolving credit because it violates the definition of "revolving credit" in, fill in the blank.

MR. OBLAK: I'll let my colleague from NYLAG fill in the blank for me.

MS. RANUCCI: Yes, your Honor. I think we're talking the Truth in Lending Act. The Truth in Lending Act defines open-end and, I believe, technically, it only defines closed-end credit, and then it defines all other credit as open-end. But it makes the distinction here.

THE COURT: Okay. So how do you deal then -- all right. Mr. Joseph, do you take the position that the description of revolving credit plan is accurate, or do you take the position that even if we violated TILA, that doesn't create damages under RICO, therefore, it can't be a predicate.

MR. JOSEPH: Well, but let me focus first on the RICO, all right. The only term that they are talking about is "closed-end" in TILA. That term does not appear in this agreement. There's no allegation that the word "revolving credit" is inherently fraudulent.

But let's go take a step further.

There is no claim, there is no allegation, they relied on the fact that it said it was revolving to enter into the agreement. They also don't allege any damages because of the fact it says it's revolving. In fact, they deny in paragraphs

129, 130, 131, and 170, that they even knew it was a loan. They deny they knew it was a loan.

Then in paragraph 181 they claim they were deceived because it's suggested it was open-ended, when it wasn't. But if they don't know they are taking out a loan, they can't be deceived, because it suggests it's open-ended, when that term is not even used in the revolving credit plan.

My position is, your Honor, it states an amount, which is the balance due. It states the interest rate, it states you're going to get monthly statements, it's going to be due 15 days afterwards; so you have a 15-day grace period upfront and every month. That's not fraudulent.

Whatever it is under TILA, it's not a predicate act. There's no fraud associated with it. And there's no fraud, there's no reliance, and there's no injury.

MS. RANUCCI: Your Honor, my response is similar to the one my colleague gave earlier, which is this is not manufactured confusion for the sake of manufacturing confusion; this is something that borrowers experience as confusing.

So many borrowers often first find out about this by reading their credit reports in which the Equitable Acceptance loan shows up as if it is a credit card, because it is reported as a revolving loan. And the borrowers are legitimately confused, many borrowers are legitimately confused about why they have what they understand to be a credit card from this

company. Of course, it's not, in fact, a credit card --

THE COURT: Well, they never got --

MS. RANUCCI: No --

THE COURT: How could they be -- credit cards come with little cards, they call it credit cards.

MS. RANUCCI: Sure.

THE COURT: They never got a little card, right?

MS. RANUCCI: Yes. Revolving credit is reported on credit reports like credit cards, which is why borrowers are confused. The structure of the loan being like a credit card is confusing to --

THE COURT: Okay. Wait a second.

You really can't -- if you're talking about any kind of reliance, you have to first say, I read this document and I saw the words "revolving credit plan," and I understood that to be a -- like a credit card, where my maximum ability to charge on it was $1300. I don't think your two plaintiffs could possibly say that, honestly.

Correct?

MR. OBLAK: Correct, your Honor. And --

THE COURT: So your argument can't be based on actual reliance, right? And obviously we know for RICO it doesn't have to be, but -- so the question -- so as I understand it -- and really, correct me if I'm wrong, the problem is calling this a revolving credit plan is inaccurate, contrary to TILA,

and the fact that it was -- and it was reported as such caused harm. I understand that.

The problem though is you recognize that harm isn't actionable under RICO.

MR. OBLAK: Right. And I want to -- I guess I don't want to get too focused on these agreements to the exclusion of the overall scheme that we've alleged. And I think even as EAC acknowledges in their payments -- or in their papers, that even though wire and mail transmissions that they engaged in, so the credit plans, for example, those don't have to be -- include false statements to be predicate acts.

So we point to these agreements as part of the overall scheme that has lured in and confused borrowers. Whether they think they are getting the $1300 credit card, that's not what we are saying. But they are confused fundamentally about the nature of this arrangement. And they believe that in taking out this new -- this new arrangement will be they will get loan forgiveness, and they will be paying some amount that will give them that benefit of loan forgiveness.

THE COURT: I get that.

Actually, let me go back and ask Mr. Joseph again.

Why is it accurate to entitle this document "revolving credit plan"?

MR. JOSEPH: Because as they make payments, the credit line opens up.

THE COURT: To do what?

