UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
VANESSA WILLIAMS and KORY TURNER,
individually and on behalf of all
persons similarly situated,

              Plaintiffs,

      - against -

EQUITABLE ACCEPTANCE CORPORATION,
SLF CENTER, LLC, INTEGRA STUDENT
SOLUTIONS, LLC, and DOES 1-41,

              Defendants.
--------------------------------X

**MEMORANDUM AND ORDER**

18 Civ. 7537 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Plaintiffs bring this action against defendants, asserting,
<u>inter alia</u>, a claim under the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), codified at 18 U.S.C. § 1962(c), and
a civil RICO conspiracy claim under 18 U.S.C. § 1962(d).
Plaintiffs allege that defendants violated those statutes by
operating a scheme to fraudulently induce individuals with federal
student loan debts to purchase certain services from dealers—
including SLF Center, LLC ("SLF") and Integra Student Solutions,
LLC ("Integra")—and to finance that purchase with a loan from
defendant Equitable Acceptance Corporation ("EAC").  Before the
Court is defendant EAC's motion to dismiss the plaintiffs' RICO
claims against it.  For the following reasons, defendant EAC's
motion is denied.

## I.  Background

A.  **Federal Student Loan Adjustment Programs**

This litigation involves certain "services" purportedly provided by defendants in connection with the student loan forgiveness programs run by the United States Department of Education ("DOE"). Each federal student loan borrower ("Borrower") is assigned to one of nine federal student loan servicers. Am. Compl. (ECF No. 30) ¶ 24. The Borrower directs any inquiry and makes payments for her student loans to the servicer. Id. The statutes governing federal student loan programs provide qualifying Borrowers a set of rights to have their repayment obligations adjusted in certain manners. Id. at ¶ 29.

First, qualifying Borrowers can consolidate their loans into a new single loan. Id. at ¶ 30. These Borrowers can apply for consolidation by filing a five-page form issued by the DOE. Id. at ¶ 31. The DOE instructions provide that, in general, one would be able to complete the form in less than 30 minutes. Id. at ¶ 32. Second, qualifying Borrowers can enroll in an Income Driven Repayment Plan, under which one's monthly payment is reduced to a fixed amount calculated as a percentage (determined based on various factors) of household discretionary income. Id. at ¶ 40. These Borrowers can enroll in the Plan by filing a four-page form issued by the DOE. Id. at ¶ 42. The DOE instructions provide that, in general, one would be able to complete the form in 10

minutes or less.  Id. at ¶ 43.  Third, qualifying Borrowers can expedite their eligibility for loan forgiveness through the Public Service Loan Forgiveness Program.  Id. at ¶ 47.  However, consolidation of qualifying loans would reset the clock for receiving the benefit of this Program.  Id. at ¶ 49.  Lastly, any Borrower can request from her servicer a temporary forbearance from collection of her student loans.  Id. at ¶ 50.  If this request is granted, the Borrower is relieved from making payments during the forbearance period, but interest continues to accrue on her loans while the accrual of time credit requisite for enrolling in the programs described above is tolled.  Id. at ¶ 51.

        B.  **Alleged Scheme**

Plaintiffs allege that defendants have constructed a scheme to defraud those with federal student loan debts.  As alleged by plaintiffs, the scheme operated in the following manner.

In around 2015, EAC expanded its business and started to provided financing for "student loan assistance services."  Id. at ¶ 60.  As a means to market its financing business, EAC recruited and entered into contracts with dealers ("Dealers") that would pitch the purported "student loan assistance services" ("Services") directly to Borrowers.  Id.  The Dealers solicited customers through direct mailing, cold-calling, online marketing, and referrals from EAC.  Id. at ¶ 65.  According to plaintiffs,

EAC entered into such arrangements with forty-three dealers. Id. at ¶ 385.

In communicating with Borrowers as potential customers, the Dealers introduced their purported Services as providing loan "forgiveness." Id. at ¶ 72. The Services furnished by the Dealers, however, were simply filing applications on behalf of a Borrower for loan consolidation and enrollment in Income Driven Repayment Plan offered by the DOE. Id. at ¶ 75. In marketing their Services, the Dealers represented those Services to Borrowers as reducing or eliminating their total student loan balance, id. at ¶ 76, but did not disclose that their Services would achieve those results only through the programs offered by the DOE, in which the Borrowers could enroll at no cost by filing the requisite forms themselves. Id. at ¶ 89. The Dealers further suggested that the Borrowers might not achieve the same results as what their Services would do if the Borrowers enroll in the programs offered by the DOE on their own. Id. at ¶ 104. Moreover, the Dealers did not disclose that the Borrowers might face some negative consequences by enrolling in those programs through their Services, such as losing their accrued credit in connection with other loan forgiveness programs offered by the DOE, paying a higher interest rate or facing some tax liabilities. Id. at ¶¶ 107-11.

