### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VANESSA WILLIAMS and KORY TURNER, individually and on behalf of all persons similarly situated,<br><br>                Plaintiffs,<br><br><br><br>         -against-<br><br><br>EQUITABLE ACCEPTANCE CORPORATION, JEFFREY D. HENN, TERESA HENN, SLF CENTER, LLC, INTEGRA STUDENT SOLUTIONS, LLC, and DOES 1-41,<br><br>                Defendants. | **No. 18-CV-7537**<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

### PRELIMINARY STATEMENT

1.      Plaintiffs are among the millions of Americans who struggle to repay their federal student loan debt.  They and the 60,000 members of the proposed class (the "Borrowers") seek redress for Defendants' unlawful scheme to sell them purported "student loan relief" services (the "Scheme").  Defendants' practices saddle these Borrowers with additional, unnecessary debt on deceptive terms and at usurious rates—all to pay for services that are available for free and are often disadvantageous to the Borrower.

2.      The Scheme is masterminded by Defendant Equitable Acceptance Corporation ("EAC") and its President and Chief Executive Officer, Jeffrey Henn ("Henn"), and depends on the coordinated efforts of EAC, Henn, and individual "Dealers," including Defendants SLF Center, LLC ("SLF Center"), Integra Student Solutions, LLC ("Integra"), and up to forty-one other companies (collectively, "Defendants").

3.     The account of Defendants' Scheme is drawn from the experiences of the named plaintiffs, Vanessa Williams and Kory Turner, and the experiences of hundreds of other Borrowers who have spoken to putative class counsel about their experiences with EAC, examples of which are included below, hundreds of publicly available complaints filed against EAC and the Dealers, as well as from documents produced by EAC in discovery.

4.     The Dealers lured vulnerable federal student loan borrowers with false promises of loan "forgiveness"—which the Dealers do not and cannot actually offer.  At EAC's direction, they sold this worthless "service" for $1,300.  Because few borrowers could afford that exorbitant sum upfront, the Dealers told Borrowers that they could pay the full price in monthly payments of around $39 to $49, and steered the Borrowers to EAC to obtain this financing.

5.     EAC then purported to extend each Borrower *an entirely new loan*, in the form of a maxed-out "line of credit" for the full price of the services.  The total cost is amortized over many years, with a sky-high annual interest rate of almost 21%—with the effect that Borrowers end up owing EAC hundreds of dollars more than the already-inflated purchase price.  EAC deliberately disguised the nature and true cost of the credit it was extending to secure Borrowers' agreement to these usurious terms.  EAC in turn pays the Dealers a portion of the full $1,300 price.

6.     The Scheme depends on the coordinated efforts of EAC, Henn, and the Dealers, which must engage in concerted unlawful activity for the Scheme to succeed.  EAC and Henn needed the Dealers to misrepresent the services they sell, or else no Borrower would agree to buy the services and thus would have needed EAC's financing.  To fund their operations, the Dealers needed EAC's financing to get the payments on the otherwise unaffordable $1,300 price tag. The Dealers' profit comes from these payments, as they were rewarded for each referral for a

new EAC loan long before the Borrowers realize the Dealers' promises of loan "forgiveness" were false.

7.      At best, the Dealers enroll Borrowers in programs that are available for free—often by falsely impersonating the Borrowers.  At worst, the Dealers take steps (some irrevocable) that effectively raise the Borrowers' student loan interest rates, balances, repayment terms, or all of the above.  If Borrowers realize Defendants' Scheme, EAC blames the Dealers for the misrepresentations and worthless services, but continues to extract payments from the Borrowers with the threat of negative credit reporting.

8.      In short, the Scheme perpetrated by Defendants deliberately targeted those for whom student debt is most crushing.  Although EAC has been directed to cease originating any new loan obligations, it has collected on them and continues to collect as to many thousands of Borrowers, diverting those Borrowers' limited resources into Defendants' own pockets—when every single dollar could have instead gone to reducing the Borrowers' student loan burden or towards other legitimate obligations.

9.      It has not escaped notice that Defendants' pattern of behavior is unlawful.  Over three hundred Borrowers have described their negative experiences with Defendants to putative class counsel.  Many hundreds of other Borrowers have complained about Defendants' practices to the Better Business Bureau ("BBB") and Consumer Financial Protection Bureau ("CFPB").  EAC and various Dealers have been sued many times over their practices.

10.     The New York Attorney General sued EAC and certain Dealers for "tak[ing] advantage of th[e] student loan debt crisis by engaging in deceptive, fraudulent and illegal conduct targeted at consumers with student loan debt," including by making many

misrepresentations in the marketing, sale, and financing of their services.[1]  EAC has also been

sued by the Federal Trade Commission ("FTC") and the Attorneys General of multiple other

states for similar conduct.

11.     Multiple of these state and federal regulators have entered consent judgments with

Defendants.  As a result, Defendants have been prohibited from enrolling new Borrowers and

extending new unlawful financing, and have been prohibited from continuing collections as to

certain groups of Borrowers, such as those in certain states and those who interacted with

specific Dealers.  Even so, these consent judgments did not prohibit Defendants from continuing

all collections as to the majority of the class, and Defendants continue their collection efforts on

their unlawful contracts.

12.     Plaintiffs therefore sue to seek relief under the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d); the Truth in Lending Act ("TILA"),

15 U.S.C. §§ 1601 *et seq.*; New York General Business Law ("GBL") § 349; New York common

law; New York General Obligations Law § 5-501(1) and New York Banking Law § 14-a(1); the

Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 *et seq.*; the Declaratory Judgment

Act, 28 U.S.C. §§ 2201(a) and 2202; N.Y. Debtor & Creditor Law §§ 273, 276; and the

Minnesota Uniform Fraudulent Transfer Act, Minn. Stat. Ann. § 513.43, *et seq.*

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this class action under the Class Action Fairness

Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs are citizens of different states than Defendants

and the amount in controversy exceeds $5,000,000.

---

[1]  *See* Second Am. Complaint, *People of the State of New York v. Debt Resolve Inc. et al.* ¶ 3, No. 18-CV-9812
(S.D.N.Y. 2018), ECF No. 41.

14.     Alternatively, this Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and 15 U.S.C. § 1640(e), and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

15.     Declaratory relief is available under 28 U.S.C. §§ 2201(a) and 2202.

16.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because it is the District in which a substantial part of the events creating Ms. Williams's claims occurred.

## **PARTIES**

17.     Plaintiff Vanessa Williams is a natural person residing in Manhattan, New York. New York is Ms. Williams's domicile in that it is the place where she has her true home and intends to remain indefinitely.

18.     Plaintiff Kory Turner is a natural person residing in Brooklyn, New York.  New York is Mr. Turner's domicile in that it is the place where he has his true home and intends to remain indefinitely.

19.     Plaintiffs are "consumers" as that term is used in TILA, *see* 15 U.S.C. § 1602(i), in that they are natural persons and the credit extended to them was for personal, family, or household purposes.

20.     Defendant Equitable Acceptance Corporation is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota.  EAC is registered as a regulated lender with the Minnesota Department of Commerce.  EAC provides financing to consumers who purchase goods or services from third-party companies.

21.     Defendant Jeffrey D. Henn is a natural person residing in Minnesota.  Henn is the President and Chief Executive Officer of EAC.  At all times described herein, Henn was either

the President and Chief Executive Officer or the Vice President of EAC.  Henn "assumed the helm" of EAC in 1984.[2]

22.     Defendant Teresa Henn is a natural person residing in Minnesota.  Teresa Henn is co-trustee of both the Jeffrey D. Henn Revocable Trust and the Teresa Henn Revocable Trust, which were each established on December 9, 2016.

23.     Defendant Integra Student Services, LLC is a limited liability company registered in Utah, with its principal place of business in Sandy, Utah.  Integra purports to offer loan assistance and debt relief services to student loan borrowers.

24.     Defendant SLF Center, LLC is a limited liability company registered in California, with its principal place of business in Irvine, California.  SLF Center purports to offer loan assistance and debt relief services to student loan borrowers.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND ON THE FEDERAL STUDENT LOAN PROGRAM

25.     The United States Department of Education ("USED") oversees the approximately $17 billion per year federal student loan program, which has over forty million borrower participants.

26.     Students can obtain federal loans through one or more federal student loan programs created by statute.  Since July 1, 2010, nearly all federal student loans have been made through the William D. Ford Federal Direct Loan Program, 20 U.S.C. § 1087a *et seq.*

27.     Each federal student loan borrower is assigned to one of the nine federal student loan servicers ("Servicers").  The Servicers contract with USED to provide billing and other

---

[2]  *See* Equitable Assurance Corporation, https://equitableacceptance.com/ (last accessed May 7, 2020).

services to borrowers.  Each Servicer is that borrower's point of contact for his or her federal

loans and the entity to which the borrower makes payments.

28.     All work performed by Servicers is *free* for federal student loan borrowers.

29.     Interest rates for federal student loans are set by the loans' promissory notes.

Servicers have no discretion to change a federal student loan's interest rate.

30.     The federal government pays Servicers for servicing borrowers' accounts

according to the terms of publicly-available contracts.[3]  Each Servicer receives a set payment

amount from USED for each borrower whose loans it services, determined by the borrower's

loan status and not by the borrower's interest rate, loan balance, or number of loans.

31.     USED designed Servicers' contracts to place financial incentives on Servicers to

"keep[] borrowers in on-time repayment status and help[] borrowers avoid default."[4]  To that

end, USED pays Servicers as much as six times more if a borrower is in a repayment plan

(including an Income Driven Repayment plan) than it does if a borrower is in default.

32.     Federal student loan borrowers have certain repayment rights that are set forth in

federal statutes and regulations.  Servicers must offer these repayment programs to all qualifying

borrowers and have no discretion in whether to enroll a qualified borrower.

**A.     Loan Consolidation**

33.     Federal student loan borrowers can consolidate their loans to replace multiple

student loans with a new consolidation loan.

---

[3]  *See* "Loan Servicing Contracts," Federal Student Aid, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing.
[4]  "U.S. Department of Education Strengthens Federal Student Loan Servicing" U.S. Department of Education (Aug. 29, 2014), https://www.ed.gov/news/press-releases/us-department-education-strengthens-federal-student-loan-servicing.

34.     A borrower can apply to consolidate his or her federal student loans simply by providing his or her personal information, two references, and a list of the loans to be consolidated.  The borrower can submit this information on a five-page form issued by USED, attached as Exhibit D, or through www.studentloans.gov.

35.     According to USED, "most people complete the [consolidation] process in less than 30 minutes."[5]

36.     The studentloans.gov website permits only authorized users to access student loan borrowers' accounts, including as part of submitting consolidation applications:

> This is a U.S. Federal Government computer system intended to be accessed solely by individual users expressly authorized to access the system by the U.S. Department of Education. . . . Except as expressly authorized by the U.S. Department of Education, unauthorized attempts to access, obtain, upload, modify, change, and/or delete information on this system are strictly prohibited and are subject to criminal prosecution under 18 U.S.C. 1030, and other applicable statutes, which may result in fines and imprisonment.  For purposes of this system, unauthorized access includes, but is not limited to: Any access by an employee or agent of a commercial entity, or other third party, who is not the individual authorized user, for purposes of commercial advantage or private financial gain (regardless of whether that commercial entity or third party is providing a service to an authorized user of the system); and Any access in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

37.     For most borrowers, consolidation offers little to no benefit.

38.     The total balance of the consolidation loan is at least equal to the borrower's prior total balance.  Consolidation sometimes increases a borrower's total balance through added interest or fees.  Consolidation nearly always increases a borrower's overall interest rate, because

---

[5]  "What is Loan Consolidation," Federal Student Aid,
https://studentloans.gov/myDirectLoan/launchConsolidation.action.

the interest rate on a consolidation loan is the weighted average of the interest rate of the borrower's pre-consolidation loans rounded up to the nearest one-eighth of a point.

39.     Consolidation lengthens a borrower's overall repayment term and re-starts a borrower's repayment history.

40.     Once a borrower consolidates his or her loans, the consolidation cannot be undone.

41.     In most cases, a borrower's loans can be consolidated only once.

42.     On rare occasions, consolidation may be especially valuable to a borrower, because a borrower whose loan is defaulted may consolidate "out of" default—that is, use consolidation to bring the loan into good status.  But because consolidation can occur only one time in a loan's lifetime, that tool is not available to a borrower once he or she has already consolidated.

### B.     Income Driven Repayment

43.     Federal student loan borrowers can also enroll in an "Income Driven Repayment" plan, which sets the borrower's required monthly payment at a percentage of his or her household discretionary income, taking into account the borrower's family size.  Payments can be as low as $0 per month.

44.     Although monthly payments in the Income Driven Repayment program are affordable, a borrower's loans continue to accrue interest.  Often, the balance of the borrower's loans balloons with the passage of time because the borrower's monthly payments are lower than interest accrued that month.

45.     A borrower can enroll in Income Driven Repayment by providing his or her family size, marital status, and income.  The borrower can submit this information on a four-page

9

form issued by USED, attached as Exhibit E, or through his or her Servicer's website or www.studentloans.gov. A borrower may select which type of Income Driven Repayment plan to enroll in; the "recommended" option is to check the box stating: "I want the income-driven repayment plan with the lowest monthly payment." A borrower must submit documentation of his or her family income, typically the previous year's tax return.

46. According to USED, "[m]ost people complete the [Income Driven Repayment application] process in 10 minutes or less."[6]

47. To remain enrolled in Income Driven Repayment, the borrower must "recertify" each year by submitting the same Income Driven Repayment application form and updated proof of income.

48. A borrower who makes *twenty to twenty-five years* of payments under Income Driven Repayment may be eligible to have the remaining balance of his or her loans forgiven. Importantly, however, the amount of any balance forgiven is taxable to the borrower. The tax liability can be tremendous for many borrowers, after decades of ballooning principal and negative amortization.

49. Enrollment in Income Driven Repayment lengthens a borrower's overall repayment term.

### C.    Public Service Loan Forgiveness

50. A small subset of borrowers in Income Driven Repayment are able to obtain loan forgiveness sooner (in as few as ten years) through the Public Service Loan Forgiveness Program.

---

[6] "What is Income-Driven Repayment?," Federal Student Aid, https://studentloans.gov/myDirectLoan/ibrInstructions.action.

51.     Under Public Service Loan Forgiveness, a borrower who has made ten years of loan payments while working in a qualifying public interest field can have the remaining balance of his or her loans forgiven.

52.     The Public Service Loan Forgiveness application is made at the end of the ten-year period of qualifying work.  Any loan consolidation restarts this ten-year clock.

### D.     Forbearance

53.     Any borrower can request a temporary "forbearance" from his or her Servicer. During forbearance, the borrower need not make any payments, but interest continues to accrue.

54.     A forbearance period does not count toward the borrower's required monthly payments under the Public Service Loan Forgiveness Program or Income Driven Repayment.

55.     Forbearance requests are often granted by phone or online with no documentation requirements.

### B.     Free Assistance from Servicers

56.     Assistance with consolidation, Income Driven Repayment, Public Service Loan Forgiveness, and forbearance is available *for free* to every federal student loan borrower from his or her Servicer.

57.     A borrower may contact his or her Servicer or visit www.studentloans.gov to apply for a consolidation loan, enroll in Income Driven Repayment, apply for Public Service Loan Forgiveness, or be placed in forbearance.

58.     There is no limit to how many times a borrower may request this free assistance.

59.     USED specifically directs borrowers to contact their Servicers "if you have any questions" about Income Driven Repayment because "[y]our loan servicer will help you decide whether one of these plans is right for you."[7]

60.     USED informs federal student loan borrowers that they "never need to pay for help with [their] student loans. **For the great price of *free***, the U.S. Department of Education can help. . . . Your loan servicer—the company that collects your payments on behalf of the Department of Education can also help you . . . for free.  If you need help with your debt, you should contact your servicer."[8]

61.     According to USED, "If you are contacted by a company asking you to pay 'enrollment,' 'subscription,' or 'maintenance' fees to enroll you in a federal repayment plan or forgiveness program, you should walk away."[9]

62.     In March 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. Law No. 116-136, provided to many federal student loan borrowers a six-month automatic suspension of payments, with adjustment to 0% interest, among other relief. CARES Act § 3513(a), (b), (e).

## II.     DEFENDANTS' SCHEME TO DEFRAUD STUDENT LOAN BORROWERS

63.     For decades EAC has provided financing to consumers purchasing goods for household use such as vacuum cleaners, cookware, and air purifiers.  In around 2015, EAC expanded its business to provide financing for purported "student loan assistance services" (the "Purported Services" or the "Services").

---

[7]  "Income-Driven Repayment Plans," Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.
[8]  Ted Mitchell, Don't Be Fooled: You Never Have to Pay for Student Loan Help (Jan. 29, 2016), *available at* https://blog.ed.gov/2016/01/dont-be-fooled-you-never-have-to-pay-for-student-loan-help/.
[9]  *See* "Loan Servicers," Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/understand/servicers.

64.     EAC and the Dealers operated the Scheme by selling and financing the purchase of Purported Services from approximately 2015 until approximately 2018.  Pursuant to consent judgments entered with multiple state and federal regulators, EAC is no longer permitted to issue new Credit Plans.  Where not prohibited by consent judgments, EAC and certain Dealers continue to operate the Scheme by collecting from Borrowers on an ongoing basis up to the present.

65.     EAC depended for referrals on individual Dealers, which pitched the Purported Services directly to Borrowers.  EAC, at the direction of Henn, recruited the Dealers, and then signed a contract (the "Master Dealer Agreement"), which was drafted by EAC, with each one. EAC has stated that it has made these arrangements with forty-three such Dealers.

66.     As of January 15, 2019, Borrowers had filed 217 complaints and 73 reviews with the BBB regarding EAC.  EAC currently has an "F" rating from the BBB, and the vast majority of the reviews about EAC are negative.

67.     As of this date, Borrowers had filed one review and 11 complaints with the BBB concerning Integra Student Services.  This company has an "F" rating on the BBB website.

68.     As of this date, Borrowers had filed seven reviews and eleven complaints with the BBB concerning SLF Center.  This company had an "F" rating on the BBB website.

69.     As of this date, Borrowers had filed 290 complaints with the Consumer Financial Protection Bureau ("CFPB") about EAC.

70.     The Dealers found potential customers through direct mail solicitation, cold-calling, and social media and other online advertising for student loan forgiveness.  The Dealers' direct mail and online advertisements instructed Borrowers to contact the Dealers by phone.  The Dealers also found Borrowers through referrals from EAC.

71.    The Dealers purported to offer legitimate student loan assistance services to Borrowers.  The Dealers fraudulently induced Borrowers to purchase the Purported Services by making a series of misrepresentations and material omissions to the Borrowers in phone calls, in later emails, and in their marketing materials.  These misrepresentations included false promises of loan forgiveness; misrepresentations about the claimed value of the Purported Services; undisclosed harms such as potential increases in student loan balances and interest; false affiliation with the federal government; and misrepresentations about how the Borrowers will pay for the Purported Services.

72.    The Dealers used aggressive sales tactics to pressure the Borrowers to agree to purchase the valueless Purported Services, including implying fake urgency and rushing the Borrowers through any review of the materials.

73.    EAC then sent each Borrower misleading documents that purport to extend each Borrower a new sham loan (the "Deceptive Loan"), a line of credit with nearly 21% interest.

74.    EAC, Henn, and the Dealers' roles in perpetuating this Scheme are interdependent and mutually beneficial.  EAC and Henn were aware of and participated in the Dealers' misrepresentations, which were necessary to persuade Borrowers to purchase the Purported Services and to steer Borrowers to EAC to obtain the Deceptive Loans.  EAC, Henn, and the Dealers all participate in ongoing deceptive conduct to respond to Borrowers who realize the nature of the Scheme and complain or seek remedies from either company.

75.    After Borrowers enrolled, the Dealers often unlawfully impersonated Borrowers on federal government websites and committed other fraud in submitting applications for consolidation and Income Driven Repayment.

76.     As a result of the conduct of EAC, Henn, and the Dealers, Borrowers have experienced and continue to experience financial and other harm.  These harms are tangible and obvious, and have been identified by other public enforcement entities including the New York Attorney General and the Federal Trade Commission, as well as private litigants.

A.     **The Dealers Falsely Promised "Student Loan Forgiveness"**

77.     The primary false representation that the Dealers made to Borrowers to induce them to sign up for the Purported Services was that the Purported Services will provide loan "forgiveness."  The Dealers intended Borrowers to understand, and Borrowers were successfully induced to understand, that "forgiveness" meant that their total loan balance would be eliminated by the Purported Services the Dealers offer.

78.     The homepage of SLF Center's website used the term "forgiveness" thirty-six times.  The main page of Integra's website stated in large type: "YOU MAY QUALIFY FOR STUDENT LOAN FORGIVENESS."

79.     But the Dealers' Purported Services did not—and could not—provide loan forgiveness for Borrowers.

80.     The Services Dealers actually provided were loan consolidation, enrollment in Income Driven Repayment, or both.

81.     The Dealers falsely represented that the Purported Services would reduce or eliminate the Borrower's total loan balance.  They failed to disclose that loan consolidation and enrollment in Income Driven Repayment do not reduce or eliminate the Borrower's total loan balance.

82.     A Borrower whom a Dealer enrolled in Income Driven Repayment did not obtain loan "forgiveness."  Such a Borrower maintains an outstanding federal student loan balance for twenty years or more, unless the borrower can qualify for Public Service Loan Forgiveness after

at least ten years.  Whether such a Borrower may obtain loan forgiveness twenty years or more

hence depends on many factors outside the Dealers' control, such as the Borrower's employment

status, income, and ability to make payments, as well as any future amendments to federal law.

83.     Ms. Williams, for example, was offered loan forgiveness by SLF Center, which

she agreed to purchase.  When selling the Purported Services to Ms. Williams, SLF Center told

her that with SLF's help, she would "never need to worry about this overwhelming issue again."

SLF Center did not obtain forgiveness of Ms. Williams's loans.

84.     Likewise, Mr. Turner was offered loan forgiveness by Integra, which he agreed to

purchase.  Integra described its Services to Mr. Turner as a "Federal Forgiveness Program" and a

"Loan Forgiveness program."  Integra did not obtain forgiveness of Mr. Turner's loans.

85.     Ms. Williams and Mr. Turner are not alone.  Many other Borrowers have

purchased the Dealers' Purported Services and obtained EAC's Deceptive Loan based on false

promises of loan forgiveness, including, as examples, the following Borrowers who have

contacted putative class counsel:

- On or around December 5, 2017, a representative of SLF Center told Borrower Jordan M. by phone that if he made an initial payment of $150, and then made monthly payments for several years (up to around six), and renewed his income information each year, his remaining loan balance would be fully forgiven.

- In approximately late November, 2016, Borrower Kevin S. received a direct mailing from Dealer Student Loan Care offering "Forgiveness of Debt."  On or around December 1, 2016, an agent of the Dealer told him by phone that if he enrolled in the Dealer's Purported Services, he would be able to obtain student loan forgiveness.

- On or about January 18, 2017, Dealer Mentor USA told Borrower Jesus A. by phone that if he enrolled in its program with $40 monthly payments, his loans would be forgiven, including that all interest would be cancelled.

- In or around August 2017, Dealer Student Loan Care sent a direct mailing to Borrower Erin C. offering "Forgiveness of Debt."  On or around August 8, 2017, an agent of the Dealer told her by phone that if she enrolled in the Dealer's Purported Services, she could access government loan forgiveness.  The Dealer

16

told her that if she made $42.42 monthly payments for about a year and her income did not change during that time, then her federal student loan balance would be forgiven.

- On or around April 21, 2017, an agent of Dealer R3 Processing told Borrower Pamela S. by phone that if she purchased the Dealer's Purported Services, her student loans would be completely forgiven after three years of payments, provided that her income did not change.

- On or around September 9, 2016, Borrower Tenille J. saw an advertisement on Facebook for "Obama student loan forgiveness." Upon clicking the link, she was prompted to call a number, which connected her with Dealer Manhattan Beach Venture, LLC. The Dealer's agent with whom she spoke represented to her that she could obtain forgiveness of her student loans by making three years of payments.

- On April 15, 2016, Dealer Student Loan Relief Department told Borrower Latoya B. by email that the Dealer "enrolled [her] into the payment relief and loan forgiveness program to get [her] $35,969 in Student Loan debt on to a $0 dollar payment with a countdown to loan forgiveness."

86.     Dozens of other Borrowers have specifically complained to the BBB and the CFPB that they purchased Purported Services based on false promises of loan forgiveness. For example:

- "[I was p]romised that my student loans . . . would be forgiven." BBB Complaint (July 22, 2018).[10]

- "They were soliciting a student loan forgiveness for me. They informed me that if I paid them $300 up front and than $49.00 every month thereafter for 2 years, my loans would be forgiven completely." BBB Complaint (May 6, 2018).

- "I was scammed by Equitable Acceptance last year. They lied like they were a loan forgiveness company but that's far from the truth. They do not do loan forgiveness. . . . . My loans have not been forgiven and they keep trying to collect . . . ." BBB Complaint (Dec. 4, 2017).

- "[A] company called me back in June 2017 stating that President Obama had implemented a student loan forgiveness program and this would allow me to pay around $50 for my current student loan for about 2 years and I would be done with it." BBB Complaint (Nov. 19, 2017).

