UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

VANESSA WILLIAMS and KORY TURNER,
individually and on behalf of all
persons similarly situated,

              Plaintiffs,

       - against -


EQUITABLE ACCEPTANCE CORPORATION,
SLF CENTER, LLC, INTEGRA STUDENT
SOLUTIONS, LLC, JEFFREY D. HENN,
and TERESA HENN,


           Defendants.

------------------------------X

**MEMORANDUM AND ORDER**

18 Civ. 7537 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    Plaintiffs have brought this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and related state claims against defendants. Plaintiffs allege that defendants operated a scheme (the "Dealers-EAC Scheme") to fraudulently induce individuals with federal student loan debts to purchase certain services from dealers and to finance that purchase with a loan from defendant Equitable Acceptance Corporation ("EAC"). EAC's prior motion to dismiss plaintiffs' RICO claim was denied by the Court in its Memorandum & Order of March 11, 2020.

See ECF No. 73 (the "RICO Order").[1]

Presently before the Court are three motions: (1) EAC's motion to dismiss plaintiffs' fraudulent conveyance claim; (2) defendants Jeffrey Henn ("Jeffrey") and Teresa Henn's ("Teresa")[2] motion to dismiss each claim made against them; and (3) plaintiffs' motion for a preliminary injunction to prohibit the Henns from moving assets out of their trusts and directing EAC to cease all transfers of funds collected as the profits of the Dealers-EAC Scheme. For the following reasons, EAC's motion to dismiss plaintiffs' fraudulent conveyance claim is granted, the Henns' motion is granted in part and denied in part, and the plaintiffs' motion for a preliminary injunction is denied.

## BACKGROUND

The Court detailed the background of this case in the RICO Order. The Court assumes familiarity with this decision and states here only those facts and procedural history necessary to resolve the pending applications.

### 1. The Dealers-EAC Scheme

As described more fully in the RICO Order, plaintiffs allege that around 2015, EAC conspired with dozens of dealers ("Dealers")

---

[1] That opinion was addressed to plaintiffs' first amended complaint. Subsequently, plaintiffs filed the Second Amended Complaint, ECF No. 119 (the "SAC"), the latter of which is the subject of the current motions.
[2] We will refer to Jeffrey and Teresa together as the "Henns."

to offer purported student loan assistance services ("Services") to federal student loan borrowers ("Borrowers").  The Dealers introduced their purported Services as providing loan "forgiveness," when in reality they were simply filing applications on behalf of the Borrowers for loan consolidation and enrollment in repayment programs offered by the Department of Education.  SAC ¶¶ 77-80, 94.  While Borrowers could have applied to these programs on their own in a process that would have taken approximately ten minutes and cost nothing, the Dealers and EAC charged approximately $1300 for these Services.  Id. ¶ 129.

Because Dealers were prohibited from receiving payments directly from Borrowers under federal regulations, Dealers referred Borrowers to EAC to finance the purchase of Services. Id. ¶¶ 131-32.  EAC would then send the Borrowers a document packet containing a "Purchase Agreement," setting forth the terms of the Borrower's purchase of Services from the Dealer and another document entitled "Equitable Acceptable Revolving Credit Plan" (the "Credit Plan").  Id. ¶¶ 171-72.  Through the Credit Plan, EAC extended a new loan to each Borrower in the form of a maxed-out "line of credit" for the full price of the Services.  Id. ¶ 5. Once the Borrowers signed the Credit Agreement, they were then required to pay back this loan to EAC – along with 21% interest –

through monthly payments of around $39 to $49 dollars.  Id.

According to the SAC, EAC then used the Credit Plans as collateral to obtain commercial loans ("EAC's Commercial Loans") from ten to twenty-five commercial lenders (the "Lenders") including Western Bank in Bloomington, Minnesota and Voyager Bank in Minnetonka, Minnesota.  Id. ¶ 406.  Plaintiffs allege that EAC used the Borrowers' payments to satisfy these obligations, and on information and belief, allege that EAC repaid these obligations at the rate of approximately $500,000 per month through at least April 2020.[3]  Id. ¶¶ 409, 644-45.

### 2. Jeffrey Henn's Involvement in the Scheme

During the course of the alleged Dealers-EAC Scheme, Jeffrey Henn served as President and CEO of EAC.  Plaintiffs allege that Jeffrey took an active role in the scheme including, *inter alia*, by: (1) drafting and approving the master agreement between Dealers and EAC (the "Master Dealer Agreement") (SAC ¶¶ 350-52); (2) recruiting Dealers and personally reviewing applications of Dealers to determine which were qualified to work with EAC (SAC ¶¶ 346-49); (3) directing and controlling the payment structure between EAC, Dealers and Borrowers, including control over the

---

[3]     Perhaps recognizing the fungibility of money and that EAC engages in several lines of business activity, the SAC does not assert that EAC's Commercial Loans were exclusively paid from proceeds of the Dealers-EAC Scheme.

amount and number of monthly payments Dealers required from Borrowers and the total contract price (SAC ¶¶ 358-60); (4) reviewing and approving materials sent to Borrowers from the Dealers (SAC ¶¶ 363-366); and (5) directing Dealers' communications with Borrowers.  SAC ¶¶ 371-373.