MR. JOSEPH: For additional uses if they -- other services they may want to purchase from the service, including, for example, resubmission, because you have to resubmit forms every few years.

THE COURT: That, of course, never happened, because this didn't last three years.

MR. JOSEPH: Right. Exactly right. It did not. But that's what's contemplated, that they are going to be making payments every month, which Ms. Turner did not -- Mr. Turner did for a period, Ms. Williams did not. That opens up the credit line. They can acquire new services from Integra or from SLF, whoever that dealer is, in order to resubmit. That is why.

But, your Honor, let me go back --

THE COURT: But what's the benefit from -- describing it as a revolving credit plan obviously did cause harm which may not be actionable under RICO, but it was harmful to the plaintiffs.

MR. JOSEPH: I'm not sure about that, your Honor, because if it had not been called revolving, they still didn't pay.

THE COURT: If I lease an automobile -- back to cars. We don't have enough debt in our structure to have many other examples.

So if I lease a car, and I pay the monthly fee every month, that improves my credit score; it doesn't hurt my credit score.

So calling this "revolving credit," when essentially the anticipation, the reality, is that the students are going to be paying $49 a month until they pay off the $1300 debt or contract, whatever. If it was treated like my car lease, I am not hurt; indeed, if I'm good, I'm helped. But calling it revolving credit isn't depositive for the students.

But I'm curious, why is it a positive for Equitable Acceptance? In other words, what benefit does EAC get from calling it revolving credit rather than from calling it a loan that's a $1300 loan repayable at $49 a month until it's repaid?

MR. JOSEPH: Let me start with the premise, your Honor. I don't know that their credit score is harmed if --

THE COURT: Well, I think they've alleged that in the complaint.

MR. JOSEPH: That's fine. I just don't know that.

I can't answer what benefit -- my client has told me they always understood it was revolving credit. If there's some benefit that's associated with that -- and that was because they could continue to have this client fill it up to the 1300 again.

THE COURT: Is there even one example?

No. I doubt it.

MR. JOSEPH: And you may be right. You may be right.

And I'm not going to say there is no other benefit, your Honor, I just have not inquired into that. I don't know what it would be, but I'm not saying there is not.

MS. RANUCCI: If I might offer a possible reason, your Honor.

THE COURT: Please.

MS. RANUCCI: The TILA requirements for closed-end credit are much stricter than those for open-end credit. If you're familiar with a car loan, you might remember there's a box that appears in the middle of the page that says how much is financed, how much is the finance charge, and then how much are the total of your payments over the payment term.

That's precisely the information that isn't here that would have potentially alerted some borrowers of the total. Because these loans are 21 percent interest; they are very high.

So for our plaintiffs, for example, it would have said the purchase price is around 1300, the interest is maybe four or 500; so the total of your payments over time, it would have given that very big number. And those clear disclosures potentially could have been a reason why EAC would not want to have structured the loans that way in the first place.

MR. JOSEPH: And I can't respond to that.

THE COURT: Okay.

Did the borrowers here receive any direct communication from EAC?

MR. JOSEPH: The allegation is that they did. In paragraph, I think it was, 331 for Mr. Turner, and 289 -- let me just make sure those are correct. Yes, on 289 it says on the same day after they had executed the service agreement, EAC emailed Ms. Williams a packet through DocuSign. And in 331 there's a parallel allegation for Mr. Turner.

THE COURT: Okay. So the conclusion from that would be that EAC received the email addresses and other information from the dealer; correct?

MR. OBLAK: That's our assumption.

MR. JOSEPH: Yes, your Honor.

THE COURT: Okay.

In the course of your either dealing with these two plaintiffs or any of the other individuals that you've had contact with, anybody ever get any of these documents in hard copy?

MR. OBLAK: Not that we're aware of.

THE COURT: Leaving to one side the question of whether any misstatement by a dealer could be attributed to EAC, does EAC dispute that the complaint adequately pleads that the dealers made material misstatements that could serve as predicates for mail and wire fraud?

MR. JOSEPH: Your Honor, you know, I hadn't considered

that, because the imputation issue was the issue for RICO purposes.

But they have alleged that misstatements were made. So I'm not going to dispute it, I just haven't analyzed the complaint on a paragraph-by-paragraph basis. We anticipated initially that dealers were going to be defending their representations of what happened, but nobody appeared.