Dealers offered their Services to each Borrower at approximately $1,300. Id. at ¶ 124. Because Dealers were

prohibited from receiving payments directly from Borrowers due to a federal regulation limiting telemarketers' ability to receive payments directly from their customers, codified at 16 C.F.R. 310.4(a)(5)(i), Dealers referred Borrowers to EAC for financing of their purchase of Services. Id. at ¶¶ 126-27. Dealers conditioned their sale of Services to Borrowers upon the EAC's acceptance of them for financing. Id. at ¶ 127. Dealers represented to Borrowers that the arrangement between Borrowers and EAC was a "payment plan." Id. at ¶ 129. The financing from EAC, however, resulted in a Borrower incurring a debt in an amount of approximately $1,300 to EAC, at least a portion of the proceeds of which were transferred to a Dealer as the payment for the Borrower's purchase of Services. Id. at ¶¶ 123, 127, 210. EAC's loans to the Borrowers generally carried interest rates exceeding 20%. Id. at ¶ 131. Moreover, contrary to the Dealers' representation that each monthly payment under the "payment plan" would be applied only to a Borrower's federal student loan balance, a portion of the monthly payment went to EAC in satisfaction of the financing charges for its loan to the Borrower. Id. at ¶ 128.

Once a Borrower agreed to purchase the Services during a marketing call, the Dealer referred the Borrower to EAC for financing. Id. at ¶ 153. According to plaintiffs, EAC constructed a system through which Dealers could instantaneously submit financing referrals to EAC and confirm EAC'S approval for financing

while Borrowers were still with them on the line. _Id._
Contemporaneously or shortly after EAC approved a Borrower for
financing, the Dealer electronically sent a document packet to the
Borrower. _Id._ at ¶ 154. Within minutes, EAC electronically sent
the Borrower another document packet. _Id._ at ¶ 155. As part of
the "high-pressure sales tactics" employed by Dealers to
effectuate the alleged scheme, a Dealer would pressure a Borrower
to electronically sign both packets of documents while the Borrower
remained on the line or immediately afterwards. _Id._ at ¶¶ 140,
156.

The second document packet sent by EAC contained a document
entitled "Purchase Agreement," which sets forth the terms of a
Borrower's purchase of Services from the Dealer. _Id._ at ¶ 166.
The packet also contained another document entitled "Equitable
Acceptance Revolving Credit Plan" ("Credit Plan"). _Id._ at ¶ 167.
The Credit Plan purports to set forth the terms of EAC's financing
to a Borrower, but plaintiffs claim that its terms are too nebulous
to create any enforceable obligation and that it is otherwise
misleading, especially due to its failure to specify the
counterparty and other key elements of the loan, such as the
principal amount and applicable interest rate. _Id._ at ¶¶ 169-204.
Paragraph 23 of the Credit Plan provided:

> 23. ASSIGNMENT. For value received, the undersigned
> assigns to Equitable Acceptance Corporation this
> contract. This assignment is governed by and made

subject to a Master Dealer Agreement or similar document between Seller and Equitable Acceptance Corporation.

See Am. Compl. Ex. B at 3, ¶ 23; Ex. C at 3, ¶ 23. Under this provision, once a Borrower signs the Credit Plan, it becomes a contract between the Borrower and EAC.

After a Borrower signed all documents in both packets, the Dealer submitted applications for consolidation of the Borrower's loans or enrollment in the Income Driven Repayment Plan. Id. at ¶ 238. The Dealer completed this process by using the Borrower's personal identifying information and log-in credentials, which the Dealer obtained from the Borrower by stating that it needs those pieces of information for effectuating the Services. Id. at ¶ 240.

C. **Named Plaintiffs**

Plaintiffs Vanessa Williams and Kory Turner ("Named Plaintiffs") bring this action on behalf of all individuals who have obtained financing from EAC in connection with purchasing the Services from Dealers. Id. at ¶ 370. Because plaintiffs have not moved yet for a class certification pursuant to Federal Rule of Civil Procedure 23, the Court here focuses on the allegations involving the Named Plaintiffs.

1. Vanessa Williams

Plaintiff Vanessa Williams graduated from the State University of New York-Buffalo State College with a bachelor's degree in fashion and textile technology in 2016. Id. at ¶ 270.