---

[10]   For each consumer narrative excerpted in this Complaint, the full text of the consumer narrative, as the consumer posted it to the BBB or CFPB website, is attached as Exhibit A.

- "[T]hey told me that I qualified for loan forgiveness and that I just had to pay a fee each month to cover their cost for paperwork." CFPB Complaint (Oct. 5, 2017).

- "[A Dealer] reached out to me on July 31, 2017 about the Student Loan Forgiveness program. They informed me that I qualified for student loan forgiveness and all I needed to do is pay 39.50 a month for three years." BBB Complaint (Sept. 9, 2017).

- "Equitable acceptance told me that they were part of . . . student loan forgiveness and that my loan was going to be forgiven." CFPB Complaint (Jun. 16, 2017).

87.     Like Ms. Williams, other Borrowers have reported to class counsel that they were falsely told that they would never have to worry about their student loans again. For example:

- On December 6, 2017, SLF Center wrote in an email to Borrower Jordan M. that with SLF Center's assistance, he "will never need to worry about this overwhelming issue [of student loans] again."

- On January 18, 2017, Dealer Mentor USA wrote in an email to Borrower Jesus A. that the Dealer "will also oversee your account for the entire life of your student to loans; so you will never need to worry about these again."

- On April 15, 2015, Dealer Student Advocates, wrote in an email to Borrower Mark H. that the Dealer "will also oversee your account for the entire life of your student loans, so you will never need to worry about these again."

- On January 6, 2017, Dealer Student Loan Relief Department wrote in an email to Borrower Marina R. that the Dealer "will oversee your account for the entire life of your student loans, so you will never need to worry about them again."

88.     The Dealers told other Borrowers that consolidation would pay off all of their student loans, intending to mislead the Borrowers to believe that their overall debt burden would be reduced or eliminated through consolidation. For example:

- On January 18, 2017, Dealer Mentor USA wrote in an email to Borrower Jesus A. that the Dealer will "get you approved for one new consolidated loan, paying off all of your existing loans."

- On April 15, 2015, Dealer Student Advocates wrote in an email to Borrower Mark H. that the Dealer will work to "get you approved for a new individual consolidated loan, paying off all of your existing loans."

- On or around August 8, 2017, Dealer Student Loan Care told Borrower Erin C. by phone that it would help her consolidate and pay off all of her loans.

- On or around May 8, 2017, Dealer Student Loan Care sent an email to Borrower Courtney C. stating falsely that "your old loans will be 100% paid off in full via consolidation into a new servicer issued by the Department of Education."

89.     On information and belief, the official sales script of at least three Dealers stated: "If approved for consolidation, the first thing done in a government program is the Department of Education will pay off every single one of your outstanding federal loans and consolidate them into one new loan."[11]

90.     In reality, a Borrower's existing loan balance is "paid off" through consolidation only because it is replaced by a new loan or loans with an equal or greater total balance.

**B.     Dealers Falsely Represented That Their Worthless Services Are Valuable**

91.     The Dealers falsely represented that their Services were valuable to Borrowers when, in reality, their Services had little or no value.

92.     Had SLF Center and Integra fully disclosed the Purported Services sold to Ms. Williams and Mr. Turner, neither would have agreed to purchase the Services.  Hundreds of Borrowers have stated the same to putative class counsel.  On information and belief, *no* Borrowers would have purchased the Purported Services if they fully understood what the Services entailed.

93.     The Dealers provided no assistance to Borrowers beyond the assistance available for *free* from each Borrower's Servicer and USED.

94.     At no point during their solicitation phone calls did the Dealers disclose to Borrowers that all the Services provided by the Dealers are otherwise available for free from

---

[11]  *See* Second Am. Complaint, *People of the State of New York v. Debt Resolve Inc. et al.* ¶ 102, No. 18 Civ. 9812 (S.D.N.Y. 2018), ECF No. 41.

their Servicers and USED.  For example, SLF Center did not disclose in its solicitation phone call to Ms. Williams that its Purported Services were available for free from her Servicer and USED.  Likewise, Integra did not disclose in its solicitation phone call to Mr. Turner that its Purported Services were available for free from his Servicer and USED.

95.     No Borrower who has contacted putative class counsel has reported that a Dealer disclosed during a solicitation phone call that the Dealer's Services were available for free from the Borrower's Servicer or USED.

96.     Dozens of other Borrowers have complained to the BBB and the CFPB that they purchased Purported Services without having been informed that the Services were available from their Servicers and USED for free.  For example:

- "You call [the Dealer] in hopes to get a new affordable monthly rate or forgiveness on your loans.  Instead they charge you $1300 on top of what you owe in loans for a 'service'. . . .  All of this you could do yourself or through your [Servicer] for free. . . .  They mislead and fooled me."  BBB Review (Apr. 4, 2017).

- "The saddest thing is that when this process could be done for free, [My Dealer is] charging almost {$2000.00}, which is still an extreme [r]ipp off of which I have been a victim as many hundreds of others."  CFPB Complaint (Dec. 4, 2017).

- "The agent that called me was a fast talker and completely misled me!!! . . . They charged $1,400 at 21% for something I could have done for free online!!!!"  BBB Review (May 26, 2017).

- "Two years ago, I was misinformed about the terms of my contract, and how it would effect my student loan balance with [my Servicer].  The sales rep on the phone basically told me anything I wanted to hear so that I could sign up. . . .  I am stuck paying for a service that was already being offered by [my Servicer] for free."  BBB Complaint (Apr. 12, 2018).

97.     The Dealers misrepresented that they could offer value to the Borrowers by completing the loan consolidation or Income Driven Repayment enrollment process for Borrowers.  Yet the Dealers used the exact consolidation and Income Driven Repayment forms and online interfaces that are available to all borrowers for free.  *See* Exs. D, E.  The Dealers

applied no expertise in completing these forms.  To the contrary, the Dealer simply filled in demographic and loan information provided by the Borrower, and transmitted documentation from the Borrower to USED or the Servicer, as any Borrower could do on her own.

98.     The Purported Services were transparently of no value to the many Borrowers who were already enrolled in Income Driven Repayment or who had already consolidated on their own before the Dealers pitch them Purported Services.  The Dealers did not disclose to and actively concealed from these Borrowers that the Services provided were the same ones the Borrower had already accessed for free from his or her Servicer and would not change the Borrower's student loan status.

99.     For example, before enrolling in Integra's Purported Services, Mr. Turner was already enrolled in an Income Driven Repayment Plan and had consolidated his loans.  Integra did not disclose to Mr. Turner that its Purported Services consisted of submitting an enrollment form for Income Driven Repayment (which he did not need because he was already enrolled in Income Driven Repayment) and requesting consolidation, for which Mr. Turner was not eligible because he had consolidated before.  Integra's Purported Services were worthless to Mr. Turner.

100.     The Dealers did not disclose to, and actively concealed from, many other Borrowers that the Dealer's Purported Services offered more than the same consolidation or Income Driven Repayment enrollment that the Borrower had already accessed in the past for no fee.  For example:

- On or around May 8, 2017, Dealer Student Loan Care failed to disclose in a phone call with Borrower Courtney C. that the Purported Services they offered consisted of loan consolidation, which she had performed by herself previously, and thus was not eligible to perform again.  The Dealer also falsely told her she needed to consolidate through a third party like Student Loan Care, because her Servicer could not process a consolidation. Student Loan Care's Purported Services also entailed Income Driven Repayment, which Courtney C. had successfully entered in the past on her own.

- In a phone call on or around April 21, 2017, Dealer R3 Processing failed to disclose to Borrower Pamela S. that the Purported Services they were offering her consisted of enrollment in the same Income Driven Repayment into which she had successfully enrolled herself in the past.

- On or about December 1, 2015, Dealer Student Advocates failed to disclose to Borrower Clayton B. that its Purported Services consisted of enrollment in the same Income Driven Repayment plan in which Clayton B. had previously enrolled himself through his Servicer.

- In a phone call on or about March 16, 2017, Dealer MJCCSL Corp. failed to disclose to Borrower Natasha O. that the Dealer's Purported Services consisted of enrollment into the same Income Driven Repayment Plan that she was currently enrolled in, under which her monthly payments were $0.

- On or about August 15, 2017, Dealer Student Loan Care falsely told Deidra B. that her currently required monthly loan payments were $1000 to $2000, when in reality she had enrolled on her own in an Income Driven Repayment Plan with affordable monthly payments. The Dealer failed to disclose to her that the Dealer's Purported Services consisted of enrollment into the same Income Driven Repayment Plan that she was currently enrolled in and consolidation, for which she was not eligible because she had already consolidated on her own.

- In a phone call on or about January 6, 2017, Dealer Student Loan Relief Department failed to disclose to Borrower Marina R. that Dealer's Purported Services consisted of enrollment into the same Income Driven Repayment Plan that she was currently enrolled in through her Servicer, under which her monthly payments were $0.

101.    The Dealers and EAC regularly falsely represented that the Purported Services offered value to the Borrowers by shortening their repayment terms.  For example, EAC's general counsel, Daniel Hill, stated that "[i]n an income driven repayment program, the loans can be forgiven in 20 years - or 10 years less than if they were not enrolled."[12]  This statement is false.  In reality, Income Driven Repayment lengthens Borrowers' repayment terms.

102.    The Dealers also conveyed to Borrowers that the Services had value by representing that they had expertise, that they would perform an individualized evaluation of

---

[12] *See* Rachel DePompa, Watching Your Wallet: Company offering to help lower student debt under investigation (Nov. 5, 2018), *available at* http://www.wtoc.com/2018/11/05/watching-your-wallet-company-offering-help-lower-student-debt-under-investigation/.

each Borrower's student loans to determine the Borrower's best possible options, and that they would provide personalized assistance to each Borrower.  For example, on August 17, 2017, SLF told Ms. Williams that it would "get [her] into the best financial position possible."

103.    These statements were false.  The Dealers did not perform an individualized evaluation of the Borrower's student loans or overall financial status, and did not have the expertise to do so.  Nor did the Dealers screen Borrowers for loan cancellation programs that could provide Borrowers with more valuable relief, such as eligibility for cancellation due to disability or school closure.

104.    The Dealers misrepresented that they had expertise in accessing federal student loan programs, when in fact they often did not properly execute even the Services they did attempt to provide, and then concealed from Borrowers that the Services had not been rendered as promised.  For example, in around April 2015, Dealer Manhattan Beach Venture, LLC told borrower Latoya B. by phone that it would consolidate her loans, but consolidated only some of them.  As a result, several of Latoya B.'s loans remained in default without her knowledge, causing her substantial harm.

105.    The Dealers falsely suggested that their Purported Services had value by falsely discrediting Servicers, and by suggesting that the Dealers provided more valuable opportunities than what a Borrower could obtain from his or her Servicer.

106.    Dealers falsely represented that the Dealers could obtain better interest rates for borrowers than Servicers could provide, or that Borrowers' loans would stop accruing interest if borrowers proceeded through the Dealers.  The Dealers falsely described the Servicers' work as "interest-based," to suggest that Borrowers could receive more favorable interest treatment

through the Dealers.  Dealers falsely stated that Servicers were trying to profit for themselves by failing to tell Borrowers about loan forgiveness.

107.    These statements were false.  Consolidation or Income Driven Repayment has the same effect on Borrowers' interest rates whether the Dealers perform the enrollment or not, and no Borrowers can stop interest accruing through these programs.

108.    For example, on or around August 17, 2017, SLF Center told Ms. Williams by phone and email that her loan servicer, Navient, had engaged in illegal activity and had been sued, to discredit Navient and suggest that SLF Center's Services were more valuable services than what Navient could provide.  As further examples:

- On December 6, 2017, SLF Center wrote in an email to Borrower Jordan M. that SLF Center "can provide a much more efficient repayment than an interest based service provider like the one managing your loans currently."

- On January 18, 2017, Dealer Mentor USA wrote in an email to Borrower Jesus A. that "in most cases [the Dealer] can provide a much more efficient repayment than an interest based service provider like the one managing your loans currently." This email also suggested that "Student Loan Giant Navient," a Servicer, was "Cheating Borrowers."

- On April 15, 2015, Dealer Student Advocates wrote to Borrower Mark H. that the Dealer "can provide a much more efficient repayment plan than an interest based service provider like the one managing your loans currently."

- On or around August 8, 2017, Dealer Student Loan Care told Borrower Erin C. by phone that she was eligible for a special program for borrowers with a loan balance of over $60,000 available only through the Dealer.

- On or around March 30, 2015, an agent of Dealer Progress Advocates Group LLC told Borrower Patricia D. by phone that the Dealer would lower her interest rate to less than two percent.

- On June 25, 2018, an agent of Dealer Progress Advocates Group wrote in an email to Borrower Mark H. that his Servicer "failed to place [him] in the most beneficial program in the first place"; that "there have been many lawsuits regarding these[] servicers keeping these programs from consumers"; and that it was "illegal" for his Servicer to advise him to stop paying EAC.

24

109.     Dealers often misrepresented the value of their Purported Services by stating that, if the Borrower completed the enrollment him or herself, results "may vary."  Dealers also often stated that they could successfully enroll borrowers whose Servicers had illegitimately denied them relief in the past.

110.     These statements were false.  Whether USED or a Servicer accepts a federal student loan borrower's application for consolidation or Income Driven Repayment is not discretionary, and cannot change based on whether the Borrower applies directly or the Dealer does so.  No expertise by any Dealer could change a borrower's eligibility.  As EAC's general counsel, Daniel Hill, has correctly explained: "The [Department of Education] has payment assistance programs available to federal student loan debtors.  Debtors either qualify for a program or not.  There is no negotiation or settlement."[13]

### C.     Dealers Failed to Disclose Harms That Their Services Could Cause Borrowers

111.     The Dealers did not disclose that the Purported Services the Dealers provided may harm Borrowers.

112.     The Dealers did not disclose, and actively concealed, that consolidation could increase the Borrower's total loan balance, interest rate, and repayment term.

113.     The Dealers did not disclose, and actively concealed, that Income Driven Repayment could increase the Borrower's total loan balance because a Borrower's monthly payment often does not cover the amount of interest that has accrued.  The Dealers did not disclose, and actively concealed, that Income Driven Repayment could increase the Borrowers' repayment term.

---

[13]  *See id.*

114.    The Dealers did not disclose, and actively concealed, that consolidation and forbearance could lead to the loss of many months (or years) of credit for payments made toward Public Service Loan Forgiveness or Income Driven Repayment, ultimately increasing the total amount of payments for Borrowers and the repayment term.

115.    The Dealers did not disclose, and actively concealed, that by consolidating, many Borrowers lose the ability to consolidate out of default in the future.

116.    The Dealers did not disclose, and actively concealed, that Borrowers may face enormous potential tax liability from enrollment in Income Driven Repayment.

117.    For example, SLF Center consolidated Ms. Williams's loans and enrolled her in Income Driven Repayment.  This had the effect of increasing her interest rate and her ultimate outstanding balance.  Ms. Williams also lost the ability to consolidate in the future, which could be valuable to her.  SLF Center did not disclose to Ms. Williams any of these harms.  SLF Center also did not disclose the potential tax implications to Ms. Williams.

118.    Integra instructed Mr. Turner to put his loans into forbearance, which set back his eligibility for eventual Public Service Loan Forgiveness by months, and had the effect of increasing his ultimate outstanding balance.  Integra did not disclose to Mr. Turner that putting his loans into forbearance would have the effect of increasing his repayment term and loan balance.

119.    In other examples:

- On or around March 3, 2016, Dealer Student Advocates applied to consolidate Borrower Jessica S.'s student loans. The Dealer did not tell Jessica, who worked in a public service field and had been making payments that qualified for Public Service Loan Forgiveness, that consolidating her loans erased those qualifying payments.

- On or around November 11, 2016, Dealer Student Loan Relief Department failed to disclose to Borrower Jacqueline G., who worked in a public service

field, that consolidating her loans would erase any qualifying payments for Public Service Loan Forgiveness she had made.

**D.      Dealers Misrepresented Affiliation with USED**

120.      Many Dealers falsely suggested or represented that they were affiliated with USED.

121.      For example, SLF Center falsely represented to Ms. Williams that her payment to SLF Center was a "federal transaction."

122.      As other examples:

- On or around May 5, 2017, an agent of Dealer Mentor represented to Borrower Amrit D. by phone that the Dealer was affiliated with the U.S. Government. The agent said that the Dealer was working with the government to reach out to low-income borrowers to lower their payment rates, and to help them qualify for loan forgiveness.  Amrit D. understood the Dealer to be an official agent acting on behalf of the U.S. Department of Education.

- On or about August 15, 2017, Dealer Student Loan Care falsely stated by phone to Borrower Deidra B. that it was submitting her information to the National Student Loan Data System, a government database.

- In approximately 2016, Dealer American Student Loan Initiative told Borrower Marvin K. by phone that American Student Loan Initiative was a part of the federal government.

- On or around September 9, 2016, an agent of Dealer Manhattan Beach Venture, LLC, falsely represented by phone to Borrower Tenille J. that the Dealer was an agent of the U.S. Government.  Tenille would have immediately hung up the phone had she understood that the Dealer was in no way affiliated with USED.

- In approximately August 2017, Dealer Student Loan Care sent to Borrower Erin C. the below direct mailing that suggested affiliation with USED by, for example, stating that it was a "secured document" and including a purported total of her outstanding student loan balance to suggest that the Dealer could access information about her account from USED.

**Student Loan Division**
1133 Westchester Avenue S-223
White Plains, NY 10604 USA

Eligibility Code: 27043133
Estimated Federal Student Loan Balances: **$63,000**
http://█████████studentloaninfo.net
Department Phone: **(888) 701-0060**
Office Hours: Monday – Friday 10:00am - 10:00pm EST

Erin ████████
████████████████

Dear Erin ████████

Contact us immediately at **(888) 701-0060**. Expiration date: **8/17/17**.

Government legislation has recently passed making you eligible for substantial Federal Student Loan Relief.
Our records indicate that your current student loan balances exceed **$63,000**.

Your current estimated student loan balances may qualify you for:

| | |
|---|---|
| ✓ **Lower Interest Rates** | ✓ **Stop Garnishments** |
| ✓ **Lower Monthly Payments** | ✓ **Adjust For Income And Family Size** |
| ✓ **Forgiveness Of Debt** | ✓ **Bring Loans In Default to Good Standing** |

We work directly on your behalf with the U.S. Department of Education to identify applicable financial relief
programs allowing your Federally Insured Student Loans to be flexible and easy to manage.

Now that you've been pre-approved for this limited eligibility program, you can feel comfortable speaking
with one of our student loan specialists to determine your available relief options.

Call now **(888) 701-0060** and provide your eligibility code so we can assist you: 27043133
Or, visit your personal website for details: http://████████studentloaninfo.net

Please forward all correspondence to:    Student Loan Division
                                          1133 Westchester Avenue S-223
Approval Dept.                            White Plains, NY 10604 USA
                                          (888) 701-0060

**SECURED DOCUMENT**                                              **2017**
WARNING: $2,000 FINE, 5 YEARS IMPRISONMENT, OR BOTH FOR ANY PERSON INTERFERING OR OBSTRUCTION WITH DELIVERY OF
THIS LETTER U.S. MAIL TITLE 18 SEC. 1720 U.S. CODE

**FINAL ELIGIBILITY NOTICE**                          Erin ████████

**PERSONAL & CONFIDENTIAL**

This is a private fee-based assistance service, not endorsed or associated with any government agency. Company provides review and preparation of documents to assist
in obtaining benefits related to publically backed student loans. Company does not lend money, broker loans or consolidate debt. Some services offered by company may
be available directly to consumers from government on a do-it-yourself basis without fees. Not available in all states. Call for complete details. Student Loan information
contained herein is modeled, this information is public record.

- In approximately late November 2016, Dealer Student Loan Care sent a similar direct mailing to Borrower Kevin S. designed to suggest that it was affiliated with USED and stating he had "Estimated Federal Student Loan Balances" of over $110,000.

- In approximately early May, 2017, Dealer Student Loan Care sent a similar direct mailing to Borrower Courtney C. designed to suggest that it was affiliated with USED and stating that she had "Estimated Federal Student Loan Balances" of over $41,000.

123. Dealers' emails often contained the seal of USED. For example, on January 18, 2017, Dealer Mentor USA sent Borrower Jesus A. an email that features a prominent seal of USED:

On Jan 18, 2017 11:45 AM, "Nicholas Lancaster" <nlancaster@mentorusa.org> wrote:

                           888-636-8670

**We Look Forward To Helping You With Your Student Loans**

Dear Jesus,

Your Case email for correspondence will always be: ▇▇▇▇▇▇▇▇. Be sure to use this email for sending us any requested documentation, questions or concerns you might have.

It was a pleasure speaking with you today. I look forward to personally assisting you through this process. I know how troubling and in some ways crippling your student loans can be on your family and financial future. The student loan crisis in America truly is an epidemic for our nation and it is our mission to throw a life line for everyone that feels like the are drowning in debt.

Our company, Mentor, works directly with consumers through the Dept. of Education to get you approved for one new consolidated loan, paying off all of your existing loans, and lowering your payment. President Obama and congress passed a piece of legislation called the William D Ford Act, which allows the Dept. of Education to consolidate student loans. So our company is here to help you pull your loans and see what you qualify for to get you into the best position possible. We will also oversee your account for the entire life of your student to loans; so you will never need to worry about these again.

**Sincerely,**

**Nicholas Lancaster**

Phone: 888-636-8670 ext.124

nlancaster@mentorusa.org

**William D. Ford Federal Direct Loan Program**
This act, provides the Department of Education the ability to forgive federal debt. These programs require specific eligibility, however in most cases we can provide a much more efficient repayment than an interest based service provider like the one managing your loans currently. **Read More**

124.    The General Counsel of USED has stated that a private company's use of the

Official Seal of USED improperly "implies that the Department is affiliated with" the company

and violates federal law.[14]

125.    Dealers routinely falsely represented that they acted in the role of, or were

authorized by, Servicers.

126.    For example, Integra told Mr. Turner that Integra assists with loan forgiveness

through the Department of Education, and suggested that Integra would become a servicer of his

student loans.  As other examples:

- On or around March 16, 2017, an agent of Dealer MJCCSL Corp. told Borrower Natasha O. by phone that the Dealer worked very closely with her federal student loan servicer, Great Lakes, and that the Dealer was authorized by Great Lakes to assist her with her student loans.

- On or around April 21, 2017, an agent of Dealer R3 Processing falsely represented to Borrower Pamela S. by phone that the Dealer acted in an equivalent capacity as her then-servicer, American Education Services ("AES"). The Dealer told her that it would directly inform AES that her student loans had been switched from AES to the Dealer.

- On or around March 7, 2018, Dealer Mentor represented to Borrower Yvonne K. that the Dealer was calling on behalf of her federal loan servicer, FedLoan Servicing.  The Dealer claimed to have information about her student loans that was not publicly available, and that was only available to her Servicer and to USED.

127.    Dozens of Borrowers have complained to the BBB and the CFPB that they

purchased Purported Services based on misrepresentations that the Dealers or EAC were

affiliated with USED or served as the Borrower's Servicer.  For example:

---

[14] *See* U.S. Dep't of Educ., Cease and Desist Letters (Jan. 28, 2016), *available at*
https://www.nasfaa.org/uploads/tn/160129_ed_cease_desist.pdf; *see also* 15 U.S.C. § 1125; 18 U.S.C. § 1017
("Whoever fraudulently or wrongfully affixes or impresses the seal of any department or agency of the United
States, to or upon any . . . paper . . . shall be fined under this title or imprisoned not more than five years, or both.").

- "Equitable Acceptance posed to be working with the U.S. Department of Education to consolidate my student loans so I could be enrolled in the Public Service Loan Forgiveness.  The U.S. Department of Education has informed me that they do not work with Equitable Acceptance, and that there is no reason I need to be paying a third party company $1,300 with credit card high interest (20.99%) to be in the Public Service Loan Forgiveness Program."  BBB Complaint (Feb. 10, 2018).

- "I felt pressured because they said that I needed to act fast before Trump changed the law that Obama had implemented.  In the end they made me believe that they had some connection with the Department of Education given the advertisements they use and [em]ails I received."  CFPB Complaint (Dec. 4, 2017).

- "I thought [the Dealer was] a credible company because they advertised that they are affiliated with the Department of Education."  BBB Complaint (Sept. 9, 2017).

- "I thought they were a credible company because they claim to have affiliations with the Department of Education. . . .  Mistakenly, I thought [the Dealer] was related to my current lender . . . and that's is not the case.  [The Dealer] misrepresented their selves and did not disclosed that their finance company is Equitable Acceptance."  CFPB Complaint (Aug. 24, 2017).

- "They claimed themselves as a 'federal loan servicer ' while other companies were 'servicers of federal loans.'  Essentially, that they were mandated and authorized by the federal government and in the public realm while the 'servicers of federal loans' were in the private realm and made money off of my loans." CFPB Complaint (Jan. 24, 2017).

### E.    Dealers Misrepresented Borrowers' Payment Obligations

128.    The Dealers misrepresented to Borrowers the nature of the payment obligation to

EAC.

129.    In consultation with EAC, each Dealer offered the Purported Services to

Borrowers at the price of approximately $1,300.

130.    Most Borrowers who purchased the Purported Services could not afford to pay the

$1,300 that the Dealers charged in a single, upfront payment.