### 3. The Henns' Trusts

On December 9, 2016 the Henns each established personal trusts.  SAC ¶ 401.  Jeffrey transferred the entirety of his "tangible personal property" into the Jeffrey D. Henn Revocable Trust ("Jeffrey's Trust") of which both Henns were designated co-trustees.  Id. at ¶ 402.  Upon its creation, Jeffrey assigned his 50% interest in EAC – along with his interest in several other companies, and rights to sales and royalties in a line of knives – to Jeffrey's Trust.  Id. at ¶ 403.  In addition, five parcels of jointly-owned land were transferred by quitclaim deed to a second trust, the Teresa Henn Revocable Trust ("Teresa's Trust").[4]  Again, both the Henns were designated co-trustees.  Id. at ¶ 404.

By the time the Trusts were created, the SAC alleges that Jeffrey was on notice that Dealers were engaging in fraudulent activity and that law enforcement was beginning to investigate.  In January of 2016, an associate of Jeffrey told him that the

---

[4]    We will refer to Jeffrey's Trust together with Teresa's Trust as the "Trusts."

materials used in the Dealers-EAC Scheme were under examination by law enforcement in New York, and in February of that year, a representative of a Dealer informed Jeffrey that the Dealer was under investigation by the New York Attorney General's Office. Id. at ¶ 305. Earlier, that same Dealer asked Jeffrey if EAC "ha[d] a way to block [Borrowers from] certain states at time of application," because it was "not worth playing in [the] playground" of New York, Illinois, and Connecticut due to law enforcement inquiries.  Id. at ¶ 308.  Also in February of 2016, Henn reviewed an email from an employee describing "a good example of the complaints [EAC is] getting from [the Better Business Bureau] and [Attorneys General] offices . . . about someone who thought the [Dealer] Student Advocates . . . was a scam." Id. at ¶ 290.  In August of 2016, a representative of the Better Business Bureau of Minnesota and North Dakota wrote Henn expressing concerns that a Dealer was "using deceptive tactics to get these students to sign up for services they don't need. . . . I would be lying if I said [the complaints] didn't trouble me." Id. at ¶ 295.  Finally, just three days before the Henns created the Trusts, Jeffrey learned of an investigation into a Dealer by Minnesota's Attorney General's Office.  Id. at ¶ 305.

**4. Procedural History**

After the Court denied EAC's motion to dismiss plaintiffs' RICO claims, plaintiffs filed the SAC, adding the Henns as defendants and asserting RICO and fraud-based claims against Jeffrey personally.  The SAC also asserted fraudulent transfer claims under New York and Minnesota law against the Henns, as co-trustees of the Trusts to which Jeffrey's assets were transferred and quitclaimed, and against EAC alleging that EAC had transferred and continues to transfer the profits of the Dealers-EAC Scheme to the Lenders.  On July 10, 2020, plaintiffs filed a motion for a preliminary injunction (ECF No. 109) to prohibit the Henns from moving assets out of their Trusts and directing EAC to cease all transfers of funds collected as the profits of the Dealers-EAC Scheme.  On July 21, 2020, EAC filed a motion to dismiss plaintiffs' fraudulent conveyance claim against it.  ECF No. 122. Finally, on August 21, 2020, the Henns filed a motion to dismiss each of the claims raised against them.  ECF No. 143.  The motions were fully briefed on October 2, 2020.

## DISCUSSION

**1. Defendants' Motions to Dismiss**

### a. Legal Standard

To survive a motion to dismiss for failure to state a claim

under Rule 12(b)(6), the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Where a plaintiff has not "nudged [his] claims across the line from conceivable to plausible," dismissal is appropriate. Id. at 570, 127 S.Ct. 1955. This pleading standard applies in "all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 684, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In applying these standards, we accept as true all factual allegations in the pleadings and draw all reasonable inferences in the non-moving party's favor. Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012).

### b. EAC's Motion to Dismiss Plaintiffs' Fraudulent Conveyance Claim ("Claim 14")

In the SAC, plaintiffs added a claim against EAC for actual fraudulent conveyance under New York and Minnesota law. The SAC asserts that the payments made by EAC to the Lenders to satisfy their obligations on EAC's Commercial Loans and secured by the collateralization of the Credit Agreements are "voidable as [conveyances] made with actual intent to hinder, delay, or defraud the Borrowers." SAC ¶¶ 648. In its motion to dismiss, EAC raises four arguments in support of its position that the claim of actual fraudulent conveyance must be dismissed: (1) plaintiffs fail to

-8-

allege the circumstances resulting in EAC's Commercial Loans with particularity as required under Rule 9(b); (2) plaintiffs fail to allege fraudulent intent with respect to EAC's Commercial Loans; (3) plaintiffs fail to identify any cognizable relief; and (4) this Court has no specific personal jurisdiction over EAC with respect to Claim 14.   Because the Court agrees with EAC that plaintiffs fail to allege fraudulent intent, Claim 14 is dismissed.

Before addressing the merits of EAC's arguments, we resolve the choice-of-law issue raised by the parties.   While plaintiffs bring Claim 14 under both New York and Minnesota law, EAC argues that Minnesota law must apply because EAC was located in Minnesota at all relevant times, and under New York's Debtor and Creditor Law ("NYDCL"), "[a] claim for relief . . . under this article is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred."   NYDCL § 279(b).   In response, plaintiffs argue that New York and Minnesota law are "functionally identical," and that therefore, the Court need not determine which law applies. Alternatively, they argue that New York law should apply to any transfers made prior to April 2020 because § 279(b) only applies to transactions made after its effective date of April 4, 2020. Further, plaintiffs contend that because they are residents of New

York who suffered injury as a result of EAC's Commercial Loans, New York has the greatest interest in the litigation.  See In re Gaston & Snow, 243 F.3d 599, 607-08 (2d Cir. 2001).