THE COURT: Then focusing on the connection between the dealers and EAC, does EAC dispute that the plaintiffs have adequately pled -- forget that. Adequately pled EAC's involvement in the dealer's marketing practices?

MR. JOSEPH: We absolutely dispute that.

All we have are information-and-belief allegations, and a couple of paragraphs, I think it's 69 and 206, that we train the dealers, which they don't even give the factual basis for that alleged information and belief. It's not true. But it's irrelevant whether it's true; it's not properly pled, because there's no factual basis for that allegation.

This is not a case, like the *Angermeir* case, where you're dealing with co-officers of the same corporate structure. These are separate individuals of separate companies, and you don't impute. You actually are responsible for your own statements, unless there's something more, some kind of participation, which none is alleged. And there's no basis for the allegation.

THE COURT: Well, I thought that they did allege that EAC provided training to dealers. You're just saying that you don't -- your view is that that's not adequately alleged.

MR. JOSEPH: To say on information and belief that we train the dealers, without a factual basis for the information and belief, allows them to say that about anybody. And there's no basis for it.

And they now have had discovery. If they want to try and amend to say that there's something in the discovery that shows that, let them say that. It's not true. There's nothing in the discovery that shows that.

THE COURT: Do you want to answer that?

MR. OBLAK: Sure.

I mean I'll start with the paragraph -- at least one of the paragraphs Mr. Joseph referred to, that's paragraph 206. And there we state that upon information and belief, we do indeed include that. In December 2016, EAC convened an in-person meeting with multiple dealers. That's based on our discussion with a representative of Integra, one of the defendants, the one who hasn't appeared. So we certainly have a basis to include that allegation, as we do a number of the other allegations that are included here regarding EAC's overall involvement in the scheme.

It's very clear, even from the discussion we've had here today, how deeply interwoven they are in this overall

scheme, from their documents popping up minutes after borrowers fill out their dealer document packages, to a whole host of allegations in the complaint about efforts that EAC has been involved with to respond to complaints from borrowers making misleading statements about their role in the process of offering this loan forgiveness.

We have both alleged in the complaint and we've certainly seen in discovery close coordination between EAC and the dealers that, you know, this is not where EAC somehow got duped into providing financing where the dealers would offer up a bunch of different finance agencies and EAC happened to be the one to take the call. This is EAC with a master dealer agreement out there recruiting dealers to find borrowers to whom they could advance this credit.

So we think on a whole host of bases, we've sufficiently alleged EAC's role in the overall scheme; so that even if you found that the credit plans themselves were not materially misleading, their role in the overall scheme under *Angermeir* and other authorities, is well-established.

MR. JOSEPH: Your Honor, I object now to having some hearsay characterization of what a third party -- nothing pled -- supposedly said.

But I'm going to go a step further. They can't reasonably rely on alleged oral statements that are expressly disclaimed in writing. They cannot do that as a matter of law.

And I don't want to let them walk away from reliance. They point to the *Bridge* case, but I want to be very clear about *Bridge*. *Bridge* said you don't have to plead first-party plaintiff reliance, when there is a third party relying that causes you, the first party, damage. There is no third party here. *Bridge* says somebody has to rely. Here, nobody can reasonably rely on statements which they now say were made that are expressly --

THE COURT: How do you deal with *Weaver* in the Second Circuit?

MR. OBLAK: Your Honor, I'm going to let my colleague Mr. Schweizer --

THE COURT: No, it's a good case for you is the answer.

How does Mr. Joseph deal with it?

MR. JOSEPH: Your Honor, I can't address the *Weaver* case at this moment because I'm not -- I just don't remember it right now.

THE COURT: Okay. It is the case that holds.

Well, you tell him what it is. I don't have to tell him.

MR. SCHWEIZER: Your Honor, *Weaver* holds that contract disclosures and disclaimers, even ones that go directly to the false and misleading statements alleged, won't defeat a RICO claim.

THE COURT: A mail fraud claim. It's not a RICO case.

MR. SCHWEIZER: Sorry, wire fraud. That's right. They won't defeat the predicate wire fraud. In *Bridge*, it said that reasonable reliance simply is not an element of RICO.

Now, he, Mr. Joseph, points to a very interesting discussion in *Bridge*, which is about third-party reliance in showing causation of injury. It's completely academic in this context.