7

In obtaining the degree, Williams incurred approximately $21,000 of debt in student loans. Id.

On August 17, 2017, an enrollment counselor at SLF made an unsolicited call to Williams and falsely stated that her student loan servicer had been sued for engaging in illegal activities. Id. at ¶ 273. The enrollment counsel offered her the SLF's Services at $1,300 to be paid through a payment plan of $49 per month. Id. at ¶ 274. Williams gave the enrollment counselor the log-in credentials for her studentloans.gov account. Id. at ¶ 276.

Williams electronically signed a document packet sent by SLF the same day. Id. at ¶ 288. That packet contained documents called "Preparation Service Agreement" and "Document Preparation and Service Agreement," which memorialize Williams's purchase of purported services by SLF in connection with her student loans. See Singer Decl. (ECF No. 39), Ex. C. Later the same day, EAC sent Williams another document packet. Am. Compl. ¶ 289. The Credit Plan contained in the EAC's packet stated that an annual interest rate of 20.99% would apply and it would take 34 months to pay-off the balance in full by paying the minimum monthly payment every month. Id., Ex. B at 3. The EAC's packet also contained the Purchase Agreement, setting forth certain information including the down payment amount, the unpaid balance, and the monthly payment amount. Id. at ¶ 290; id., Ex. B at 4. Williams

electronically signed the documents in the EAC'S packet as well. Id. at ¶ 292.

The next day, the same enrollment counselor from SLF called Williams again and instructed her to provide proof of income so that SLF could "send it to the [DOE] for review." Id. at ¶ 294. Williams sent the SLF enrollment counselor her paystubs three days later. Id. SLF forwarded her paystubs to EAC shortly after it received them from Williams. Id. at ¶ 295.

A few weeks later, Williams authorized an electronic payment of $150 to SLF as a down payment on her financing from EAC. Id. at ¶ 296. On September 18, 2017, Williams reached out to the SLF enrollment counselor to confirm that her down payment had been processed. Id. at ¶ 297. The counselor responded that the payment usually takes a few days to process due to the fact that it is a "federal transaction." Id. The down payment of $150 to SLF was eventually debited from Williams' bank account on September 19, 2017. Id. at ¶ 299.

In late September 2017, SLF logged into studentloans.gov with the Williams' credentials and applied for loan consolidation and enrollment in the Income Driven Repayment Plan. Id. at ¶¶ 300-01. SLF falsely stated in the application that Williams had not filed tax returns in the previous two years. Id. at ¶ 304. On September 27, 2017, SLF electronically signed the promissory note for Williams' consolidated loan. Id. at ¶ 301. In the promissory

note, SLF entered an email address not associated with Williams. Id. at ¶ 302. As a result of consolidation, Williams faces a higher interest rate on her student loans. Id. at ¶ 310.

Williams made her initial monthly payment of $49 to EAC on October 21, 2017 by auto pay. Id. at ¶ 306. Thereafter, EAC sent its monthly billing statements to Williams from November 2017 to February 2018, and Williams made payments to EAC. Id. at ¶¶ 305, 312.

### 2. Kory Turner

Plaintiff Kory Turner graduated from Montclair State University with a bachelor's degree in 2011. Id. at ¶ 317. He also graduated from Drew Theological School with a master's degree in 2015. Id. In obtaining these degrees, Turner incurred approximately $80,000 of debt in student loans. Id. Shortly after he graduated from Drew Theological School in 2015, Turner successfully applied for consolidation of his student loans on his own by working with his student loan servicer. Id. at ¶ 318.

In September 2016, Turner called Integra, which he learned of through a co-worker. Id. at ¶¶ 319-20. During the call, an Integra representative told Turner that Integra could assist him with loan forgiveness through the DOE and suggested that Integra would become the servicer of his student loans. Id. at ¶ 321. The Integra representative offered Turner its purported Services at $1,300 that could be paid through a payment plan of $39 per

month.  Id. at ¶ 322.  The Integra representative also told Turner

that he should not contact his student loan servicer because doing

so would interfere with the implementation of Integra's Services.

Id. at ¶ 325.

On September 23, 2016, a few days after the call, Integra

sent Turner a document packet.  Id. at ¶ 330.  Similar to the case

of Williams, this packet from Integra contained documents called

"Document Preparation & Administrative Service Agreement" and

"Document Preparation and Service Agreement."  See Singer Decl.,

Ex. A.  Turner electronically signed the documents in it on the

same day.  Id. at ¶ 330.  Three minutes after Turner signed those

documents, EAC sent to Turner via e-mail another document packet

that included the Purchase Agreement and the Credit Plan for the

Turner's transactions with Integra and EAC.  Id. at ¶¶ 331–32.