131.    Even if a Borrower could afford the full price, the Dealers were prohibited by federal regulation from accepting upfront payment before performing services for the Borrower.[15]

132.    For that reason, to complete the Scheme, the Dealers referred Borrowers to EAC to finance the purchase.  The Dealers conditioned enrollment in the Dealer's program upon EAC's acceptance of the Borrower for financing.

133.    To secure Borrowers' agreement to enroll in the Dealers' Purported Services, many Dealers quoted Borrowers a monthly cost that the Borrower would owe if he or she enrolled in the Services.  The single quoted amount included both an estimated future monthly student loan payment due to the Borrower's Servicer under Income Driven Repayment *and* the monthly payment obligation to EAC.  Yet the Dealers misrepresented the structure of this payment, often telling Borrowers that this payment would only be applied toward their federal student loan balance and failing to disclose that a portion of this payment goes to EAC to pay for the financing.

134.    When Dealers did identify that Borrowers would be making a separate payment on top of their student loan payments, the Dealers often falsely stated that the payment to EAC constituted a "payment plan" to purchase the Services.

---

[15]    *See* 16 C.F.R 310.4(a)(5)(i).

135.    For example, SLF Center told Ms. Williams that she could pay her $1,377 purchase price through a down payment of $150 and a payment plan of $49 per month. Integra told Mr. Turner that he could pay his $1,314 purchase price through a payment plan of $39 per month.

136.    The Dealers concealed from Borrowers that the financing from EAC was in the form of a new Deceptive Loan with 21% interest.

137.    The Dealers concealed from Borrowers that the financing from EAC would appear on Borrowers' credit reports as a maxed out line of credit.

138.    The Dealers made these misrepresentations and material omissions knowing they did not accurately or completely describe the terms of EAC's financing, and with intent to secure Borrowers' agreement to accept financing with EAC.

139.    For example, Integra told Mr. Turner that he would have no payments for 75 days, then would have a monthly payment of $39.42. Integra did not disclose to Mr. Turner that these monthly payments were not being applied to Mr. Turner's student loan balance and did not disclose that these payments were towards the new Deceptive Loan from EAC with 21% interest or that the Deceptive Loan would appear on his credit report as a maxed out line of credit.

140.    SLF Center did not disclose to Ms. Williams that her monthly payments of $49 were not being applied to her student loan balance and did not disclose that these payments were towards the new Deceptive Loan from EAC with 21% interest or that the Deceptive Loan would appear on her credit report as a maxed out line of credit.

141.    In other examples:

- On or around December 5, 2017, SLF Center told Borrower Jordan M. by phone that his monthly payments would go toward his student loans, when in reality they would go to fund EAC's financing.

- On or about January 18, 2017, Dealer Mentor USA told Borrower Jesus A. by phone that his loan payments could be reduced from $132 per month to $40 per month, without disclosing that this $40 per month payment was to EAC rather than to his student loans.

- On or around December 1, 2016, an agent of Dealer Student Loan Care represented to Borrower Kevin S. over the phone that, given his income and family size, he would be eligible for low monthly payments of $42.42 a month, without disclosing that this payment was to EAC rather than to his student loans.

- On or around April 15, 2015, Dealer Student Advocates told Borrower Mark H. by phone that after purchasing Dealer's Purported Services, his loan payments would fall to $49, when in reality those were payments to EAC. Relying on these statements, he ceased making payments on his student loans to FedLoan Servicing.

- On or around April 21, 2017, an agent of Dealer R3 Processing falsely represented to Borrower Pamela S. over the phone that her $49 monthly payment was her new student loan payment.

- In approximately 2016, a representative of Dealer American Student Loan Initiative told Borrower Marvin K. that he would be eligible for a single monthly student loan payment of approximately $39, without disclosing that the $39 would go to EAC.

- On or around June 3, 2016, Dealer Student Advocates represented to Borrower Amanda Y. that a monthly "fee" of $39 would go towards her federal student loan balance.

- On or around September 9, 2016, an agent of Dealer Manhattan Beach Venture, LLC, falsely represented to Borrower Tenille J. that her $39.42 monthly payments would go directly toward her student loans.

- On or around May 8, 2017, Dealer Student Loan Care told Borrower Courtney C. by phone that her $167.37 monthly payment would comprise two separate payments: $124.75 that would go to the Department of Education to pay her student loan balances, and $42.42 that would pay the "processing fee" to the Dealer for consolidating her loans. He stated that the processing fee was necessary to obtain consolidation. That same day, Student Loan Care emailed her reminding her that she would be making two separate payments, one toward her student loans and "[o]ne toward the financing of your consolidation." She had in fact already consolidated her loans on her own, so she was not even eligible for consolidation.

142.    Dozens of other Borrowers have complained to the BBB and the CFPB that they were not informed that they were obtaining a loan from EAC to finance the Dealer's fee.  For example:

- "I was contacted by a student loan forgiveness agency in February of 2016. . . . I [made payments for] 1 1/2 years, but never received any student loan forgiveness services.  Then upon checking my credit I find that there is a loan for about 1300.00 held by this same company. I never agreed to a loan . . ." BBB Complaint (March 13, 2018).

- "Was tricked into getting loan forgiveness through this company.  We agreed to pay them 49$ a month and the board of education was supposed to pay off our loans.  Then without consent they took out a credit card under my social security #." BBB Complaint (December 2, 2017).

- "[Dealer] called me about student loan forgiveness.  They told me all I have to pay is a one time fee of $1300.00 and they will wipe away my student loan. . . .  They emailed me papers and I signed I had no idea they opted me into a loan with a company called equitable acceptance. . . .  [I] have been paying them for a year now with an interest rate of 20 %. They did not tell me this verbally.  I have no idea why I'm paying this company from. I was scammed." CFPB Complaint (Sep. 13, 2017).

- "[T]he representative I spoke with. . . advised there would be a flat fee of $1300.00 payable in 48 monthly installments. . . .  I later found out that my payment is actually higher and not set up as a flat fee payment, but actually as a revolving credit line with severely high interest serviced by Equitable Acceptance Corp. . . .  I was not sold a credit card and I would not have opened a credit card with Equitable Acceptance if properly advised." CFPB Complaint (May 8, 2017).

- "[EAC] misled me into making monthly payments directly to them, saying the payments were going towards my student loans.  Additionally, this 'loan' from Equitable Acceptance Corp. is being listed on my credit reports as a Credit Card.  There services are false, misleading and a scam." CFPB Complaint (Jan. 19, 2017).

143.    The Dealers concealed that they were collecting income-related information from Borrowers, or checking their credit, so that EAC could determine the Borrower's creditworthiness.

144.     For example, SLF Center instructed Ms. Williams to provide proof of income so that SLF Center could "send it to the Department of Education for review" and stated that SLF Center would send her paystubs "right over to the DOE." This statement was misleading; SLF Center first provided the information to EAC to check Ms. Williams's creditworthiness, and sought the information for that purpose.

**F.      Dealers Used Misleading Calls and High Pressure Sales Tactics to Deceive Borrowers Into Agreeing to Purchase the Purported Services**

145.     The Dealers conducted misleading phone calls with Borrowers, often including high-pressure sales tactics, to secure Borrowers' agreement to purchase Purported Services.

146.     Taken together, the misrepresentations and material omissions made by each Dealer, and the tactics they utilize, constituted a deceptive sales pitch that fully misrepresented the Purported Services and financing from EAC. Ms. Williams and Mr. Turner were both subject to deceptive sales pitches during telephone calls with Defendants SLF Center and Integra, respectively, as described more fully below.

147.     As a further example, on or around August 15, 2017, a representative of Dealer Student Loan Care had a solicitation call with Borrower Deidra B. that lasted more than an hour and was rife with misrepresentations.

148.     The Dealer began the call by falsely stating that Deidra's Servicer was "doubling up . . . payments" and "doubling up . . . interest rates without telling you"; was "only [applying] payments towards the interest"; and that "the Department of Education, who really owns the loan, is not receiving any of their money back." The Dealer told her that her Servicer, Nelnet, was charging her payments of "at least a thousand or two thousand dollars a month" and that her current repayment status was "really not safe for [her]."

149.    In reality, she was enrolled in Income Driven Repayment with Nelnet and her loans were in good status.

150.    The Dealer then stated: "What we're trying to do is, we're trying to get you qualified to a government program to pull you away from Nelnet." He also stated: "As soon as we get everything approved and processed for you, the Department of Education will pay off all of your federal student loans in full. [You will have] the one loan . . . back in good standing, and it will be paid in full by the Department of Education. The lender that you will have then, it will be regulated, so that means that you don't have to worry about them changing the interest rates on you."

151.    The Dealer did not tell Deidra that the Purported Services had no value to her because she had already consolidated her loans and enrolled in Income Driven Repayment on her own.

152.    The Dealer mentioned loan forgiveness to Deidra more than a dozen times over the course of the call, including stating that "[o]nce you're processed and get approved to the forgiveness program, then the Department of Education pays off the full loan, so it it's like a clean slate for you."

153.    The Dealer first told Deidra that her monthly payments would be $98.42, without disclosing that this price included both her $56 student loan payment under Income Driven Repayment and $42.42 per month to EAC. Over an hour into the call, the Dealer first mentioned that the $42.42 charge was separate, explaining: "The $42.42 is going to go towards the underwriting, document preparation and processing of your federal loan forgiveness program. . . . So, what it guarantees you is the lowest monthly payment possible, as well as the

most amount forgiven, for your student loan payment there."  At no point did the Dealer disclose to Deidra that she would be obtaining a new loan from EAC.

154.    In fact, the Dealer only mentioned EAC at the very end of the call: "So if you go ahead and open up your email there, you'll see that an e-document was sent to you, and that's going to be for the Equitable, for the $42 payments.  Okay?  So go ahead and open that up there.  Go through it, just make sure everything is correct there, and then, uh, click through to agree to everything, and then once you're finished, let me know."

155.    The Dealers often create a false sense of urgency over Borrowers' enrollment by stating that Borrowers may be eligible only for relief for a short time.  For example:

- On or about December 1, 2015, an agent of Dealer Student Advocates told Borrower Clayton B. by phone that he should purchase the Dealer's Services immediately, stating that they were part of an Obama administration government program that would most likely be suspended when the next President took office. Based on these representations, Clayton signed the documents the Dealer sent while on the phone with the Dealer.

- On January 6, 2017, Dealer Student Loan Relief Department represented to Borrower Marina R. by phone that it was imperative she sign up for the Dealer's Purported Services immediately, because the incoming administration of President Trump might suspend the existing student loan forgiveness program for which Marina R. was supposedly eligible.

- On or around September 9, 2016, Dealer Manhattan Beach Venture, LLC, represented to Borrower Tenille J. that the offer of loan forgiveness was a "limited-time offer," and that she therefore did not have time to wait and think about whether to purchase the Dealer's Purported Services.

- In approximately November 2016, Dealer Student Loan Care sent Kevin S. a mailed solicitation for a "limited eligibility program" with an "Expiration date" of December 1, 2016.

- In approximately July or August, 2017, Dealer Student Loan Care sent Erin C. a mailed solicitation for a "limited eligibility program" with an "Expiration date" of August 17, 2017.

- In approximately late April, 2017, Dealer Student Loan Care sent Courtney C. a mailed solicitation for a "limited eligibility program" with an "Expiration date" of May 4, 2017.

156.    Pressured by the Dealer, Borrowers often agreed to purchase the Purported Services during the first phone call with the Dealer.

157.    On information and belief, the Dealers obtained Borrowers' auto pay information during the first phone call, in order to make it more difficult later for Borrowers to withdraw from the transaction.

158.    Once a Dealer secured a Borrower's oral agreement to purchase the Purported Services, the Dealer referred the Borrower to EAC for financing.  On information and belief, EAC designed an integrated software platform by which each Dealer could submit financing referrals to EAC with the click of a button.  EAC evaluated each Borrower's creditworthiness and assigned each Borrower a letter grade, with "A" corresponding to the most creditworthy Borrower.  On information and belief, Dealers often submitted Borrowers for approval by EAC, and received approval from EAC, while the Borrower remained on the phone with the Dealer.

159.    The Dealers electronically sent to some or all Borrowers a document packet through an electronic signature application, such as "SignByX."  At the Dealers' insistence, Borrowers often used this tool to execute the documents in a matter of minutes or even seconds.

160.    Within minutes, EAC electronically sent Borrowers a second document packet through an electronic signature application called "DocuSign."  At the Dealers' insistence, Borrowers often used this tool to execute the documents in a matter of minutes or even seconds.

161.    The Dealers pressured Borrowers to electronically sign both packets of documents while they remained on the phone with the Dealer, or immediately afterwards.

162.    The Dealers ensured that Borrowers were only presented with these documents after the Dealers had made extensive oral misrepresentations.

163.     The Dealers took steps designed to ensure that the Borrower would not read or understand any of the documents sent to them by the Dealer or EAC.

164.     For example:

- In a phone call in approximately early December 2017, SLF Center misrepresented to Borrower Jordan M. that SLF Center's Services entailed loan forgiveness, then emailed Jordan a document packet.  Jordan M. asked the representative, "What am I signing?"  The representative told Jordan that he was "signing over" his loans, and repeated his previous explanation regarding loan forgiveness.

- On or around May 8, 2017, Dealer Student Loan Care told Borrower Courtney C. by phone that the contract it emailed her was one she needed to sign to enter a consolidation.

165.     The Dealers concealed that these documents may have contradicted explicit material representations made orally by the Dealer.

166.     Often, Dealers included language in the document packets that they sent to Borrowers that purported to disclose features of the transaction, such as that the Dealers were not affiliated with the Department of Education.  These attempted disclosures were not labelled as disclosures and did not disclose or disclaim most of the Dealers' misrepresentations, including the core falsity that the Borrowers would obtain loan forgiveness through buying the Purported Services.

167.     The Dealers' document packets disclaimed that the Dealer was extending any credit to the borrower, stating that the Dealer "is not a lender."  For example, Integra's document packet stated that "[i]n no way does Integra Student Services offer its own Credit Plan."

168.     On information and belief, all EAC-affiliated Dealers sent document packets to Borrowers that contained materially identical terms.  On information and belief, EAC provided these terms to the Dealers. EAC required that all Dealers use an EAC-approved document when enrolling Borrowers.

G.     **EAC's Deceptive Loans**

169.    All document packets sent by EAC to the Borrowers were virtually identical except for the Borrower's information, the name of the Dealer, and the description and price of the specific Purported Services purchased.  Each document packet sent by EAC was stamped on the first page with EAC's name and corporate logo.  Once completed, the document packet contained a stamp on each page stating that "[t]he original document is owned by Equitable Acceptance."

170.    EAC communicated with Borrowers about the document packet by email and phone.  Many Borrowers with whom EAC communicated live in New York.

171.    The EAC document packet contained a "Purchase Agreement," which set forth the terms of the Borrower's purchase of Purported Services from the Dealer, including total sales price, down payment, unpaid balance, and monthly payment.  The Purchase Agreement conditioned the Borrower's purchase of the Purported Services on the Purchase Agreement being "accepted under the Revolving Credit Plan."

172.    The document packet also contained an "Equitable Acceptance Revolving Credit Plan" (the "Credit Plan").

173.    On information and belief, EAC purposefully drafted the Credit Plan with the intent to deny that it originated any loans, in order to avoid liability arising from the deceptive and usurious nature of the loans.

174.    As a result, the Credit Plan is so ambiguous about the identity of any purported extender of credit and the establishment of a loan that it does not create any enforceable obligation at all.

175.    No provision of the Credit Plan purports to extend credit, or states the amount of credit purportedly being extended.

176.    No provision of the Credit Plan identifies any party purportedly extending credit.

177.    The Credit Plan states: "I [the Borrower] am executing my Revolving Credit Plan with you (the 'Credit Plan')."  It also states that purchases will be debited against "the line of credit that you (meaning only Equitable Acceptance Corporation or any other sales organization to which this agreement is assigned and accepted) may establish hereunder."  Other provisions of the Credit Plan, however, describe EAC as an assignee.

178.    The Credit Plan is labeled as an Equitable Acceptance document, but the Dealer's name and a "Rep ID" number appear in the signature area of the document.

179.    The Credit Plan provides for an annual interest rate of 20.99% (or, in what is, on information and belief, a small minority of contracts, 17.99%).  It sets forth the number of months it will take the Borrower to pay off the balance by making the minimum monthly payments, but does not state the amount of the minimum monthly payments.  It also provides for a $20 fee for late payments or payments returned due to insufficient funds.

180.    The Credit Plan states that as a holder, EAC "is subject to all claims and defenses" that any Borrower "could assert against the seller of goods or services" obtained "with the proceeds" of the Credit Plan, that is, against the Dealer.

181.    The packet also includes an "Equitable Acceptance Auto Pay Terms of Use," by which the Borrower authorized EAC to make monthly electronic ACH debits from the Borrower's bank account in the amount of the "Monthly Payment" set forth in the Purchase Agreement.  EAC charges a 4% surcharge on any credit or debit card payment not made through auto pay.

182.    To the extent the Credit Plan creates any credit obligation at all, that credit obligation is deceptive to the Borrower.

183. "Revolving credit" and "line of credit," also known as "open-end credit," describe a consumer credit arrangement—like a credit card—that allows the borrower to buy goods on a continuing basis, through repeat transactions, as long as the outstanding balance does not exceed the credit limit.

184. But to the extent EAC's Credit Plan extends credit, that credit is *not* open-end credit. It is closed-end credit.

185. In the prototypical closed-end credit sale, such as a car sale, the creditor extends the borrower a fixed amount of credit to finance a single purchase at a particular interest rate, to be payable in equal monthly installments over a fixed number of months.

186. Although labelled as open-end credit, the credit purportedly extended by EAC's Credit Plan is in reality closed-end credit: it is a fixed amount of credit (the unpaid balance), at a particular interest rate, to fund a single purchase, and is payable in equal monthly installments over a fixed number of months.

187. Dealers often described EAC's financing as a "payment plan" or provided a monthly payment amount. The Purchase Agreement states a "Monthly Payment" amount, and EAC's auto pay program is set up to debit that same amount each month.

188. EAC did not reasonably contemplate repeated transactions under the Credit Plan.

189. None of the Borrowers who have contacted undersigned counsel have made repeated purchases under the Credit Plan.

190. No Borrower has ever made repeated purchases under the Credit Plan.

191. The Credit Plan permits Borrowers to make additional purchases only with permission from EAC itself (not the Dealer). The Credit Plan requires that Borrowers "reapply" for credit if they want to use it for other purchases, and "this requirement will be exercised at the

sole discretion of Equitable Acceptance." The Credit Plan also states that "[a]dditional purchases may be made in excess of the credit extended under this agreement only upon written application and advance approval by [EAC]."

192. In addition, because the initial purchase draws the Borrower's full line of credit, and the monthly payments are minimal compared to the total balance, no Borrower would have sufficient credit to purchase additional services for a long time.

193. In any event, as EAC knows, no reasonable Borrower would repeatedly purchase the Purported Services, because the "loan forgiveness" the Dealers promise, if obtained, would end the Borrower's student loan obligations. Thus, no Borrower would need to engage in future transactions with the Dealer or EAC.

194. When credit is facially characterized as open-end, but is in fact closed-end, it is called "spurious open-end credit." Provision of closed-end credit is highly regulated. Extenders of closed-end credit are subject to strict disclosure laws designed to ensure that Borrowers have adequate information to assess the true cost of credit. Spurious open-end credit is subject to the disclosure requirements that apply to closed-end credit.

195. EAC offered its spurious open-end Credit Plan to conceal the total cost of credit from Borrowers, and to deceive Borrowers into accepting unfavorable credit terms that they would not accept if they received the disclosures required for extensions of closed-end credit.

196. EAC's Credit Plan omits many pieces of information that the law requires.

197. The Credit Plan does not set forth the actual amount financed under the contract—that is, the Purported Services sales price minus any down payment made by the Borrower.

44

198.   The Credit Plan does not state the dollar amount of the finance charge, as required by law.  Instead, it expresses the finance charge as a Daily Periodic Rate (0.0575%) and corresponding Annual Percentage Rate (20.99%).

199.   The Credit Plan does not state the dollar amount of the total payments the Borrower will have to make, which would be calculated as the sum of the amount financed and the amount of the finance charge.

200.   The Credit Plan does not state how a Borrower can avoid having to pay a finance charge, or whether there is any time period during which a Borrower can make payments without having a finance charge imposed (a "Grace Period").

201.   The Credit Plan does not state the "Monthly Payment" amount, which it also describes as a "Monthly Minimum Payment," as a dollar amount.  Nor does the Credit Plan state the due date of any payment.  Instead, the Credit Plan only describes the method of calculating that payment.

202.   The Credit Plan does not disclose the Borrower's right to dispute billing errors.

203.   EAC prepares and transmits monthly billing statements to Borrowers.  These statements provide the starting balance, the finance charge and any fees imposed, any payments made, and the resulting closing balance.  The statements do not disclose any Grace Period available to Borrowers.

204.   The Credit Plan and the Billing Statements deliberately conceal the true cost of the credit.

205.   As a result of EAC's misrepresentations and omissions, Borrowers did not know, and were, and continue to be, misled about the true cost of the credit.

206. EAC never disclosed to Borrowers that under the Credit Plan they will pay hundreds of dollars more for the Purported Services than the purchase price, because the Credit Plan provides for a high interest rate and a long repayment term.

207. If the documents disclosed the true cost of the Credit Plan, including the total cost of the Purported Services, few if any Borrowers would have accepted EAC's financing terms.

208. EAC reports the Deceptive Loan as revolving (open-end) credit to each of the three major credit bureaus each month, continuing through the present. On information and belief, EAC uses the interstate mails and wires to transmit its reports to the credit bureaus.

209. When Borrowers complain about how the Deceptive Loan appears on their credit reports, EAC falsely represents that it "ha[s] no control over how the credit bureaus report [a Borrower's] account."[16]

## III.   THE DEALERS', EAC'S, AND HENN'S INTERDEPENDENT SCHEME

210. EAC, Henn, and the Dealers benefitted from the fraudulent misrepresentations and omissions used by the Dealers when selling the Purported Services. Without these misrepresentations and omissions, no Borrowers would have purchased the Dealers' Purported Services, which have little or no value, or obtained EAC's Deceptive Loan.

211. EAC and Henn knew about, and actively participated in, the misrepresentations and material omissions used by the Dealers in the sales and marketing process. At various times, including in December 2016 and October 2017, EAC, at Henn's direction, convened in-person meetings with multiple Dealers and discussed the Dealers' marketing practices.

212. EAC and Henn in particular reviewed the many complaints and reviews Borrowers submit on the BBB and CFPB websites and receive many complaints directly from

---

[16] "Student Loan Consolidation/Repayment," Equitable Acceptance Corporation, https://equitableacceptance.com/student-loan-consolidation-repayment/.

Borrowers by phone or email.  These complaints describe the Dealers' misrepresentations and omissions in detail.

213.    Many of EAC's responses to the complaints and reviews also reveal that EAC and Henn have information about the specific Purported Services offered by the Dealer to each Borrower as well as the consequences to the Borrowers.

214.    Sometimes, EAC is directly involved in providing Services to Borrowers.  For example, in approximately late August 2018, EAC emailed many Borrowers who had been enrolled by various other Dealers, including Jordan M. and Pamela S.: "[W]e have arranged for [Dealer] TitanPrep to assist you with any remaining student loan payment assistance services to which you are still entitled.  This is a good thing.  TitanPrep successfully services thousands of student loan payment customers, and we find them to be a professional, customer service oriented company."  The email also stated: "Our goal is simple – to ensure you receive all of the help and assistance to which you are entitled with your federal student loans."

215.    The Master Dealer Agreement between EAC and each Dealer provides that EAC will make an upfront payment to the Dealer for each Borrower enrolled.  This upfront payment allowed Dealers to obtain cash immediately for each new customer, while sidestepping the federal prohibition against telemarketers directly charging Borrowers for services that have not yet been provided.

216.    On EAC's website, which it uses to recruit new Dealers, EAC stated that this "fast funding" pumps money into the Dealer's "revenue stream."

217.    Borrowers' later payments, including interest payments and late fees, are made to EAC directly.

218.    The Master Dealer Agreement also has a "recourse" provision that allows EAC to sell a Borrower's payment obligation to the Dealer at EAC's sole option.

219.    When EAC invokes the recourse provision, the Dealer must pay EAC an amount to cover the Borrower's outstanding balance on the obligation. The Dealer may pay this amount directly or out of a reserve fund of the Dealer's money that EAC holds.

220.    The Dealers, EAC, and Henn knowingly took and continue to take steps to conceal their fraud because Defendants' Scheme depends on the continued active participation of the Dealers, EAC, and Henn.

221.    The Dealers and EAC took and continue to take steps to cut Borrowers off from any contact with their Servicers. On information and belief, they do this to prevent Borrowers from learning from their Servicers that the Dealers' Purported Services are worthless.

222.    As an example, the Dealers often changed Borrowers' contact information with their Servicers and USED so that notifications about the Borrowers' loans will go to the Dealers, instead of the Borrowers. The Dealers also changed Borrowers' log-in credentials. For example, SLF Center changed Ms. Williams's email address to an address at the domain numailnow.com that does not belong to her.

223.    As a result, Borrowers can no longer access information about their accounts, nor can they obtain the free services and information available from their Servicers. Borrowers do not receive notice of delinquency or default in their federal student loan accounts.