The text of New York and Minnesota's actual fraudulent transfer statutes are identical: "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." N.Y. Debt. & Cred. Law § 273(a)(1); Minn. Stat. Ann. § 513.44(a)(1).  Case law however, provides a potential difference between the laws of Minnesota and New York – namely that New York recognizes a "Ponzi scheme presumption" – i.e., that courts will presume fraudulent intent where the transferor pays off earlier investors in furtherance of a Ponzi scheme.  Minnesota courts, meanwhile, do not automatically presume actual fraudulent intent where a Ponzi scheme is found, although "a court could make a 'rational inference' from the existence of a Ponzi scheme that a particular transfer was made with fraudulent intent." Finn v. All. Bank, 860 N.W.2d 638, 647 (Minn. 2015).  However, for the reasons discussed below, we find that the "Ponzi Scheme presumption" is inapplicable to Claim 14.

Therefore, for our purposes there are no material differences between the statutes and the Court need not decide whether to apply New York or Minnesota law.  See Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143-44 (2d Cir. 2004) (dispensing with choice of law analysis where no material conflict existed).

Plaintiffs first assert that the Court should presume that EAC's Commercial Loans were entered into with fraudulent intent under the "Ponzi scheme presumption."  They write:

> In a Ponzi scheme, investors are promised false returns in order to defraud them into paying for a valueless investment. Here, the Dealers and EAC promised Borrowers access to valueless services to defraud them into paying the predatory and usurious costs and fees of the Credit Plans. As in a Ponzi scheme, where funds from the later defrauded investors are used to pay off debts to earlier investors, EAC used funds collected from the Borrowers to pay off the debts that it obtained from the Lenders.  EAC's use of the Credit Plans as collateral essentially acted as a promise to do exactly this—to continue to obtain payments from an ever-growing pool of newly defrauded Borrowers in order to pay off the obligations incurred to start and facilitate the fraud, and in order to compensate for EAC's reduced revenue as Borrowers identified the fraud and refused to pay. As in a Ponzi scheme, where ongoing payments to earlier investors serve to shield the scammer from discovery and an end to its fraud, EAC's collection of funds from the Borrowers and transfers of those funds in payments to the Lenders serve to protect EAC by preventing the Lenders from seizing the fraudulent Credit Plans, enforcing any personal guarantees, and ending the Scheme.

ECF No. 132 at 15-16.

In a Ponzi scheme, "money contributed by later investors is used to pay artificially high dividends to the original investors, creating an illusion of profitability, thus attracting new investors." Ades–Berg Inv'rs v. Breeden (In re The Bennett Funding Grp., Inc.), 439 F.3d 155, 157 n.2 (2d Cir. 2006); accord Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 12 (S.D.N.Y. 2007) ("A key factor [in a Ponzi scheme] is that the Ponzi schemer requires — and secures — new investors to keep the sham arrangement afloat . . . . Another factor is that new monies are used to pay off earlier investors.").

Plaintiffs' allegations share none of these characteristics. The glaring difference between the Dealers-EAC Scheme and a Ponzi scheme is that EAC owes nothing to the students; rather, the students as Borrowers owe money to EAC. Nor is there any factual support that EAC's Commercial Loans were necessary to keep the scheme afloat.

Rather than EAC paying the proceeds of the fraud to earlier investors, it instead – according to plaintiffs' allegations – used the proceeds to obtain and then pay back financing from Lenders. Payment to Lenders, however, in no way created "an illusion of profitability" which then would attract additional

investors to defraud – the heart of a Ponzi scheme.  Nor could plaintiffs argue that the payment of EAC's obligations to Lenders created an illusion of financial well-being necessary to continue the Dealers-EAC Scheme.  Such an allegation is totally unsupported in the SAC, and regardless, Borrowers would have no insight into EAC's financial maneuverings.

EAC's collateralization of the Credit Agreement to obtain loans from the Lenders therefore did not further the Dealers-EAC Scheme.  But that is the critical feature behind the "Ponzi scheme presumption":  Payments made to early investors allow the fraudster to continue the scheme by attracting new investors with the promises of inflated returns.  The presumption is only warranted when "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors."  Bear Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 8 (S.D.N.Y. 2007) (internal quotations omitted).  Here, however, plaintiffs acknowledge an alternative purpose in their pleadings: to "access the profits of the scheme upfront."  SAC ¶ 405.  Indeed, rather than as a ploy to defraud Borrowers, it is far more likely that EAC borrowed their loans from Lenders at much lower interest rates than they collected from the student Borrowers, thus providing an additional source of

revenue.  But the fact that EAC may have additionally profited from these loans does not make the loans part of the Dealers-EAC Scheme.  Instead, from EAC's perspective, EAC's Commercial Loans made economic sense by increasing the profits of the business separate and apart from any fraud against the Borrowers.[5]

Plaintiffs suggest that that EAC's profiting from its commercial borrowing somehow caused further injury to the Borrowers.  In an effort to conjure up some new harm to the plaintiffs from EAC's borrowing, plaintiffs focus on the use of the Credit Agreements to collateralize the loans.  Regardless of how such collateralization could have been a source of profit to EAC, it had no impact on plaintiffs.  Their obligations remained the same.