First, it has nothing to do with disclosures whatsoever; that's something about the causation of damages.

Also, as my colleague, and as this discussion, and our amended complaint, and the papers show up and down, as well as common sense, the borrowers actually did rely on false and misleading statements in entering these agreements, because of course they did. The services that they received, the supposed services, are available for free from the government, and are harmful. I think that there are more than -- if I can just turn -- oh, okay.

MR. JOSEPH: May I?

THE COURT: Let me just respond to your one thing.

Clearly, you just said, I believe, that, well, of course, there must have been misrepresentations, because the services are available for free, right? Basically, that's what you said.

MR. SCHWEIZER: Not --

THE COURT: In other words, that since you could get the same service doing it yourself, it must be that there were misrepresentations, or otherwise the plaintiffs wouldn't have signed up. Isn't that basically what you're saying?

MR. SCHWEIZER: That's the gist of it, your Honor.

THE COURT: All right.

But isn't that intellectually just plain wrong? I can mow my own lawn, but I may pay a gardener to do it for me. I may be able to change the oil in my car -- back to the car -- but I may bring it to a Jiffy Lube or my car dealer to do it for me. In other words, the mere fact that we can do something for ourselves does not make it a fraud when we pay someone else to do it. So you need more than just that.

MR. SCHWEIZER: Completely agreed, your Honor.

What you need are actual false or misleading statements that are material. Here we've alleged them.

I had brought up the valuelessness of the services; and they are valueless, even though in the abstract it might be nice to have document preparation done. But I brought up the scamming nature of the services in the context of rebutting Mr. Joseph's point about *Bridge*.

Now, he points to *obiter dicta* in *Bridge* in which the Supreme Court is discussing causation of damages. *Bridge* is a case that holds that justifiable reliance isn't an element of a RICO claim.

And in the passage that Mr. Joseph points to, the court says, essentially, that to prove -- even though there's no reliance element, because that's how Congress wrote the statute, regardless, you probably will need to show that somebody relied on a false or misleading statement in order to ultimately show that there was proximate causation. I would submit that that is completely irrelevant on this motion, because proximate causation is a summary judgment issue. And I had stated my belief that we will be able to show that in a slam dunk. It's really not a viable basis for summary judgment either.

THE COURT: Well, there's a stronger argument. The stronger argument is that to satisfy the mail or wire fraud statutes, you do not need a completed scheme. No one has to be defrauded. There just has to be a scheme that involves material misstatements which a reasonable person would have found to be influential, i.e., material. So that's the difference. You don't need damages, you don't need reliance to assert mail and wire fraud as a predicate act.

MR. SCHWEIZER: I would like to adopt your Honor, that's fine.

THE COURT: Why not.

MR. JOSEPH: Your Honor, that's true. But there is no private right of action for mail or wire fraud. And under 1962(d), which is the RICO private right of action, you have to

plead and prove proximate cause and reliance. And the *Weaver* case -- I now look back at it -- just holds that a boilerplate merger clause --

THE COURT: Actually, my law clerk did some more work on that. It's always good to have great law clerks. And that argument was made in the briefs to the Second Circuit, and obviously it did not prevail.

MR. JOSEPH: Here we have specific disclaimers. This is not a boilerplate merger clause. We have specific language that says we are not associated with the government. We are a private company. It goes through each of the elements that they claim is false. It says that they are providing provision of debt relief form services, they are not providing debt relief.

It says they are not affiliated with the government. It says the government programs are available for free. And says that the EAC loan, which is the EAC loan -- that's what EAC can be charged with, is the loan itself, that document. And there's nothing fraudulent, for RICO purposes, about that document.

But there's no case saying that you can have an express disclaimer of the exact representation, not just a merger clause saying, We're not relying on anything, but the exact language.

THE COURT: Okay. Let me read to you the disclaimer

that's in the record in *Weaver*:

Purchaser understands that seller has no affiliation or financial relationship with professional locating companies, and that seller has no involvement whatsoever in securing retail locations.

It goes on.

Purchaser and seller agree that this purchase order contains the entire understanding of the agreement between the parties, and that there is no reliance upon any verbal representation whatsoever. Seller has not guaranteed any minimum or maximum earnings. Earnings are primarily dependent upon location selected by the purchaser for its vending machines, the type of service, and the promotion rendered by the purchaser, and the sales volume, factors beyond the control of the seller.