Relying on the Integra representative's statements during the

call, Turner executed the documents in this packet as well.  Id.

at ¶ 334.  Upon Integra's request, Turner faxed to Integra his tax

return as a proof of his income, and Integra forwarded it to the

EAC.  Id. at ¶ 336.

On October 4, 2016, Integra submitted an application for

enrollment in the Income Driven Repayment Plan on behalf of Turner.

Id. at ¶ 338.  In the application, Integra, unbeknownst to Turner,

falsely stated that he had two children in his family that were

receiving more than half of their support from him.  Id.  As a

result of filing this application despite that Turner was already enrolled into the Income Driven Repayment Plan, Turner's required monthly payment for his student loans increased from $0 to $58.74 per month. Id. at ¶ 339. On October 10, 2016, Integra arranged an application for forbearance on his student loans to be submitted, either by submitting one by itself or by instructing him to do so. Id. at ¶ 340. According to plaintiffs, Integra did so in order to conceal the fact that its application on behalf of Turner resulted in an increase in his required monthly payment. Id.

After concluding that EAC and Integra's Services were a scam, Turner stopped making payments to Integra and sent a cancellation letter to Integra by certified mail in February 2018. Id. ¶ 357. However, the letter was returned as undeliverable. Id. In the meantime, Integra continuously contacted Turner, stating that his account with Integra was delinquent. Id. at ¶¶ 358-59. On April 17, 2018, Turner faxed to Integra another cancellation letter but did not receive a response. Id. at ¶ 360.

EAC sent its billing statements to Turner from November 2016 to August 2017. Id. at ¶ 337. Turner made his initial monthly payment of $39.42 to EAC on December 5, 2016 by auto pay. Id. at ¶ 343. Thereafter, Turner made payments to EAC up until February 2018. Id. at ¶¶ 345, 348 & 356.

D.  **Procedural History**

Plaintiffs commenced this action by filing a class action complaint on August 17, 2018.  See ECF No. 1.  Pursuant to a consensual stipulation of briefing schedule, defendant EAC moved to dismiss the RICO claims in the complaint on November 19, 2018. See ECF Nos. 22, 23.  As contemplated by the parties in the stipulation, plaintiffs filed an amended complaint on January 15, 2019 ("Amended Complaint") instead of opposing the EAC's motion. See ECF No. 30.  Subsequently, EAC moved again to dismiss the RICO claims in the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  See ECF No. 37.  The Court heard oral argument on this motion on December 9, 2019.  See ECF No. 72.

## II.  Discussion

A.  **Legal Standards**

1.  Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  City of Providence v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014). "Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." Id. If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id.

2. Pleading of RICO Claim under 18 U.S.C. § 1962(c)

To state a civil RICO claim under 18 U.S.C. §1962(c), plaintiffs must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly . . . participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983). To establish a pattern of racketeering activity, "plaintiff[s] must plead at least two predicate acts, and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." GICC Cap. Corp. v. Tech. Fin. Grp., 67 F.3d 463, 465 (2d Cir. 1995)(internal citation omitted).

B.  **Analysis**

EAC challenges plaintiffs' pleading of RICO claim under 18 U.S.C. § 1962(c) on the grounds that plaintiffs have failed to adequately plead (1) ECA's commission of two or more predicate acts and (2) continuity requisite for pleading a "pattern of racketeering activity." We address each ground in turn.

1.  **Predicate Acts**

a)  Adequacy of Pleading

Plaintiffs allege mail and wire fraud violations as the predicate acts of their civil RICO claim. "Where, as here, the predicate acts on which a RICO claim is based sound in fraud, those acts must be pleaded in conformity with Rule 9(b)'s heightened pleading standard." Continental Petroleum Corp., Inc. v. Corp. Funding Partners, LLC, No. 11 Civ. 7801(PAE), 2012 WL 1231775, at *4 (S.D.N.Y. Apr. 12, 2012). In order to comply with Rule 9(b), plaintiffs "must: (1) specify the statements that [plaintiffs] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006)(internal quotation marks omitted).