224.    The Dealers also direct Borrowers to ignore or forward mail or calls received from their Servicers. For example, on September 15, 2017, Integra emailed Mr. Turner: "Should you ever receive something regarding your student loans that doesn't match what we are telling you then please contact us immediately." As further examples:

- On December 19, 2017, and again on January 19, 2018, Dealer SLF Center sent Borrower Jordan M. an email stating, "Please note that as your agent all correspondence from the Department of Education should be directed to our attention **immediately**." On January 24, 2018, SLF Center sent him an email stating, "Please note that **all** correspondence from the Department of Education Servicer should be directed to our attention for handling on your behalf. Please immediately forward correspondence . . . ."

- On August 23, 2018, Borrower Pamela S. received an email from Dealer TitanPrep stating: "NOTE: As we move forward, you may receive correspondence regarding your student loans from your current loan servicer or the Department of Education. Please note that as your agent, all correspondence from the Department of Education should be directed to our attention **immediately**."

- On June 14, 2017, Borrower Jessica S. received an email from Dealer Progress Advocates Group stating: "*Please note that as your agent all correspondence from the Department of Education should be directed to our attention **immediately**."

225.    Dealers provide negative information about Borrowers' Servicers so that Borrowers will be less likely to believe their Servicers if the Servicers tell the Borrowers that the Dealers' Services are worthless.

226.    EAC's website stated:

> If someone contacts you, and tells you that you have been 'scammed' or defrauded by choosing to hire an expert to help you take advantage of student loan assistance programs, and/or they encourage you not to make your payments, you have been misled! Please gather whatever details you can about the person who contacted you with this misinformation, and call us ASAP. We understand that receiving calls such as these can be distressing. We care about our customers, and are here to address any concerns you have, including unlawful calls you may receive.

227.    By including this statement on its website, EAC discouraged (and intended to discourage) Borrowers from realizing or complaining that they have been the victims of fraud.

228.    EAC required that virtually all Borrowers enroll in auto pay in part to conceal the Scheme. By automatically taking payments out of Borrower's bank accounts, EAC reduces the chance that a Borrower will realize that those payments are not going to their loans.

229.     EAC required each Dealer to record a "verification" portion of any call with a Borrower being referred to EAC for financing.  The Dealer's verification must follow a script that EAC wrote or approved, in which the Dealer confirms with the Borrower that EAC is a finance company with which the Dealer contracts.  EAC required the Dealer to transmit the audio recording of the verification through the software platform designed by EAC.

230.     The representations in this script did not disclose that the Borrower will obtain a new "loan" or "line of credit" from EAC or that the Borrower would be charged interest.  On information and belief, the script often contradicted other representations made by the Dealers during the calls.  The substance of this scripted portion and the timing of its delivery were intended to minimize the likelihood that a Borrower would change his or her mind and decide not to purchase the Purported Services.

231.     EAC required Dealers to record the verification call so that EAC could later claim to the Borrower that the Borrower understood the nature of EAC's financing, thus concealing the many material misrepresentations made by Dealers, including in the remainder of the solicitation call.

232.     EAC makes misrepresentations about the value of the Dealers' Services to Borrowers who complain.

233.     For example, in a November 27, 2017 response to a BBB review, EAC wrote: "[T]o the extent [the Borrower] is suggesting that federal student loan debtors can obtain the same assistance for free from their federal loan servicer, that too is inaccurate."  This statement is false.  Federal student loan borrowers can obtain all Services provided by Dealers for free through their Servicers.

234.    In response to Borrower complaints, EAC often conveys to Borrowers that it is not legally responsible for the Dealers' misconduct.  This statement is false.  EAC is liable for the Dealers' misconduct in many respects, including under the Credit Plan's term that as a holder, EAC "is subject to all claims and defenses" that any Borrower "could assert against the seller of goods or services" obtained "with the proceeds" of the Credit Plan, i.e., against the Dealer.

235.    EAC regularly states to Borrowers that it was not involved in their purchase of Services from the Dealers, notwithstanding EAC's integral role in that transaction.

236.    In response to the large number of negative reviews and complaints lodged against it, EAC began in April 2017 to post a uniform response to Borrowers' complaints on the BBB website.  As of January 2019, EAC had posted over 130 such responses, including as recently as December 2018.  Each states, in sum and substance, something much like the following response, posted on May 26, 2017:

> We purchased a contract from [Dealer] for the customer to finance the documentation preparation fee the dealer charged to work with the Department of Education to consolidate or refinance student loans.  The customer and dealer entered into a written agreement, which Equitable was not involved and clearly states the dealer was offering to help navigate the student loan relief bureaucracy. Equitable did not contact the customer about this process, that was done by the dealer.  The customer needs to read the documents she signed to better understand the transaction she signed up for.  We look forward to having the customer fulfilling her obligation to us.

*Response to BBB Review* (May 26, 2017).  This statement is false.  As described above, EAC was involved in virtually every aspect of the Dealers' sale of Services to Borrowers.

237.    In other examples:

- On January 31, 2017, EAC wrote by email to Borrower Mark H. that "Equitable Acceptance Corporation only finances the service fee charged by Progress Advocates Group for consolidating your student loan.  We are not affiliated with the student loan consolidation process."

- In a letter dated March 8, 2018, EAC's lawyer, Daniel Hill, wrote to Borrower Latoya B. that "EAC was not involved whatsoever in the underlying transaction between" the Dealer and the Borrower; that EAC was "hired . . . merely to service the contract"; and that "EAC's only connection to [Latoya B.] is to process her payments for [Dealer] and to send billing correspondence."

238.    EAC repeatedly states that it "purchased" or "acquired" the Borrowers' contracts from the Dealers.  This statement is false.  In fact, to the extent the Credit Plan creates any loan obligation, EAC is the party that extended credit to the Borrower.

239.    EAC threatens Borrowers who complain or who miss payments with negative credit reporting, to induce those Borrowers to continue making payments to EAC.

240.    EAC provides a deceptive "Release" to certain Borrowers who complain, in which the Borrower must waive all claims against EAC and its affiliates in exchange for a release of any financial obligation to EAC.  EAC intends the Borrowers to understand that upon signing the Release, they will no longer owe any payment obligation relating to their EAC account.  But before or after the Borrower signs the Release, EAC sells the payment obligation to the Dealer under the recourse provision of the Master Dealer Agreement.  The Dealer, unaffected by the Release, may continue to collect on that Borrower's obligation.  Borrowers who EAC successfully pressures into such an agreement have received nothing of value in exchange for purportedly releasing EAC from claims.

241.    For example, on October 24, 2018, Borrower Mark H. complained to the CFPB that "Equitable Acceptance has not contacted [my Servicer], and is taking money from me that does not benefit me."  On October 29, 2018, EAC responded to the CFPB, stating that if Mark would sign a Release, EAC would "cancel his contract with EAC [and] refund his payments."  But the next day, after Mark requested such a Release, EAC's general counsel Daniel Hill wrote in an email to him that "Equitable is unable to refund any payments."  Mr. Hill wrote to Mark on October 30, 2018, that upon Mark signing the Release, EAC would sell his debt obligation to the

Dealer, which "will mean . . . that your promise to pay [the Dealer] still exists; Equitable just would no longer own it. I am fairly confident [the Dealer's] position will be that you . . . have to pay."

242. Defendants' Scheme is ongoing, and Defendants benefit from the continued operation of the Scheme. EAC continues to send monthly bills to Borrowers and to make collection efforts on Credit Plans, as recently as February 17, 2020. EAC continues to collect payments, including through auto pay. EAC continues to threaten Borrowers that if they do not continue to make payments, EAC will negatively report their accounts to credit Bureaus. EAC continues to tell Borrowers who complain that it was not involved in the Dealers' sale of the Purported Services. EAC no longer issues new Credit Plans, because it is prohibited from doing so by consent judgments it entered into with the Federal Trade Commission and other regulators.

### A. In Providing the Purported Services, Dealers Impersonate Borrowers and Defraud the Federal Government

243. After Borrowers enrolled with the Dealers, the Dealers took steps to complete the Purported Services, including submitting applications for consolidation and Income Driven Repayment.

244. The Dealers unlawfully impersonated Borrowers on federal government websites.

245. The Dealers falsely represented that they needed access to a Borrower's personal identifying information and log-in credentials for their Servicer's website and studenloans.gov to obtain the Purported Services. The Dealers subsequently logged in to the Borrower's Servicer's website by falsely impersonating the Borrower and using the Borrower's personal information. While impersonating the Borrower, the Dealers executed promissory notes for loan consolidation, creating a new legal obligation for the Borrower. This practice violates federal law.

246.     While completing application forms for Income Driven Repayment, the Dealers often falsified the Borrowers' personal information, including family size, number of dependents, marital status, and tax filing status, without the knowledge or consent of the Borrowers.  The Dealers did this to obtain lower payments for a Borrower than those to which the Borrower is legally entitled under USED regulations.

247.     For example, Integra falsely stated on the Income Driven Repayment application it completed for Mr. Turner that Mr. Turner had two children he supported, when Mr. Turner in fact had no children he supported.  By falsely overstating his family size, Integra fraudulently lowered Mr. Turner's monthly payments. Mr. Turner did not know of these false statements and did not give—and would not have given—Integra permission to make them.

248.     Likewise, SLF Center falsely stated on the Income Driven Repayment application it completed for Ms. Williams that Ms. Williams had not filed taxes in the previous two years, when in fact she had done so.  By falsely stating that Ms. Williams did not file taxes, SLF Center circumvented the federal governments' income documentation rules to fraudulently lower Ms. Williams's monthly payments.  Ms. Williams did not know of this false statement and did not give—and would not have given—SLF Center permission to make it.

249.     As other examples:

- On August 18, 2017, Dealer Student Loan Care applied for Income Driven Repayment for Borrower Deidra B. that falsely claimed her sister as a dependent and falsely stated that she could not "reasonably access" her husband's income—even though Deidra had submitted her husband's income to Student Loan Care a few days before. By falsely understating household income and overstating family size, the Dealer fraudulently lowered her monthly payments.

- On information and belief, on or around June 3, 2016, Dealer Student Advocates submitted an Income Driven Repayment application behalf of Borrower Amanda Y. that falsely stated that she could not reasonably access her husband's income. By falsely understating household income, Student Advocates fraudulently lowered her monthly payments.

- On or around March 3, 2016, Dealer Student Advocates submitted an application to consolidate Borrower Jessica S.'s student loans that included falsified addresses for her parents, whom the Dealer listed as references.

- On March 16, 2017, Dealer Student Advisors emailed borrower Natasha O. to request that she provide proof of income for submission to USED. The email stated: "If [you are] married we prefer to use pay stubs instead of joint tax return filing." On information and belief, Student Advisors made this statement to her, and has made it to many other borrowers, because Student Advisors intended to unlawfully conceal Borrowers' spouses' income from USED.

250.    At times, Dealers also took other steps to impersonate the Borrower, such as by forging the Borrower's handwritten signature on documents that cannot be submitted electronically. For example, on August 15, 2017, Dealer Student Loan Care forged Borrower Deidra B.'s handwritten signature on an application for forbearance.

### B.    Harm to Borrowers

251.    As a direct and proximate result of EAC's, Henn's and the Dealers' Scheme, Borrowers have experienced, and continue to experience, financial and other harm.

252.    Borrowers are harmed financially in the amount of the approximately $1,300 they are induced into paying for the Purported Services, or for which they have outstanding indebtedness.

253.    Borrowers are also harmed financially by the Deceptive Loan's usurious interest, totaling hundreds of dollars, and, where applicable, late fees and insufficient funds charges that they pay to EAC or for which they have outstanding indebtedness.

254.    Each payment a Borrower pays to EAC or a Dealer could have been paid directly to reduce the Borrower's federal student loan balance. But with the payments going instead to EAC or a Dealer, the Borrower's federal student loan balance does not decrease and continues to accrue interest.

255. Many Borrowers are harmed by the Dealers' Purported Services themselves, which for many Borrowers increase their total loan balance and interest rate on their student loans. Many Borrowers also lose credit for months of payments under Income Driven Repayment or Public Service Loan Forgiveness, and many other Borrowers lose their valuable single opportunity to consolidate.

256. Because the Dealers mislead many Borrowers into believing that their monthly payments to EAC satisfy their student loan obligations or that the Dealers are otherwise taking care of their student loan obligations, many Borrowers stop making payments on their federal loans upon enrollment with EAC. This causes delinquency and sometimes even default on those Borrowers' student loans, with associated late fees and collections costs. Defaulted Borrowers face the federal government's extraordinary collections powers, including tax offset, wage garnishment, and litigation.

257. Borrowers' credit reports and credit scores are damaged four times over by Defendants' Scheme.

- *First*, EAC routinely runs credit checks ("inquiries") on Borrowers and reports Borrowers' loan status to credit bureaus. This damages their credit scores.

- *Second*, EAC reports the financing it extends to Borrowers as a fully maxed out line of credit, which damages the Borrowers' credit scores.

- *Third*, for Borrowers who miss or fall behind on payments, EAC provides even more negative reporting associated with missed payments or delinquent accounts.

- *Fourth*, Borrowers who cease federal student loan payments experience negative reporting associated with those missed payments or delinquent accounts.

258.    Diminished credit scores inhibit Borrowers' ability to access credit (or allow them to access it only on more expensive, disadvantageous terms) and can prevent Borrowers from obtaining housing or jobs.

259.    Borrowers experience financial harm enlisting professionals, such as financial counselors and attorneys, to help them uncover Defendants' Scheme and address negative consequences of the Scheme on their credit and student loans.

260.    Borrowers experience emotional and psychological harm, both from the toll of mounting debt and, for those who learn about the Scheme, Defendants' efforts to block Borrowers from obtaining relief.

261.    Ms. Williams was harmed by Defendants' Scheme.  Her student loans have not been forgiven and continue to accrue interest, at an increased rate.  Her loan balance has increased.  She was harmed in the amount of the payments she made to EAC and SLF Center, which could have gone towards reducing her federal student loan balance.  Her credit has been damaged, and she has experienced emotional distress.

262.    Mr. Turner was harmed by Defendants' Scheme.  His student loans have not been forgiven, and continue to accrue interest.  His loan balance has increased, and he lost credit towards Public Service Loan Forgiveness.  He was harmed in the amount of the payments he made to EAC and Integra, which could have gone towards reducing his federal student loan balance.  His credit has been damaged, and he has experienced emotional distress.

263.    Borrowers' complaints show the wide-ranging harm they have experienced.  For example:

- "I do not know what to do. I want all my monies returned to me.  I have read the complaints on the BBB website and I am literally sick to my stomach.  They have all my personal information to do with whatever they want."  BBB Complaint (May 6, 2018).

- "I told Equitable Acceptance I wanted out of the contract because of this problem, and they told me my credit would receive bad reports. I am stuck paying for a service that was already being offered by FedLoan for free, a service that I am now at risk of having my student loan default . . . . P.S. I am currently 20 weeks pregnant and currently unemployed so please help." BBB Complaint (Apr. 12, 2018).

- "Well, tonight I decided to check credit karma for my credit score, and it looks like they've done a wonderful job at screwing me because my account shows that a credit card under the name 'Equitable Acceptance' has been maxed out, and it seems that the $49 payment I have been making toward Equitable every month was actually the minimum amount paid toward this credit card." BBB Review (Sep. 9, 2017).

- "YOUR COMPANY SERVED NO PURPOSE WHATSOEVER. I paid a thousand dollars to Equitable acceptance for absolutely no reason. That money could have been used to feed my family. Believe it or not, in a lower middle class family $40 a month adds up and could have served a better purpose than in the pockets of an employee at Equitable Acceptance Corporation." BBB Review (Jul. 12, 2017).

- "Since I started associating and making payments with equitable Acceptance, my credit score has dropped by over 100 pts and also they are showing up as a credit card on my credit report for $1414.00!" BBB Complaint (May 22, 2018).

264.     Defendants' conduct injures New York consumers in all the ways described above. Putative class counsel has spoken to additional New York consumers injured by Defendants' conduct, and more than a dozen New York Borrowers have submitted CFPB complaints that are similar in substance to those described above.

## C.     Other Lawsuits and Investigations

265.     The fraudulent misrepresentations made by the Dealers are strikingly consistent with how the FTC has described "deceptive student loan debt relief scams." The FTC has explained that hallmarks of such scams include "promise[s of] fast loan forgiveness"; "pay[ing] an upfront fee for help"; requesting a Borrower's username and password for studentloans.gov; "pretend[ing] to be affiliated with the government"; and "charg[ing] a monthly fee for the life of

the loan … and represent[ing] that the fee would go towards the student loan balance" when it did not.[17]

266.     In September 2018, the New York Attorney General sued EAC and certain Dealers.  The New York Attorney General's suit alleged, among other things, that EAC and those Dealers "engag[ed] in deceptive, fraudulent and illegal conduct," including by misrepresenting that they were affiliated with the federal government and that borrowers could not apply for services on their own, when in fact they can do so for free.  The Attorney General alleged that EAC's and its affiliates' conduct violated TILA and the GBL, and constituted unlawful fraud and usury.[18] EAC entered into a consent judgment with the New York Attorney General.[19]

267.     EAC was investigated by, and entered into two consent judgments with, the FTC for similar practices.[20]

268.     EAC was investigated by, and entered into a consent judgment with, the Minnesota Attorney General for similar practices.[21]

269.     EAC was investigated by, and entered into a consent judgment with, the Massachusetts Attorney General for similar practices.[22]

---

[17]  10/13/2017 FTC Blog Post, *available at* https://www.ftc.gov/news-events/press-releases/2017/10/ftc-state-law-enforcement-partners-announce-nationwide-crackdown; 3/8/2018 FTC Blog Post FTC, *available at* https://www.consumer.ftc.gov/blog/2018/03/ftc-continues-crack-down-student-loan-scams.

[18]  *See* Second Am. Complaint, *People of the State of New York v. Debt Resolve Inc. et al*. ¶¶ 3-5, 11-14, No. 18 Civ. 9812 (S.D.N.Y. 2018), ECF No. 41.

[19]  8/8/2019 New York Attorney General's Press Release, available at https://ag.ny.gov/press-release/2019/attorney-general-james-holds-lender-responsible-ripping-student-borrowers

[20] 9/12/2019 FTC Press Release, *available at* https://www.ftc.gov/news-events/press-releases/2019/09/ftc-takes-action-against-operators-student-loan-debt-relief; Consent Judgments available at https://www.ftc.gov/system/files/documents/cases/172_3036_pag_stipulated_order_eac_signed_0.pdf *and available at* https://www.ftc.gov/system/files/documents/cases/172_3041_mbv_case_-_eac_order_signed.pdf.

[21] 9/12/2019 FTC Press Release, *available at* https://www.ftc.gov/system/files/documents/cases/172_3041_mbv_complaint_0.pdf.

[22] 8/7/2019 Massachusetts Attorney General Press Release, *available at* https://www.mass.gov/news/finance-company-to-pay-340000-in-loan-relief-to-students-banned-from-providing-services-in.

270.     EAC was investigated by, and entered into a consent judgment with, the New

Hampshire Banking Department for similar practices.[23]

271.     EAC was investigated by the North Carolina Attorney General for similar

practices.

272.     EAC was investigated by the State of Washington Attorney General for similar

practices.

273.     EAC was investigated by the Pennsylvania Attorney General for similar practices.

274.     EAC is under investigation by the Consumer Financial Protection Bureau for

similar practices.[24]

275.     On information and belief, EAC is also under investigation by other regulators.

276.     In August 2017, one Dealer entered into an Assurance of Voluntary Compliance

with the North Dakota Attorney General's Office based on the Attorney General's allegations

that the Dealer had engaged in unlawful solicitation and debt relief services.

277.     In January 2017, the BBB notified EAC of a "pattern of complaints" about EAC

and the Dealers, and "expressed concern" about practices described in the complaints.

"However," the BBB reported, "the volume of complaints filed against the business has not

decreased."[25]

278.     Borrowers and other entities have sued EAC and Dealers over conduct much like

that described in this Complaint.

---

[23] 3/30/2020 New Hampshire Banking Department Consent Order, available at
https://www.nh.gov/banking/orders/enforcement/documents/17-239-co-20200303.pdf
[24] 12/26/2019 Bureau's  Decision and Order on Petition by Equitable Acceptance Corp, *available at*
https://files.consumerfinance.gov/f/documents/cfpb_equitable-acceptance-corp__decision-and-order-on-petition.pdf
[25]  "Pattern of Complaint," Better Business Bureau, *available at*
https://www.bbb.org/us/mn/minnetonka/profile/financing/equitable-acceptance-corporation-0704-
3943/details#Pattern-of-Complaint.

279.    In July 2018, a federal student loan borrower sued EAC and a Dealer, alleging, among other things, that the Dealer "represented that it was affiliated with the United States Department of Education [and] that its consolidation services were pursuant to the William D. Ford Act" and that the Dealer and EAC refused to cancel her account.[26]

280.    In October 2017, a Servicer sued EAC and a Dealer, alleging that they had unlawfully conspired to obtain funds from a federal student loan borrower "based upon a false promise to obtain loan forgiveness on her behalf" and impersonated that borrower when calling the Servicer and logging in to her studentloans.gov account.[27]

## IV.   HENN KNEW OF AND PARTICIPATED IN VIRTUALLY EVERY ASPECT OF THE SCHEME

281.    Henn, who is the Chief Executive Officer and President of EAC, knew of and directly participated in virtually every aspect of the Scheme.

282.    Henn's involvement in the Scheme extended beyond his role as an employee of EAC, exercising influence and control over the Scheme beyond the scope of his employment by or his responsibilities to EAC.

283.    Henn intertwined his own personal finances with EAC's operations by providing financial support to EAC, including by providing his own creditworthiness to back EAC's debt obligations.  Recognizing this intermingling, Henn sought to shield his personal assets from creditors when EAC's operations became the target of regulatory investigations.

### A.    Henn Knew That the Scheme Was Fraudulent and Was Harming Borrowers

284.    Henn knew that the Scheme in which he was participating with EAC and the Dealers was acting fraudulently and defrauding Borrowers.

---

[26] *Potts v. SAS Marketing Group LLC, et al.*, No. 18-cv-1835 (M.D. Fla. 2018).
[27] *Higher Ed. Loan Auth. of the State of Missouri v. Equitable Acceptance Corp.*, No. 17SL-AC28273 (St. Louis Cty Ct., Mo.).

285.    Henn was warned by consumers, attorneys, its vendors, the Better Business Bureau, and law enforcement agencies, among others, that the Scheme was illegal.

286.    Henn reviewed voluminous information from Dealers about their business practices that put him on notice that those practices were fraudulent.

287.    These communications put Henn on notice of each of the fraudulent elements of the Scheme set forth above, including at ¶¶ 77-79 & 86 (the Dealers made false promises of student loan forgiveness); ¶¶ 96 & 101 (the Dealers falsely told Borrowers that their services had value); ¶ 127 (the Dealers falsely represented their relationship with the Department of Education); ¶ 142 (the Dealers misrepresented Borrowers' payment obligations); ¶¶ 145-168 (the Dealers used high pressure sales tactics); and ¶¶ 169-209 (EAC's Credit Plans were unlawfully deceptive).

288.    Henn also reviewed information about student loan scams, which identified multiple of the Dealers' business practices as indicia of scams, including: that the Dealers promised loan forgiveness, that the Dealers pressured Borrowers into enrolling, and that the Dealers asked Borrowers to share personal information. Henn reviewed reputable information explaining that all of the Dealers' services were available, for free, from the federal government.

### 1.    Henn Personally Reviewed Borrower Complaints

289.    Henn personally reviewed complaints from Borrowers made directly to EAC, to Dealers, to the Better Business Bureau, to the CFPB, and to state Attorneys General.

290.    As examples:

- On or around February 23, 2016, Henn reviewed an email from a high-ranking EAC employee forwarding what the employee described as "a good example of the complaints [EAC is] getting from [Better Business Bureau] and [Attorney General] offices . . . about someone who thought the [Dealer] Student Advocates . . . was a scam (and was told by the [Department of Education] it is." The Borrower's complaint stated: "I was falsely lead into processing this loan by [the Dealer]. [The Dealer] contacted me . . . advertising the product as student

loan forgiveness, when in fact the product is student loan consolidation. [The Dealer's representative] sent me the contracts electronically.  While [the Dealer] has me on the phone [it] rushed me through to sign. . . .  Even though I found out the product [the Dealer] had me purchase[] is fraudulent I was still making my [m]onthly payments to Equitable Acceptance Corporation. . . .  I . . . tried to explain [to EAC] how [the Dealer] had me to finance the loan fraudulently [but] the reply I received f[ro]m [EAC] was that [they] had nothing to do with that.  At this time I am asking that the fraudulent loan [be] absolved and all payments refunded.  It is my opinion that Equitable Acceptance has full knowledge the [Dealer is] deceiving consumers into taking our loans with them."

- On or around January 16, 2017, Henn reviewed a complaint from a Borrower who stated that being involved with EAC had dropped her credit score by 80 points, and further stated: "I would like to understand how I applied for assistance with Progress Advocates [the Dealer] to help me with my Student Loan Forgiveness program and ended up with my account and information being sold to the likes of Equitable Acceptance Corporation.  Your company has not resolved my debt. . . . I never, ever, ever agreed to open a credit card account with Equitable Acceptance Corporation.  I would have never done that. I was scammed into a line of credit. . . .  We come to you because we need assistance with our student loans and you sell our accounts to [dis]reputable companies that charge high fees and use aggressive tactics. . . .  Furthermore this is a service that the Student Forgiveness Government Program offers for free – but you have now made it into commerce while victimizing us. . . .  I'm worse off than I was before I ask[ed] [the Dealer] to help me.  Both of your companies are scamming student loan borrowers."  Henn personally directed EAC staff's response to this Borrower.