Therefore, plaintiffs have failed to allege a Ponzi scheme, and thus there can be no presumption that the use of the Credit Agreements to collateralize the presumably profitable borrowing from the Lenders was done with the intent to defraud the Borrowers.

---

[5]     Plaintiffs' argument that in accessing the profits of the fraud upfront, EAC "hinder[ed] the Borrowers' ability to recover monetarily by ensuring EAC has no available funds and that Borrowers must instead seek to recover from the Lenders," ECF No. 132 at 14, is devoid of logic.  The funds obtained from Lenders could themselves be a source of recovery for Borrowers.  No aspect of converting the Credit Agreements into cash upfront suggests an intent to prevent Borrowers from recovering damages.  To the extent that EAC, as it presumably did, borrowed at a lower interest rate than it charged the Borrowers, EAC could have made money from the commercial loans, thereby increasing the funds available to repay the Borrowers.

While all Ponzi schemes are frauds, not all frauds (alleged or otherwise) are Ponzi schemes.

Because the "Ponzi scheme presumption" does not apply, plaintiffs must demonstrate that EAC's Commercial Loans were entered into with intent to "hinder, delay or defraud" the Borrowers. They cannot. Plaintiffs rely on the Court's upholding of their RICO claim, but this does not in itself establish that EAC had fraudulent intent in procuring commercial loans, which is required to sustain plaintiffs' claim for fraudulent conveyance. Indeed, plaintiffs conflate the Dealers-EAC Scheme with the subsequent lending arrangement between EAC and Lenders. For the reasons previously discussed, EAC's loan borrowing did not further the Dealers-EAC Scheme.

The Second Circuit's decision in In re Sharp Intern. Corp. well illustrates the distinction. There, officers of a corporation raised funds from a bank by fraudulently falsifying sales records and then looted those funds from the company for personal enrichment. 403 F.3d 43, 46-47 (2d Cir. 2005). When the bank discovered the scheme, it demanded that the corporation secure new financing from investors to pay back its debt to the bank. After the officers' fraud was exposed and the corporation filed for bankruptcy, the new investors sued to have the transfers to the

initial bank voided as actual fraudulent transfers.  In affirming the dismissal of the claim, the Second Circuit opined that the payment to the bank "was at most a preference between creditors and did not hinder, delay, or defraud either present or future creditors" because "the fraud alleged in the complaint relates to the manner in which [the corporation] obtained new funding from [investors], not [the corporation's] subsequent payment of part of the proceeds to" the bank.  Id. at 57 (internal quotations omitted).

The Dealers-EAC Scheme alleged in the SAC is between EAC and the Dealers and involved a plan to induce Borrowers into taking out loans from EAC in order to purchase Services from the Dealers. The Borrowers were misled into believing these Services would reduce their student debt obligations.  This resulted in Borrowers indebting themselves to EAC by entering into the Credit Agreements. As was the case in Sharp, the fraud alleged was antecedent to payments made to the Lenders, but those payments were not themselves part of the fraud against Borrowers.

Plaintiffs offer two additional arguments to support their contention that EAC'S Commercial Loans were entered into with intent to defraud the Borrowers, neither of which is convincing. First, plaintiffs suggest that the loans "facilitated the

initiation and continuation of the Scheme – including by allowing for an influx of financial support to identify new Borrowers, as others refused to pay." ECF No. 132 at 18. How they did so goes entirely unstated. The SAC says nothing more than "[o]n information and belief, this liquidity both financed the initiation of the Scheme and enabled the Scheme to continue even as Borrowers refused to pay on fraudulently obtained debts." SAC ¶ 408. This conclusory statement satisfies neither the heightened pleading standards of Rule 9(b), nor even the lower pleading standard under <u>Twombly</u> and <u>Iqbal</u>. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to sustain a claim against a motion under 12(b)(6)). And considering the Dealers-EAC Scheme must have been underway in order for EAC to collateralize the Credit Agreements from the Borrowers to secure their loans from the Lenders, the flaw in the argument that EAC's Commercial Loan borrowing supported initiation of the Dealers-EAC Scheme is obvious. Before the scheme was well underway there would have been no Credit Agreements to collateralize the commercial loans.

Second, plaintiffs argue that there must be fraudulent intent because, since "the obligations were secured by the Credit

Plans . . . if EAC stopped payments, the Lenders could end the Scheme by seizing the Credit Plans." ECF No. 132 at 18. While this argument is difficult to comprehend,[6] it appears to be a repetition of its Ponzi scheme argument, which we have already rejected.

Because plaintiffs have not alleged fraudulent intent, Claim 14 is dismissed. The Court need not reach EAC's additional grounds for dismissal.

### c. The Henns' Motion to Dismiss

#### i. The Trust Claims

In addition to the fraudulent conveyance claim raised against EAC, plaintiffs bring two claims of fraudulent conveyance (the "Trust Claims") against the Henns. Plaintiffs assert that, with notice that law enforcement was opening investigations into Dealers' activities vis-à-vis Borrowers, Jeffrey transferred his interests in several businesses (including his 50% interest in EAC) and real property owned jointly with Teresa into the Trusts, with Jeffrey and Teresa serving as co-trustees. SAC ¶¶ 628-34. The Henns move to dismiss the Trust Claims on three grounds: (1)

---

[6]     Plaintiffs, after all, do not offer any reason why, if Lenders seize the Credit Agreements, that would necessarily end the Scheme. According to their own allegations, EAC already profited from the Credit Agreements through the loans provided by the Lenders; losing previously obtained Credit Agreements would not prevent EAC from entering into new Credit Agreements with new Borrowers.

trusts revocable by the settlor are subject to claims of creditors and thus cannot be fraudulent conveyances; (2) plaintiffs failed to allege fraudulent intent; and (3) the Court lacks personal jurisdiction over the Henns.