All right. I'm sorry. That is specific, and that was the issue in *Weaver*. I don't think *Weaver* is distinguishable on that basis.

MR. JOSEPH: That may be sufficient, your Honor, for criminal mail and wire fraud purposes.

THE COURT: The issue at this point is simply have the plaintiffs adequately pled as a predicate act a mail or wire fraud. That is not for RICO, for right now. Eventually, will they have to prove other things? Yes. But that's not the motion that's here right now. The issue --

MR. JOSEPH: Well, then, your Honor, I'd like to turn to continuity.

THE COURT: Okay.

MR. JOSEPH: Because that is something they have not pled. There has to be a minimum of two years' continuity in the Second Circuit.

Normally, when you're dealing with a loan, you don't go to the entire payment stream. We have to put in every payment. We go from the first contact in September '16, to the last contact in April of '18. You do not have the two-plus years, which are a minimum. And it's not enough to say it's a regular way of doing business with others.

The Second Circuit rejected that again on August 30th of this year in a case called *Ambase*, which is 2019 Westlaw 4127342. There's no closed-end continuity because it doesn't go two years. You can't say they did it to other people which you don't identify and don't name. They have anonymous borrowers with other dealers and unnamed dealers.

If we were to start taking into account unnamed dealers, then the enterprise is a spoke-and-hub enterprise which isn't recognized as an enterprise under RICO.

What they have is what they've got. They have two people. It's less than two years. They haven't stated continuity. Then you have all sorts of other claims, but they haven't stated a RICO claim.

THE COURT: There's no question Mr. Joseph is correct about the Second Circuit requiring two years as the benchmark for closed-end continuity. Do the plaintiffs have any argument that this case is so distinctive that we ought to find closed-end continuity, despite the fact that you don't meet the two-year standard?

MR. OBLAK: Yes, your Honor. And I'll start with Mr. Joseph's suggestion that the Court should disregard what he describes as anonymous borrowers or anonymous sources.

As your Honor is aware, we identify specifically by name 20 additional borrowers among the 60 or so we had spoken to as of the time we filed the amended complaint. And we include very specific allegations in here, including not just name, but dates of events and who they spoke with and things of that nature.

And so in their papers, EAC suggests that those borrowers' allegations should be disregarded as anonymous. The reality is that EAC knows who each one of those individuals are. If they didn't from the information provided in the complaint, they do because those individuals were identified in our initial disclosures. So these are not the type of anonymous sources or amalgamations of confidential information that's unattributable; these are allegations from specific people that we've spoken to and identified by name. These borrowers are all known to EAC. And the specificity of their

allegations is more than sufficient for those to be credited here. And what we see for them is that this is a pattern of conduct that is extended more than two years.

We have allegations from the amended complaint from the earliest instances of borrowers being contacted as part of this scheme; March 2015, I think, is the earliest date. That's in paragraph 103. There are at various places in the complaint where it discusses the experiences of other borrowers, where dates in that 2015-2016 period are identified specifically with the act of the dealer contacting them.

What's important is these are not borrowers who got their financing from someone else. These are borrowers who got their financing from EAC. That's why they are in the complaint. So the fact that it may be a dealer who wasn't named as a defendant doesn't negate the fact that EAC is involved in this business and has been doing it extensively. We know from their own papers something like 60,000 borrowers have signed on to these agreements. And we have identified scores by name in this complaint whose experiences date back a year or two earlier than our named plaintiffs. And we think that's more than sufficient to meet the continuity requirement and illustrating the vast pattern that EAC has engaged in.

MR. JOSEPH: Your Honor, what we are dealing with then -- I mean we're talking -- if we look at paragraph 103 --

THE COURT: Just a second.

MR. JOSEPH: Allegations that are made by different dealers to different individuals that are not these plaintiffs, and they are not part of the enterprise.

If you look at paragraph 384, the enterprise is an association-in-fact between the dealers named in this complaint and EAC. And you couldn't have an enterprise that's naming every other dealer in the country.

By the way, I believe everybody in 103 -- pretty much everybody, at least three of them -- have all settled. So EAC is not collecting on those loans. But that's not their enterprise. Their enterprise is just EAC and the dealers. And that's what they have to show continuity for, and they don't show that.