"The elements of wire fraud under 18 U.S.C. § 1343 are (1) a scheme to defraud (2) to get money or property, (3) furthered by the use of interstate wires." U.S. v. Pierce, 224 F.3d 158, 165 (2d Cir. 2000). "The elements of mail fraud under 18 U.S.C. § 1341

are identical, except that mail fraud must be furthered by use of the mails" instead of interstate wires. Tymoshenko v. Firtash, 57 F. Supp. 3d 311, 321 (S.D.N.Y. 2014).

Drawing all reasonable inferences in plaintiffs' favor, the Court concludes that plaintiffs have adequately pled that EAC has devised a scheme to defraud, the gist of which can be described as the following:[1]

> A Dealer "lure[s] . . . [a Borrower] . . . and sell[s] [its Services] for $1,300." ¶ 4. The Services in fact simply "provide . . . loan consolidation, enrollment in Income Driven Repayment, or both." ¶ 75. In fact, those programs are "available for free to every [Borrower] from his or her Servicer." ¶ 53. In marketing its Services over the phone, the Dealer makes certain statements suggesting that "[the Dealer] will perform an individualized evaluation of each Borrower's student loans to determine the Borrower's best possible options," ¶ 97, and "the Dealer[] provide[s] more valuable opportunities than what a Borrower can obtain from his or her Servicer." ¶ 100.
>
> During the marketing call, "[t]he Dealer refer[s] Borrowers to EAC to finance the purchase" of its Services, ¶ 127, because it is "prohibited by federal regulation from accepting upfront payment before performing services for the Borrower." ¶ 126. The Dealer tells the Borrower that she "[can] pay . . . [the] purchase price [of the Services] through a payment plan of [an amount less than $50] per month." ¶ 130. "The Dealer conceal[s] from Borrower[] that the financing from EAC in in the form of a new loan with 21% interest," ¶ 131, and that the "monthly payments were not being applied to [the Borrower]'s student loan balance but . . . . towards the new [loan] from EAC." ¶¶ 134, 135.
>
> "Once [the] Dealer secure[s] a Borrower's oral agreement to purchase the . . . Services, the Dealer refers the Borrower to EAC for financing." ¶ 153.

---

[1]     The numbers in the following paragraph denote the paragraph numbers in the Amended Complaint (ECF No. 30).

"EAC has designed an integrated software platform by which each Dealer can submit financing referrals to EAC with the click of a button."[2] Id.

Subsequently, "the Dealer[] electronically send[s] to [the Borrower] a document packet through an electronic signature application." ¶ 154. "Within minutes, EAC electronically sends [the] Borrower[] a second document packet through an electronic signature application called 'DocuSign.'" ¶ 155. "The EAC document packet contains [the] 'Purchase Agreement,' which sets forth the terms of the Borrower's purchase of [ ] Services from the Dealer." ¶ 166. "[This] packet also contains [the] . . . Credit Plan." ¶ 167. "The Credit Plan provides for an annual interest rate of 20.99%." ¶ 174. "The Dealer[] pressure[s] the Borrowers to electronically sign both packets of documents while they remain on the phone with the Dealer, or immediately afterwards." ¶ 156.

"No provision of the Credit Plan identifies any party purportedly extending credit." ¶ 171. However, the Credit Plan contains a provision stating that, "[f]or value received, the undersigned assigns to Equitable Acceptance Corporation this contract," Am. Compl., Ex. B at 3; Ex. C at 3, and the Dealer's name appears at the bottom of the Credit Plan. See Id., Ex. B at 2; Ex. C at 2. The provision further states that "[t]he assignment is governed by and made subject to a Master Dealer Agreement or similar document between Seller and Equitable Acceptance Corporation." Id., Ex. B at 3; id., Ex. C. at 3. "EAC signs [the Master Dealer Agreement] with" a Dealer when "EAC recruits [it]." ¶ 60.

"The Master Dealer Agreement between EAC and each Dealer provides that EAC will make an upfront payment to the Dealer for each Borrower enrolled." ¶ 210. Thereafter, "EAC continues to send monthly bills to Borrowers and to make collection efforts on Credit Plans." ¶ 237.

---

[2]      Despite plaintiffs make this allegation on information and belief, it can be considered in resolving this motion because the alleged fact is "peculiarly within the possession and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citation omitted).

Am. Compl. (ECF No. 30). Plaintiffs adduce sufficient factual allegations in the Amended Complaint to show that EAC "devised" this scheme: EAC provided training to Dealers regarding their marketing practices, id. at ¶ 206; entered into an agreement with each Dealer, under which EAC will make an upfront payment to the Dealer for each new Borrower obtaining financing from it, id. at ¶ 210; prepared a script that Dealers would use in their calls with Borrowers in confirming the financing component of the purchase of the Services, id. at ¶¶ 224-26; and sent a document packet that contained the Credit Plan to Borrowers. Id. at ¶ 164. In sum, these allegations, if assumed true, establish that, in devising the scheme, EAC intended to deceive Borrowers so that they would incur debts to it. Therefore, plaintiffs have adequately pled the "scheme to defraud" element as to EAC.