- On or about April 19, 2017, Henn reviewed a Borrower's complaint submitted to the Ohio Attorney General's Office, stating: "I . . . [was] told that [the Dealer Manhattan Beach Venture] could forgive my federal loans . . . and that my payment would be $39.00.  Then my bank started getting charged $39.42 every month by Equitable Acceptance. . . .  However I have never been contacted by [the Dealer] nor have they done anything on my credit paperwork . . . . I contacted the department of education myself and set up affordable payments for my federal loans. . . .  I went to the bank and stopped the automatic withdrawals from my account . . .  I then received a phone call from Equitable Acceptance telling me I was in default. . . .  I do not want my credit to be affected by this scam and would like to know what steps I can take to end this and protect myself with the least amount of cost as I already have plenty of student debt to worry about."

291.    Starting on or about April 25, 2017, Henn was personally notified by email each time a Borrower filed a complaint with the Consumer Financial Protection Bureau.  On information and belief, Henn was thus on notice of every Borrower complaint filed with the

Consumer Financial Protection Bureau, including those set forth at ¶¶ 86, 96, 127, 142, & 241

and in Exhibit A, submitted on or after that date.

292.    Prior to the filing of this suit, Henn was previously notified when EAC and the

Dealers were sued by consumers and others for their fraudulent practices, including those related

to the Scheme.

293.    As examples:

- On or about May 11, 2017, Henn was notified that EAC had been sued by two consumers in California who alleged, among other things, that EAC's credit contracts violated TILA (*Sanchez v. Brainstorm USA LLC, et al.*, No. 17 Civ. 0933 (C.D. Cal.)).

- On or about September 21, 2017, Henn was notified that EAC had been sued by a consumer in Florida (*Taylor v. SAS Marketing Group, LLC et al.*, No. 17 Civ. 2024 (M.D. Fla.)) who alleged, among other things, that she was fraudulently induced to enroll in the Dealer's Services and EAC's Credit Plan.

### 2.    Henn Personally Reviewed Warnings From Third Parties That the Dealers and EAC Were Committing Fraud

294.    One or more private consumer protection non-profit agencies told Henn that the

Scheme was fraudulent and that EAC faced potential liability.

295.    As examples:

- On or about August 26, 2016, a representative of the Better Business Bureau of Minnesota and North Dakota wrote to Henn: "There's a pretty clear pattern emerging from these complaints. . . . Quite honestly, the tactics they appear to be using to sign these students up for loan consolidation are . . . troubling. . . . You're probably aware that students don't need to pay any company to consolidate their loans. That's something they can do for free. . . . If I had heard it from just one complainant, I might think, 'Well, maybe they (the student) misunderstood.' At this point, I don't think they're misunderstanding what the [Dealer] is offering. I'm fairly convinced the [Dealer] is using deceptive tactics to get these students to sign up for services they don't need. . . . I would be lying if I said [the complaints] didn't trouble me. And from where I sit, after many years doing this job, I think some of their actions could lead to regulatory action of some kind. . . . In the last year alone . . . we've handled 34 complaints against EAC (compared to just six, total, in the two years prior to that [when EAC was not involved in the student loan debt relief business]). So there is definitely an underlying issue here."

- On or about January 2, 2017, the same representative wrote to Henn: "[N]ot much has changed since we corresponded (and talked directly) late last summer. . . . I have the same concerns about these complaints as I did last year. I do not feel the [Dealers] you're working with (in many cases) are operating ethnically, nor do I believe they have students best interests in mind. . . . I feel gross misrepresentations are regularly being made (by representatives of these companies you deal with)."

296.    One or more federal student loan servicers told Henn that the Scheme was

fraudulent and that EAC faced potential liability.

297.    As examples:

- On or about August 30, 2017, the Executive Director of a federal loan Servicer wrote to Henn: "I am seeing too many complaints come through about Equitable Acceptance Corporation from the customers we have in common . . . . I understand that you are financing fees they agree to pay to [the Dealer]. However, the [Dealer] is charging too high of a price, pressuring and confusing borrowers, and much more. . . . I believe that you are dealing with some really bad business[es] that are truly hurting borrowers. . . . I[t] really just puts a pit in my stomach when I talk to these borrowers and/or read the case file after they find out they have been scammed. . . . When vulnerable people lose $1,000 or $1,500 to a scam, it can mean a full month[']s take home pay."

- On or about October 1, 2017, the Executive Director again wrote to Henn: "I . . . believe that you are actually working with companies that are misleading borrowers, taking advantage of borrowers, offering services to borrowers that are already on the best repayment plan available to them, and more. In some cases, I believe I have direct evidence and recordings of [Dealers] calling [the Servicer] and impersonating a borrower to conduct activity on their account. . . . I believe that I have an overwhelming amount of information, call recordings, and more that clearly lead me to believe you are financing debt incurred by unsuspecting borrowers duped into believing they are receiving services from a company that operates ethnically and legally, but in my opinion that is not the case. . . . The legality of these carefully crafted scheme will be determined by various law enforcement agencies in the coming months and years."

- Henn reported to that Executive Director that he knew many Borrowers were told by their Servicers that the Purported Services were a scam.

298.    EAC's vendors told Henn that the Scheme was fraudulent. On multiple

occasions, such vendors refused to work with EAC on the basis that the Scheme being

perpetrated by the Dealers and EAC was defrauding Borrowers, including by putting Henn on notice of potential misrepresentations about the ability to promise loan forgiveness.

299.   As examples:

- From about July to September 2016, Henn worked with a vendor to arrange sending credit offers directly to consumers. The vendor met with three Dealers' management and toured their offices. On or about September 29, 2016, he wrote to Henn: "If you were to make firm offers of credit to generate leads for the 3 [Dealers] involved, then it would likely just be a matter of time before EAC would be sued by multiple AGs, the CFPB and FTC. These [Dealers] would put EAC out of business. When [you are] . . . an indirect lender with no licensing and working with insolvent, shoe string companies like the three [Dealers] who are losing money and are desperate to do anything including breaking the law, then you open yourself up to considerable risk."

- From about May to September 2017, Henn worked with a different vendor to send credit offers to Borrowers. The vendor reviewed a proposed offer drafted by Dealer Student Advocates, which stated that a Borrower should "call now . . . to determine if your federal student loans are eligible for forgiveness." On or about August 14, 2017, the vendor told Henn that its "compliance team" recommended striking the reference to "forgiveness" and revising the offer to instead read "call now . . . to determine how best to manage your federal student loans."

- On or about September 2016, EAC announced to Dealers that it could no longer accept Borrower payments by credit card for student loan debt relief accounts only (this did not apply to EAC's non student loan business). Henn explained that EAC changed the policy as a result of EAC's banks and credit card payment processors "closing down" EAC's ability to process credit card payments, which they did because "a large number [of Borrowers] are claiming fraud on . . . payments" on EAC's student loan debt relief accounts. Henn explained that many Borrowers bought the Services "and pa[id] for it on a [credit card] and then claim[ed] it was fraudulently done."

- On or about March 2017, EAC's payment processor told Henn that the processor was unhappy with EAC's student loan debt relief business. Henn contacted a vendor to find a different payment processor. On or about March 15, 2017, the vendor informed Henn that "[out] of the 37 [payment] processors in my network there are only 2 that will board your account considering the student loan [business] in your portfolio. However, they will not board this at low-risk rates. . . ."

300.   Dealers told Henn that certain Dealers were engaged in illegal activity.

301.   As examples:

- On or about January 9, 2017, Kenton King, a representative of Dealer Student Financial Help Consultants, told Henn that it sought to change the structure of its business "to shelter[] [it] from any vulnerability to regulation."

- On or about September 3, 2017, Anthony Smith, a representative of Dealer Titan Prep, warned Henn that "[t]here seems to be some illegal activity with my client data."

- On or about October 26, 2017, Steve Waldon, a representative of Dealer Manhattan Beach Venture, told Henn: "Since I've started this business I haven't really seen a truly COMPLIANT model. . . .  Advertising . . . can NOT be deceptive or misleading. . . .  The majority of call centers use third party lead generators and don't actually know what advertising made their phone ring and we've learned that most of the advertising being used is misleading and violates [federal] regulations. . . .  The sales/call center needs to follow through with this deceptive, non-misleading approach when talking with the potential client.  This means educating the client briefly as to what the dealer does on their behalf without promising forgiveness, reduction in payment, or any other outcome . . . or represent that they are [somehow] in contact with the servicer or part of any government agency. . . .  What's very important as well is to make ABSOLUTELY CLEAR what the fee structure is and what it is for. It is for the dealer's service ONLY. . . .  Between the FTC and AG issues surrounding this industry along with the countless defaults and complaints coming from the client base, this can only end poorly."

- On or about November 29, 2017, Henn was informed by Nick Blankenship, who was a representative of a Dealer or prospective Dealer, that "[i]t is common practice for [Dealers] to call in [to Servicers] and impersonate the client. . . .  This could easily be construed as felony fraud being that they are federal loans."

- On or about December 6, 2017, Granger Teeple, who was a representative of a Dealer or prospective Dealer, told Henn that "[o]ther [Dealers] . . . are NOT doing it legally — they imposter [sic] customers and other things."

302.    Outside attorneys repeatedly warned Henn that EAC's Credit Plans might be

unlawful.

303.    As examples:

- On or about January 18, 2016, Henn reviewed an analysis of EAC's business model from an attorney from Greenspoon Marder, P.A.  The attorney asked: "How could [this business] ever comply with []TILA disclosures?"

- On or about April 8, 2016, Henn reviewed the same attorney's analysis of EAC's Credit Plans.  The attorney asked:  "[The Credit Plan] states consumer may make future purchases under the terms of this agreement.  Is that accurate?  To what

extent? . . . Is the cost of the [student loan] services provided by [the Dealer] the only 'product' the loan is available for?"

- On or about May 13, 2016, Henn reviewed another attorney's analysis of EAC's Credit Plans. That attorney stated that EAC must "obtain[] licensure to provide credit services/loans," and also stated that EAC's three-day cancellation policy "is problematic given that the subject of the financing is student loan consolidation. The consumer needs to be able to cancel and receive a refund."

- On or about October 30, 2017, Henn reviewed an email from Granger Teeple stating that a regulatory attorney at Greenspoon Marder, P.A. had "a LOT of concern for EAC at this time" and that other "VERY credible lawyers" had said that same thing.

304.    Law enforcement agencies notified Henn that the Scheme was fraudulent by commencing investigations of EAC and the Dealers.

305.    As early as January 2016, Henn knew that law enforcement agencies were investigating Dealers and/or EAC for fraud. As examples:

- On January 14, 2016, Hunt informed Henn that marketing materials used in the Scheme were under investigation by law enforcement in New York.

- On or about February 1, 2016, a representative of Dealer Progress Advocates told Henn that the Dealer was being investigated by the New York Attorney General's Office. Henn directed EAC staff to prepare EAC files for the Dealer to provide to the Attorney General's Office.

- On or about December 5, 2016, the Minnesota Attorney General's Office served on Hunt, as representative of Dealer Progress Advocates, a Civil Investigative Demand stating that the Attorney General had "reasonable grounds to believe" that the Dealer "has engaged in unlawful, deceptive, and/or fraudulent practices through its marketing, selling, and provision of goods or services related to repayment of student loans." On or about December 6, 2016, Progress Advocates sent that Civil Investigative Demand to Henn. On or about December 19, 2016, Henn personally verified EAC's answers to the Demand.

- On or about July 5, 2017, the North Carolina Attorney General's Office served on EAC an Investigative Demand regarding EAC's student loan debt relief financing business and its work with certain Dealers, including Progress Advocates and Student Advocates. On information and belief, Henn became aware of this Demand and directed EAC's response.

- On or about August 14, 2017, the State of Washington's Attorney General's Office served on Henn a Civil Investigative Demand addressed to EAC stating that the

68

Attorney general was investigating EAC for "unfair or deceptive acts or practices . . . specifically practices associated with the adjusting or consolidation of student loan debt owed by Washington consumers, and the financing thereof." On September 18, 2017, Henn personally verified EAC's answers to the Demand.

- On or about September 28, 2017, Jeff Henn personally verified EAC's answers to two Civil Investigative Demands issued by the Federal Trade Commission regarding EAC's student loan debt relief financing business and its work with certain Dealers.

- On or about November 16, 2017, EAC responded to a Civil Investigative Demand issued by the Massachusetts Attorney General's Office regarding EAC's student loan debt relief financing business and its work with certain Dealers, including Student Advocates and Progress Advocates. On information and belief, Henn became aware of this Demand and directed EAC's response.

- On or about November 20, 2017, a representative of Dealer Student Loan Care told Henn that the Massachusetts Attorney General had issued the Dealer a subpoena. The Dealer sought Henn's advice on its response on whether it should "defend . . . what we do as legal."

- On or about August 6, 2018, Henn was told that the Pennsylvania Attorney General was investigating EAC's use of lead generation by Transunion to send direct mailings to Borrowers. Henn directed Dealer Student Advocates to provide a list of Pennsylvania residents who were contacted as part of that campaign.

306.    Upon learning of the law enforcement investigations, Henn did not stop EAC from issuing new Credit Plans or from collecting on existing Credit Plans.

307.    Henn coordinated with the Dealers to maintain a list of "blacklisted" states, including Washington, Minnesota, New York, Massachusetts, and others. On information and belief, Henn and the Dealers feared that the consumers in those states might come to the attention of law enforcement officials and thus support those officials' investigations of EAC and/or the Dealers.

308.    On or about January 14, 2016, Dealer Progress Advocates asked Henn if EAC "ha[d] a way to block [Borrowers from] certain states at time of application," because it was "not worth playing in [the] playground" of New York, Illinois, and Connecticut due to law enforcement inquiries.

**B.      Henn Managed the Scheme by Directing EAC's and the Dealers'
Participation**

309.    Henn was directly involved in the operation and management of virtually every
aspect of the Scheme, including by directing EAC's and the Dealers' participation in the
Scheme.

310.    In doing so, Henn often worked with certain Dealer representatives, including
Brad Hunt.  Hunt was the President of Dealer Student Advocates and also served as a broker for
EAC.

**1.      Henn Directed EAC's Participation in the Scheme**

311.    As Vice President, and then as President and Chief Executive Officer of EAC,
Henn controlled EAC's day-to-day operations and managed all aspects of EAC's business.

312.    Henn directly supervised EAC's staff, including staff who worked with Dealers,
staff who communicated with Borrowers and responded to Borrower complaints, and staff who
managed compliance.

313.    Henn controlled the material terms of the Credit Plans entered by Borrowers.  On
information and belief, Henn's approval was required for material changes to the Credit Plans.

314.    Henn selected the amount of financing under the Credit Plans by directing the
purchase price offered by Dealers and the amount of down payment required to be paid to
Dealers, if any.

315.    Henn approved of, and calculated, the Credit Plans' usurious interest rate.  Henn
knew that EAC's net interest rate (the total interest rate less EAC's costs in servicing the
account) was almost twenty percent.

316.    Henn managed EAC's calculation of interest on Borrower accounts.

317.    Henn approved of, and disseminated, the idea that EAC is an assignee of the Credit Plans.  On information and belief, Henn directed the dissemination of that idea with the intent to avoid legal requirements and liability, including the requirement that companies lending money must be licensed.

318.    For example, Henn wrote to a Dealer that "EAC['s] model is to buy contracts, not lend money.  To lend money requires licensing."

319.    Henn directed all aspects of EAC's responses to Borrowers who complained about Dealers or EAC.

320.    Henn directed EAC staff to disclaim EAC's responsibility when responding to Borrowers' complaints.

321.    For example, in September 2016, at Henn's direction, an EAC staff member contacted the Better Business Bureau in response to a Borrower complaint to explain that EAC's fee "was separate from the student loan payment" and that EAC was "simply attempting to collect on the loan she agreed to."

322.    Henn directed EAC staff to respond to borrower complaints, including the uniform language used in many of EAC's responses to BBB and CFPB complaints, *supra* ¶ 236.

323.    Henn directed EAC's staff in its collections efforts.  As examples, Henn directed what text messages were sent to Borrowers, and skip tracing of Borrowers to find updated addresses of delinquent Borrowers.

324.    On information and belief, Henn directed EAC's policies with respect to credit reporting with respect to Borrowers' EAC accounts.

325.    Henn managed EAC's standards of creditworthiness for Borrowers.

326.   Henn managed EAC's "reinstatement" policy, under which a Borrower past-due on payments could begin making payments again.

327.   Henn oversaw EAC's data management systems that it used to collect information about Borrowers and Dealers.

328.   Henn managed EAC's response to law enforcement inquiries into the Scheme, including by verifying EAC's responses to Civil Investigative Demands.

329.   Henn worked with Dealers on a "Government Plan" to advocate for EAC's and Dealers' interests to the Federal Trade Commission, Congress, and State Attorneys General, among others, "focused specifically on reaching FTC Commissioners' offices as a priority."

330.   Henn, on behalf of EAC, contracted with a public relations firm. Henn sought from Dealers "positive reviews" and shared these reviews with the firm.

331.   Henn worked to obtain funding for EAC to facilitate its operations by offering the Credit Plans as collateral or by otherwise using the profits of the Scheme. On information and belief, Henn did so in order to perpetuate the Scheme, as the bank financing provided a necessary influx of cash to support the Scheme and allowed Henn and EAC to expand the Scheme's scope.

332.   Henn devised a strategy by which EAC would sell EAC's student loan portfolios to third parties for profit. Henn recruited, hired, and coordinated with, brokers who sought to effectuate such transactions. On information and belief, Henn did so in order to perpetuate the Scheme, as he believed such sales could provide a necessary influx of cash to support the Scheme and allow Henn and EAC to expand the Scheme's scope.

### 2.   Henn Coordinated with Dealers to Recruit Borrowers to the Scheme

333.   Henn managed the recruitment of Borrowers to purchase Dealers' Services Dealers. Upon information and belief, Henn did so because a constant stream of newly recruited

Borrowers was necessary to in order for EAC to issue new Credit Plans and sustain the Scheme on an ongoing basis.

334.    Henn identified so-called "lead generators" and arranged for them to refer Borrowers directly to Dealers in order to help perpetuate the Scheme.  A "lead generator" is an entity that identifies consumers and directs them to companies to purchase products or services in exchange for a fee.  Henn worked with lead generators because he understood that that service was critical to recruiting the constant stream of Borrowers that the Scheme required in order to continue.  Henn also personally identified providers of marketing services to Dealers.

335.    As examples:

- On or around June 30, 2016, Henn and Hunt together considered whether a particular lead generator could "provide marketing to all Dealers."

- On or about December 14, 2016, Henn met with a "[m]arketing guru" who could "generate quality traffic for all the Dealers."

336.    As a further example, from about May to September 2017, Henn transacted directly with the credit reporting company TransUnion to purchase identifying data for 100,000 consumers with at least two outstanding student loans (with a total balance of over $10,000), so that a "pre-qualified" offer of credit could be sent to them.  The purpose of the letter was to inform consumers that they were "pre-qualified" to receive financing from EAC with which to purchase Services from Dealer Student Advocates, in order to solicit the consumers to contact the Dealer to purchase Services.

337.    Henn personally directed that the letter explicitly refer to EAC, and personally set a credit score cutoff so that all the consumers receiving the letter would have a credit score above the limit.

338.     TransUnion told Henn that one draft of the offer did not clearly state who was offering credit or what the credit was for.  The vendor instructed that the advertisement "should clearly indicate that it is Equitable Acceptance, not [the Dealer], that is actually making the firm offer [of credit]" and that it "should clearly indicate that the credit Equitable Acceptance is making a firm offer is the financing of the fees for the [Dealer's] services."

339.     On or about September 1, 2017, Henn approved the final version of the solicitation offer:



340.     Henn received the invoice for the solicitations, directed payment of the invoice by EAC, and directed the Dealer to reimburse EAC for the cost.

341.     Henn considered requests by other Dealers to enter similar arrangements.  These Dealers sought Henn's "blessing" to engage in such arrangements.

### 3.     Henn Directed Dealers' Participation in the Scheme

342.    Henn coordinated every aspect of Dealers' participation in the Scheme.

343.    Henn personally recruited certain Dealers.

344.    Henn hired, managed, and directed brokers and coordinated with them to recruit other Dealers to participate in the Scheme.

345.    One of the brokers that Henn hired and supervised was Hunt.  Henn spoke to Hunt multiple times per week and exchanged hundreds of emails with him over the course of approximately three years about Hunt's recruitment of Dealers.  At certain times, all new Dealer applicants were required to go through Hunt to reach Henn.

346.    All Dealers who sought to participate in the Scheme by referring Borrowers to EAC to finance the purchase of Services were required to submit an application to EAC.  Only if the application was approved would a Dealer be permitted to enter a Master Dealer Agreement.

347.    Henn reviewed application packages submitted by prospective Dealers.  These packages included the Dealer's history of consumer complaints and their websites.  Henn personally tracked down missing application paperwork from Dealers.

348.    Henn coordinated EAC's process for accepting or declining new Dealer applicants.  On information and belief, Henn personally approved or rejected each Dealer application.

349.    On information and belief, Henn accepted new Dealer applicants to perpetuate the Scheme, as enrolling new Dealers allowed Henn to expand the Scheme's scope and to enroll more Borrowers in the Scheme.  In addition, Henn knew that Dealers were likely to close or disappear, and thus new Dealers were necessary in order to recruit additional Borrowers to take out Credit Plans from EAC.

350.    Henn reviewed and approved the language of key documents relating to the Dealers.

351.    Henn, along with EAC's attorney, drafted the Master Dealer Agreement that EAC entered into with each Dealer.

352.    Henn solicited Dealers' input on the Master Dealer Agreement and discussed its terms with the Dealers.

353.    Henn was deeply involved in the day-to-day operations of Dealers.

354.    Henn spoke with Dealers on the phone on a daily basis regarding the Scheme.

355.    Henn attended and/or hosted many in-person meetings with Dealers regarding the Scheme.  Henn traveled to California to attend an in-person meeting with a Dealer in February 2016.  Henn attended in-person meetings with Dealers in December 2016, November 2017, and March 2018.  On information and belief, Henn attended in-person meetings with Dealers in August 2016 and April 2018, among other dates.

356.    For example, in October 2017, EAC hosted an in-person meeting for Dealers in EAC's Minneapolis Headquarters.  The meeting was mandatory, in that Dealers that did not attend would no longer be able to participate in obtaining EAC financing as to certain Borrowers. Henn attended and hosted this meeting.  Dealers' performances, EAC's future business model, marketing, and compliance issues were scheduled to be discussed.  During the meeting, Henn expressed to Dealers his concern about borrower complaints.

357.    Henn controlled the material terms of Dealers' sale of Purported Services to Borrowers.

358.    For example, Henn controlled the amount and number of monthly payments Dealers required from Borrowers and the total contract price.

359.    Henn required that Dealers seeking to structure Borrowers' payments differently obtain his approval.

360.    EAC, at Henn's direction, implemented a new payment structure for all Dealers beginning in November 2017.  The Dealers understood that this new payment structure was a mandatory directive from Henn and those that wanted to change the implementation timeline sought his personal approval.

361.    Henn controlled the Purported Services that Dealers offered Borrowers.

362.    Henn required that Dealers seeking to structure the Purported Services differently obtain his approval.  For example, one Dealer sought Henn's approval to have Borrowers submit forms to their Servicers on their own, rather than have the Dealer submit forms to the Servicer on the Borrower's behalf.

363.    On information and belief, Henn required all Dealers to use the same terms in the document packets they sent to Borrowers. *See supra* ¶ 168.

364.    Henn reviewed and approved the terms of these agreements, including statements that "many [Borrowers] are stuck with their lender not offering legitimate help" and "[i]n many cases, we are successful in assisting borrowers . . . where their lenders had previously denied them based on illegitimate reasons."

365.    On information and belief, Henn approved the requirement that all Dealers record a "verification" portion of any call with a Borrower being referred to EAC for financing; that the Dealer use a script approved by EAC to do so; and that EAC transmit the audio recording of the verification to EAC. *See supra* ¶ 229.

366.    Henn reviewed specific "verification" scripts proposed by Dealers.  On information and belief, Henn directed changes to those scripts.

367.    By requiring Dealers to use the verification scripts, as revised by Henn, EAC could later deny that Borrowers had been misled about the Purported Services and EAC financing, which helped perpetuate the Scheme by putting off Borrowers who complained.

368.    Henn communicated with Dealers about EAC's "reinstatement" policy that would allow a Borrower past-due on payments to begin making payments again.

369.    Henn communicated with Dealers about EAC's calculation of interest on Borrower accounts.

370.    Henn communicated with Dealers about EAC's standards of creditworthiness for Borrowers.

371.    Henn managed, and communicated with Dealers about, EAC's policies regarding Dealers' communication with Borrowers.

372.    For example, in December 2017, EAC directed Dealers that they "may not use Equitable's name, phone number, email address, or any other information when you are contacting any federal student loan debtor for any reason."  On information and belief, EAC did so at the direction of Henn.

373.    Henn directed Dealers' collections efforts with respect to Borrowers who did not make payments.  For example, Henn reviewed language of Dealers' collection emails to Borrowers.