Plaintiffs do not contest that the Trusts are revocable. Under the laws of both New York and Minnesota,[7] the property of a revocable trust is subject to the claims of the settlor's creditors. Minn. Stat. 501C.0505(1); Shpak v. Curtis, No. 10-CV-1818, 2012 WL 511478, at *7 (E.D.N.Y. Feb. 14, 2012) ("[W]here the settlor of a trust retains an unqualified power of revocation, the settlor is considered to be the absolute owner of the trust's corpus so far as the rights of her creditors or purchasers are concerned"). Because the property within the Trusts are equally as subject to the claims against the settlor – here, Jeffrey – as they were prior to the creation of the Trusts, there could be no plausible intent to hinder, delay or defraud the Borrowers. See id. ("The settlor cannot defraud her creditors by conveying her own property to [a revocable] trust, since the trust corpus can be reached by her creditors as if it were held in the settlor's name."); McCarthy v. Revocable Tr. Agreement of Thomas J. McCarthy,

---

[7]     Again, the parties disagree as to which law applies but do not proffer any material differences that would lead to a different outcome in this case. Therefore, the Court need not engage in the choice-of-law analysis.

2013 WL 4404591, at *1 (Minn. Ct. App. Aug. 19, 2013) (holding that because settlor "retained possession and control of his assets and could have amended the revocable trust . . . [the plaintiff] was not injured by [defendant's] transfer of assets"); see also TD Bank, N.A. v. Pearl, 891 F. Supp. 2d 103, 110 (D.D.C. 2012) (internal quotations omitted) (explaining that "because [defendant's trust] was a revocable trust . . . the property of [the trust] is subject to the claims of his creditors" and plaintiffs therefore could not establish likelihood to succeed on merits of fraudulent conveyance claim); In re Plotkin's Estate, 290 N.Y.S.2d 46, 53 (Surr. Ct. 1968) (holding transfer to revocable trust "do[es] not constitute a transfer of any interest at all").

In response, plaintiffs' only argument is that because Teresa was designated as a co-trustee of the Trusts, she is therefore empowered to act unilaterally and independently to bind the Trusts, i.e., she can dispose of the assets of the Trusts at any time. Further, plaintiffs argue that because Teresa did not have this authority prior to the creation of the Trusts, Jeffrey effectively transferred his assets to Teresa. ECF No. 154 at 8. Plaintiffs offer no support in the case law for the theory that Teresa's authority under the Trusts instruments effectively constitutes a transfer of the corpus to her, and logic does not support such a

proposition.  The settlor retains power over the trust assets and may revoke the trust at any time.  <u>See</u> Minnesota Stat. 501C.0604 ("While a trust is revocable, rights of the beneficiaries are subject to the control of, and the duties of the trustee are owed exclusively to, the settlor.").  Because the ultimate control resides in the settlor, there is no impediment to the settlor's creditors in subjecting the corpus of the trust to their claims. <u>Cf.</u> <u>Vanderbilt Credit Corp. v. Chase Manhattan Bank, NA</u>, 100 A.D.2d 544, 546 (2d Dep't 1984) (holding that "settlor's creditors need not allege or prove the trust is a fraudulent conveyance before they are permitted to reach the full amount of beneficial interest retained by the settlor," where trust was created by the settlor for his benefit with brother as trustee).  There is therefore no fraudulent conveyance and the Trust Claims are dismissed.[8]

### ii.  Personal Jurisdiction over the Jeffrey Henn

The Henns further argue that the RICO and fraud-based claims (claims 1, 2, and 8) as against Jeffrey must be dismissed for lack of personal jurisdiction.  In determining whether it has personal jurisdiction over a defendant, the Court employs a two-step inquiry. First, the Court must determine whether there is a

---

[8]    While transfers of the Henns' property to the Trusts do not constitute fraudulent transfers, the Henns are now indisputably on notice of plaintiffs' claims.

"statutory basis for exercising personal jurisdiction." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 128 (2d Cir. 2013) (citation omitted). A federal court applies the forum state's personal jurisdiction rules unless a federal statute "specifically provide[s] for national service of process." PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotations omitted). Second, the Court must consider whether exercise of personal jurisdiction over the defendant is consistent with due process under the Constitution. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 167-68 (2d Cir. 2013).

Here, 18 U.S.C. § 1965 governs personal jurisdiction for the RICO claims against Jeffrey. See PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 71-72 (2d Cir. 1998). Section 1965(a) provides for personal jurisdiction over a defendant in a civil RICO case in the district court for the district in which that person resides, is found, has an agent, or transacts his or her affairs. "In other words, a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established."[9] Id. "Courts in this Circuit have

---

[9]     An additional provision of the statute, § 1965(b), provides that a court may exercise personal jurisdiction over "other parties residing in any other district" if the "ends of justice" so require. This provision is inapplicable here as courts in this Circuit have held that the "ends of justice" require a court to exercise personal jurisdiction over out-of-state parties "only when no

-22-

concluded that '[t]he phrase "transacts his or her affairs" contained in § 1965(a) "has been held to be synonymous with the 'transacts business' language of section 12 of the Clayton Act" and "[t]he test for transacting business for venue purposes under the antitrust laws is co-extensive with the test for jurisdiction under New York CPLR § 302."'" <u>Dandong Old N.-E. Agric. & Animal Husbandry Co. v. Hu,</u> No. 15 CIV. 10015 (KPF), 2017 WL 3328239, at *6 (S.D.N.Y. Aug. 3, 2017) (quoting <u>Arabi v. Javaherian</u>, No. 13 Civ. 456, 2014 WL 3892098, at *8 (E.D.N.Y. May 1, 2014); <u>see also City of New York v. Cyco.Net, Inc.</u>, 383 F. Supp. 2d 526, 542 (S.D.N.Y. 2005).