THE COURT: What do you say back to that?

MR. OBLAK: I disagree that we cannot meet this continuity requirement by identifying other borrowers who fell victim to the same scheme.

THE COURT: But you have to have an enterprise. In other words, you have to have the scheme in the first instance. And the question is how long does your evidence show that scheme lasted?

MR. OBLAK: And we've identified -- we have named additional Doe defendants, which would be other -- including other of the dealers who engaged in this scheme.

THE COURT: No. You can't name -- when you know what

their names are, you can't call them Does and then rely on it. You filed an amended complaint, you had a chance to name, if it was appropriate -- I don't know whether it was or it wasn't -- additional dealers. You had the opportunity to name additional plaintiffs.

MR. OBLAK: Again, I think we would argue that based on the breadth of the allegations identified in the amended complaint, including the additional 20 borrowers who are named, if not closed-ended, again, I am not familiar with the decision Mr. Joseph cited, the Court cited about the regular course of business, I didn't believe that the open-ended continuity was entirely foreclosed as an avenue.

And again, we would suggest, based on the breadth of the allegations, that if the Court were not to consider the other borrower allegations for the purpose of continuity, that we would have satisfied it for open-ended continuity.

THE COURT: I'm not saying that -- all I'm saying is you have alleged a certain enterprise and a certain, sort of, scheme. And that's the one, ultimately, I have to work with, I think. But we'll see.

MR. OBLAK: Understood.

I guess I'd just close by pointing out that, again, the additional borrowers who we've identified were all borrowers who were extended credit by EAC over that time period. It's part of a business that they themselves promoted,

having entered in 2015. We allege that in the complaint, as well, that they began offering these services. That's at paragraph 59, when they first began offering these services.

THE COURT: Okay.

(Pause)

THE COURT: One question: Is there anyplace in the various documents that we've been looking at where there is a disclosure that the loan might be put back to the dealer from EAC?

MR. OBLAK: I don't believe there is, your Honor. I might circle that, but my colleagues are agreeing with me.

MR. JOSEPH: Your Honor, I just have to read them again.

THE COURT: Okay. Well, if you find that, would you let me know?

MR. JOSEPH: Yes, your Honor.

THE COURT: Okay. Happy reading.

Anyway, all right, I've asked a whole bunch of questions, actually, for about almost two hours. So if there's something that you would like to say that you haven't said in the course of this question-and-answer period, please let me give -- I guess we'll give Mr. Joseph the floor, since it's his motion.

MR. JOSEPH: Your Honor, I think we've covered essentially everything at this point.

THE COURT: Okay.

MR. OBLAK: With respect to the issues subject to the motion, I think we covered most of what we planned to address, mostly in response to the argument we anticipated.

I think we perhaps want to maybe have some housekeeping discussions, if you're ready to move past the motion, discussions of the motion itself.

THE COURT: I thought that was the only thing on my docket this morning.

MR. OBLAK: Okay.

THE COURT: I still think that, based on our initial conversation, that -- well, that given apparently the acceptance by governmental entities that EAC is not a deep pocket, and given that borrowers can get a benefit from cancellation of a loan, a real benefit, even if they are not getting their money back -- although I recognize that, having now learned today, which I don't think I did know, that some of the loans have been returned to the dealers for collection, and I recognize that that complicates everything, because it's not a situation where everyone is in front of me. And I don't know how to overcome that, frankly. I might speculate that I'm not sure how you overcome that period.

You can still only have a class action against the named defendants. That doesn't give you some broad opportunity to suck everybody else into this case. So I don't know that

that challenge is ever going to be solved in this litigation.

MR. JOSEPH: Your Honor, I did identify while we were waiting, there's a part of the New York AG's website which has a heading called "Information About Settlement with Equitable Acceptance Corporation." And in question and answer -- it's frequently asked questions, what are the terms of the Equitable consent order, the last bullet under it says: Equitable must pay the state -- New York State $225,000. The consent order provides for a $1.66 million judgment, but the judgment was suspended based on the company's inability to pay.

THE COURT: Right. I did actually look at that website a number of weeks ago.

Do you want to go just off the record and talk about this a little bit?

MR. OBLAK: Sure.

(Off record)

* * *