Plaintiffs have adequately pled the remaining two elements of mail and wire fraud violations as well. Plaintiffs allege that EAC obtained money through this scheme in the form of finance charges and other fees collected from Borrowers. Id. at ¶ 198. Plaintiffs also allege that EAC used phone calls and online conference programs in providing training to the Dealers, id. at ¶ 206, and sent the document packet that contained the Credit Plan to Borrowers via e-mail.[3] Id. at ¶¶ 289, 331.

---

[3]     As the Amended Complaint contains sufficient allegations as to the pivotal role of the Credit Plan in consummating the alleged scheme, whether the Credit Plan itself contained any material misrepresentation or omission is

The Amended Complaint contains allegations detailing how this scheme was effectuated as to the Named Plaintiffs. Am. Compl. ¶¶ 270-369. Those allegations establish at least two instances of wire fraud violations under 18 U.S.C. § 1343 by EAC. Therefore, plaintiffs have adequately pled the predicate acts requisite for stating a claim under 18 U.S.C. § 1962(c).

### b) <u>EAC's Arguments</u>

EAC challenges plaintiffs' pleading of predicate acts with two arguments: (1) plaintiffs cannot rely on the alleged misstatements by the Dealers as the predicates in pleading mail and wire fraud violations because the agreements between Dealers and Borrowers contain express disclaimers as to those misstatements, and (2) plaintiffs fails to plead any material misstatement or omission made by EAC itself. The Court concludes that neither argument is meritorious.

### (1) **Contractual Disclaimers**

EAC first challenges the plaintiffs' reliance on the alleged oral misrepresentations by SLF and Integra in pleading the predicate acts of mail and wire fraud violations on the ground that reliance on those misrepresentations is precluded as a matter of law due to the disclaimers in the agreements between plaintiffs and the Dealers. In support of this argument, EAC invokes a New

---

irrelevant. <u>Schmuck v. U.S.</u>, 489 U.S. 705, 715 (1989)("In Parr, the Court specifically acknowledged that 'innocent' mailings—ones that contain no false information—may supply the mailing element.").

York law principle that reliance on alleged oral promises that directly contradict the terms of written agreements is unreasonable as a matter of law. Def.'s Opp'n at 11-15.

EAC's reliance on this New York law principle is misplaced because plaintiffs are not required to plead justifiable reliance—or even any reliance—in pleading mail or wire fraud. The United States Supreme Court has made it clear that "[t]he common-law requirements of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes" because interpreting the mail and wire fraud statutes as requiring a proof of justifiable reliance would be inconsistent with the statutes as enacted by Congress: "prohibiting the 'scheme to defraud,' rather than the completed fraud." <u>Neder v. U.S.</u>, 527 U.S. 1, 24-25 (1999). The Supreme Court has further concluded that, in light of its decision in <u>Neder</u>, "no showing of reliance is required" even when mail or wire fraud is asserted as a predicate act of RICO claim under 18 U.S.C § 1962(c). <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639, 649 (2008).

Most notably, the specific argument raised by defendant EAC has already been rejected by the Second Circuit in <u>United States v. Weaver</u>, 860 F.3d 90 (2d Cir. 2017). There, the appellant sought to vacate his mail and wire fraud convictions, arguing that any misrepresentations preceding the written contracts between the victims of the alleged scheme and his company were immaterial as

a matter of law because the victims expressly disclaimed reliance on extra-contract representations in those contracts. Id. at 94. In discussing this argument, the Second Circuit held that "contractual disclaimers of reliance on prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes." Id. at 95. The Second Circuit further observed that "[w]hile [contractual] disclaimers may in some circumstances defeat a civil claim for damages based on fraud, they do not bear on the defendant's criminal liability [under the criminal and wire fraud statutes]." Id. at 95. Although Weaver was a criminal law case, the Supreme Court's decision in Bridge to import Neder into civil RICO context suggests that doctrines involving the mail and wire fraud statutes, at least with respect to the reliance element, would apply even when mail and wire fraud violations are pled as predicate acts in a civil RICO case. Therefore, we conclude that Weaver is controlling here and reject EAC's argument based on a contractual disclaimer.