374.    Henn was involved in the minutiae of the Dealers' day to day operations with respect to individual Borrowers.

375.    For example, Dealers often contacted Henn to request that EAC take specific actions on individual Borrowers' accounts, such as extension of payment deadlines or

cancellation or chargeback of individual accounts.  Henn personally responded to these requests and directed them to EAC staff.

376.    Henn worked directly with Dealers and EAC's attorney to develop a "client benefit statement"—a statement that the Borrower would receive directly from EAC, describing the Borrower's purported benefits from the Dealer's Services.  Such a "client benefit statement" could be used to conceal the worthlessness of the Purported Services, and thus could be used to perpetuate the Scheme.

377.    Henn reviewed multiple drafts of the client benefit statement that approximated the Borrower's monthly payment under a standard repayment plan (regardless of whether the Borrower was in fact enrolled in such a plan) and used it to calculate the Borrower's purported "total savings."  These purported "total savings" did not accurately reflect the value of the Dealers' Services.  The client benefit statement drafts Henn reviewed also characterized the loan payments on EAC's Credit Plan as an "enrollment fee" on a "federal program."

378.    On information and belief, Henn approved a version of the client benefit statement. Henn directed EAC staff to set up the automatic creation of the client benefit statement in EAC's software.

379.    Henn sought access to, and, on information and belief did access, certain Dealers' full records about Borrower accounts.  Henn reviewed, and approved or denied, certain requests from Dealers to change the way this data was maintained.

380.    As examples:

- On or around November 15, 2016, Henn sought to obtain access to certain Dealers' electronic records in this system so that EAC could access all information about Borrowers that Dealers possessed.

- On or around November 18, 2016, Henn reviewed contractual language that would allow access to such data for certain Dealers.

- On or around January 3, 2017, Henn was trained on how to access certain Dealers' data management system and discussed the use of this system with the Dealers.

- On or around November 1, 2017, Henn directed certain Dealers to integrate a quality control function into their data management system.

- On or around November 27, 2017, Henn held a phone call with a Dealer who sought Henn's approval to build in a feature to the software that would automatically log in to a Borrower's studentloans.gov account.

- On or around November 29, 2017, Henn emailed the vendor who managed certain Dealers' data systems seeking access to Dealers' data.

381.    Henn reviewed, and approved or denied, Dealers' requests to change the individuals who were able to access EAC's account information, such as after a change of control of the Dealer.

382.    By doing so, EAC and Henn would continue to have access to the records in the event Dealers closed or disappeared.

383.    Henn regularly reviewed Borrower complaints lodged against Dealers.  Henn coordinated with Dealers to respond to such complaints.

384.    Henn directed Dealers that all BBB complaints needed to be answered.

385.    On information and belief, Henn directed the Dealers' responses to complaints in order to perpetuate the Scheme, by encouraging existing Borrowers to continue to pay under the Credit Plans, avoiding public complaints that might deter new Borrowers from enrolling, and avoiding scrutiny by law enforcement.

386.    Henn managed the financial structure of the Scheme.  Henn had control over EAC's finances.  Henn had control over a significant portion of the Dealers' finances because he controlled EAC's "reserve" account for each Dealer.

387.    Henn controlled EAC's financial relationship with the Dealers and the flow of funds between EAC and the Dealers.

388.     Henn knew that the Dealers obtained EAC's financing for Borrowers in order for the Dealers to evade the Telemarketing Sales Rule's prohibition on up-front payments to providers of debt relief services.

389.     For example, Henn was told by a Dealer that the "attractiveness of financing is the advance" payment from EAC to the Dealer.

390.     Henn set the amount that EAC would pay the Dealers for each Borrower and the schedule under which these payments would be made.

391.     Henn managed, and communicated with Dealers about, EAC's "chargeback" policy and chargeback amounts.  The "chargeback amount" was the amount a Dealer's account would be credited when EAC exercised the "recourse" option in its contact with the Dealer and sold the contract to the Dealer.

392.     Henn managed, and communicated with Dealers about, the status of Dealers' payouts under their contracts with EAC and the amount being held by EAC in "reserve" accounts.

393.     Henn reviewed and approved agreements that Dealers made with their own contractors.  For example, Henn reviewed and approved agreements with "processing companies" that certain Dealers retained to provide the Purported Services to Borrowers.  Henn communicated extensively with Dealers regarding these processing companies.

394.     Henn was actively involved in the strategic management of Dealers' businesses in participating in the Scheme.  For example, one Dealer turned to Henn for advice on the "short term future" of the Dealer as EAC was "a huge part of the equation."

395.     Henn reviewed, and approved or denied, Dealers' requests to sell Borrowers' contracts among each other.

396.     Henn provided material assistance to the Dealers to enable their continued participation in the Scheme.

397.     Henn issued promissory notes to Dealers through which EAC lent Dealers hundreds of thousands of dollars.  Henn controlled the repayment terms of those notes.

### 4.     Henn Profited from the Scheme and Transferred Assets Out of Reach of the Putative Class, Who are Creditors Harmed by the Scheme

398.     Upon information and belief, Henn has personally profited from his participation in the Scheme.

399.     Henn appears to have offered his individual creditworthiness, and potentially offered financial support or assurances, in order to facilitate EAC's obtaining of financing for use in perpetuating the Scheme.

400.     Henn has also taken steps to shield his personal assets from potential liability resulting from his, EAC's, and the Dealers' unlawful conduct.

401.     On December 6, 2016—just *three days after* Henn was notified that the Minnesota Attorney General had issued a civil investigative demand as part of an investigation of the Scheme—Henn and his wife, Teresa (together, the "Henns") each established personal trusts.

402.     Into the Jeffrey D. Henn Revocable Trust, of which both Henns are Co-Trustees, Henn contemporaneously transferred all of his "tangible personal property," including automobiles, jewelry, and furniture, for the consideration of $1.00.

403.     The same day, Henn assigned his rights to 50% interest in EAC to the Jeffrey D. Henn Revocable Trust (the "JDH Trust Assets"), along with a 31% interest in a company called NE Holdings, Inc., and a 34% interest in a company called Northeast Properties, LLC, and his rights in the sales and royalties from a line of knives.

404.     Also on December 6, 2016, Jeffrey Henn and Teresa Henn executed the
quitclaims of five parcels of jointly-owned land (the "Henn Real Estate Assets") into the Teresa
Henn Revocable Trust, of which both Henns are the Co-Trustees.  The parcels, as described in
the quitclaim documents are.

- Tax Parcel No. 57-028-2-42-06-06-2 01-000-000010, located  in the Town of
  Spider Lake, Sawyer County, Wisconsin;

- Tax Parcel No. 57-028-2-42-07-034 03-000-000010, located in the Town of
  Spider Lake, Sawyer County, Wisconsin;

- Tax Parcel No. 57-028-2-42-07-034 04-000-000010, located in the Town of
  Spider Lake, Sawyer County, Wisconsin;

- Tax Parcel No. 04-021-2-44-06-32-2 05-002-32000, located in in the Town of
  Grand View, Bayfield County, Wisconsin; and,

- Tax Parcel No. 04-021-2-44-06-32-3 05-003-05000, located in the Town of
  Grand View, Bayfield County, Wisconsin.

## IV.    EAC USED THE CREDIT PLANS AS COLLATERAL TO OBTAIN
COMMERCIAL LOANS, AND HAS TRANSFERRED THE PROFITS OF THE
SCHEME TO REPAY THOSE OBLIGATIONS

405.     EAC was able access its profits from the Scheme upfront and on a continuing
basis, by obtaining liquidity from commercial lenders.

406.     EAC used its Credit Plans as collateral to obtain financing from as many as ten to
twenty-five commercial lenders (the "Lenders").  The Lenders extended funds based on the
profits of the Scheme and, at least in some instances, based on using the Credit Plans as
collateral.

407.     On information and belief, EAC sought and obtained commercial debt from the
Lenders as early as February 2015 and at least through May 2017.  Upon information and belief,
the Lenders include but are not limited to Western Bank in Bloomington, Minnesota and
Voyager Bank in Minnetonka, Minnesota.

408.   On information and belief, this liquidity both financed the initiation of the Scheme and enabled the Scheme to continue even as Borrowers refused to pay on fraudulently obtained debts.

409.   On information and belief, EAC's payments on its obligations to the Lenders continue until today, totaling at this time approximately $500,000 per month.

### THE NAMED PLAINTIFFS

410.   Named Plaintiffs Vanessa Williams and Kory Turner were deceived by Dealers and EAC to pay for Purported Services of no value to them and take out Deceptive Loans.  Their individual experiences, as detailed further below, are representative of the Scheme described herein.

## V.      VANESSA WILLIAMS

411.   Plaintiff Vanessa Williams is a twenty-five-year-old Manhattan resident.  She graduated from the State University of New York- Buffalo State with a bachelor's degree in fashion and textile technology in 2016.  Ms. Williams borrowed approximately $21,000 in student loans to obtain her bachelor's degree.

### A.      SLF Center's Fraudulent Sale of Purported Services to Ms. Williams

412.   On August 17, 2017, Ms. Williams received an unsolicited phone call on her cell phone from Samantha Gonzalez-Banuelos ("Gonzalez-Banuelos"), an "enrollment counselor" at SLF Center.

413.   Gonzalez-Banuelos asked Ms. Williams whether she had student loans and told Ms. Williams that SLF Center could obtain loan forgiveness for Ms. Williams.

414.   Gonzalez-Banuelos informed Ms. Williams that Ms. Williams's loan servicer, Navient, had engaged in illegal activity and had been sued.

415.    Gonzalez-Banuelos told Ms. Williams that SLF Center charged approximately $1,300 for loan forgiveness Services.  Gonzalez-Banuelos told Ms. Williams that she could pay through a payment plan of $49 per month.

416.    Relying on Gonzalez-Banuelos's statements, Ms. Williams understood that by paying $1,300 in $49 monthly payments, she would have her full $21,000 of loans forgiven— that is, eliminated.  She therefore agreed to purchase SLF Center's services.

417.    Gonzalez-Banuelos also asked Ms. Williams for her studentloans.gov log-in credentials, stating that SLF Center required them to take the steps that would lead to loan forgiveness.  Relying on this representation, Ms. Williams provided the log-in credentials.

418.    Later that day, Gonzalez-Banuelos emailed Ms. Williams.  The email contained many materially false and misleading statements, including that "it is our mission to throw a life line to everyone that feels like they are drowning in debt"; that with SLF Center's assistance, Ms. Williams "will never need to worry about this overwhelming issue again"; that "President Obama and Congress passed . . . the William D Ford Act which allows the Department of Education to consolidate your existing student loans"; that the "William D Ford Act" was "continued in the court of Law"; that "Federal Student Loan Consolidation" would "lower [Ms. Williams's] payments"; and that SLF Center would "get [her] into the best financial position possible."  The email also described lawsuits against Navient and provided "helpful links regarding Student Loan Forgiveness."

419.    Gonzalez-Banuelos provided information and links to induce Ms. Williams to agree to purchase SLF Center's Services by suggesting that SLF Center was a legitimate entity related to USED and that SLF Center's Services would financially benefit her.

420.    Gonzalez-Banuelos's representations about Navient were intended to discredit Navient and to discourage Ms. Williams from contacting Navient and thus learning that SLF Center's Services were a scam.

421.    Relying on Gonzalez-Banuelos's representations over phone and email, Ms. Williams agreed to continue with her purchase of SLF Center's Services.

422.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams that the $49 per month payment plan was, in reality, a new line of credit from EAC that would be drawn in full immediately to pay for SLF Center's purchase price, or that interest would accrue on the $1,300.

423.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams that the government programs Ms. Gonzalez-Banuelos described to Ms. Williams were available to all student loan borrowers for free from their Servicers and USED.

424.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams that consolidation would increase the overall interest charged on her loans.

425.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams that the Services could increase her overall loan balance.

426.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams that by using her one shot at consolidation through the Services, Ms. Williams would lose the opportunity to consolidate in the future, when it could be valuable.

427.    At no point did Gonzalez-Banuelos or SLF Center tell Ms. Williams the potential tax liability from enrollment in Income Driven Repayment.

428.    Each of Gonzalez-Banuelos's representations in the August 17, 2017 phone call and email was false.  Gonzalez-Banuelos made those misrepresentations, and omitted material

information, knowingly, and with the intent to induce Ms. Williams to purchase the Purported Services.

429.     According to EAC, SLF Center sent Ms. Williams a document packet that she electronically signed on August 17, 2017.

**B.     EAC's Deceptive Loan to Ms. Williams**

430.     On the same day, EAC emailed Ms. Williams a document packet through DocuSign.

431.     The document packet sent by EAC had the same form and content described above (¶¶ 169-181).  No provision of the Credit Plan sent to Ms. Williams purports to extend credit, or states the amount of credit purportedly being extended, or identifies any party purportedly extending credit.  The Credit Plan sent to Ms. Williams did not contain the disclosures described above (¶¶ 196-207), including, but not limited to, disclosures of the amount financed, the finance charge, the total of payments, the amount and due dates of required payments, the Grace Period, and billing error rights.

432.     The Credit Plan did not disclose that due to the 21% interest rate and 34-month repayment schedule, Ms. Williams would need to pay nearly $400 in finance charges on top of the purchase price.

433.     Relying on the representations made by Gonzalez-Banuelos and the material nondisclosures in the documents, Ms. Williams executed the documents in the EAC document packet.

434.     Only nine minutes after receiving confirmation of her executed document packet through DocuSign, Ms. Williams received another email from EAC with the subject line "Congratulations on your approval."  This email attached the completed copy of her document

packet, which is attached as Exhibit B.  The email stated that she should call EAC with "any

questions regarding [her] financing."

    **C.**     **Defendants' Misconduct in Providing Purported Services and Collecting on the Deceptive Loan**

    435.     The next day, Gonzalez-Banuelos emailed Ms. Williams, instructing her to

provide proof of income so that SLF Center could "send it to the Department of Education for

review."  Three days later, Ms. Williams sent Gonzalez-Banuelos her paystubs.  Gonzalez-

Banuelos responded that she would "send this right over to the DOE."  This statement was false;

Gonzalez-Banuelos did not intend to immediately send her income documentation to USED.

    436.     Gonzalez-Banuelos made these statements knowingly with the intent to secure

Ms. Williams's proof of income for other purposes.  In fact, SLF Center requested Ms.

Williams's proof of income to send to EAC so EAC could verify her creditworthiness.  SLF

Center sent that information to EAC shortly after receiving it.

    437.     A few weeks later, Ms. Williams authorized an electronic payment to SLF Center

of $150 as a down payment on the Deceptive Loan.

    438.     On September 18, Ms. Williams emailed Gonzalez-Banuelos to see whether her

down payment had been processed.  Later that day, Gonzalez-Banuelos responded that the

payment "usually takes a few days to process due to the fact that it is a federal transaction."  The

representation that Ms. Williams's down payment to SLF Center was a "federal transaction" was

false and Gonzalez-Banuelos made that misrepresentation knowingly and with intent to disguise

the true nature of the Purported Services so that Ms. Williams would not understand she had

been fraudulently induced to purchase them.

    439.     In fact, $122.48 was due to Navient for Ms. Williams's federal loans on

September 12, 2017, but SLF Center never made this payment, and Ms. Williams's federal

student loan account became past due as a result. SLF Center never disclosed to Ms. Williams that a payment on her account was missed or that her account became past due. SLF Center concealed that information to disguise the true nature of the Purported Services so that Ms. Williams would not understand she had been fraudulently induced to purchase them.

440.    On September 19, the $150 payment to SLF Center was debited from Ms. Williams's bank account.

441.    In late September 2017, SLF Center logged in to Ms. Williams's online federal student loan account on studentloans.gov by falsely impersonating Ms. Williams. To do so, SLF Center entered Ms. Williams's personal information.

442.    Through the website, SLF Center electronically applied for loan consolidation and Income Driven Repayment by falsely impersonating Ms. Williams. On September 27, 2017, SLF Center falsely impersonated Ms. Williams and electronically signed her name on the Master Promissory Note for Ms. Williams's new consolidation loan.

443.    On the Master Promissory Note, SLF Center listed Ms. Williams's email address as at the domain numailnow.com. Ms. Williams has never had an email address at this domain. SLF Center changed Ms. Williams's email address to attempt to direct all communication regarding the consolidation loan directly to SLF Center, not Ms. Williams, to disguise the true nature of the Purported Services so that Ms. Williams would not understand that she had been fraudulently induced to purchase them.

444.    The consolidation loan obtained by SLF Center for Ms. Williams increased the overall interest being assessed on Ms. Williams's federal loans.

445.    SLF Center falsely stated on the Income Driven Repayment application it completed for Ms. Williams that Ms. Williams had not filed taxes in the previous two years,

when in fact she had done so.  SLF Center did this so that it could use Ms. Williams's pay stubs, rather than her tax returns, as basis for the documentation of her income, fraudulently lowering her monthly payment amount.  Ms. Williams did not know of this false statement and did not give—and would not have given—SLF Center permission to make it.

446.    EAC sent monthly billing statements to Ms. Williams from November 2017 to February 2018.  None of these billing statements disclosed the Grace Period.

**D.    Harms to Ms. Williams**

447.    On October 21, 2017, Ms. Williams made the first $49 monthly payment to EAC by auto pay.

448.    Ms. Williams later reviewed her credit report and saw the EAC trade line.  She learned that EAC was likely a student loan assistance scam.

449.    Soon thereafter, Ms. Williams logged in to EAC's online web portal and cancelled the auto pay authorization to EAC.  She made no further payments to EAC.

450.    As a direct and proximate result of Defendants' Scheme, Ms. Williams has experienced financial and other harm.

451.    Ms. Williams's student loans were not forgiven.  Ms. Williams currently owes over $23,000 on her loans.  Ms. Williams now owes increased interest on those loans because the consolidation SLF Center performed increased her interest rate.  She was also harmed by the missed payment on her student loans.

452.    Ms. Williams was financially harmed in the amount of the payments she made to SLF Center and EAC.  She is also harmed by her ongoing outstanding indebtedness to EAC.

453.    Every dollar that Ms. Williams paid to EAC and SLF Center could have gone to reducing her federal student loan burden.

454.   Ms. Williams's credit was damaged by Defendants' Scheme in several ways, including by EAC's "inquiry" into her creditworthiness, EAC's reporting of her debt obligation as a fully maxed-out $1,227 line of credit, and EAC's reporting of her missed payments. Ms. Williams worries that this will hurt her future opportunity to obtain housing and access credit.

455.   As a result of her reduced credit score, two of Ms. Williams's credit card issuers reduced the credit limits associated with her cards.

456.   Ms. Williams also experienced emotional distress because of Defendants' Scheme.

457.   Ms. Williams resided and was present in New York during all or some of the time during which she was sold the Purported Services, made payments on her Deceptive Loan, otherwise interacted with the Defendants, and was ultimately harmed by the Defendants' fraudulent conduct.

## VI.   KORY TURNER

458.   Plaintiff Kory Turner is a thirty-two-year-old Brooklyn resident. He graduated from Montclair State with a bachelor's degree in 2011. He attended seminary at Drew Theological School and graduated with a master's degree in 2015. He borrowed approximately $80,000 in student loans to obtain his undergraduate and graduate degrees.

459.   Shortly after graduating in 2015, Mr. Turner consolidated his student loans and enrolled in Income Driven Repayment on his own by working with his Servicer.

### A.   Integra's Fraudulent Sale of Purported Services to Mr. Turner

460.   Mr. Turner learned of Integra through a co-worker.

461.   In September 2016, Mr. Turner called Integra. An Integra representative who is, on information and belief, named Shawn Johnson, told him that Integra could obtain loan forgiveness for Mr. Turner.

462.     The representative told Mr. Turner that Integra assists with loan forgiveness through the Department of Education, and suggested that Integra would become a servicer of his student loans.  Relying on the representative's statements, Mr. Turner believed that Integra was affiliated with the government.

463.     The Integra representative told Mr. Turner that Integra charged approximately $1,300 for loan forgiveness services, which Mr. Turner could pay through a payment plan of $39 per month.

464.     The Integra Representative told Mr. Turner that he would have no payments for 75 days, then would have a monthly payment of $39.42.

465.     Relying on Integra's statements, Mr. Turner understood that by paying $1,300 in $39 monthly payments, he would have his full $80,000 of loans forgiven—that is, eliminated. He therefore agreed to purchase Integra's Services.

466.     The Integra representative also told Mr. Turner that Integra would take over all communications with Mr. Turner's Servicer and that Mr. Turner should not contact his Servicer because doing so would interfere with Integra's Services.

467.     At no point did Integra tell Mr. Turner that the $39 per month payment plan was, in reality, a new line of credit from EAC that would be drawn in full immediately to pay for Integra's purchase price, or that interest would accrue on the $1,300.

468.     At no point did Integra tell Mr. Turner that the government programs Integra described were available to all student loan borrowers for free from their Servicers and USED.

469.     At no point did Integra tell Mr. Turner that the Services provided by Integra consisted of consolidation and enrollment in Income Driven Repayment, which Mr. Turner had performed before on his own.

470.     Each of Integra's representations in the September 2016 phone call was false. Integra made those misrepresentations, and omitted material information, knowingly, and with the intent to induce Mr. Turner to purchase the Purported Services.

471.     According to EAC, a few days later, on September 23, 2016, Integra sent Mr. Turner a document packet through SignByX, an electronic signature application, and Mr. Turner electronically signed this contract.

### B.     EAC's Deceptive Loan to Mr. Turner

472.     Three minutes after Mr. Turner purportedly electronically signed Integra's document packet, EAC emailed Mr. Turner a document packet through DocuSign.

473.     The document packet sent by EAC had the same form and content described above (¶¶ 169-181).  No provision of the Credit Plan sent to Mr. Turner purports to extend credit, or states the amount of credit purportedly being extended, or identifies any party purportedly extending credit.  The Credit Plan sent to Mr. Turner did not contain the disclosures described above (¶¶ 196-207), including, but not limited to, disclosures of the amount financed, the finance charge, the total of payments, the amount and due dates of required payments, the Grace Period, and billing error rights.

474.     The Credit Plan did not disclose that due to the 21% interest rate and 51-month repayment schedule, Mr. Turner would have to pay nearly $700 in finance charges on top of the purchase price.

475.     Relying on the representations made by Integra and the material nondisclosures in the documents, Mr. Turner executed the documents in the document packet.

476.     Only one minute after receiving confirmation of his executed document packet by DocuSign, Mr. Turner received another email from EAC that attached the completed copy of his

document packet, attached as Exhibit C.  The email stated that he should call EAC with "any questions regarding [his] financing."

477.    Upon Integra's request, Mr. Turner faxed his tax return to Integra as proof of his income.  On information and belief, Integra submitted Mr. Turner's tax return to EAC to verify his creditworthiness.

478.    EAC transmitted billing statements to Mr. Turner from November 2016 to August 2017.  None of these billing statements disclosed the Grace Period.

### C.    Defendants' Misconduct in Providing Purported Services and Collecting on the Deceptive Loan

479.    On October 4, 2016, Integra submitted an Income Driven Repayment application that it had completed on Mr. Turner's behalf (dated October 3, 2016).  On this application, Integra falsely stated that Mr. Turner had two children in his family who received more than half of their support from him.  At the time of submission, Mr. Turner did not live with or support any children.  Integra did this to increase Mr. Turner's reported family size, fraudulently lowering his monthly payment amount.  Mr. Turner did not know of this false statement and did not give—and would not have given—Integra permission to make it.

480.    Moreover, Mr. Turner had already enrolled himself, and was then in, an Income Driven Repayment plan before he purchased the Purported Services from Integra.  On the application it prepared and submitted, Integra checked the box stating that Mr. Turner was "already in an income-driven repayment plan" and was "submitting documentation early" so that his payment amount would be re-calculated "immediately."  As a result of the Income Driven Repayment application Integra submitted, the amount of Mr. Turner's required monthly payment *increased*, from $0 to $58.74 per month.

481.     Integra applied for, or instructed Mr. Turner to apply for, forbearance on Mr. Turner's loans on October 10, 2016.  Integra applied for this forbearance (or instructed Mr. Turner to do so) in order to conceal from Mr. Turner that his loan payments had increased.

482.     The forbearance in which Integra placed Mr. Turner was disadvantageous to him because months in forbearance do not count for Public Service Loan Forgiveness, which Mr. Turner intends to seek as soon as he is eligible.  As a result of the forbearance, Mr. Turner lost credit for months of eligible payments.

483.     On November 9, 2016, an agent of Integra requested Mr. Turner's log-in credentials for his Servicer's website, representing that the credentials were needed to bring his account to current status.  These statements were false, and were made with knowledge of falsity and with intent to induce Mr. Turner to send his log-in credentials.  Relying on the misrepresentations, Mr. Turner did provide his log-in credentials.

484.     On December 5, 2016 Mr. Turner made the first $39.42 monthly payment to EAC by auto pay.

485.     In January 2017, Mr. Turner began a five-month training program, for which he borrowed another $6,000 in student loans.  Mr. Turner did not owe payments on any of his federal loans while he was back in school.  All the same, EAC continued to send billing statements that demanded payment from Mr. Turner.

486.     Mr. Turner made payments to EAC by auto pay in January, February, March, and April 2017.

487.     When Mr. Turner completed his training program and was looking for a job, he removed EAC's auto pay authorization to his bank account to avoid the possibility of overdraft charges.