We therefore turn to New York's long-arm statute to determine whether Jeffrey had minimum contacts with the state sufficient to exercise personal jurisdiction.  C.P.L.R. § 302(a)(1) permits courts to reach a foreign defendant "who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."  "To establish personal jurisdiction under this provision, the plaintiff must

---

one judicial district could exercise personal jurisdiction over all of the defendants and thus, without such exercise of jurisdiction, all of the members of a nationwide RICO conspiracy could not be tried in one action." <u>Casio Computer Co. v. Sayo</u>, No. 98CV3772 (WK), 2000 WL 1877516, at *24 (S.D.N.Y. Oct. 13, 2000) (quoting <u>PT United Can Co., Ltd. v. Crown Cork & Seal Co., Inc.</u>, No. 96 Civ. 3669, 1997 WL 31194, at *3 (S.D.N.Y. Jan. 28, 1997), <u>aff'd</u>, 138 F.3d 65 (1998)).  Here, the parties do not dispute that the District Court of Minnesota could exercise jurisdiction over each of the defendants.

demonstrate that the defendant engaged in a purposeful business transaction in or directed to New York and that such contacts with the state had a 'substantial relationship' to the claim asserted in the underlying litigation." Pearson Educ., Inc. v. Shi, 525 F. Supp. 2d 551, 555 (S.D.N.Y. 2007). "A single contact is sufficient to show that a defendant 'transacted business' within the meaning of CPLR 302(a)(1)." Packer v. TDI Sys., Inc., 959 F. Supp. 192, 199 (S.D.N.Y. 1997) (citing Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988)).

New York courts have also held that a corporation can act as an agent on behalf of an individual and that the corporation's contacts can be imputed to the individual in order to satisfy § 302(a)(1). "Plaintiff need not establish a formal agency relationship between defendants and [the corporation]. He need only convince the court that [the corporation] engaged in purposeful activities in this State in relation to [its] transaction for the benefit of and with the knowledge and consent of the [non-domiciliary] defendants and that they exercised some control over [the corporation] in this matter." Cyco.Net, Inc., 383 F. Supp. 2d at 542 (S.D.N.Y. 2005) (citing Retail Software Services v. Lashlee, 854 F.2d 18, 22 (2d Cir. 1988)). However, "control cannot be shown based merely upon a defendant's title or

position within the corporation, or upon conclusory allegations that the defendant controls the corporation." In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 336 (S.D.N.Y. 2000). Here, plaintiffs have established that both Jeffrey's personal contacts in the state and his agency relationship with EAC are sufficient for this Court's exercise of personal jurisdiction over him.

The SAC is devoid of specific allegations relating to Jeffrey's contacts in New York. However, "[i]n reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), a court may look to evidence outside the pleadings." Roxx Allison Ltd. v. Jewelers Inc., 385 F. Supp. 3d 377, 379 (S.D.N.Y. 2019) (quoting Sandoval v. Abaco Club on Winding Bay, 507 F. Supp. 2d 312, 315 (S.D.N.Y. 2007)). Here, plaintiffs have provided the Court with declarations attaching communications between Jeffrey and a New York-based Dealer CEO, Bruce Bellmare ("Bellmare"). These communications purport to show Jeffrey and Bellmare planning how to process Borrowers' contracts through the shared EAC/Dealer "Portal" system (ECF No. 155, Ex. 2); assessing Borrower credit score data to optimize the percentage of Borrowers enrolled in the Scheme (ECF No. 111, Ex. 28); strategizing as to how to respond to an increasing number of Borrower credit card fraud and other fraud complaints (Id., Ex. 58); seeking financing from a New York

investment bank (ECF NO. 155, Ex. 5); and coordinating as to Borrower communications (ECF No. 111, Ex. 30), credit bureau reporting (Id., Ex. 32), and debt collection (Id. Ex. 31).[10]  These contacts are part and parcel of the larger Dealers-EAC Scheme which constitutes the basis of the RICO and fraud-based claims against Jeffery – namely, that he conspired through EAC and with Dealers to offer fraudulent Services to Borrowers.  If the Court credits the allegations in the SAC against Jeffrey – and the Henns give no reason why it should not – then Jeffrey's contacts with Bellmare were clearly in furtherance of the Dealers-EAC Scheme at the heart of those allegations.  These contacts are more than sufficient to support the Court's exercise of personal jurisdiction over Jeffrey for the RICO and fraud-based claims against him.