(2) **Lack of Misrepresentation by EAC Itself**

EAC also argues that, even if plaintiffs could base their pleading of predicate acts on the alleged oral misrepresentations by Integra and SLF, plaintiffs' RICO claim should be dismissed as to EAC because the Amended Complaint is "devoid of any allegation that EAC itself made false or omissive statements resembling those attributed to Integra and SLF." Def.'s Opp'n at 20.

21

As EAC correctly points out in its reply brief, plaintiffs must adequately plead "[t]he requirements of section 1962(c) . . . as to each individual defendant." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001). What EAC fails to explain, however, is the relationship between the lack of any allegation of a misrepresentation made by EAC itself and the adequacy of pleading predicate acts as to EAC under 18 U.S.C. § 1962(c). A complaint alleging mail and wire fraud as predicate acts of a RICO claim needs to plead only "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996)(emphasis added). Under this standard, plaintiffs need not allege that each defendant itself made a misrepresentation as long as they allege sufficient facts showing each defendant's knowing or intentional participation in the alleged scheme to defraud. The mail and wire fraud statutes only require that the scheme, in which EAC allegedly participated with knowledge or intent, contain a material misrepresentation, not that EAC made any misrepresentation by itself. See 18 U.S.C. § 1341; 18 U.S.C. § 1343. As long as EAC had an intent to defraud in participating in the scheme and the scheme contained a material misstatement, EAC may be held liable for mail and wire fraud violations. See Serin v. Northern Leasing

<u>Sys., Inc.</u>, No. 06 Civ. 1625(JSG), 2009 WL 7823216, at *8 (S.D.N.Y. Dec. 18, 2009)(concluding that the allegations of a company's executives, by nature of their positions within it, orchestrating and supervising the day-to-day operations of the alleged scheme were sufficient to plead a RICO claim against them despite the fact that the complaint did not include any allegation that each executive personally committed the predicate acts).

EAC alternatively seeks to challenge plaintiffs' pleading of predicate acts by arguing that the alleged misstatements by SLF and Integra could not be attributed to it. Specifically, EAC argues that, once the alleged misstatements by those Dealers are excluded, the scheme as alleged does not contain any misstatement of material fact, and that this defect is fatal to pleading of mail or wire fraud violations under <u>Williams v. Affinion Grp., LLC</u>, 889 F.3d 116, 125 (2d Cir. 2018). Any effort by EAC to dissociate itself from the Dealers, however, is without merit. As discussed above, the Credit Plan contained an assignment provision that converts plaintiffs' payment obligations to their respective Dealer to EAC. At oral argument, EAC conceded that the Credit Plan that was signed by each of the Named Plaintiffs was EAC's document. <u>See</u> Oral Arg. Tr. (ECF No. 72) at 21-22. Plaintiffs also allege that this assignment was a necessary step for effectuating the alleged scheme because the Dealers were precluded from collecting any payments from the Borrowers due to federal

telemarketer regulations.  Moreover, the assignment provision in the Credit Plan for each of the Named Plaintiffs refers to the Master Dealer Agreement between the Dealer and EAC and provides that the assignment of Credit Plan is governed by that Agreement. These contractual arrangements foreclose any attempt by EAC to disassociate itself from the Dealers with respect to the scheme as alleged by plaintiffs.  Accordingly, given our conclusion that the Amended Complaint contains sufficient allegations of EAC's knowing and intentional participation in the scheme and the pleading of fraudulent intent, the absence of any allegation that EAC itself made a misrepresentation does not render the plaintiffs' pleading of a RICO claim under 18 U.S.C. § 1962(c) defective.

     2.   <u>Continuity</u>

EAC argues that plaintiffs have failed to adequately plead the continuity requisite for establishing that the alleged predicate acts constitute a "pattern of racketeering activity." The continuity requisite for stating a claim under 18 U.S.C. § 1962(c) can be proven in two different ways: "closed-ended continuity," and "open-ended continuity."  <u>Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.</u>, 187 F.3d 229, 242 (2d Cir. 1999).  A closed-ended pattern of racketeering activity involves predicate acts "extending over a substantial period of time." <u>GICC Cap. Corp.</u>, 67 F.3d at 466.  In this Circuit, a pattern should generally extend over at least two years to establish closed-ended

continuity.  Reich v. Lopez, 858 F.3d 55, 60 (2d Cir. 2017).
"Although continuity is primarily a temporal concept, other
factors such as the number and variety of predicate acts, the
number of both participants and victims, and the presence of
separate schemes are also relevant in determining whether closed-
ended continuity exists."  First Cap. Asset Manag., Inc. v.
Satinwood, Inc., 385 F.3d 159, 181 (2d Cir. 2004).