488.    After Mr. Turner left school, Integra again placed his loans in forbearance.

489.    Mr. Turner made a $90 payment to EAC in June 2017.

490.    On August 10, 2017, EAC sent Mr. Turner a letter stating that his account was "severely delinquent" and "is now facing further actions."  Mr. Turner's past due balance was listed as $87.68.

491.    In response to this email, on August 30, 2017, Mr. Turner made a $41 payment to EAC.

492.    On September 15, 2017, Integra emailed Mr. Turner: "Should you ever receive something regarding your student loans that doesn't match what we are telling you then please contact us immediately."  This statement was made to alert Integra if anyone, including Mr. Turner's Servicer, notified him of his repayment options or informed him that Integra's Purported Services were fraudulent.

493.    In a second email Integra sent to Mr. Turner on that same day, Integra wrote that the log-in credentials to Mr. Turner's studentloans.gov account that it "had on file ha[d] been changed" and asked Mr. Turner to "[p]lease reply with [his] username and password."

494.    On September 29, 2017, EAC sent Mr. Turner a "Final Demand Letter" stating that his account was "seriously delinquent" and "is now facing further actions."

495.    EAC assigned Mr. Turner's Credit Plan to Integra shortly after sending the Final Demand Letter.  On information and belief, EAC made this assignment by invoking the recourse provision of the Master Dealer Agreement between EAC and Integra.

496.    After Mr. Turner's contract was assigned to Integra, Integra sent Mr. Turner many text messages and emails prompting him to pay Integra.

497.    Mr. Turner made $49 payments to Integra in December 2017 and January and February 2018.  On information and belief, Mr. Turner at some point made one additional $49 payment to Integra.

498.    After learning that EAC and Integra's Services were a scam, Mr. Turner stopped making payments to Integra.  He mailed a cancellation letter to Integra in February 2018 by certified mail, which asserted that Mr. Turner was cancelling his account because Integra did not provide the services it had promised and that the high interest rate on the Deceptive Loan violated usury laws.  The letter was returned as undeliverable.

499.    On March 28, March 30, and April 9, 2018, Integra emailed Mr. Turner with the subject line "Time to renew your Federal Forgiveness Program Payment!"  The body of the email stated that "[i]t's time for you to re-certify your Loan Forgiveness program with the Department of Education" and that Mr. Turner "ha[d] to submit" certain information to Integra "in order to remain in the Loan Forgiveness program."  These statements were false. The March 30 email also stated that the log-in credentials to Mr. Turner's studentloans.gov account had been changed and instructed him to "reply to this email with [his] log-in information."

500.    On March 20 and April 12, 2018, Integra emailed Mr. Turner stating that he did not pay and asking him to call Integra "as soon as possible so we can get these payments processed and get you all caught up with the program."  On March 20, April 20, and May 20, Integra texted Mr. Turner stating that "[t]here's a problem with a payment" on his Integra account and asking him to call Integra immediately.

501.    On April 17, 2018, Mr. Turner faxed to Integra a new cancellation letter that raised similar grounds as his February letter.  Mr. Turner has never received a response to the cancellation letter.

D.      **Harms to Mr. Turner**

502.    As a direct and proximate result of Defendants' Scheme, Mr. Turner has experienced financial and other harm.

503.    Mr. Turner's student loans were not forgiven.  Mr. Turner currently owes $99,800 on his loans, which continue to accrue interest.

504.    Mr. Turner was also harmed because the forbearance into which Integra placed him has the effect of increasing his total loan balance, and extending the period after which he will become eligible for Public Service Loan Forgiveness.

505.    Mr. Turner was financially harmed in the amount of the payments he made to Integra and EAC.  He is also harmed by his ongoing outstanding indebtedness to Integra.

506.    Every dollar that Mr. Turner paid to EAC and Integra could have gone to reducing his federal student loan burden.

507.    Mr. Turner's credit was damaged by Defendants' Scheme in several ways, including by EAC's "inquiry" into his creditworthiness, EAC's reporting of his debt obligation as a fully maxed-out $1,314 line of credit, and EAC's reporting of his missed payments.  Mr. Turner worries this will hurt his future opportunity to obtain housing or access credit.

508.    Mr. Turner has also experienced emotional distress because of Defendants' Scheme.

509.    Mr. Turner spent time and faced difficulty accessing his online accounts with his Servicer.

510.    Mr. Turner resided and was present in New York during all or some of the time during which he was sold the Purported Services, made payments on his Deceptive Loan from EAC, otherwise interacted with the Defendants, and was ultimately harmed by the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

511.    Plaintiffs sue under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil

Procedure, on behalf of themselves and as representatives of a nationwide class consisting of:

> All individuals who have obtained purported financing from EAC for student loan
> assistance services.

512.    The class is so numerous that joinder of all class members would be

impracticable.

513.    On information and belief, the class consists of approximately 60,000 individuals.

EAC's general counsel, Daniel Hill, has stated that EAC has provided financing to about 60,000

Borrowers.  The precise number and identity of the class members is contained within

Defendants' business and litigation records.

514.    Defendants have acted and continue to act on grounds generally applicable to

each member of the plaintiff class, making appropriate final declaratory and injunctive relief for

the class as a whole.

515.    Class members present common questions of law and fact and these questions

predominate over any individual questions.

516.    The common questions of law include, but are not limited to, whether:

- EAC is a creditor under TILA;

- the Credit Plans constitute spurious open-end credit;

- EAC is liable for the Dealers' actions as a holder of the Credit Plans;

- Defendants' conduct is consumer-oriented;

- the Dealers' sales practices constitute deceptive acts or practices;

- the Credit Plans create enforceable loan obligations;

- the Credit Plans constitute a loan or forbearance of money subject to usury limitations;

- Defendants form an association-in-fact enterprise; and

- Defendants committed a pattern of racketeering activity.

517. The common questions of fact include, but are not limited to whether:

- the Dealers falsely represented that Borrowers would obtain loan "forgiveness";

- the Dealers falsely represented that their Services would benefit Borrowers;

- the Dealers failed to disclose that the financing is in the form of a new loan from EAC;

- the Dealers made such false representations with the intent to induce Borrowers to purchase the Purported Services;

- the Dealers electronically signed consolidation loan promissory notes on behalf of Borrowers;

- EAC drafted standard form Purchase Agreements and Credit Plans;

- the Credit Plans failed to disclose the amount financed, finance charge, total of payments, due date and schedule of payments, billing notice rights, and Grace Period;

- EAC drafted and transmitted monthly billing statements;

- EAC charged and collected 21% interest;

- Defendants used the interstate mails and wires;

- Henn transferred assets with the intent to hinder, delay, or defraud the putative class; and

- EAC made payments to the Lenders with the intent to hinder, delay, or defraud the putative class.

518.    The claims of the named Plaintiffs are typical of the claims of the class.  On information and belief, Defendants offered the named Plaintiffs "student loan assistance" services by making the same types of misrepresentations as they did to members of the putative class.  Defendants also offered Plaintiffs the same extension of credit using the same standard form contract as they did to members of the putative class and acted in the same manner applicable to the class as a whole, including: offering nearly identical Credit Plans; charging the same interest rate; and sending nearly identical billing statements.  Defendants also worked together, as a unified enterprise, to mass market to Plaintiffs, use false or misleading statements to steer Plaintiffs into purchasing the Purported Services, and use the wires or mails to conceal from Plaintiffs the true nature of the Services.  Defendants performed each step in the Scheme knowingly, and the Scheme caused similar kinds of harm to each Plaintiff.

519.    The Named Plaintiffs will adequately and fairly protect the interests of all members of the proposed class because they have the requisite personal interest in the outcome of this litigation and have no interest antagonistic to any member of the proposed class.

520.    The Named Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG") and Quinn Emanuel Urquhart & Sullivan LLC ("QEU&S").  Attorneys at NYLAG and QEU&S are experienced in complex federal litigation, class action litigation, and consumer defense litigation.

521.    A class action is the superior method for a fair and efficient adjudication of this matter in that Defendants have acted in a manner generally applicable to the class and a class action will avoid numerous separate actions by class members that would unduly burden the

courts and create the possibility of inconsistent decisions, making final injunctive and declaratory relief appropriate for the class as a whole.

522.    Moreover, it would be impracticable for potential plaintiffs, who are, on information and belief, mainly individuals with high debt burden and limited means and thus have limited access to counsel, to obtain legal services on an individual basis for their claims. Thus their rights under the law may well be meaningless without certification of a class action seeking common redress.

### FIRST CAUSE OF ACTION
### (Civil RICO, 18 U.S.C. § 1962(c))
*Against Dealers, EAC, and Henn*

523.    Plaintiffs and Defendant Henn are natural persons, and therefore "persons" under 18 U.S.C. § 1961(3).

524.    Defendants Dealers and EAC are corporate entities, and therefore "persons" under 18 U.S.C. § 1961(3) as well as 1 U.S.C. § 1.

**A.    The Enterprise**

525.    Henn, EAC and the Dealers together form an association-in-fact and constitute an enterprise under 18 U.S.C. § 1961(4) (the "Enterprise"). Every Defendant is linked to the Enterprise.

526.    The purpose of the Enterprise is to extract payments from federal student loan Borrowers by using material false or misleading statements and omissions to induce those Borrowers to purchase Purported Services and take out Deceptive Loans from EAC. The Enterprise consists of Henn, EAC and the 43 Dealers which sold Services and steered Borrowers to EAC to obtain Deceptive Loans to finance their purchases of the Services.

527.     The Dealers mainly found customers by cold-calling phone numbers or using social-media and direct mail advertising to generate calls from federal student loan Borrowers. On calls with Borrowers, the Dealers made false or misleading statements and omissions to induce Borrowers to purchase Purported Services, including that the Dealers offer "loan forgiveness." Through these material false or misleading statements and omissions, the Dealers induced Borrowers to purchase Services, which typically included loan consolidation and enrollment in Income Driven Repayment.

528.     The Enterprise could not accomplish its purpose without coordinated activity among its members.

529.     For example, Henn and EAC recruited certain Dealers to participate in the Scheme. Henn and EAC also hired, managed, directed, and coordinated with brokers to recruit additional Dealers to join the Scheme.

530.     Henn and EAC also assisted Dealers to identify potential Borrowers by working with "lead generators," who referred Borrowers to Dealers. Henn and EAC also transacted with credit reporting company TransUnion to purchase personally identifying information for the purpose of soliciting customers to purchase the Services.

531.     The Dealers also depended on payments from EAC to fund their operations. EAC provided these payments; it even advertised itself as offering the Dealers "fast funding" to support the Dealers' "revenue stream." Henn was responsible for EAC's financial relationship with the Dealers, including through controlling the flow of payments from EAC to the Dealers.

532.     The Dealers also depended on EAC in that the Borrowers that purchased the Purported Services could not afford the upfront cost charged by the Dealers and, in any event, the Dealers were prohibited by federal regulation from accepting payment upfront.

533.    In fact, the Dealers conditioned "acceptance" into the Purported Services program upon EAC extending credit to the Borrowers.  The Dealers could not profit unless Borrowers were successfully steered to EAC for Deceptive Loans.  The Dealers and EAC together misrepresented the financing EAC extends, concealing its usurious terms so that Borrowers would agree it to it.

534.    EAC is financially intertwined with, and has been dependent on, the Dealers' fraudulent marketing of the Purported Services.  On information and belief, Henn and EAC were aware of, and actively participated in, the fraudulent misrepresentations and omissions that Dealers made to Borrowers.  Henn and EAC did so because if the Dealers accurately described the Purported Services, no Borrower would agree to pay approximately $1,300 plus usurious interest to obtain those Services, and thus no Borrowers would ever agree to EAC's Deceptive Loans.

535.    What is more, the standard Credit Plan extended by EAC to Plaintiffs is subject to a recourse agreement between the Dealer and EAC, so that EAC may assign the Credit Plan to the pertinent Dealer.  On information and belief, EAC is thereby able to deflect Borrowers who raise complaints or legal challenges to the thinly capitalized Dealers.  This aspect of the Purported Services further illustrates that Defendants act as a single Enterprise in carrying out the Scheme.

536.    For at least four years the Enterprise has been engaged in, and continues to be engaged in, activities that affect interstate commerce.  Defendants' unlawful Enterprise in violation of RICO has been and remains longstanding, continuous, and open-ended.

**B.      Pattern of Racketeering Activity**

537.    Defendants, individually and as part of the Enterprise, have engaged, and continue to engage, directly or indirectly, in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

538.    Defendants, acting individually and as part of the Enterprise, have devised the Scheme, in order to defraud and to obtain money or property by means of false or fraudulent pretenses and representations.  Each Defendant's participation is critical to the racketeering activity.

539.    Defendants, acting individually and as part of the Enterprise, have enabled, conducted, and maintained the Scheme by:

- Knowingly making material false or misleading statements, or material omissions, to Borrowers through the mail or wires, to induce Borrowers to purchase Purported Services and to conceal the true nature of the Purported Services;

- Knowingly providing Purported Services and receiving funds therefor;

- Knowingly extending deceptively-marketed loans at usurious rates;

- Knowingly soliciting and employing Borrower credentials to log on to restricted USED and Servicer websites to impersonate the Borrower and alter Borrower loan terms and contact information.

540.    Henn was, and continues to be, directly or indirectly, associated with EAC, the Dealers and the Scheme, and has, and continues to, manage or operate, directly or indirectly, the affairs of the Scheme through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).

541.    Henn has enabled, conducted, and maintained the Scheme, by:

- Knowingly operating and managing virtually every aspect of the Scheme, including by directing EAC's and the Dealers' participation in the Scheme;

- Knowingly determining the amount of financing under the Credit Plans, and controlling the material terms of the Credit Plans entered by Borrowers, including the total contract price and the amount and number of monthly payments that Dealers required from Borrowers;

- Knowingly approving and calculating the Credit Plan's usurious interest rate;

- Knowingly managing the recruitment of Borrowers to purchase Dealers' Services; and

- Knowingly managing EAC's collection efforts from Borrowers on an ongoing basis.

- Providing financial support or assurances to assist EAC in obtaining financing to operate the Scheme.

542.    Defendants, acting individually and as part of the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, to knowingly make fraudulent misrepresentations and omissions.  Each use of the mails and wires has furthered the Scheme and enabled Defendants to take money and property from Ms. Williams and Mr. Turner and putative class members through false pretenses and material false statements or omissions.  Specifically:

- Defendants used the mails and wires to knowingly make fraudulent misrepresentations and omissions to Ms. Williams by phone and email on August 17, 2017 and various dates thereafter, as described with particularity above (¶¶ 412-446), with the intent to induce her to agree to purchase Purported

Services from SLF Center; agree to a Deceptive Loan from EAC; make payments to Defendants; provide information to Defendants to facilitate their fraud; and conceal their fraud after the fact.

- Defendants used the mails and wires to knowingly make fraudulent misrepresentations and omissions to Mr. Turner by phone and email in September 2016 and on various dates thereafter, as described with particularity above (¶¶ 460-501), with the intent to induce him to agree to purchase Purported Services from Integra; agree to a Deceptive Loan from EAC; make payments to Defendants; provide information to Defendants to facilitate their fraud; and conceal their fraud after the fact.

- Defendants used the mails and wires to knowingly make fraudulent misrepresentations and omissions to members of the putative class, as described with particularity above (¶¶ 85, 87-88, 96, 100, 104,, 108, 119, 121-23, 126, 141, 147-55, 164, 214, 224, 23, 236-37, 241, 249-50), with the intent to induce them to agree to purchase Purported Services from the Dealers; agree to a Deceptive Loan from EAC; make payments to Defendants; provide information to Defendants to facilitate their fraud; and conceal their fraud after the fact.

- Defendants have made fraudulent misrepresentations and omissions to other members of the putative class on thousands of other occasions that Plaintiffs cannot identify at this time but are known to Defendants.

543. Defendants' pattern of using the mails or wires to perpetrate fraud is further reflected by the many complaints that have been filed against EAC and the Dealers with

the CFPB and BBB, as well as by the litigation and investigations alleged above (¶¶ 66-68, 86, 96, 127, 142, 265-73).

544.   Every Defendant has specific knowledge that the mails and wires are being used to advance the overall purpose of executing the Scheme to defraud, or it was reasonably foreseeable that the mails and wires would be used because executing Defendants' Scheme depends on calling or emailing Borrowers, transmitting and requesting the execution and return of various forms and contracts by the mails and wires, and unlawfully accessing the internet while purporting to be a Borrower.

545.   Each of the thousands of uses of the mails and wires as part of the Scheme, spanning a period of no fewer than three years, constitutes a separate instance of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, and thus is a predicate act.

546.   These predicate acts constitute "a pattern of racketeering activity" under 18 U.S.C. §§ 1961 and 1962.

547.   As part of Defendants' Scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.* The acts of racketeering are an ongoing part of Defendants' regular way of doing business. Defendants' Scheme is ongoing, and Defendants benefit from the continued operation of the Scheme. Under the terms of consent judgments EAC entered into with the Federal Trade Commission and other regulators, EAC is no longer permitted to issue new Deceptive Loans. EAC continues to send monthly bills to Borrowers and collect payments, including through auto pay. EAC continues to threaten Borrowers that if they do not make payments, EAC will negatively report their accounts to credit bureaus. EAC continues to tell Borrowers who complain that it was not involved in the Dealers'

sale of the Purported Services. EAC continues to sell Borrowers' payment obligations to Dealers through the recourse provisions in its Master Dealer Agreements with Dealers.

548. The predicate acts have been, and will be, repeated many times, absent judicial redress.

### C. Relationship of Pattern of Racketeering Activity to Enterprise

549. The goal of the Enterprise is to fraudulently procure payments from Borrowers in connection with their purchase of Purported Services and their Deceptive Loans from EAC.

550. The pattern of racketeering activity described above is integral to the Scheme. Without engaging in mail and wire fraud, Defendants would be unable to procure the payments they seek.

551. Each Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. As a result, each Defendant has violated 18 U.S.C. § 1962(c).

552. As a direct and proximate result of the RICO violations described in this Complaint, Ms. Williams and Mr. Turner and putative class members have suffered substantial and concrete injury. Defendants' actions in violation of 18 U.S.C. § 1962(c) have caused Plaintiffs and putative class members to unknowingly enter into the Credit Plans at usurious interest rates; incur costs by making unlawfully procured payments to the Dealers and EAC under their Purchase Agreements and Credit Plans; default on or accept unfavorable alterations to their student loans; and suffer damage to their credit ratings. These harms constitute injuries to Plaintiffs' property under 18 U.S.C. § 1964.

553. Defendants' conduct has involved and continues to pose a threat of long-term illegality since it is believed to have commenced over four years ago and has actively continued

to the present. The pattern of racketeering activity has been directed towards thousands of persons, including Ms. Williams and Mr. Turner, and the pattern has spanned many years.

554.    Because of Defendants' violations of 18 U.S.C. § 1 962(c), Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

### SECOND CAUSE OF ACTION
### (Civil RICO, 18 U.S.C. § 1962(d))
*Against Dealers, EAC, and Henn*

555.    In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that, beginning no later than 2015 and continuing through today, they knowingly agreed and conspired to conduct or participate in, directly or indirectly, the affairs of the Enterprise through the pattern of racketeering activity described above.

556.    The volume and frequency of the fraudulent activity, and the continuance of the Scheme for over four years, could not have occurred without the consent and knowing collusion of Defendants and other conspirators. Additionally, among other things, on multiple occasions, including in December 2016 and October 2017, EAC and Henn convened in-person meetings with multiple Dealers to discuss the Dealers' marketing practices.

557.    As part of, and to advance, their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that those acts were in furtherance of that pattern of racketeering activity. As part of and to advance their conspiracy, each Defendant agreed to and did commit at least two predicate acts of racketeering.

558.    Plaintiffs' property interests have been injured by, and as a direct and proximate result of, Defendants' violations of 18 U.S.C. § 1962(d).

559.    Because of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

## THIRD CAUSE OF ACTION
### Violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1637(a), 1637(b), 1638(a)
*Against EAC*

560.    To the extent the Credit Plans create enforceable loan obligations, the Credit Plans violate the Truth in Lending Act ("TILA"), 15 U.S.C. §1601 *et seq.*

561.    TILA requires creditors to provide meaningful disclosures of credit terms "so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."

562.    The Credit Plan constitutes an extension of "credit" as that term is defined by TILA, 15 U.S.C. § 1602(f), in that it provides for the Borrower to incur debt and defer its payment.

563.    EAC is a "creditor" as that term is defined under TILA, 15 U.S.C. § 1602(g), because it regularly extends consumer credit for which the payment of a finance charge is required and it is the entity to which Borrowers' obligations on the Credit Plans were initially payable.

564.    EAC violated TILA by falsely presenting the credit offered under the Credit Plan as open-end when it is, in fact, closed-end.  EAC did not disclose to Plaintiffs and putative class members certain required disclosures for closed-end credit, including:

- The "amount financed," 15 U.S.C. § 1638(a)(2)(A);

- The "finance charge," 15 U.S.C. § 1638(a)(3);

- The "total of payments," which is determined by the sum of the amount financed and the finance charge, 15 U.S.C. § 1638(a)(5); and,

- The amount and due dates of the required payments, 15 U.S.C. § 1638(a)(6).

565. EAC also did not disclose to Plaintiffs and putative class members certain required open-end credit account-opening disclosures, including:

- The Grace Period, which must be disclosed in tabular format, 15 U.S.C. § 1637(a)(1); 12 C.F.R. § 1026.6(b)(2)(v); and

- A statement of the Borrower's billing error rights, 15 U.S.C. § 1637(a)(7).

566. EAC transmitted monthly billing statements to Plaintiffs and putative class members that did not disclose certain required open-end credit monthly billing statement disclosures, including:

- The Grace Period, or that no such period is provided, 15 U.S.C. § 1637(b)(9).

567. Plaintiffs and putative class members relied on the Credit Plans and billing statements containing the violations described above.

568. As a direct and proximate result of these violations of TILA, 15 U.S.C. §1601 *et seq.*, Plaintiffs and putative class members have suffered compensable harm and are entitled to recover statutory and actual damages.

### FOURTH CAUSE OF ACTION
### Violation of TILA, 15 U.S.C. §§ 1637(a), 1637(b), 1638(a)
*Against Dealers and EAC*

569. To the extent the Credit Plans create enforceable loan obligations, the Credit Plans violate the Truth in Lending Act ("TILA"), 15 U.S.C. §1601 *et seq.*

570.     The Credit Plan constitutes an extension of "credit" as that term is defined by TILA, 15 U.S.C. § 1602(f), in that it provides for the Borrower to incur debt and defer its payment.

571.     In the alternative: each of the Dealer Defendants is a "creditor" as that term is defined under TILA, 15 U.S.C. § 1602(g), because it regularly extends consumer credit for which the payment of a finance charge is required and are the entities to which Borrowers' obligations on the Credit Plans were initially payable.

572.     EAC is an "assignee" as that term is defined under TILA, 15 U.S.C. § 1641(a), that is liable for the below-listed violations that are evident on the face of the Credit Plans.

573.     The Dealers violated TILA by falsely presenting the credit offered under the Credit Plan as open-end when it is, in fact, closed-end.  The Dealers did not disclose to Plaintiffs and putative class members certain required disclosures for closed-end credit, including:

- The "amount financed," 15 U.S.C. § 1638(a)(2)(A);

- The "finance charge," 15 U.S.C. § 1638(a)(3);

- The "total of payments," which is determined by the sum of the amount financed and the finance charge, 15 U.S.C. § 1638(a)(5); and

- The amount and due dates of the required payments, 15 U.S.C. § 1638(a)(6).

574.     The Dealers also did not disclose to Plaintiffs certain required open-end credit account-opening disclosures, including:

- The Grace Period, which must be disclosed in tabular format, 15 U.S.C. § 1637(a)(1); 12 C.F.R. § 1026.6(b)(2)(v); and

- A statement of the Borrower's billing error rights, 15 U.S.C. § 1637(a)(7).

575.     EAC transmitted monthly billing statements to Plaintiffs and putative class members that did not disclose certain required open-end credit monthly billing statement disclosures, including:

- The Grace Period, or that no such period is provided, 15 U.S.C. § 1637(b)(9).

576.    Plaintiffs and putative class members relied on the Credit Plans and billing statements containing the violations described above.

577.    As a direct and proximate result of these violations of TILA, 15 U.S.C. §1601 *et seq.*, Plaintiffs and putative class members have suffered compensable harm and are entitled to recover statutory and actual damages.

## FIFTH CAUSE OF ACTION
### (N.Y. Gen. Bus. Law § 349)
*Against Dealers and EAC*

578.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

579.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."  N.Y. Gen. Bus. Law § 349(h).

580.    The Dealers violated New York General Business Law Section 349 by using deceptive acts and practices in the conduct of the Scheme.

581.    The Dealers committed the deceptive acts and practices willfully and/or knowingly.

582.    The Dealers' conduct was consumer-oriented and has a broad impact on New York consumers at large.

583.    The Dealers caused actual injury and damages to Ms. Williams, Mr. Turner, and class members, including the financial harm of paying for and owing outstanding indebtedness

on a Deceptive Loan to fund worthless Services and the enrollment in student loan programs that may ultimately increase their debt burden over time.  Unless enjoined, the Dealers' conduct will cause further irreparable injury to class members and to members of the public.

584.    To induce the Borrowers to purchase the Purported Services and while providing the Services, the Dealers made a series of willful and/or knowing misrepresentations and material omissions to Ms. Williams, as described with particularity above (¶¶ 412-29, 294-304), to Mr. Turner, as described with particularity above (¶¶ 479-483, 448, 492-93, 496-501), to putative class members, as described with particularity above (¶¶ 85, 87-88, 96, 100, 104, 108, 119, 121-23, 126, 141, 147-55, 164, 214, 224, 249-50), and to thousands of other putative class members.  The Dealers' knowingly and/or willfully wrongful and deceptive acts include, but are not limited to:

- Falsely representing that Borrowers will obtain loan "forgiveness" through the Purported Services;

- Falsely representing that the Purported Services are valuable to Borrowers;

- Failing to disclose that the Purported Services provided by the Dealers are all free federal programs that can be obtained by the Borrowers without fees from their federal student loan Servicer and/or USED;

- Failing to disclose that the Dealers' Purported Services harm Borrowers, including by increasing the Borrower's total loan balance, interest rate, or repayment term;

- Falsely representing that the Dealer is affiliated with USED or that the Dealer is, or is authorized by, a Servicer;

- Falsely representing the payment structure for the Purported Services, such as by misrepresenting that the Borrower can pay for the Purported Services through a payment plan or that monthly payments for the Services would be credited toward the Borrower's federal student loan balance;

- Failing to disclose that the financing for the Purported Services is a new loan from EAC to the Borrower and that monthly payments to EAC would be made pursuant to that loan;

- Using deceptive and high-pressure sales tactics to secure Borrowers' agreement to purchase the Purported Services;

- Using Borrowers' log-in credentials to impersonate Borrowers, including on studentloans.gov and Servicers' websites; and

- Making false statements about Borrowers on forms submitted to Servicers and the federal government.

585.   EAC is also liable for the above-listed violations by the Dealers because EAC is a holder of Borrowers' Credit Plans, which state: "[A]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services [obtained] pu[]rsuant hereto or with the proceeds hereof."

586.   As a direct and proximate result of these violations of Section 349 of the General Business Law, Ms. Williams, Mr. Turner, and class members have suffered compensable harm and are entitled to injunctive relief and to recover actual and treble damages, costs, and attorney's fees.

### SIXTH CAUSE OF ACTION
### (N.Y. Gen. Bus. Law § 349)
*Against EAC*

587.   EAC violated New York General Business Law Section 349 by using deceptive acts and practices in the conduct of the Scheme.

588.   EAC committed the deceptive acts and practices willfully and/or knowingly.

589.   EAC's conduct was consumer-oriented and has a broad impact on New York consumers at large.

590.   EAC caused actual injury and damages to Ms. Williams, Mr. Turner, and class members, including the financial harm of paying for a Deceptive Loan to fund worthless Services and negative credit reporting.  Unless enjoined, EAC's conduct will cause further irreparable injury to class members and to members of the public.

591.     To induce Borrowers to agree to the Deceptive Loans and while collecting payments on those loans, EAC made a series of willful and/or knowing misrepresentations and material omissions to Ms. Williams, as described with particularity above (¶¶ 430-35, 446), to Mr. Turner, as described with particularity above (¶¶ 472-78, 484-87, 489-91, 494-95), to putative class members, as described with particularity above (¶¶ 214, 233, 236-37, 241), and to thousands of other putative class members.  EAC's wrongful and deceptive acts include, but are not limited to:

- Failing to disclose the amount of finance charge and the total cost of credit;

- Falsely representing the nature of the credit extended;

- Falsely representing the value of the Dealers' Purported Services;

- Falsely discrediting Servicers, such as by representing that Servicers do not provide free services; and

- Offering the deceptive Release.

592.     As a direct and proximate result of these violations of Section 349 of the General Business Law, Ms. Williams, Mr. Turner, and class members have suffered compensable harm and are entitled to injunctive relief and to recover actual and treble damages, costs, and attorney's fees.

**SEVENTH CAUSE OF ACTION**

**(Fraudulent Inducement)**

*Against Dealers and EAC*

593.     The Dealers committed fraud in the inducement by knowingly making material misrepresentations or omitting material facts, with the intent to induce Plaintiffs and the putative class members based on the misrepresentations.  Plaintiffs and the putative class members reasonably relied upon the Dealers' misrepresentations and suffered pecuniary damages as a result.

594.     To induce the Borrowers to purchase the Purported Services, the Dealers made a series of knowing and material misrepresentations and omissions to Ms. Williams, as described with particularity above (¶¶ 412-29, 435-445), to Mr. Turner, as described with particularity above (¶¶ 479-83, 488, 492-93, 496-501), to putative class members, as described with particularity above (¶¶ 85, 87-88, 96, 100, 104, 108, 119, 121-23, 126, 141, 147-55, 164, 214, 224, 249-50), and to thousands of other putative class members.  The Dealers' material misrepresentations and omissions include, but are not limited to:

- Falsely representing that consumers will obtain loan "forgiveness" through the Purported Services;

- Falsely representing that the Purported Services are valuable to Borrowers;

- Failing to disclose that the Purported Services provided by the Dealers are all free federal programs that can be obtained by the Borrowers without fees from their federal student loan Servicer and/or USED;

- Failing to disclose that the Dealers' Purported Services harm Borrowers, including by increasing the Borrower's total loan balance, interest rate, or repayment term;

- Falsely representing that the Dealer is affiliated with USED or that the Dealer is, or is authorized by, a Servicer;

- Falsely representing the payment structure for the Purported Services, such as by misrepresenting that the Borrower can pay for the Purported Services through a payment plan or that monthly payments for the Services would be credited toward the Borrower's federal student loan balance;

- Failing to disclose that the financing for the Purported Services is a new loan from EAC to the Borrower and that monthly payments to EAC would be made pursuant to that loan;

- Using deceptive and high-pressure sales tactics to secure Borrowers' agreement to purchase the Purported Services;

- Using Borrowers' log-in credentials to impersonate Borrowers, including on studentloans.gov and Servicers' websites; and

- Making false statements about Borrowers on forms submitted to Servicers and the federal government.

595.   EAC is also liable for the above-listed violations by the Dealers because EAC is a holder of the Borrowers' Credit Plans, which state: "[A]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services [obtained] pu[]rsuant hereto or with the proceeds hereof."

596.   The actions of the Dealers, in coordination with EAC, have caused injury and damages to Plaintiffs and putative class members and unless enjoined, will cause further irreparable injury.

597.   As a direct and proximate result of these violations, Plaintiffs and putative class members have suffered compensable harm and are entitled to recover actual and punitive damages and are entitled to rescission of their contracts with Defendants.

**EIGHTH CAUSE OF ACTION**
**(Aiding and Abetting Fraudulent Inducement)**
*Against Henn and EAC*

598.   The Dealers committed fraud in the inducement by knowingly making material misrepresentations or omitting material facts, with the intent to induce Plaintiffs and the putative class members to act based on the misrepresentations.  Plaintiffs and the putative class members reasonably relied upon the Dealers' misrepresentations and suffered injuries as a result.

599.   Henn and EAC had knowledge of the fraudulent representations and omissions by the Dealers and the resulting fraud in the inducement.

600.   Henn and EAC knowingly provided substantial assistance to the Dealers' in accomplishing the fraudulent inducement, thereby aiding and abetting the fraudulent inducement.

601.   Henn's assistance included:

- Reviewing and approving the language of key documents relating to the Dealers;

- Drafting the Master Dealer Agreement that EAC entered into with each Dealer;

119

- Securing financing for EAC to fund the Scheme;

- Attending and/or hosting many in-person meetings with Dealers regarding the Scheme;

- Controlling the material terms of Dealers' sale of Purported Services to Borrowers;

- Personally responding to requests that EAC take specific actions on individual Borrowers' accounts;

- Regularly reviewing Borrower complaints lodged against Dealers; and

- Reviewing and approving agreements that Dealers made with their own contractors.

602.   EAC's assistance included:

- Consummating the transactions with the Borrowers initiated by the Dealers, including furnishing the Purchase Agreement to the Borrowers, which formalizes the terms agreed to between the Borrowers and the Dealers, and procuring the Borrowers' electronic signatures on that agreement, as pled with respect to Ms. Williams above (¶¶ 430-34), and Mr. Turner above (¶¶ 472-78);

- Falsely representing the value of the Dealers' Purported Services;

- Concealing the Dealers' misrepresentations from Borrowers;

- Referring Borrowers to the Dealers;

- Transferring Borrower accounts to, and arranging for the provision of Purported Services by, Dealers such as TitanPrep;

- Designing software used by the Dealers to transmit Borrowers' information and applications to EAC;

- Financing the upfront purchases of the Purported Services through the Credit Plans and making payments to the Dealers, such that the Dealers can profit from the contracts the Borrowers are induced to sign through the Dealers' misrepresentations; and

- Training the Dealers regarding their fraudulent marketing practices.

603.    Henn's and EAC's acts to aid and abet the fraud by the Dealers have caused injury and damages to Plaintiffs and putative class members and unless enjoined, will cause further irreparable injury.

604.    As a direct and proximate result of these violations, Plaintiffs and putative class members have suffered compensable harm and are entitled to recover actual and punitive damages and are entitled to rescission of their contracts.

## NINTH CAUSE OF ACTION

**(Violations of New York's Civil Usury Cap: New York General Obligations Law § 5-501(1), Banking Law § 14-a(1))**

*Against EAC and Dealers*

605.    To the extent the Credit Plans create enforceable loan obligations, the Credit Plans exceed the usury cap under New York law.

606.    New York General Obligations Law Section 5–501(1) provides that "[t]he rate of interest . . . upon the loan or forbearance of any money, goods, or things in action, except as . . . otherwise provided by law, shall be six per centum per annum unless a different rate is prescribed in section fourteen-a of the banking law."

607.    Banking Law Section 14–a(1) states: "The maximum rate of interest provided for in section 5–501 of the general obligations law shall be sixteen per centum per annum."  Thus, the interest rate on any "loan or forbearance of any money, goods, or things in action" cannot exceed sixteen percent in New York.

608.    EAC, or, in the alternative, the Dealers, extended credit at an interest rate of 20.99% APR or 17.99% APR on the loans extended under the Credit Plans.

609.    EAC and/or the Dealers collected payments on the loans extended under the Credit Plans.

610.    EAC is liable for any above-listed violations committed by the Dealers because EAC is a holder of Borrowers' Credit Plans, which state: "[A]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services [obtained] pu[]rsuant hereto or with the proceeds hereof."

611.    At all times and continuing to the present, against the extenders of credit through the Credit Plans and all subsequent assignees, the Credit Plans are void due to the usurious interest rate. Ms. Williams, Mr. Turner, and the putative class members are thus entitled to rescission of their Credit Plans with Defendants and restitution.

## TENTH CAUSE OF ACTION
### (Civil Violations of the Computer Fraud and Abuse Act: 18 U.S.C. § 1030(g))
*Against Dealers*

612.    The Computer Fraud and Abuse Act imposes civil liability on a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," 18 U.S.C. § 1030(a)(2)(C), who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value," *id.* § 1030(a)(4), or who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss," *id.* § 1030(a)(5)(C), where the violation causes a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value," *id.* § 1030(c)(4)(A)(i)(I), (g).

613.    When student loan borrowers log on to their accounts at studentloans.gov, whether to consolidate their loans or apply for Income Driven Repayment, they are warned that the site is "intended to be accessed solely by individual users expressly authorized to access the system by the U.S. Department of Education" and that "unauthorized attempts to access, obtain,

upload, modify, change, and/or delete information on this system are strictly prohibited and are subject to criminal prosecution under 18 U.S.C. § 1030, and other applicable statutes." The notice further states that "unauthorized access includes, but is not limited to . . . [a]ccess by employee or agent of a commercial entity, or other third party . . . for purposes of commercial advantage or private financial gain."

614.    In providing Purported Services, the Dealers intentionally accessed the online studentloans.gov and Servicer accounts of Ms. Williams, Mr. Turner, and putative class members without authorization or in excess of any authorization provided.

615.    To obtain the Borrowers' studentloans.gov and Servicer website account credentials and personal identifying information, the Dealers used misrepresentations and did not disclose to the Borrowers the illegality of the Dealers' accessing the Borrowers' accounts. The Dealers used the credentials and personal information to impersonate the Borrowers and log on to studentloans.gov and Servicer websites.

616.    While improperly accessing the Borrowers' studentloans.gov and Servicer website accounts and with an intent to defraud the Borrowers, the Dealers altered the Borrowers' loan obligations, including by executing loan consolidation promissory notes, enrolling the Borrowers in Income Driven Repayment, placing the Borrowers' loans into forbearance, and misrepresenting the Borrowers' information (such as income and family size) to the federal government.

617.    While improperly accessing the Borrowers' studentloans.gov and Servicer accounts and with an intent to defraud the Borrowers, the Dealers changed the Borrowers' contact information and log-in information, in order to sever contact between the Borrowers and USED or Servicers, to conceal the Dealers' fraudulent activities, and to delay the Borrowers'

discovery of the resulting harms. The Dealers also obtained information about the Borrowers' student loans which the Dealers used to conceal their fraudulent activities.

618. By accessing the Borrowers' studentloans.gov accounts, the Dealers furthered the Scheme, allowing EAC to continue to collect payments from Borrowers.

619. Over a one year period, Ms. Williams, Mr. Turner, and class members each suffered losses resulting from the Dealers' conduct aggregating at least $5,000 in value.

620. Ms. Williams suffered losses collectively in excess of $5,000, including but not limited to:

- Over $23,000 in indebtedness on the new consolidation loan in Ms. Williams's name, fraudulently originated by SLF Center when it accessed Ms. Williams's studentloans.gov account and electronically signed her name on the new Master Promissory Note;

- Increased indebtedness for interest on her consolidation loan, which exceeds her interest on her pre-consolidation loans, and increased indebtedness for interest because of the payment SLF Center's unlawful activities caused her to miss;

- Ms. Williams's payment to SLF Center for the Purported Services, which included SLF Center's improper and unauthorized accessing of Ms. Williams's online accounts;

- Ms. Williams's payment to EAC toward the Deceptive Loan that financed her purchase of the Purported Services, which included SLF Center's improper and unauthorized accessing of Ms. Williams's online accounts, plus outstanding indebtedness for the remainder of the $1,227 plus interest in financing due to EAC in payment for the Services,

- Financial harm stemming from negative credit reporting by EAC resulting from Ms. Williams's cessation of payments to EAC upon learning of SLF Center's fraud, which included SLF Center's improper and unauthorized accessing of Ms. Williams's online accounts.

621. Mr. Turner suffered losses collectively in excess of $5,000, including but not limited to:

- Increased monthly payments—$58.74 instead of $0—under the Income Driven Repayment plan in which Integra enrolled Mr. Turner when it improperly and unlawfully accessed his online accounts;

- The cost of additional months of federal student loan payments towards eligibility for the Public Service Loan Forgiveness program, due to the forbearance that Integra initiated when it accessed Mr. Turner's federal student loan account or Servicer account;

- The cost of approximately five additional months of payments on Mr. Turner's loan, resulting from Integra placing the loan into forbearance, which will cost Mr. Turner approximately $1,000 per month under a standard repayment plan;

- The approximately $2,000 in interest accrued during the months when Integra placed Mr. Turner's loans into forbearance;

- The over $3,000 increase in Mr. Turner's loan balance between October 2016, when Integra placed his loans into forbearance, and February 2017, when the loans for his training program were disbursed;

- The over $5,000 increase in Mr. Turner's loan balance between June 2017, when he left the training program, and February 2018 when he learned of the Scheme and attempted to cancel the Deceptive Loan;

- Mr. Turner's payments to EAC and Integra toward the Deceptive Loan that financed his purchase of the Purported Services, which included Integra's improper and unauthorized accessing of Mr. Turner's online accounts, plus outstanding indebtedness for the remainder of the $1,314 plus interest in financing due to EAC and/or Integra in payment for the Services; and

- Financial harm stemming from negative credit reporting by EAC and/or Integra resulting from Mr. Turner's cessation of payments to EAC and/or Integra upon learning of the Scheme, which included Integra's improper and unauthorized accessing of Mr. Turner's online account.

622.   Members of the class suffered losses of the type experienced by Ms. Williams and Mr. Turner and described above (¶¶ 251-64).

623.   As a result of these violations of the CFAA, Ms. Williams, Mr. Turner, and class members have suffered losses and are entitled to compensatory damages and injunctive relief.

### ELEVENTH CAUSE OF ACTION
### (Declaratory Judgment, 28 U.S.C. §§ 2201-2202)

*Against EAC and Dealers*

624.   EAC wrote and transmitted Credit Plans to Plaintiffs and class members.

625.    EAC holds out the Credit Plans as creating loan obligations owed by Plaintiffs and class members.

626.    Because no provision of the Credit Plan purports to extend credit, or states the amount of credit purportedly being extended, or identifies any party purportedly extending credit, the Credit Plans do not create enforceable loan obligations, and are thus void or unenforceable as against Plaintiffs and class members.

627.    Plaintiffs and class members seek a declaration that the Credit Plans are void or unenforceable as against Plaintiffs and class members.

**TWELFTH CAUSE OF ACTION**

**(Actual Fraudulent Conveyance, N.Y. Debt. & Cred. Law § 273(a)(1) and Minn. Stat. Ann. § 513.44(a)(1))**

*Against Jeffrey D. Henn and Teresa Henn, as Co-Trustees of the Jeffrey D. Henn Revocable Trust*

628.    Under New York and Minnesota law, "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." N.Y. Debt. & Cred. Law § 273(a)(1); Minn. Stat. Ann. § 513.44(a)(1).

629.    On December 9, 2016, Jeffrey and Teresa Henn established the Jeffrey D. Henn Revocable Trust, of which both Henns are Co-Trustees.

630.    Also on December 9, 2016, Jeffrey Henn transferred the JDH Trust Assets into the Jeffrey D. Henn Revocable Trust:

- All of his "tangible personal property," including automobiles, jewelry, and furniture, for the consideration of $1.00;

- His rights to 50% interest in EAC, without consideration;

- His 31% interest in a company called NE Holdings, Inc., without consideration;

- His 34% interest in a company called Northeast Properties, LLC, without consideration; and

- His rights in the sales and royalties from a line of knives, without consideration.

631.    Three days prior to the time Jeffrey Henn transferred the JDH Trust Assets into the Jeffrey D. Henn Revocable Trust, Henn had learned that the Minnesota Attorney General was commencing an investigation into EAC and the Scheme.

632.    At the time Jeffrey Henn transferred the JDH Trust Assets into the Jeffrey D. Henn Revocable Trust, he was also aware that the New York Attorney General had been investigating the Scheme for a year.

633.    Jeffrey Henn has retained control over the JDH Trust Assets, as Co-Trustee of the Jeffrey D. Henn Revocable Trust with Teresa Henn, who also has the ability to act independently and bind the trust.

634.    The transfer of the JDH Trust Assets into the Jeffrey D. Henn Revocable Trust are voidable as conveyances made with actual intent to hinder, delay, or defraud the Borrowers, who are Jeffrey Henn's creditors, pursuant to N.Y. Debt. & Cred. Law § 273(a)(1) and Minn. Stat. Ann. § 513.44(a)(1).

## THIRTEENTH CAUSE OF ACTION
### (Actual Fraudulent Conveyance, N.Y. Debt. & Cred. Law § 273(a)(1) and Minn. Stat. Ann. § 513.44(a)(1))
*Against Jeffrey D. Henn and Teresa Henn, as Co-Trustees of the Teresa Henn Revocable Trust*

635.    Under New York and Minnesota law, "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the

obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." N.Y.

Debt. & Cred. Law § 273(a)(1); Minn. Stat. Ann. § 513.44(a)(1).

636.    On December 9, 2016, Jeffrey and Teresa Henn established the Teresa Henn

Revocable Trust, of which both Henns are Co-Trustees.

637.    Also on December 9, 2016, by quitclaim and without consideration, Jeffrey and

Teresa Henn transferred the Henn Real Estate Assets into the Teresa Henn Revocable Trust.

638.    Three days prior to the time the Henns transferred the Henn Real Estate Assets

into the Teresa Henn Revocable Trust, Jeffrey Henn had learned that the Minnesota Attorney

General was commencing an investigation into EAC and the Scheme.

639.    At the time that the Henns transferred the Henn Real Estate Assets into the Teresa

Henn Revocable Trust, Jeffrey Henn was also aware that the New York Attorney General had

been investigating EAC and the Scheme for a year.

640.    Jeffrey Henn has retained control over the Henn Real Estate Assets, as Co-Trustee

of the Teresa Henn Revocable Trust with Teresa Henn.

641.    The quitclaims of the Henn Real Estate Assets into the Teresa Henn Revocable

Trust are voidable as conveyances made with actual intent to hinder, delay, or defraud the

Borrowers, who are Henn's creditors, pursuant to N.Y. Debt. & Cred. Law § 273(a)(1) and

Minn. Stat. Ann. § 513.44(a)(1).

## FOURTEENTH CAUSE OF ACTION
## (Actual Fraudulent Conveyance, N.Y. Debt. & Cred. Law § 273(a)(1) and Minn. Stat. Ann. § 513.44(a)(1))
*Against EAC*

642.    Under New York and Minnesota law, "[a] transfer made or obligation incurred

by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the

transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the

obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." N.Y. Debt. & Cred. Law § 273(a)(1); Minn. Stat. Ann. § 513.44(a)(1).

643.    From as early as February 2015, EAC obtained financing, including by using the Credit Plans as collateral, from up to twenty five lenders.  These Lenders, upon information and belief, include but are not limited to Western Bank in Bloomington, Minnesota and Voyager Bank in Minnetonka, Minnesota.

644.    EAC has conveyed funds and continues to convey funds that it collected as the profits of the Scheme to satisfy these obligations.

645.    Upon information and belief, continuing through until at least April 2020, EAC's continued payments on these obligation total approximately $500,000 per month.

646.    EAC understood the intent and outcome of the Scheme, created and managed the Scheme, and in the face of evidence that the Scheme was fraudulent and causing harm, persisted in originating and enforcing Credit Plans.

647.    Any profits of the Scheme were obtained with actual intent to defraud the Borrowers, who are members of the Class.  Any transfer of those profits is in furtherance of that fraud on these Borrowers.  Any obligations incurred to facilitate the Scheme or using the Credit Plans as collateral were incurred with actual intent to defraud the Borrowers.

648.    Every payment on a commercial loan secured by a Credit Plan and/or paid using the profits of the Scheme is voidable as a conveyance made with actual intent to hinder, delay, or defraud the Borrowers, who are EAC's creditors, pursuant to N.Y. Debt. & Cred. Law § 273(a)(1) and Minn. Stat. Ann. § 513.44(a)(1).

WHEREFORE, Plaintiffs request that this Court decree, order, and/or adjudge as follows:

a.    Certifying this case as a class action, pursuant to Rules 23(a), (b)(2) and (b)(3) of the

129

Federal Rules of Civil Procedure, with a class defined as:

All individuals who have obtained purported financing from EAC for student loan assistance services.

b. Declaring that Defendants have committed the violations of law alleged in this action and enjoining Defendants from committing further violations;

c. Declaring that the Credit Plans are void or unenforceable as against Plaintiffs and class members;

d. Preliminarily and permanently enjoining and directing Defendants to cease committing the violations of law alleged in this action;

e. Ordering rescission of all contracts between Defendants and Plaintiffs and putative class members and ordering restitution to Plaintiffs and putative class members;

f. Voiding and enjoining the transfers of:

   i. the JDH Trust Assets into the Jeffrey D. Henn Revocable Trust made on December 9, 2016;

   ii. the Henn Real Estate Assets into the Theresa Teresa Henn Revocable Trust;

   iii. assets transferred into the Jeffrey D. Henn Revocable Trust or the Theresa Teresa Henn Revocable Trust subsequent to December 2016, made with the intent to hinder, delay, or defraud creditors;

   iv. every payment on a commercial loan secured by a Credit Plan and/or paid using the profits of the Scheme; and

   v. any other property, payment, or asset by EAC or Henn that was made with the intent to hinder, delay, or defraud creditors; and,

g. Awarding to Plaintiffs:

   i. actual and/or compensatory damages against all Defendants, in an amount to be proven at trial;

   ii. treble damages, pursuant to RICO, 18 U.S.C. § 1964(c), and N.Y. G.B.L. § 349(h);

   iii. statutory damages pursuant to TILA, 16 U.S.C. § 1640(a)(2)(B);

   iv. punitive damages pursuant to New York law; and

   v. disbursements, costs, and attorneys' fees pursuant to RICO, 18 U.S.C. § 1964(c), TILA, 16 U.S.C. § 1640(a)(3), and N.Y. G.B.L. § 349(h); and,

h.   Granting such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all issues triable by a jury.

Dated:  June 10, 2020
        New York, New York

Respectfully submitted,

By:   */s/ Jonathan Oblak*                   By:   */s/ Danielle Tarantolo*
      Jonathan Oblak                                Danielle Tarantolo
      Anna Deknatel                                 Jane Greengold Stevens
      Sophia Qasir                                  Jessica Ranucci
      QUINN EMANUEL URQUHART                         NEW YORK LEGAL ASSISTANCE GROUP
      & SULLIVAN, LLP                                7 Hanover Square
      51 Madison Avenue, 22nd Floor                  New York, NY 10004
      New York, NY 10010                             (212) 613-5000
      (212) 849-7000                                 dtarantolo@nylag.org
      jonoblak@quinnemanuel.com

                                                     *Counsel for Plaintiff*