Even disregarding those specific contacts, plaintiffs have established that EAC "engaged in purposeful activities in this State in relation to [the RICO and fraud-based claims] for the benefit of and with the knowledge and consent of [Jeffrey] and

---

[10]    The Henns' supposition that Jeffrey's contacts with Bellmare cannot form the basis of the Court's personal jurisdiction over him rests on the flawed premise that Jeffrey's contacts were made solely as an officer of EAC and accordingly, such acts could not render him subject to personal jurisdiction as an individual.  This, however, is not the law.  See Retail Software Servs., Inc. v. Lashlee, 854 F.2d 18, 22 (2d Cir. 1988) "[T]he New York Court of Appeals . . . held that the fiduciary shield doctrine does not apply to any of the provisions of New York's long-arm statute."); CPC Internat'l, Inc. v. McKesson Corp., 70 N.Y.2d at 288, (holding fiduciary shield doctrine does not apply when long-arm jurisdiction is predicated on defendant's commission of tortious acts within the state).

that [Jeffrey] exercised some control over [EAC] in this matter"
such that EAC's contacts with the state can properly be imputed to
Jeffrey for the purpose of exercising personal jurisdiction over
him.  See Retail Software Servs., Inc. v. Lashlee, 854 F.2d 18, 22
(2d Cir. 1988).  "At the heart of this inquiry is whether the out-
of-state corporate officers were primary actors in the transaction
in New York that gave rise to the litigation."  Karabu Corp. v.
Gitner, 16 F. Supp. 2d 319, 323 (S.D.N.Y. 1998) (internal
quotations omitted).

      EAC's contacts with New York are well established, and the
Court's personal jurisdiction over EAC arising from its
participation in the Scheme has never been in dispute.  Cf. People
of the State of New York vs. Debt Resolve, Inc., et al., Case No.
18-cv-9812, ECF No. 111 (Stipulated Final Judgment and Order as to
Equitable Acceptance Corporation), ¶ 4 ("[EAC] admits the facts
necessary to establish the Court's jurisdiction over it" in case
brought by the New York Attorney General on the same underlying
facts).  Plaintiffs have satisfied a *prima facie* case that Jeffrey
was a "primary actor" with regards to EAC's transactions in New
York.  The SAC alleges that Jeffrey was intimately involved in
numerous aspects of the alleged scheme between EAC and Dealers,
from recruiting Dealers and approving the Master Dealer Agreement

between Dealers and EAC (SAC ¶¶ 346-49, 350-52), directing and controlling the payment structure between EAC, Dealers, and Borrowers – including control over the amount and number of monthly payments Dealers required from Borrowers and the total contract price – (SAC ¶¶ 358-60), reviewing and approving materials sent to Borrowers from the Dealers (SAC ¶¶ 363-366), and directing Dealers' communications with Borrowers.  SAC ¶¶ 371-373.  These actions go to the heart of the scheme to defraud Borrowers, and demonstrate that Jeffrey had significant control over EAC (if not Dealers as well).  While the SAC avers this conduct generally without specific reference to conduct directed at New York, we can appropriately infer that Jeffrey was cognizant of and consented to EAC's doing business in New York with Dealers given the communications between Jeffrey and Bellmare.  Lastly, as Jeffrey had a 50% interest in EAC, EAC was certainly acting at least in part for Jeffrey's benefit.  See City of New York v. Cyco.Net, Inc., 383 F. Supp. 2d 526, 542 (S.D.N.Y. 2005) (finding company's president and vice president's direction of website to engage in business in New York "sufficient to establish prima facie that the [defendants] transact their affairs in New York and thus, are amenable to personal jurisdiction in New York.").

"Having established that the [defendant has] minimum contacts

with New York, the court must also consider "whether the assertion of jurisdiction 'comports with traditional notions of fair play and substantial justice — that is, whether it is reasonable under the circumstances of a particular case.'" Id. (quoting Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir.), cert. denied, 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). If, as plaintiffs allege, Jeffrey was centrally involved in the operations of the scheme between EAC and Dealers and knew that the scheme spanned to Dealers in New York who would work to defraud New York residents, the Court is satisfied that Jeffrey had adequate notice that he could be reasonably haled into court in New York, in accordance with the Due Process clause of the Fourteenth Amendment of the Constitution. See Dandong Old N.-E. Agric. & Animal Husbandry Co. v. Hu, No. 15 CIV. 10015, 2017 WL 3328239, at *8 (S.D.N.Y. Aug. 3, 2017) (finding due process concerns satisfied where "[p]laintiff ha[d] . . . demonstrated that the exercise of personal jurisdiction over [non-domiciliary defendant] is reasonable by alleging that [said defendant] acted in New York to further [the] RICO scheme").

### iii.   Venue

Lastly, the Henns argue that the claims against Jeffrey should be dismissed for improper venue.  Under the general venue statute,

28 U.S.C. § 1391(b), venue is proper in the district in which (1) any defendant resides, if all defendants are residents of the State in which the district is located; or (2) a substantial part of the events or omissions giving rise to the claim occurred.  28 U.S. §§1391(b)(1)-(2).  The RICO statute, however, provides for venue "in the district court of the United States for any district in which [a RICO defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). "Congress intended the civil RICO venue provisions to be a liberalization to the federal venue statute 28 U.S.C. § 1391." Cyco.Net, Inc., 383 F. Supp. 2d 526, 544.  Courts in this Circuit "read[] the RICO venue provision to permit adjudication in any district where minimum contacts are established." Id.  Thus, for the same reasons that this Court has personal jurisdiction over Jeffrey, so too is venue proper.[11]

Venue would also be proper under the general venue statute. Venue may be proper although a forum is not the only possible forum, Fisher v. Hopkins, No. 02-7077, 2003 WL 102845, *3 (S.D.N.Y. Jan. 9, 2003), and even when a greater part of the events giving rise to a claim occurred in another forum.  Id.; Astor

---

[11]   The Court also has pendent venue over the related non-RICO claims as these claims clearly arise out of the same nucleus of operative fact. See Lawson v. Rubin, No. 17-cv-6404, 2018 WL 2012869, at *7 (E.D.N.Y. Apr. 29, 2018).  The Henns do not assert otherwise.

Holdings, Inc. v. Roski, No. 01-1905, 2002 WL 72936, at *8
(S.D.N.Y. Jan. 17, 2002). "[C]ourts are not, in general, required
to determine the 'best venue,' but merely a logical one with a
substantial connection to the litigation." Reliance Ins. Co. v.
Polyvision Corp., 474 F.3d 54, 59 (2d Cir. 2007). Thus, "venue
may properly lie in any judicial district in which significant
events or omissions material to the plaintiff[s'] claim have
occurred." Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 354 (2d
Cir. 2005).

Plaintiffs have alleged that significant events or omissions
material to plaintiffs' claims took place in this district. The
account of one of the named plaintiffs, Vanessa Williams, as
detailed in the SAC, demonstrates that significant events material
to plaintiffs' claims took place in the district. Within the
district, Williams received communications from EAC and a Dealer
(SAC ¶¶ 412-29), entered into a Credit Plan with EAC (SAC ¶¶ 430-
34), made payments to EAC, and was injured from increased student
loan interest rates and a negative impact on her credit score.
SAC ¶¶ 437-40, 451, 454-55. See Kirk v. New York State Dep't of
Educ., No. 08-CV-6016 (CJS), 2008 WL 819632, at *4 (W.D.N.Y. Mar.
25, 2008) (noting the "fact that the Plaintiff suffers harm in a
particular judicial district is [sometimes] sufficient to satisfy

§ 1391(b)(2)"). And the evidence provided by plaintiffs suggests that Williams was far from alone in her experience. <u>See</u> ECF No. 155, Ex. 9 (press release reporting that EAC financed over 4,000 New Yorkers).

Moreover, Jeffrey maintained a continuous business relationship with White Plains-based Bellmare, and while the Dealer for which Bellmare was CEO was not responsible for the harms alleged to named plaintiffs, plaintiffs have averred that Bellmare's Dealers were involved in the overarching Dealers-EAC Scheme along with Jeffrey and EAC. ECF No. 155, Ex. 1.[12]

Because personal jurisdiction and venue are proper, the Henns' motion to dismiss Claims 1, 2 and 8 as to Jeffrey is denied.

### 2. Plaintiffs' Motion for a Preliminary Injunction

Having addressed EAC's and the Henns' motions to dismiss, the Court turns last to plaintiffs' motion for a preliminary injunction. ECF No. 109. Plaintiffs move for preliminary injunctions prohibiting the Henns from moving assets out of their Trusts and directing EAC to cease all distributions of funds collected as the profits of the Dealers-EAC Scheme.

---

[12]   As with personal jurisdiction, a "court may examine facts outside the complaint to determine whether venue is proper." <u>Avalon Holdings Corp. v. Gentile</u>, No. 18-CV-7291 (VSB), 2019 WL 4640206, at *3 (S.D.N.Y. Sept. 24, 2019).

A preliminary injunction under Rule 65 may be granted where the plaintiff establishes: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018).

The basis for plaintiffs' motion is the assertion that they are likely to succeed on the merits of their fraudulent transfer claims against EAC.  Given the Court's decision to grant EAC's motion to dismiss Claim 14, and its decision to grant the Henns' motion to dismiss the Trust Claims, the motion must be denied. "[B]ecause the underlying claim[s are] being dismissed, Plaintiff[s] cannot establish the necessary prerequisites for grant of a motion for preliminary injunction, specifically that the party seeking the injunction is likely to succeed on the merits or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the moving party." Marshall v. Nat'l Ass'n of Letter Carriers BR36, No. 02 CIV. 1754

LTS AJP, 2004 WL 2202574, at *5 (S.D.N.Y. Sept. 30, 2004).[13]

**CONCLUSION**

For the foregoing reasons, EAC's motion to dismiss Claim 14 of the SAC is GRANTED, the Henns' motion to dismiss is GRANTED as to the Trust Claims (Claims 12 and 13) against Jeffrey and Teresa Henn and DENIED as to the RICO and fraud claims (Claims 1, 2 and 8) against Jeffrey Henn, and plaintiffs' motion for a preliminary injunction is DENIED.  The Clerk of Court is respectfully directed to terminate the motions pending at ECF No. 109, ECF No. 122, and ECF No. 143.

**SO ORDERED.**

Dated:      New York, New York
            January 14, 2021

                                            _____
                                              NAOMI REICE BUCHWALD
                                            UNITED STATES DISTRICT JUDGE

---

[13]   Plaintiffs do not suggest that the remaining claims against EAC and Jeffrey could be the predicate for a preliminary injunction, and in any event such an argument would fail.  Federal courts lack freestanding authority to issue "asset freeze" injunctions to protect a plaintiff's ability to collect upon a potential future judgment for damages.  Grupo Mexicano de Desarrollo, S.A., v. Alliance Bond Fund, Inc., 527 U.S. 308, 333 (1999).  See also Paradigm BioDevices Inc. v. Centinel Spine Inc., 11-Civ-3489, 2013 WL 1915330 (S.D.N.Y. May 9, 2013) (explaining plaintiff must allege fraudulent transfer because court could not bar general asset freeze).