A pattern of racketeering can alternatively be established
with open-ended continuity when the alleged scheme "by its nature
projects into the future with a threat of repetition."  H.J. Inc.
v. Northwestern Bell Tel. Co., 492 U.S. 229, 241 (1989).  Such
threat is "generally presumed when the enterprise's business is
primarily or inherently unlawful."  Spool v. World Child Int'l
Adoption Agency, 520 F.3d 178, 185 (2d Cir. 2008).  Open-ended
continuity may still exist even when the enterprise's business is
legitimate if "the predicate acts were the regular way of operating
that business."  Cofacredit, 187 F.3d at 243.

EAC argues that plaintiffs have failed to plead closed-ended
continuity because the alleged communications between defendants
and the Named Plaintiffs spanned only 19 months, even when viewed
most favorably to plaintiffs, a duration shorter than 2 years, the
benchmark for closed-ended continuity in this Circuit.  Although
the fact that the alleged predicate acts spanned less than 2 years
does not automatically disqualify those acts from establishing

25

closed-ended continuity, we need not resolve the closed-ended continuity issue as we conclude that plaintiffs have adequately pled open-ended continuity.

In Beauford v. Helmsley, the Second Circuit held the allegations that defendants had engaged in a one-time mailing of 8000 copies of fraudulent documents in connection with a condominium conversion plan as sufficient to plead a pattern of racketeering activity because "there was reason to believe that similarly fraudulent mailings would be made over an additional period of years." 865 F.2d 1386, 1392 (2d Cir.)(en banc), vacated and remanded, 492 U.S. 914, adhered to on remand, 893 F.2d 1433, cert. denied, 493 U.S. 992 (1989). Similarly, in Azrielli v. Cohen Law Offices, the Second Circuit concluded that a series of fraudulent sales of securities over at least one year, coupled with the fact that the defendant "apparently ha[d] been trying to continue to sell" securities permitted a jury to find a pattern of racketeering. 21 F.3d 512, 521 (2d Cir. 1994).

Here, the alleged predicate acts, as conceded by EAC, spanned at least 17 months. Def.'s Opp'n at 23 n. 45. Moreover, the Amended Complaint, especially Exhibit A (Excerpts of consumer complaints about EAC filed with Better Business Bureau and Consumer Financial Protection Bureau), contains allegations of numerous individuals other than the Named Plaintiffs complaining about their transactions with EAC that are consistent with the scheme

alleged by plaintiffs. Given these allegations, the Amended
Complaint contains sufficient allegations that reveal "the threat
of continuity," Beauford, 865 F.2d at 1392, and sufficient support
for the proposition that EAC "ha[s] been trying to continue" the
alleged scheme with respect to individuals in addition to the Named
Plaintiffs. Azrielli, 21 F.3d at 521. Therefore, plaintiffs have
adequately pled a pattern of racketeering activities by alleging
sufficient facts to establish open-ended continuity.[4]

---

[4]     In an attempt to preclude plaintiffs from relying on the allegations
as to the transactions between individuals other than the Named Plaintiffs and
defendants, EAC argues that those allegations are insufficient to support a
pleading of open-ended continuity due to their conclusory nature and failure to
identify the purported victims. In support of this position, EAC cites two
cases outside this Circuit: Higgins v. Farr Fin. Inc., C 07-02200, 2009 WL
3517597, at *3 (N.D. Cal. Oct. 26, 2009), and Goren v. New Vision Int'l, Inc.,
156 F.3d 721, 729 (7th Cir. 1998). However, EAC's reliance on these cases is
misplaced because the courts in both cases held that the plaintiff could not
rely on allegations involving an unidentified individual in pleading one of the
two required predicate acts, not in pleading continuity.

### III.  Conclusion

For the foregoing reasons, defendant EAC's motion to dismiss plaintiffs' RICO claim under 18 U.S.C. § 1962(c) is denied. Because EAC moves to dismiss plaintiffs' RICO conspiracy claim under 18 U.S.C § 1962(d) solely based on plaintiffs' failure to adequately plead a substantive RICO claim under 18 U.S.C. § 1962(c), EAC's motion as to the RICO conspiracy claim is also denied. Defendant EAC shall answer the Amended Complaint within thirty (30) days. This Order resolves ECF Entry No. 37.

**SO ORDERED.**

Dated:     New York, New York
           March 11, 2020

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE